**Richard R. Best**
**Sanjay Wadhwa**
**George N. Stepaniuk**
**Alexander M. Vasilescu**
**Victor Suthammanont**
**Thomas Peirce\***
**David Zetlin-Jones**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-5674 (Suthammanont)**
**Email: SuthammanontV@sec.gov**
**\*Not Admitted in SDNY**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>              -- against --<br><br>**AT&T, INC.,**<br>**CHRISTOPHER C. WOMACK,**<br>**KENT D. EVANS, and**<br>**MICHAEL J. BLACK,**<br><br>                              **Defendants.** | **21 Civ. ____ ( )**<br><br>**ECF Case**<br><br>**COMPLAINT**<br><u>**AND JURY DEMAND**</u> |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants AT&T, Inc. ("AT&T"), Christopher C. Womack ("Womack"), Kent D. Evans ("Evans"), and Michael J. Black ("Black") (collectively, "Defendants") alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.      In March and April of 2016, Defendant AT&T, aided and abetted by Defendants Womack, Evans, and Black, executives in its Investor Relations ("IR") Department, repeatedly violated Regulation FD (Fair Disclosure)—a Commission rule aimed at promoting investor

confidence in the integrity of the capital markets by prohibiting selective disclosures by issuers of material nonpublic information to securities analysts, among others—by disclosing AT&T's projected and actual financial results during phone calls Womack, Evans, and Black held with equity stock analysts from approximately 20 Wall Street firms on a one-on-one basis.

2.      In early March 2016, AT&T and its executives, including Womack, Evans, and Black, learned that a steeper-than-expected decline in smartphone sales by AT&T would cause its revenue for the first quarter of 2016 ("1Q16") to fall short of analysts' estimates. In fact, AT&T's "equipment upgrade rate" (i.e., the rate at which existing customers purchased new smartphones) would be a record low for the company, with the result that AT&T's consolidated gross revenue was expected to fall more than $1 billion below the consensus estimate—that is, the average of the forecasts for all analysts covering AT&T.

3.      Fearful of a revenue miss at the end of the quarter, AT&T's Chief Financial Officer instructed AT&T's IR Department to "work[] the analysts who still have equipment revenue too high."

4.      In turn, the Director of Investor Relations ("IR Director") instructed Womack, Evans, and Black to speak to analysts privately on a one-by-one basis about their estimates in order to "walk the analysts down"—i.e., induce analysts to reduce their individual estimates. The goal was to induce enough analysts to lower their estimates so that the consensus revenue estimate would fall to the level that AT&T expected to report to the public—i.e., AT&T would not have a revenue miss, which would have been the company's third consecutive quarterly miss.

5.      Between March 9 and April 26, 2016, Womack, Evans, and Black called approximately 20 separate analyst firms and spoke to analysts in order to induce them to lower their revenue estimate and thereby reduce the consensus estimate to the level that AT&T

2

expected to report. During these calls, Womack, Evans, and Black intentionally disclosed material nonpublic information regarding AT&T's results to date. Depending on the firm and the date of the call, Womack, Evans, and Black disclosed AT&T's projected or actual equipment upgrade rate, its projected or actual wireless equipment revenue amount (presented as a percentage decrease compared with the first quarter of 2015), or both.

6.     On some of Black's calls to analysts, he represented to the analysts that he was conveying publicly available consensus estimates, when in fact he was providing AT&T's own internal projected or actual results. Black knew or recklessly disregarded that he was misrepresenting the information he was conveying to analysts because he tracked AT&T's calculation of consensus estimates—none of which matched the information he provided on the calls with analysts.

7.     Womack, Evans, and Black knew or recklessly disregarded that the information that they provided to the analysts during these calls was both material and nonpublic. Among other things, they knew that they were prohibited from selectively disclosing AT&T's internal revenue and related data to analysts, and they did so with the expectation that the analysts would act on the information to substantially reduce the estimates they published for investors. Their knowing or reckless conduct is also evidenced by, for example, Black's efforts to disguise the internal information he was presenting as "consensus," the fact that the analysts' initial estimates deviated so far from AT&T's projected and actual results that the group needed to call approximately 20 separate firms to bring the consensus down to where AT&T could meet it, and that they presented the equipment upgrade rate as a "record low" during some of these calls.

8.      The analyst firms that received these calls promptly adjusted their revenue estimates, resulting in a reduced consensus revenue forecast for 1Q16 that AT&T beat when it announced earnings on April 26, 2016, in a Form 8-K filed with the Commission.

## VIOLATIONS

9.      By engaging in the conduct set forth in this Complaint, Defendant AT&T violated, and Defendants Womack, Evans, and Black aided and abetted AT&T's violations of, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Regulation FD [17 C.F.R. § 243.100 *et seq.*] thereunder.

10.     Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this Complaint, and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d)(1), (d)(3), and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (d)(3), and (d)(5)] seeking a final judgment: (a) permanently restraining and enjoining AT&T, Womack, Evans, and Black from engaging in the acts, practices, and courses of business alleged herein; and (b) imposing civil monetary penalties on AT&T, Womack, Evans, and Black pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 21(d) and (e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in, and the

means or instrumentalities of, interstate commerce in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, AT&T transacts business within this district, including but not limited to providing services and operating retail establishments within the district, and AT&T issues stock traded on the New York Stock Exchange, and Defendants Womack, Evans, and Black made multiple telephone calls to stock analysts based in this district.

## DEFENDANTS

14.     **AT&T**, a Delaware corporation headquartered in Dallas, Texas, is a telecommunications company. AT&T's stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the New York Stock Exchange under the ticker "T."

15.     **Womack**, age 54, is a resident of Columbia, New Jersey, and an Executive Director in AT&T's IR Department. During the relevant period, Womack worked in AT&T's Bedminster, New Jersey office.

16.     **Evans**, age 64, is a resident of Brookhaven, Georgia, and an Associate Vice President in AT&T's IR Department. During the relevant period, Evans worked in AT&T's Atlanta, Georgia office, where AT&T's Mobile Division is located.

17.     **Black**, age 56, is a resident of Bloomsbury, New Jersey, and a Finance Director in AT&T's IR Department. During the relevant period, Black worked in AT&T's Bedminster, New Jersey office.

**BACKGROUND ON REGULATION FD**

18.     Regulation FD prohibits issuers or persons acting on their behalf from disclosing material nonpublic information to, among others, securities analysts, without disclosing that information to the public. One of the primary purposes of Regulation FD is to prohibit issuers from selectively providing nonpublic guidance to securities analysts regarding earnings forecasts. In the adopting release for Regulation FD, for example, the Commission explained:

> One common situation that raises special concerns about selective disclosure has been the practice of securities analyst seeking 'guidance' from issuers regarding earnings forecasts. When an issuer official engages in a private discussion with an analyst who is seeking guidance about earnings estimates, he or she takes on a high degree of risk under Regulation FD. If the issuer official communicates selectively to the analyst nonpublic information that the company's anticipated earnings will be higher than, lower than, or even the same as what analysts have been forecasting, the issuer will likely have violated Regulation FD. This is true whether the information about earnings is communicated expressly or through indirect "guidance," the meaning of which is apparent though implied.

Regulation FD, Rule 100; Final Rule: Selective Disclosure and Insider Trading, Exchange Act Rel. No. 43154, 65 Fed. Reg. 51, 721 (Aug. 15, 2000).

19.     Where a selective disclosure of material nonpublic information is "intentional," as defined in Regulation FD, issuers must make a public disclosure simultaneously with the selective disclosure.

20.     Stock analysts employed by financial institutions such as investment banks publish estimated forecasts of AT&T's and other issuers' financial performance for the benefit of their investor clients. Analysts forecast financial performance by considering market-wide and industry-wide trends, public disclosures by issuers, and other research, including one-on-one conversations with employees at issuers such as AT&T. Regulation FD prohibits the disclosure

6

by the issuer of material nonpublic information during such discussions, absent a simultaneous public disclosure of the same information.

21.     Financial-research companies aggregate analyst forecasts and report the average as "consensus estimates." When covering AT&T's and other issuers' quarterly and annual financial results, news outlets and analysts compare the actual results to the consensus estimates. When actual results fall short of analyst estimates, i.e., "miss consensus," investors and markets typically treat such results as negative news for the issuer.

## FACTS

### A.     AT&T's IR Department

22.     As a public company, AT&T maintains an IR Department whose principal function is to provide investors and analysts, among others, with accurate information concerning the company's affairs in order to assist investors and investment funds (i.e., "buy-side") and brokerage or institutional analysts (i.e., "sell-side") in making informed decisions regarding their potential AT&T investments and recommendations.

23.     Within AT&T's IR Department, Womack and Black were principally responsible for communicating with sell-side research analysts who covered AT&T.

24.     Evans was a subject-matter expert for AT&T's wireless business. His role was to communicate with both buy-side investors and sell-side analysts about the wireless business and to keep others in the IR department up to date about key trends within that business segment.

25.     As members of AT&T's IR Department, Womack, Evans, and Black received periodic training on Regulation FD and were familiar with its proscriptions against the selective disclosure of material nonpublic information.

26.     The materials used in AT&T's Regulation FD training provided to the IR Department specifically informed the IR Department personnel that AT&T's revenue and sales of smartphones were types of information generally considered "material" to AT&T investors.

27.     Accordingly, Womack, Evans, and Black, while engaged in the conduct described in this Complaint, knew or recklessly disregarded that the selectively disclosed information concerning AT&T's revenue and smartphone sales was material for purposes of Regulation FD.

**B.     AT&T's Reduced Smartphone Sales Resulted in Fourth Quarter 2015 Revenue Miss**

*(i)     Overview of Wireless Equipment Revenue Reporting by AT&T*

28.     AT&T reported the revenue it derived from the sales of smartphones to cellular subscribers in its financial statements filed with the Commission on Forms 10-Q and 10-K, as well as in earnings releases filed on Forms 8-K, as wireless equipment revenue.

29.     When AT&T reported its wireless equipment revenue in its quarterly earnings releases, it provided as a comparison the percentage increase or decrease from the same quarter of the prior year, e.g., 1Q16 against the first quarter of 2015 ("1Q15").

30.     AT&T publicly disclosed the rate at which its subscribers upgraded their smartphones through AT&T (i.e., the "postpaid upgrade rate") in "Investor Briefing" publications that it released contemporaneously with the earnings releases and documents that it filed with the Commission. AT&T made the Investor Briefings available on its website.

*(ii)     Factors Resulting in Decreased Wireless Equipment Revenue for AT&T in 2015*

31.     Beginning in 2015, a series of factors caused a reduction in wireless equipment revenue.

32.     First, within the two years prior to 1Q16, AT&T changed the business model by which it sold smartphones to subscribers. Whereas it previously subsidized the purchase of a smartphone by offering its customers significant discounts on the purchase price of the phone,

AT&T began charging its customers full price for phones, payable over time in installments. Customers paying full price for a phone (for example, $600 for a $600 phone instead of $200 for the same phone under the previous subsidized model) were more likely to hold onto that phone longer, resulting in customers trading in their phones for upgrades less frequently.

33.     Second, in late 2015, the newest version of one manufacturer's smartphone offered fewer improvements over the previous model than prior new versions, diminishing the trade-in demand that typically accompanied that manufacturer's previous phone releases.

34.     Third, smartphone manufacturers began offering leasing and other installment payment programs for their phones directly to wireless consumers. As a result, customers were more likely to buy their phones from these manufacturers, as opposed to through AT&T, than they were in the past.

35.     Analysts covering AT&T failed to appreciate the magnitude of the effect these trends would have on AT&T's wireless equipment revenue. In the fourth quarter of 2015 ("4Q15"), AT&T's reported revenue fell $600 million short of analysts' consensus estimate, due in large part to analysts' overestimation of AT&T's wireless equipment revenue. AT&T's reported revenue also fell below the consensus estimate in the first and third quarters of 2015.

36.     During AT&T's 4Q15 earnings call on January 26, 2016, AT&T's CFO emphasized the above-referenced trends, noting their contribution to AT&T's diminished wireless equipment revenue and telegraphing the likelihood that these impacts would persist into future quarters. The CFO observed that AT&T's revenue growth in the fourth quarter of 2015 was hampered by "lower equipment sales, as customers chose to hold onto their phones longer." He also highlighted the growing number of customers that were choosing to bring their own device to AT&T for network hook-ups (for which AT&T recognizes no wireless equipment

revenue), observing that the 4Q15 saw 700,000 such subscribers—up from 90,000-100,000 on average prior to AT&T's introduction of its installment payment program for smartphones, and from 300,000-400,000 per quarter for most of 2015.

37.    Negative headlines generated by AT&T's 4Q15 revenue miss in January 2016 caused consternation within AT&T's IR department.

38.    For example, the IR Director, who was located in Dallas, Texas, urged his team to take steps to avoid another revenue miss in the following quarter (i.e., 1Q16), writing in an email to Womack: "Chris, we have a tendency to focus on EPS and have recently missed the mark on consolidated revenue. We need to make sure our story gets consensus trued up for both EPS as well as revenue." When Womack responded with an analysis of analysts' revenue estimates for 2016 showing that the consensus revenue estimate for 1Q16 was higher than AT&T's internal forecast at the time, the IR Director replied: "We will have to nip 1Q in the bud, otherwise we will be in the same spot we've been the last few quarters, i.e. missing revenue."

39.    The IR team held calls with analyst firms immediately following AT&T's earnings announcements as a matter of practice.

40.    Following the 4Q15 earnings announcement, the IR team anticipated questions from sell-side analysts regarding the revenue pressures resulting from reduced smartphone sales. In preparation for these questions, the IR Department, in consultation with AT&T's corporate communications team, prepared talking points stressing that "equipment revenue was impacted by lower sales, fewer upgrades and higher BYOD [customers bringing their own devices to AT&T]," noting further that "2015 [was] a unique year" because of the "lack of an iconic handset," and that "customers holding onto phones longer [was] impacting upgrade volumes."

41.     By the end of February 2016, analysts had reduced their forecasts sufficiently to bring the consensus revenue estimate in line with AT&T's internal revenue estimate, then at approximately $41.05 billion.

**C.     AT&T Projects Even Lower Wireless Equipment Revenue for 1Q16 and Has the CFO Make Public Remarks**

*(i)      AT&T Projects Lower than Expected Wireless Equipment Revenue for 1Q16*

42.     In early March 2016, AT&T's IR Department learned that the company's 1Q16 revenue would be even worse than anticipated.

43.     On March 7, the IR Director and Womack met with AT&T's financial controller to review AT&T's actual results through February 2016. Those interim quarterly results, which were nonpublic, showed that AT&T's upgrade rate—the percentage of AT&T subscribers who upgraded their handsets through AT&T—for the first two months was only 3.1%, putting AT&T on pace for a record-low upgrade rate for the quarter, which would drive both wireless equipment and total revenue well below consensus analyst expectations, i.e., the same expectations the IR Department had helped establish in the calls with analysts following the 4Q15 earnings announcement.

44.     After receiving these actual quarter-to-date results and learning that wireless equipment revenue and upgrade rates were on track to fall below analysts' forecasts, AT&T determined to make a public disclosure to manage market expectations.

45.     AT&T briefly considered issuing a Form 8-K to address, among other things, the accelerating downward trend in its upgrade rate and wireless equipment revenue. It elected instead, however, to have its CFO address the issue at an investor conference on March 9, 2016, at which the CFO was already scheduled to speak.

*(ii)     The CFO's Remarks at an Investor Conference*

46.     During the CFO's remarks at the March 9 conference, which were webcast, the CFO referred back to his comments from AT&T's 4Q15 earnings release regarding the decline in wireless equipment revenue and stated that he "would not be surprised" to see that trend continue.

47.     The CFO gave no quantitative guidance about AT&T's wireless equipment revenue or any other metrics for 1Q16. Asked specifically by the conference host to do so, AT&T's CFO stated that he could "only talk about up through the fourth quarter" and repeated the figures he relayed in January 2016 during AT&T's 4Q15 earnings call.

48.     AT&T did not publicly disseminate any additional guidance or information regarding its 1Q16 upgrade rate or wireless equipment revenue at any other point prior to its 1Q16 earnings release on April 26, 2016.

49.     Those analyst firms that published updated revenue estimates following the CFO's March 9 remarks and before receiving the calls from Womack, Evans, or Black described below did not sufficiently lower their revenue estimates to bring the consensus estimate in line with AT&T's internal expectations.

50.     Other analyst firms did not publish revised revenue estimates between the CFO's remarks and when they received the calls from Womack, Evans, or Black described below.

**D.     The IR Department's Further Revenue Analysis and Planned Outreach to Analysts**

*(i)     The IR Department's Ongoing 1Q16 Wireless Equipment Revenue Analysis Based on Actual Results to Date*

51.     On March 9, 2016, the same day as the CFO's remarks, Womack internally circulated a further analysis of what the first quarter upgrade rate and wireless equipment revenue would be based on the first two months of actual results. Womack concluded that AT&T

would likely report a record-low upgrade rate of less than 5% and a wireless equipment revenue decline of approximately 25% compared to the first quarter of 2015.

52.     Womack continued to refine the analysis in consultation with Evans, the IR Department's wireless expert. On March 14, Womack sent an email to the rest of the team conveying Evans's determination that the upgrade rate would most likely be in the 5% to 5.25% range, still a record low, and that the year-over-year decline in wireless equipment revenue would be in the range of the high-teens to 20%.

53.     Throughout the remainder of the quarter, which ended on March 31, 2016, the IR Department, including Womack, Evans, and Black, received updated estimates of AT&T's financial results from AT&T's financial controller, with the upgrade rate staying in a range of 4.7% to 5.2%.

54.     During March 2016, Evans obtained from the Mobile Division in AT&T's Atlanta office, where he was also based, material nonpublic information regarding the smartphone upgrade rate and shared that information with Womack and Black.

55.     On April 8, 2016, the IR Department, including Womack, Evans, and Black, received AT&T's actual quarter-end results, confirming the company would report a record-low equipment upgrade rate of 5% for 1Q16.

56.     At no time before AT&T's April 26, 2016 earnings announcement were any of the foregoing internal estimates or actual results disclosed to the public.

(ii)     *The IR Department's Plan to Induce Analysts to Lower Their Revenue Estimates*

57.     Following the CFO's remarks at the March 9 conference, AT&T's IR Department developed a plan to contact individual analyst firms whose estimates were higher than AT&T's projections. The purpose of this outreach was to get each analyst firm to lower its revenue

estimate sufficiently to bring the resulting consensus estimate down to the level that AT&T expected to report.

58.     AT&T and Womack, Evans, and Black understood that they needed the analyst firms to lower their revenue forecasts by a total dollar amount that, in the aggregate, was large enough to lower the consensus estimate to an amount AT&T could meet.

59.     As Womack, Evans, and Black also understood, the IR Department's outreach to analysts and its objectives were a top priority at the company. For example, after receiving a report on March 22, 2016, showing that analysts were still forecasting AT&T's 1Q16 revenue to be over $1 billion higher than AT&T's internal estimate, the CFO stopped by the office of the IR Director to make sure that his team was "working the analysts that still have equipment revenue too high." The CFO was assured that it was the IR Department's "top priority over the next few weeks."

60.     AT&T's IR Director, who supervised Womack, Evans, and Black, took steps to ensure that the IR team prioritized this analyst outreach and its objectives.

61.     At the IR Director's request, Black prepared a chart for each analyst firm indicating: (a) its current first quarter revenue projection, and (b) which IR team member was responsible for contacting the analyst.

62.     The IR team updated the spreadsheet weekly to reflect analysts' recent revenue adjustments and their impact on the consensus estimate.

63.     In addition, the IR Director held weekly calls to track the team's progress in contacting analyst firms and the effect of the outreach on reducing the overall consensus revenue estimate.

**E.**   **The Selective Disclosures Made By Womack, Evans, and Black**

64.   Pursuant to the IR Department's plan to contact analyst firms, between March 9, 2016 (after the IR Department learned that AT&T's first quarter upgrade rate, wireless equipment revenue and consolidated revenue would be much lower than previously anticipated) through April 21, 2016 (five days before AT&T publicly reported its actual first quarter results), Womack, Evans, and/or Black held private, one-on-one phone calls with approximately 20 sell-side analyst firms covering AT&T.

65.   Womack, Evans, and Black made these calls while in possession of AT&T's internal, nonpublic quarter-to-date results, including the upgrade rate and wireless equipment revenue data, which was material information.

66.   Womack, Evans, and Black disclosed, among other things, AT&T's internal upgrade rate and wireless equipment revenue data for the first quarter on these calls and otherwise communicated to the analysts, in sum and substance, that the analysts' revenue estimates were above what AT&T was expecting to report and therefore needed to be reduced.

67.   As detailed in the following table, each of the twenty analysts issued revised research reports reducing their revenue estimates shortly after the calls, and almost all of them cited a record low upgrade rate and reduced wireless equipment revenue as the primary reasons, typically reducing their estimates of those metrics to the level AT&T was internally forecasting or knew it would report. Most of the analysts specifically cited an expected upgrade rate of 5%.

68.   The following table details (i) each analyst firm that received a call, (ii) the date of contact with AT&T's IR Department and the employee who called, (iii) the date of the analyst firm's revised estimate, (iv) the analyst firm's revenue forecast at the time of the call, (v) the analyst firm's updated forecast following the call with AT&T's IR Department, and (vi) AT&T's internal forecast or actual results as known to its IR Department.

15

| Analyst Firm | Date of Contact | Date of Revision | Estimates | Revised Estimates |
|---|---|---|---|---|
| AT&T Internal Estimates: 5-5.25% Upgrade Rate, High Teens to 20% YoY Decline Wireless Equipment Revenue, $39.612B Total Revenue | | | | |
| Analyst Firm A | 3/9/2016 (Womack) | 3/22/2016 | UG: 6.5%[1] ER: +0.2%[2] TR: $40.665B[3] | UG: 5.0% ER: -22.9%[4] TR: $40.023B |
| Analyst Firm B | 3/14/2016 (Evans) | 3/31/2016 | UG: N/A ER: +3.5% TR: $41.115B | UG: N/A ER: -21.3% TR: $40.513B |
| Analyst Firm C | 3/9/2016 (Womack) 3/16/2016 (Womack) | 3/18/2016 | UG: 6.2% ER: +8.1% TR: $40.616B | UG: 5.1% ER: -18.1% TR: $39.954B |
| Analyst Firm D | 3/17/2016 (Womack) | 3/21/2016 | UG: 6.5% ER: +10.8% TR: $41.035B | UG: 5.2% ER: -19.8% TR: $39.969B |
| Analyst Firm  E | 3/21/2016 (Womack) | 3/22/2016 | UG: 7.0% ER: +5.0% TR: $41.375B | UG: 6.0% ER: -20.1% TR: $40.510B |
| Analyst Firm F | 3/22/2016 (Black) | 3/30/2016 | UG: 6.5% ER: +7.5% TR: $41.486B | UG: 5.0% ER: -15.0% TR: $40.294B |
| Analyst Firm G | 3/17/2016 (Womack) 3/22/2016 (Black) | 3/28/2016 | UG: 9.0% ER: +17.5% TR: $41.753B | UG: 5.0% ER: -20.2% TR: $40.180B |
| AT&T Internal Estimates: 4.7% Upgrade Rate, -11.5% YoY Decline Wireless Equipment Revenue, $40.296B Total Revenue | | | | |
| Analyst Firm H | 3/24/2016 (Black) | 3/31/2016 | UG: N/A ER: N/A TR: $42.357B | UG: 5.0% ER: -17.0% TR: $40.248B |
| Analyst Firm I | 3/30/2016 (Black) | 4/11/2016 | UG: 6.6% ER: +18.2% TR: $42.245B | UG: 5.0% ER: -16.3% TR: $41.349B |
| Analyst Firm J | 3/30/2016 (Black) | 4/7/2016 | UG: 6.8% ER: +12.2% TR: $40.944B | UG: 5.0% ER: -8.5% TR: $40.566B |

---

[1]    "UG" = Upgrade Rate

[2]    "ER" = Wireless Equipment Revenue (expressed as a percentage increase/decline year-over-year).

[3]    "TR" = Total Revenue

[4]    At the time of the March 9 call with Analyst Firm A, AT&T was estimating that its wireless equipment revenues would decline by approximately 25% year-over-year.

| Analyst Firm | Date of Contact | Date of Revision | Estimates | Revised Estimates |
|---|---|---|---|---|
| Analyst Firm K | 4/5/2016 (Evans) | 4/7/2016 | UG: 6.5%<br>ER: +.5%<br>TR: $41.579B | UG: 4.7%<br>ER: -17.2%<br>TR: $40.484B |
| Analyst Firm L | 4/1/2016<br>4/6/2016 | 4/7/2016 | UG: 5.7%<br>ER: +5.5%<br>TR: $41.714B | UG: 5.7%<br>ER: -14.6%<br>TR: $40.872B |
| Analyst Firm M | 4/6/2016 (Womack) | 4/7/2016 | UG: 6.6%<br>ER: +8.6%<br>TR: $41.369B | UG: 5.0%<br>ER: -10.4%<br>TR: $40.756B |
| AT&T Actual Results: 5.0% Upgrade Rate, -6.5% YoY Decline Wireless Equipment Revenue, $40.535B Total Revenue | | | | |
| Analyst Firm N[5] | 4/8/2016 (Black) | 4/19/2016 | UG: N/A<br>ER:N/A<br>TR: N/A | UG: N/A<br>ER: N/A<br>TR: $40.384B |
| Analyst Firm O | 4/11/2016 (Womack) | 4/18/2016 | UG: 6.7%<br>ER: -16.2%<br>TR: $40.870B | UG: 5.0%<br>ER: -24.0%<br>TR: $40.044B |
| Analyst Firm P | 4/11/2016 (Black)<br>4/12/2016 (Womack) | 4/13/2016 | UG: 7.7%<br>ER: +11.9%<br>TR: $41.789B | UG: 5.1%<br>ER: -14.5%<br>TR: $40.425B |
| Analyst Firm Q | 4/5/2016 (Black)<br>4/15/2016 (Womack) | 4/19/2016 | UG: N/A<br>ER: 0.0%<br>TR: $41.372B | UG: 5.0%<br>ER: -14.5%<br>TR: $40.535B |
| Analyst Firm R | 4/12/2016 (Black)<br>4/20/2016 (Black) | 4/25/2016 | UG: N/A<br>ER: +7.1%<br>TR: $41.286B | UG: N/A<br>ER: -17.0%<br>TR: $40.141B |
| Analyst Firm S | 4/15/2016 (Evans) | 4/20/2016 | UG: N/A<br>ER: +14.1%<br>TR: $41.691B | UG: 4.8%<br>ER: -17.3%<br>TR: $40.567B |
| Analyst Firm T | 4/7/2016 (Womack)<br>4/21/2016 (Womack) | 4/24/2016 | UG: N/A<br>ER: 0.0%<br>TR: $41.554B | UG: N/A<br>ER: -15%<br>TR: $40.510B |

69.     Described below are illustrative examples of the material nonpublic information that Womack, Evans, and Black selectively disclosed to specific analysts. Together with the facts

---

[5]     Analyst Firm N did not publish estimates of AT&T's quarterly results prior to the first quarter of 2016.

set forth in the foregoing chart, the additional facts detailed below with respect to specific calls show that Womack, Evans, and Black knew or recklessly disregarded that the internal data they communicated was material nonpublic information when they selectively disclosed that information in one-on-one calls with the analyst firms.

70.     In addition, as the facts set forth in the above table and detailed below show, Womack, Evans, and Black knew or recklessly disregarded that the timing of the calls (i.e., near and after the quarter's end) and the subject matter discussed (i.e., AT&T's wireless equipment revenue and/or upgrade rate) also independently conveyed, apart from the specific details that were discussed on a given call, material nonpublic information to the analysts—that their revenue and related estimates were higher than AT&T's expected results.

     (i)     *Womack*

          (a)     *Analyst Firm A*

71.     On March 9, 2016, after AT&T's CFO spoke at the investor conference, Womack had a conference call with the lead and junior analysts from Analyst Firm A.

72.     At the time of the call, Womack understood that, based on AT&T's actual (and nonpublic) results through February, AT&T expected to report an upgrade rate of approximately 5% for 1Q16 and a wireless equipment revenue decline of approximately 25% measured against 1Q15.

73.     On the call, Womack told both analysts that AT&T's upgrade rate for 1Q16 would be a record low of 5% or less. He also told both analysts that AT&T's wireless equipment revenue would decline from 1Q15 by more than the 15% that Analyst Firm A was then anticipating.

74.     Womack knew or recklessly disregarded that both pieces of information were material and nonpublic.

75.     Immediately after the March 9 call, Analyst Firm A's lead analyst emailed other employees at Analyst Firm A, including traders, about Womack's disclosure of AT&T's record low first quarter upgrade rate: "AT&T telling us that handset upgrades this quarter will be historic lows. <5% vs. 6.5% a year ago."

76.     On March 22, Analyst Firm A issued a report adjusting its first quarter projections for AT&T, reducing its upgrade rate estimate from 6.5% to 5% and its wireless equipment revenue estimate to an approximately 23% decline compared to 1Q15, and lowering its 1Q16 total revenue estimate by approximately $640 million.

> (b)     *Analyst Firm C*

77.     Womack had two calls with analysts from Analyst Firm C in March 2016.

78.     First, on March 9, 2016, a few hours after speaking with Analyst Firm A, Womack spoke with Analyst Firm C's senior telecom analyst. As in his call with Analyst Firm A the same day, Womack told the senior analyst from Analyst Firm C during this March 9 call that AT&T was expecting record low upgrade rates in 1Q16 and subsequent quarters.

79.     The senior analyst sent an email to his colleagues shortly after the call, stating: "Hey guys, AT&T . . . is saying it will probably see record low upgrade rates for the next 3 quarters."

80.     Second, on March 16, 2016, Womack had a call with Analyst Firm C's junior telecom analyst.

81.     This call occurred two days after Womack and Evans completed their further analysis of AT&T's actual (and nonpublic) results to date and concluded that AT&T would likely report a year-over-year (i.e., compared with 1Q15) percentage decline in wireless equipment revenue between the high-teens and 20%.

82.     On the March 16, 2016 call, Womack provided this internal estimate to Analyst Firm C's junior analyst, disclosing to the analyst that AT&T's first quarter wireless equipment revenue would be down approximately 20% year-over-year.

83.     The information regarding AT&T's upgrade rates that Womack disclosed on his March 9, 2016 call with Analyst Firm C and the information regarding AT&T's wireless equipment revenue that Womack disclosed on the March 16, 2016 call with Analyst Firm C was derived from AT&T's internal, quarter-to-date results and, as Womack knew or recklessly disregarded, both pieces of information were material and nonpublic.

84.     On March 18, 2016, following Womack's calls, Analyst Firm C revised its first quarter estimates to reflect a 5.1% upgrade rate (down from 6.2%) and an 18.1% decline year-over-year in wireless equipment revenue (down from an 8% *increase*), and reduced its total revenue forecast by approximately $660 million.

>           *(c)     Analyst Firm D*

85.     On March 17, 2016, Womack spoke to two analysts from Analyst Firm D.

86.     As alleged above, just three days earlier, Womack and Evans had concluded that AT&T's upgrade rate for the quarter would likely be around 5-5.25% and that wireless equipment revenue would likely decline in the high-teens to 20% from what was reported in 1Q15.

87.     On the March 17, 2016 call, Womack told the analysts that AT&T would report a year-over-year wireless equipment revenue decline of somewhere between the high-teens to 20% in 1Q16, and that AT&T would report a low upgrade rate of approximately 5% for the quarter.

88.     Womack knew or recklessly disregarded that the information he disclosed to Analyst Firm D, derived from AT&T's internal results, was material and nonpublic.

89.     On March 21, 2016, Analyst Firm D published revised first quarter estimates, reducing its upgrade rate estimate from 6.5% to 5.2% and reducing its wireless equipment revenue estimate from an expected *increase* of 10.8% year-over-year to an expected *decrease* of 19.8% year-over-year—levels virtually identical to AT&T's internal estimates to date—and reducing its total revenue estimate for the quarter by over $1 billion.

       (d)     *Analyst Firm Q*

90.     Womack spoke with two telecom analysts from Analyst Firm Q on April 15, 2016.

91.     At the time of the call, Womack knew AT&T's actual first quarter results, based on AT&T's internal reporting, including a record-low 5% upgrade rate.

92.     The April 15, 2016 call was a follow-up to a call Black had previously held with Analyst Firm Q's junior analyst on April 5, 2016, but which had not prompted Analyst Firm Q to revise its revenue estimate.

93.     On the April 15, 2016 call, Womack told the analysts from Analyst Firm Q that that AT&T's 1Q16 upgrade rate was a record low of around 5%.

94.     Womack knew or recklessly disregarded that this information was material and nonpublic.

95.     Shortly after the call, Analyst Firm Q's senior analyst emailed a buy-side client: "I spoke to AT&T this morning. The[ir] upgrade rate, which has been 8-9% historically, is at an all-time low this quarter at 5%."

96.     Four days later, on April 19, 2016, Analyst Firm Q published a report lowering its total revenue estimate by nearly $840 million, mostly attributable to reduced wireless equipment revenue stemming from a "record low" 5% upgrade rate.

97.     After publication of its revised estimates, the senior analyst emailed another buy-side client informing him that the "genesis of the note was [AT&T] making sure the outliers on equipment revenue were whipped back into line."

98.     On April 19, 2016, AT&T's IR Director, after learning that Analyst Firm Q reduced its revenue estimates, wrote to Womack: "[Analyst Firm Q's senior analyst] came through[.]"

    *(ii)*    <u>*Evans*</u>

        *(a)*    *Analyst Firm S*

99.     On April 15, 2016, Evans spoke with two analysts from Analyst Firm S.

100.     When Evans spoke with these analysts, he possessed AT&T's final numbers for 1Q16 and knew that AT&T would report a record low upgrade rate of 5%.

101.     On the April 15, 2016 call, Evans told the analysts that the 1Q16 upgrade rate would be a record low of approximately 5%.

102.     Evans knew or recklessly disregarded that this information—what he knew AT&T would report when it reported first quarter earnings on April 26, 2016—was material and nonpublic.

103.     Although Analyst Firm S had already published its earnings preview for 1Q16 on April 7, 2016, the firm published a new research report revising its estimates on April 20, 2016, after its call with Evans.

104.     In this April 20 report, Analyst Firm S reduced its revenue estimates for 1Q16 by approximately $1.1 billion, based on a new upgrade rate estimate of 4.8% and a reduction in its wireless equipment revenue estimate to a year-over-year decline of 17.3% from its previously forecast *increase* of 14.1%.

     *(iii)*   <u>*Black*</u>

       *(a)*   *Analyst Firm F*

105.    On March 22, 2016, Black spoke by phone with the junior analyst from Analyst Firm F.

106.    At the time of the call, Black knew that AT&T was internally projecting its quarterly upgrade rate to be about 5%, and its wireless equipment revenue to decline compared with 1Q15 by somewhere between the high-teens and 20%.

107.    At the same time, consensus estimates for AT&T's first quarter results on these metrics, according to a chart Black personally compiled and maintained for the IR Department, forecasted AT&T to report an upgrade rate of 6.4% and a wireless equipment revenue *increase* of 1.7% year-over-year.

108.    Nevertheless, on the March 22, 2016 call, Black falsely told the analyst that the "consensus" estimate—the average of the forecasts for all analysts covering AT&T—for AT&T's upgrade rate for 1Q16 was around 5%, and that the consensus estimate for AT&T's 1Q16 wireless equipment revenue was a decline of about 18% from 1Q15.

109.    In fact, as Black knew, the 5% equipment upgrade rate and the 18% year-over-year wireless equipment revenue decrease Black provided to Analyst Firm F were AT&T's nonpublic internal projections at the time.

110.    Black knew or recklessly disregarded that the numbers he provided to Analyst Firm F analyst were not, as he characterized them on the call, "consensus" estimates of these metrics, because Black himself tracked AT&T's internal calculation of the consensus estimates.

111.    Black knew or recklessly disregarded that the internal AT&T information for these metrics that he disclosed to Analyst Firm F was material and nonpublic, which is why he falsely presented it on the call as "consensus."

112.     On March 30, 2016, Analyst Firm F published a research report revising its first quarter upgrade rate estimate from 6.5% to 5.0% and its wireless equipment revenue forecast from a 7.5% *increase* year-over-year to a 15% *decrease* year-over-year, and lowering its consolidated revenue estimate for 1Q16 by approximately $1.2 billion.

113.     On March 30, 2016, when Analyst Firm F reduced its revenue estimates, the IR Director emailed Black: "Nice job with [Analyst Firm F's analyst], especially getting his revenue number down to $40.3[billion]."

            (b)     *Analyst Firm G*

114.     On March 22, 2016, Black also spoke by phone with a telecom analyst from Analyst Firm G.

115.     On this call, Black told the analyst that AT&T's first quarter upgrade rate would be 5%, and that wireless equipment revenue would decline somewhere between 18% and 21% year-over-year.

116.     As on the call with Analyst Firm F the same day, the numbers that Black communicated to the analyst were not, as he falsely characterized them on the call with Analyst Firm G, consensus estimates of AT&T's results as to these metrics at the time of the call, but rather AT&T's internal estimates, which Black knew or recklessly disregarded to be material nonpublic information.

117.     On March 28, 2016, Analyst Firm G reduced its 1Q16 upgrade rate estimate from 9% to 5% and its wireless equipment revenue forecast from an estimated *increase* of 17.5% year-over-year to an estimated *decrease* of 20.2% year-over-year, and lowered its first quarter consolidated revenue estimate by approximately $1.6 billion.

            (c)     *Analyst Firm H*

118.     On March 24, 2016, Black had a call with an analyst from Analyst Firm H.

24

119.     On this call, Black—again falsely claiming to provide consensus numbers—knowingly or recklessly provided the analyst with material nonpublic information about AT&T's internal estimates. Specifically, Black told the analyst that AT&T's first quarter upgrade rate would be approximately 5% and that wireless equipment revenue would decrease by approximately 15% to 20% year-over-year.

120.     Immediately after the call, the analyst sent an email to another analyst at his firm, stating: "Just got off the phone with AT&T. They are proactively reaching out to analysts to reinforce comments CFO made at conferences. Consensus phone upgrade rate in 1Q around 5%, versus 7.6% actual in 4Q. Consensus equipment revenue down 15% to 20%."

121.     At the time of this call, according to the chart Black personally kept, the consensus estimate for AT&T's first quarter upgrade rate was 6.1%, and the consensus estimate for AT&T's wireless equipment revenue was a decline of only 1.6% year-over-year.

122.     As such, Black knew or recklessly disregarded that the information he portrayed as "consensus" estimates was, in fact, AT&T's internal forecasts based on nonpublic actual first quarter results to date, which was material nonpublic information.

123.     On March 31, 2016, Analyst Firm H published a report reducing its first quarter total revenue estimate by approximately $2.1 billion based on a newly estimated upgrade rate of 5% and a newly estimated wireless equipment revenue decline of 17% year-over-year.

                    (d)     Analyst Firm J

124.     Black had a call with a telecom analyst covering AT&T from Analyst Firm J on March 31, 2016.

125.     At the time of the March 31, 2016 call, according to the consensus tracking chart Black personally maintained, the consensus estimate for AT&T's first quarter upgrade rate was

6.1%, and the consensus estimate for AT&T's wireless equipment revenues was a decline of 6.4% year-over-year.

126.    By March 31, 2016, AT&T had updated its internal forecast for these metrics to an estimated upgrade rate of 4.7% and an estimated wireless equipment revenue decline of 11.5% year-over-year.

127.    On his March 31, 2016 call with the analyst from Analyst Firm J, Black falsely told the analyst that the "consensus" estimate for AT&T's upgrade rate was 5%, and that the "consensus" wireless equipment revenue estimate was a decline of between 10% to 15% year-over-year.

128.    As on his calls with other analysts, the estimates that Black disclosed to the analyst were not "consensus" information, but rather mirrored AT&T's own internal data for these metrics.

129.    Black knew or recklessly disregarded that the information he provided to Analyst Firm J was material and nonpublic.

130.    A week later, on April 7, 2016, Analyst Firm J reduced its 1Q16 total revenue estimate by approximately $400 million, attributing the reduction to a lower upgrade rate estimate (reduced from 6.8% to 5%) and a decline in wireless equipment revenue (reduced from an estimated *increase* of 12.2% year-over-year to an estimated *decrease* of 8.5% year-over-year.)

**F.    AT&T Narrowly Beats Revised Consensus Estimates in 1Q16**

131.    On April 25, 2016—the day before AT&T reported its 1Q16 earnings—the last of the approximately 20 analyst revenue reductions brought the consensus estimate just below what AT&T knew it would ultimately report.

132.    AT&T's CFO emailed the IR Director: "We may just beat revenue consensus."

133.    The IR Director replied: "I think we will ☺"

26

134.    The CFO forwarded this email to AT&T's Chief Executive Officer and wrote: "These two updates may do it for us – we may beat revenue consensus – not by much but a beat nonetheless."

135.    The CEO replied, "Good."

136.    AT&T's reported $40.535 billion in revenue for 1Q16, beating the final consensus revenue estimate by less than $100 million.

## FIRST CLAIM FOR RELIEF

### Violations of Section 13(a) of the Exchange Act and Regulation FD
### (Defendant AT&T)

137.    The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 136, as though fully set forth herein.

138.    Regulation FD requires that when an issuer or certain persons acting on its behalf, including IR personnel, privately disclose material nonpublic information to certain persons outside the issuer, including securities analysts, the issuer must simultaneously disclose such information to the public. Where the issuer or such persons acting on its behalf know or recklessly disregard that the information being privately disclosed is both material and nonpublic, the disclosure is intentional within the meaning of Regulation FD.

139.    Defendant AT&T, through Womack, Evans, and Black, intentionally disclosed material nonpublic information during private telephone calls with the analyst firms as alleged above without making simultaneous disclosure of that information to the public.

140.    Accordingly, Defendant AT&T violated, and, unless restrained and enjoined, will again violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Regulation FD [17 C.F.R. § 243.100, *et seq*.] thereunder.

## <u>SECOND CLAIM FOR RELIEF</u>

**Aiding and Abetting AT&T's Violations of
Section 13(a) of the Exchange Act and Regulation FD
(Defendants Womack, Evans, and Black)**

141.   The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 140, as though fully set forth herein.

142.   Based on the conduct alleged above, Defendant AT&T violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Regulation FD [17 C.F.R. § 243.100, *et seq*.] thereunder, which requires that when an issuer or certain persons acting on its behalf, including IR personnel, privately disclose material nonpublic information to certain persons outside the issuer, including securities analysts, the issuer must simultaneously disclose such information to the public. Where the issuer or such persons acting on its behalf know or recklessly disregard that the information being privately disclosed is both material and nonpublic, the disclosure is intentional within the meaning of Regulation FD.

143.   By engaging in the conduct alleged above, Defendants Womack, Evans, and Black knowingly or recklessly provided substantial assistance to AT&T with respect to its violations of, and, unless enjoined, will again aid and abet AT&T's violations of, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Regulation FD [17 C.F.R. § 243.100, *et seq*.] thereunder.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

### I.

A Final Judgment permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating, or aiding and abetting violations of, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Regulation FD, 17 C.F.R. § 243.100, *et seq*.;

### II.

A Final Judgment directing the Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

### III.

Such other and further relief as this Court deems appropriate and necessary for the benefit of investors.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: New York, New York  
 March 5, 2021

SECURITIES AND EXCHANGE COMMISSION

By:  __/s/  Richard R. Best_____  
  Richard R. Best  
  Sanjay Wadhwa  
  George N. Stepaniuk  
  Alexander M. Vasilescu  
  Victor Suthammanont  
  David Zetlin-Jones  
  200 Vesey Street, Suite 400  
  New York, New York 1028  
  (212) 336-5674 (Suthammanont)  
  Email: SuthammanontV@sec.gov

  Attorneys for Plaintiff

Of Counsel:  
  Thomas W. Peirce*  
  Securities and Exchange Commission  
  200 Vesey Street, Suite 400  
  New York, New York 1028

  * Not admitted in the U.S. District Court for the  
    Southern District of New York