## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AT&T INC., *et al.*,<br><br>Defendants. | No. 1:21-cv-01951-PAE |

### MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT

Defendant Michael J. Black ("Black") files this Answer to the Original Complaint filed by the Securities and Exchange Commission ("SEC" or the "Commission") for alleged violations of Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Regulation FD and states as follows.

### RESPONSES TO NUMBERED PARAGRAPHS IN COMPLAINT

Unless otherwise defined herein, capitalized terms have the meanings assigned to such terms in the Complaint. All references to numbered paragraphs refer to the corresponding paragraph in the SEC's Complaint. All allegations not expressly admitted herein, including those contained in the headings and in non-numbered paragraphs, are denied. The recitation of the SEC's headings are for organizational purposes only and shall not be construed as an admission with respect to the substance or accuracy of any such heading.

**THE COMMISSION'S SUMMARY OF THE ALLEGATIONS**

1.      Black admits that he, Evans and Womack were mid-level employees in AT&T's Investor Relations ("IR") Department in March and April 2016.  As to the portion of Paragraph 1 discussing the purported intent of the Commission in adopting Regulation FD, Black lacks sufficient knowledge to admit or deny what the Commission's subjective intent was in adopting Regulation FD.  Black denies that Regulation FD is lawful or constitutional.   Black otherwise denies all other allegations in Paragraph 1 of the Complaint and denies that he violated Regulation FD.

2.      Black admits that on March 9, 2016, AT&T's Chief Financial Officer ("CFO") publicly disclosed that the same customer behavior that caused the fourth quarter decline in upgrade rates and equipment revenue—*i.e.*, that customers were upgrading more slowly—was still ongoing, and that he "wouldn't be surprised" (i.e., would expect) to see the slowdown in the upgrade cycle continue in the first quarter of 2016.  Black also admits that the upgrade rate ultimately realized for the first quarter of 2016 was a record low for AT&T.  Black otherwise denies the allegations in Paragraph 2.

3.      Black denies the allegations in Paragraph 3.

4.      Black states that the email he believes is referenced in this paragraph speaks for itself but otherwise denies the allegations in Paragraph 4.

5.      Black admits that between March 9, 2016 and April 26, 2016, Womack, Evans, and Black had conversations with approximately 20 analyst firms for the

purpose of ensuring that the analysts had an accurate understanding of AT&T's existing public disclosures.  Black otherwise denies the allegations in Paragraph 5.

6.      Black denies the allegations in Paragraph 6.

7.      Black denies the allegations in Paragraph 7.

8.      Black lacks sufficient knowledge to admit or deny the allegations in Paragraph 8 to the extent the allegations suggest that the analysts made internal adjustments to their forecasts at any specific time or considered any specific information pertaining to any such adjustments.  Black admits that analysts who cover AT&T, including analysts that Womack, Evans, and Black contacted during March and April of 2016, published reports and forecasts pertaining to AT&T during March and April 2016.   The analysts' public reports and forecasts speak for themselves.  Black otherwise denies the allegations in Paragraph 8.

## VIOLATIONS

9.      Paragraph 9 states legal conclusions to which no response is required. To the extent any further response is required, Black denies the allegations in Paragraph 9.

10.     Black denies the allegations in Paragraph 10.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

11.     Black responds that Paragraph 11 states legal conclusions to which no response is required. To the extent any further response is required, Black denies the allegations in Paragraph 11.

## JURISDICTION AND VENUE

12.     Black states that Paragraph 12 states legal conclusions to which no response is required. To the extent any further response is required, Black admits that this Court has jurisdiction over alleged violations of the Securities Exchange Act of 1934 (the "Exchange Act"), but denies that any such violations occurred or that the Exchange Act properly authorized the SEC to promulgate Regulation FD. Black otherwise denies the allegations in Paragraph 12.

13.     Black states that Paragraph 13 contains legal conclusions to which no response is required. To the extent any further response is required, Black admits that he, Womack, and Evans made telephone calls to stock analysts located in the District.

## DEFENDANTS

14.     Black admits the allegations in paragraph 14.

15.     Black admits that Defendant Womack is 55 years old, resides in Sparta, New Jersey, and during March and April 2016 was an Executive Director in AT&T's IR Department and worked in AT&T's Bedminster, New Jersey office.

16.     Black admits that Defendant Evans is 65 years old, resides in Woodstock, Georgia, and during March and April 2016 was an Associate Vice President in AT&T's IR Department and worked in AT&T's Atlanta, Georgia office.

17.     Black admits that he is 56 years old, resides in Bloomsbury, New Jersey, and during March and April 2016 was a Finance Director in AT&T's IR Department and worked in AT&T's Bedminster, New Jersey office.

## BACKGROUND ON REGULATION FD

18.     Black states that Paragraph 18 contains legal conclusions to which no response is required.  To the extent any further response is required, Black admits that Paragraph 18 quotes part of the Adopting Release for Regulation FD while selectively omitting other important provisions.   Black otherwise denies the allegations in Paragraph 18.

19.     Black states that Paragraph 19 contains legal conclusions to which no response is required and that Regulation FD speaks for itself.  To the extent any further response is required, Black denies that Regulation FD was properly authorized by the Exchange Act or that Regulation FD is constitutional or valid under the First and Fifth Amendments to the United States Constitution.  Black also denies that he violated Regulation FD in any respect and otherwise denies the allegations in Paragraph 19.

20.     Answering the first and second sentences of paragraph 20, Black states that, as a general matter, stock analysts publish forecasts and other analyses pertaining to AT&T and other issuers, and that stock analysts consider market-wide and industry-wide trends, public disclosures, other research and other public information in preparing their forecasts.  Further answering these sentences, Black states that analysts also may rely on "one-on-one conversations with employees at issuers such as AT&T" as such conversations are commonplace and benefit issuers, analysts and investors alike by allowing analysts to clarify their understanding of companies' public disclosures, thus reducing the risk of mistakes in analyst reports.

Answering the third sentence of Paragraph 20, Black states that this is a legal conclusion to which no answer is required and that Regulation FD speaks for itself. To the extent any further response is required, Black denies that Regulation FD was properly authorized by the Exchange Act or that Regulation FD is constitutional or valid under the First and Fifth Amendments to the United States Constitution. Black also denies that he violated Regulation FD in any respect and otherwise denies the allegations in Paragraph 20.

21.     In response to the first and second sentences, of Paragraph 21, Black states that, as a general matter, financial research companies aggregate analyst forecasts and report "consensus estimates" based on their compilations and that there are published comparisons of actual results to consensus estimates.  Black denies the allegations in the third sentence of Paragraph 21.  Black otherwise denies the allegations in Paragraph 21.

## FACTS

**A.     AT&T's IR Department**

22.     Black admits the allegations in Paragraph 22.

23.     Black admits that his and Womack's job responsibilities included communicating with sell-side research analysts who covered AT&T.  Black otherwise denies the allegations in Paragraph 23.

24.     Answering the first sentence of Paragraph 24, Black admits that Defendant Evans admits that he has a thorough understanding of AT&T's wireless

business.  Black admits the second sentence of Paragraph 24.  Black otherwise denies the allegations in Paragraph 24.

25.    Black admits that he, Womack, and Evans received periodic training on Regulation FD and were familiar with its content concerning the selective disclosure of material nonpublic information.    Black again denies that Regulation FD is constitutional or valid under the First and Fifth Amendments to the United States Constitution or was validly authorized by the Exchange Act.

26.    Black denies the allegations in Paragraph 26.

27.    Black denies the allegations in Paragraph 27.

**B.**    **AT&T's Reduced Smartphone Sales Resulted in Fourth Quarter 2015 Revenue Miss**

   **(i)    *Overview of Wireless Equipment Revenue Reporting by AT&T***

28.    Black admits the allegations in Paragraph 28.

29.    Black admits the allegations in Paragraph 29.

30.    Black admits the allegations in Paragraph 30.

   **(ii)    *Factors Resulting in Decreased Wireless Equipment Revenue for AT&T in 2015***

31.    Black admits the allegations in Paragraph 31 and further states that these factors, as well as the impact on wireless equipment revenue, were publicly reported by AT&T and disclosed in the public record prior to the alleged analyst calls at issue in this litigation.

32.    Black admits the allegations in Paragraph 32 (although not necessarily the specific pricing example employed) and further states that AT&T publicly

disclosed the change in its business model referenced in this paragraph on multiple occasions and disclosed the referenced trend on multiple occasions prior to the analyst calls at issue in this case.  Black further states that this trend was also reported by other wireless companies and in multiple news reports.

33.    Black admits that in late 2015, the newest version of one manufacturer's smartphone  offered fewer improvements over the previous model than prior new versions, which diminished the trade-in demand that accompanied that manufacturer's previous phone releases.  Black otherwise denies the allegations in Paragraph 33.

34.    Black admits the allegations in Paragraph 34.

35.    Black admits that, in the fourth quarter of 2015  ("4Q15"), AT&T's reported revenue fell $600 million short of analysts' consensus estimate, due  in large part to analysts' overestimating AT&T's wireless equipment revenue and that AT&T's reported revenue also fell below the consensus estimate in the first and third quarters of 2015.  Further answering this paragraph, Black states that AT&T's stock price was not materially affected by these misses.   Black otherwise denies the allegations in Paragraph 35.

36.    Black admits Paragraph 36 recounts some, but not all, of the matters discussed or disclosed during a January 26, 2016 earnings call by AT&T.  Black further agrees with and admits the SEC's statement in Paragraph 36 that AT&T publicly disclosed the trends described in Paragraphs 32-34 during its January 26, 2016 earnings call, and that AT&T "telegraph[ed]" (*i.e.*, conveyed) during that call that

these trends were likely to "persist into future quarters."  Black otherwise denies the allegations in Paragraph 36.

37.    Black admits that media and analyst reports on January 26, 2016 made reference to the fact that AT&T's overall revenue for the fourth quarter of 2015 was below consensus estimates and that some of these reports were discussed within AT&T's IR department.  Black otherwise denies the allegations in Paragraph 37.

38.    Black states that Paragraph 38 selectively quotes from an email exchange between AT&T's IR Director and Womack and that the emails speak for themselves.  Black otherwise denies the allegations in Paragraph 38.

39.    Black admits the allegations in Paragraph 39.

40.    Black denies the allegations in Paragraph 40.

41.    Black states that by the end of February 2016, certain, although not all, analysts had published forecasts for AT&T and that those forecasts speak for themselves.  Further answering this paragraph, to the extent the SEC is referring to internal calculations by analysts, Black lacks sufficient knowledge to admit or deny the allegations in this paragraph and, on that basis, denies the same.

**C.    AT&T Projects Even Lower Wireless Equipment Revenue for 1Q16 and Has the CFO Make Public Remarks**

***(i)    AT&T Projects Lower than Expected Wireless Equipment Revenue for 1Q16***

42.    Black denies the allegations in Paragraph 42.

43.    Black admits that on March 7, Womack and the IR Director met with AT&T's financial controller   to review documents reflecting AT&T's actual results

through February 2016 and that those interim quarterly results speak for themselves. Black otherwise denies the allegations in Paragraph 43.

44.     Black admits that on or about March 9, 2016, after the March 7 meeting described in Paragraph 43, AT&T made a public disclosure with respect to anticipated customer trends on AT&T's upgrade rates and equipment revenue for the first quarter of 2016 for the purpose of conveying accurate information to the market and that the disclosure speaks for itself.  Black otherwise denies the allegations in Paragraph 44.

45.     Black admits that AT&T considered issuing a Form 8-K to address, among other things, the continued  downward trend in its upgrade rate and wireless equipment revenue.  Black further admits that AT&T's CFO publicly disclosed this issue at an investor conference on March 9, 2016,  at which the CFO was already scheduled to speak.  Black otherwise denies the allegations in Paragraph 45.

### (ii)   *The CFO's Remarks at an Investor Conference*

46.     Black admits the allegations in Paragraph 46 and further states that AT&T's CFO also made clear during the call that the behavioral phenomenon that caused this trend – *i.e.*, that customers were holding their phones longer and upgrading more slowly – was still ongoing.

47.     Black admits the allegations in Paragraph 47 to the extent they quote AT&T's CFO during a public discussion but further state that such quotes are selective and that the transcript speaks for itself.  Black otherwise denies the allegations in Paragraph 47.

48.     Black denies the allegations in Paragraph 48.

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                    **Page 10**

49.    Black admits that some analyst firms published revenue estimates after the March 9, 2016 conference and before the calls with Womack, Evans, and Black at issue in this lawsuit and that those estimates speak for themselves.  Black otherwise denies the allegations in Paragraph 49.

50.    Black admits that some of the analysts who participated in calls at issue in this case with Womack, Evans, or himself did not publish any new estimates for AT&T between the March 9, 2016 investor conference and the date of the call as alleged herein.  Black otherwise denies the allegations in Paragraph 50, including whether any such call is accurately alleged by the SEC.

**D.    The IR Department's Further Revenue Analysis and Planned Outreach to Analysts**

*(i)    The IR Department's Ongoing 1Q16 Wireless Equipment Revenue Analysis Based on Actual Results to Date.*

51.    Black admits that on March 9, 2016, the same day as the CFO's remarks, Womack internally circulated a document discussing upgrade rates and wireless equipment revenue for the first quarter of 2016 and that such document speaks for itself.  Black otherwise denies the allegations in Paragraph 51.

52.    Black admits that on March 14, 2016, Womack sent an email to other members of AT&T's IR team discussing the upgrade rate for the first quarter of 2016 and that such email speaks for itself.  Black otherwise denies the allegations in Paragraph 52.

53.    Black admits that members of AT&T's IR Department, including Evans, Womack, and himself received additional emails discussing estimated upgrade rates

through the end of the first quarter of 2016 and that such emails speak for themselves. Black otherwise denies the allegations in Paragraph 53.

54.     Black denies the allegations in Paragraph 54.

55.     Black admits that on or about April 8, 2016, AT&T's IR Department, including Evans, Womack, and himself, received a document containing AT&T's actual quarter-end results and that such document speaks for itself.  Black otherwise denies the allegations in Paragraph 55.

56.     Black denies the allegations in Paragraph 56.

**(ii)     *The IR Department's Plan to Induce Analysts to Lower Their Revenue Estimates***

57.     Black denies the allegations in Paragraph 57.

58.     Black denies the allegations in Paragraph 58.

59.     Black states that Paragraph 59 appears, in part, to refer to a report AT&T's CFO received on or about March 22, 2016, and then selectively quotes from a communication between AT&T's CFO and AT&T's IR Director.  The report and communication speak for themselves.  Black otherwise denies the allegations in Paragraph 59.

60.     Black objects that the phrase "ensure that the IR team prioritized this analyst outreach and its objectives" is vague and ambiguous and thus is not capable of a complete response. Subject to and without waiving this objection, Black denies the allegations in Paragraph 60.

61.     Black admits that he prepared a chart for each analyst firm indicating its current first quarter revenue projection but otherwise denies the allegations in Paragraph 61.

62.     Black admits that the IR team prepared updates of the chart described in Paragraph 61 and those updates speak for themselves.  Black otherwise denies the allegations in Paragraph 62.

63.     Black admits that AT&T's IR Director held multiple calls with other IR employees in which communications with analysts were discussed. Black otherwise denies the allegations in Paragraph 63.

## E.     The Selective Disclosures Made By Black, Evans, and Black

64.     Black admits that between March 9, 2016 and April 21, 2016, he, Evans, and Womack had phone calls with approximately 20 sell-side analyst firms covering AT&T.  Black otherwise denies the allegations in Paragraph 64.

65.     Black denies the allegations in Paragraph 65.

66.     Black denies the allegations in Paragraph 66.

67.     Black admits that the analysts referenced in Paragraph 67 published research reports during March and April 2016 and that those reports speak for themselves.  Black otherwise denies the allegations in Paragraph 67.

68.     Black objects to the use of code names for each analyst firm instead of providing fair notice regarding the actual name of each firm.  The use of such code names interferes with the ability to give a complete answer to this paragraph.  Subject to and without waiving this objection, Black admits that analysts published research

reports during March and April 2016 and that those reports speak for themselves. Black otherwise denies the allegations in Paragraph 68.

69. Black denies the allegations in Paragraph 69.

70. Black denies the allegations in Paragraph 70.

*(i)* **_Womack_**

    *(a)* **_Analyst Firm A_**

71. Black objects that the code name "Analyst Firm A" fails to provide him with fair notice regarding the actual identity of the analysts or analyst firm. Subject to and without waiving this objection, Black admits that that on March 9, 2016, Womack had a call with the lead and junior analysts from the analyst firm that Black reasonably believes that the SEC is referring to as "Analyst Firm A."

72. Black denies the allegations in Paragraph 72.

73. Black denies the allegations in Paragraph 73.

74. Black denies the allegations in Paragraph 74.

75. Black denies the allegations in Paragraph 75.

76. Black objects that the code name "Analyst Firm A" fails to provide fair notice regarding the identity of the analyst or analyst firm. Subject to and without waiving this objection, Black admits that the analyst firm it believes the SEC is referring to in Paragraphs 71-75 issued a report on or about March 22, 2016 and that such report speaks for itself. Black otherwise denies the allegations in Paragraph 76.

### (b)  Analyst Firm C

77.    Black objects that the code name "Analyst Firm C" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that AT&T's employees had one or more calls with various analysts during March 2016, including with the firm that he reasonably believes that the SEC is referring to as "Analyst Firm C" in Paragraph 77.  Black otherwise denies the allegations in Paragraph 77.

78.    Black objects that the code name "Analyst Firm C" fails to provide him with fair notice regarding the identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that on March 9, 2016, Womack had a call with a senior telecom analyst at the analyst firm Black reasonably believes that the SEC is referring to as "Analyst Firm C."  Black otherwise denies the allegations in Paragraph 78.

79.    Black lacks sufficient knowledge, information or belief to admit or deny the allegations in Paragraph 79, which refer to an internal email sent within an analyst firm that is referred to by a code name instead of by its actual name and on that basis denies the same.

80.    Black objects that the code name "Analyst Firm C" fails to provide him with fair notice regarding the identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that on or about March 16, 2016, Womack had a call with the junior telecom analyst at the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm C."

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                     **Page 15**

81.    Black admits that he had a call with the analyst he reasonably believes that the SEC is referring to as "Analyst Firm C" on March 16, 2016, but otherwise denies the allegations in Paragraph 81.

82.    Black denies the allegations in Paragraph 82.

83.    Black denies the allegations in Paragraph 83.

84.    Black objects that the code name "Analyst Firm C" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that the analyst firm he reasonably believes that the SEC is referring to as "Analyst Firm C" issued a report on or about March 18, 2016 and that report speaks for itself.  Black otherwise denies the allegations in Paragraph 84.

### (c)    Analyst Firm D

85.    Black objects that the code name "Analyst Firm D" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that on March 17, 2016, Womack spoke to two analysts from the analyst firm Black reasonably believes that the SEC is referring to as "Analyst Firm D" in Paragraph 85.

86.    Black denies the allegations in Paragraph 86.

87.    Black denies the allegations in Paragraph 87.

88.    Black denies the allegations in Paragraph 88.

89.    Black objects that the code name "Analyst Firm D" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject

to and without waiving this objection, Black admits that the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm D" issued a report on or about March 21, 2016 and that report speaks for itself.    Black otherwise denies the allegations in Paragraph 89.

### (d)    Analyst Firm Q

90.    Black objects that the code name "Analyst Firm Q" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that Womack spoke with two analysts from the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm Q" on or about April 15, 2016.

91.    Black admits that on or before April 15, 2016, Womack had been provided with AT&T's actual first quarter results.   Black otherwise denies the allegations in Paragraph 91.

92.    Black objects that the code name "Analyst Firm Q" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black states that he lacks sufficient knowledge, information or belief as to whether the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm Q" had already lowered its internal forecasted revenue estimates for AT&T as of April 15, 2016 and on that basis denies the allegations in Paragraph 92.

93.    Black denies the allegations in Paragraph 93.

94.    Black denies the allegations in Paragraph 94.

MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT                    Page 17

95.     Black objects that the code name "Analyst Firm Q" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black states that he lacks sufficient knowledge, information or belief to admit or deny the allegations in Paragraph 95 and on that basis denies the same.

96.     Black objects that the code name "Analyst Firm Q" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm Q" issued a report on or about April 19, 2016 and that such report speaks for itself.  Black otherwise denies the allegations in Paragraph 96.

97.     Black objects that the code name "Analyst Firm Q" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black states that he lacks sufficient knowledge, information or belief to admit or deny the allegations in Paragraph 97 and on that basis denies the same.

98.     Black objects that the code name "Analyst Firm Q" fails to provide Black with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, to the extent any further response is required, Black admits that Paragraph 98 selectively quotes part of an April 19, 2016 email between AT&T's IR Director and Womack and that such email speaks for itself.  Black otherwise denies the allegations in Paragraph 98.

### (ii)   *Evans*

#### (a)   *Analyst Firm S*

99.   Black objects that the code name "Analyst Firm S" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, to the extent any further response is required, Black admits that Evans spoke with two analysts from the analyst firm Evans reasonably believes the SEC is referring to as "Analyst Firm S" on or about April 15, 2016.

100.   Black admits that as of April 15, 2016, Evans had received AT&T's actual first quarter results. Black otherwise denies the allegations in Paragraph 100.

101.   Black denies the allegations in Paragraph 101.

102.   Black denies the allegations in Paragraph 102.

103.   Black objects that the code name "Analyst Firm S" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, to the extent any further response is required, Black admits that the analyst firm Evans reasonably believes the SEC is referring to as "Analyst Firm S" issued a "preview" report on or about April 7, 2016, and a report on or about April 20, 2016.   Black further states that those documents speak for themselves.  Black otherwise denies the allegations in Paragraph 103.

104.   Black objects that the code name "Analyst Firm S" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that the analyst firm he

reasonably believes the SEC is referring to as "Analyst Firm S" issued a "preview" report on or about April 7, 2016, and a report on or about April 20, 2016 and that those documents speak for themselves.  Black otherwise denies the allegations in Paragraph 104.

### *(iii)* *Black*

#### *(a)*    *Analyst Firm F*

105.   Black objects that the code name "Analyst Firm F" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that he spoke by phone with the junior analyst from the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm F" on or about March 22, 2016.

106.   Black admits that he received information regarding AT&T's internal projections for its quarterly upgrade rate prior to March 22, 2016 and that such projections speak for themselves.   Black otherwise denies the allegations in Paragraph 106.

107.   Black denies the allegations in Paragraph 107.

108.   Black denies the allegations in Paragraph 108.

109.   Black denies the allegations in Paragraph 109.

110.   Black denies the allegations in Paragraph 110.

111.   Black denies the allegations in Paragraph 111.

112.   Black objects that the code name "Analyst Firm F" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject

to and without waiving this objection, Black admits that the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm F" issued a report on or about March 30, 2016 and such report speaks for itself.  Black otherwise denies the allegations in Paragraph 112.

113.   Black objects that the code name "Analyst Firm F" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that Paragraph 113 selectively quotes from a March 30, 2016 email between AT&T's IR Director and himself and further that such email speaks for itself.  Black otherwise denies the allegations in Paragraph 113.

### (b)   Analyst Firm G

114.   Black objects that the code name "Analyst Firm G" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that he spoke by phone with an analyst from the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm G" on or about March 22, 2016.

115.   Black denies the allegations in Paragraph 115.

116.   Black denies the allegations in Paragraph 116.

117.   Black objects that the code name "Analyst Firm G" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm G" issued a report on or

about March 28, 2016. And such report speaks for itself. Black otherwise denies the allegations in Paragraph 117.

### (c)    Analyst Firm H

118.    Black objects that the code name "Analyst Firm H" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm. Subject to and without waiving this objection, Black admits that he spoke by phone with an analyst from the analyst firm Black reasonably believes the SEC is referring to as "Analyst Firm H" on or about March 24, 2016.

119.    Black denies the allegations in Paragraph 119.

120.    Black objects that the code name "Analyst Firm H" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm. Subject to and without waiving this objection, Black states that he lacks sufficient knowledge, information or belief to admit or deny the allegations in Paragraph 120 and on that basis denies the same.

121.    Black denies the allegations in Paragraph 121.

122.    Black denies the allegations in Paragraph 122.

123.    Black objects that the code name "Analyst Firm H" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm. Subject to and without waiving this objection, Black admits that the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm H" issued a report on or about March 31, 2016 and that such report speaks for itself. Black otherwise denies the allegations in Paragraph 123.

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                **Page 22**

### (d) *Analyst Firm J*

124.   Black objects that the code name "Analyst Firm J" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that he spoke by phone with an analyst from the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm J" on or about March 31, 2016.

125.   Black denies the allegations in Paragraph 125.

126.   Black denies the allegations in Paragraph 126.

127.   Black denies the allegations in Paragraph 127.

128.   Black denies the allegations in Paragraph 128.

129.   Black denies the allegations in Paragraph 129.

130.   Black objects that the code name "Analyst Firm J" fails to provide him with fair notice regarding the actual identity of the analyst or analyst firm.  Subject to and without waiving this objection, Black admits that the analyst firm he reasonably believes the SEC is referring to as "Analyst Firm J" issued a report on or about April 7, 2016 and that such report speaks for itself.  Black otherwise denies the allegations in Paragraph 130.

## F.   AT&T Narrowly Beats Revised Consensus Estimates in 1Q2016

131.   Black admits that April 25, 2016 was "the day before AT&T reported its 1Q2016 earnings," but otherwise denies the allegations in Paragraph 131.

132.   Black admits that Paragraph 132 selectively quotes from part of an email between AT&T's CFO and AT&T's IR Director and that such email speaks for itself. Black otherwise denies the allegations in Paragraph 132.

133.   Black admits that Paragraph 133 selectively quotes from part of an email between AT&T's CFO and AT&T's IR Director and that such email speaks for itself.  Black otherwise denies the allegations in Paragraph 133.

134.   Black admits that Paragraph 134 selectively quotes from part of an email between AT&T's CFO and AT&T's Chief Executive Officer and that such email speaks for itself.  Black otherwise denies the allegations in Paragraph 134.

135.   Black admits that Paragraph 135 quotes from part of an email between AT&T's CFO and AT&T's CEO and that such email speaks for itself.  Black otherwise denies the allegations in Paragraph 135.

136.   Black admits the allegations in Paragraph 136.

## FIRST CLAIM FOR RELIEF

### Violations of Section 13(a) of the Exchange Act and Regulation FD

137.   Black denies the allegations in Paragraph 137 to the extent previously set forth in Paragraphs 1-136 and incorporates his admissions and denials to the allegations in those Paragraphs.  To the extent any further response is required, Black otherwise denies the allegations in Paragraph 137.

138.   Paragraph 138 recites legal conclusions that do not require a response. To the extent any further response is required, Black denies that Regulation FD complies with the First or Fifth Amendments to the United States Constitution, was

validly authorized by statute, or that Black aided and abetted any violation of Regulation FD.  To the extent any further response is required, Black otherwise denies the allegations in Paragraph 138.

139.    Black denies the allegations in Paragraph 139.

140.    Black denies the allegations in Paragraph 140.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting AT&T's Violations of Section 13(a) of the Securities Exchange Act and Regulation FD

141.    Black denies the allegations in Paragraph 141 to the extent previously set forth in Paragraphs 1-140 and incorporates their admissions and denials to the allegations in those Paragraphs.  To the extent any further response is required, Black otherwise denies the allegations in Paragraph 141.

142.    Black denies the allegations of Paragraph 142.

143.    Black denies the allegations in Paragraph 143.

## THE SEC'S PRAYER FOR RELIEF

The SEC's "Prayer for Relief" asserts legal conclusions and claims for relief that do not require a response.  To the extent any further response is required, Black denies that the SEC is entitled to any of the relief listed in the Prayer for Relief, including all of its subparts, or that the SEC is otherwise entitled to any relief in this matter.

## DEFENSES AND AFFIRMATIVE DEFENSES[1]

## FIRST DEFENSE

The SEC's claims fail in whole or in part because the SEC has failed to allege or otherwise show facts demonstrating that AT&T or the individual Defendants selectively disclosed any information that was both material and nonpublic.  Indeed, the information allegedly disclosed during the analyst calls at issue in this matter was neither nonpublic nor material.

Notably, during the twenty years since Regulation FD's adoption, the SEC has litigated only one Regulation FD primary liability case in federal court – *SEC v. Siebel Systems, Inc.* — a case that Judge Daniels dismissed on the pleadings.[2]  Judge Daniels criticized the SEC's attempt at "nit-picking" the company's disclosures and warned against using Regulation FD to chill legitimate communications with analysts.[3]  By bringing this case, the SEC follows the same meritless script it proffered in *Siebel Systems* and should meet the same outcome.  Indeed, one could hardly envision a more pointed example of linguistic "nit-picking" than the SEC's contention that AT&T's March 9, 2016 public statement that it "wouldn't be surprised" to see the slower-upgrade trend continue is meaningfully different from a statement that the trend "was expected" to continue in the first quarter.

---

[1] The listing of any defense or argument in this section shall not be construed as an admission that AT&T bears the burden of proof with respect to that defense or argument.
[2] 384 F. Supp. 2d 694 (S.D.N.Y. 2005).

[3] *See id.* at 701-02, 704-05.

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                    **Page 26**

Moreover, as in *Siebel Systems*, the metrics at issue fall outside the seven categories of potentially material information enumerated in the SEC's Adopting Release, which included "earnings information" and information about major corporate events like mergers, new products, defaults, and bankruptcies.[4]  During the relevant time period, pass-through equipment revenue had no material impact on AT&T's "earnings," which is the only category of financial information enumerated in the Adopting Release as potentially material, and is in no way remotely comparable to a merger, bankruptcy, default, or any of the other enumerated categories.   As Judge Daniels aptly observed regarding the similarly immaterial statements at issue in *Siebel Systems*,

> Significantly, none of the statements challenged by the SEC falls squarely within the seven enumerated categories listed by the SEC, in the Adopting Release, as being more likely to be considered material. Applying Regulation FD in an overly aggressive manner cannot effectively encourage full and complete public disclosure of facts reasonably deemed relevant to investment decision-making. It provides no clear guidance for companies to conform their conduct in compliance with Regulation FD. Instead, the enforcement of Regulation FD by excessively scrutinizing vague general comments has a potential chilling

---

[4] *See id.* at 708 (citing Adopting Release).  The Adopting Release enumerates the following seven categories of potentially material information:  (1) earnings information; (2) mergers, acquisitions, tender offers, joint ventures, or changes in assets; (3) new products or discoveries, or developments regarding customers or suppliers (e.g., the acquisition or loss of a contract); (4) changes in control or in management; (5) change in auditors or auditor notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities -- e.g., defaults on senior securities, calls of securities for redemption, repurchase plans, stock splits or changes in dividends, changes to the rights of security holders, public or private sales of additional securities; and (7) bankruptcies or receiverships.  Even for information falling within these categories, the Adopting Release cautioned that "[b]y including this list, we do not mean to imply that each of these items is per se material. The information and events on this list still require determinations as to their materiality (although some determinations will be reached more easily than others). For example, some new products or contracts may clearly be material to an issuer; yet that does not mean that all product developments or contracts will be material."

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                    **Page 27**

effect which can discourage, rather than, encourage public disclosure of material information.[5]

The same concerns that Judge Daniels expressed about the SEC's claims in *Siebel Systems* apply with full force here.   Simply put, AT&T's IR employees did not selectively disclose material nonpublic information during any of the analyst calls at issue.

## **SECOND DEFENSE**

The SEC's claims fail in whole or in part because the SEC has failed to allege or otherwise show facts demonstrating that AT&T or the individual Defendants acted intentionally, knowingly, or recklessly with respect to any purported selective disclosures.  It is well-settled that a party does not act intentionally or recklessly if the duty it is alleged to have violated "was not so clear." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).  Other courts have similarly recognized that conduct is not reckless unless the obligation at issue was clear-cut, and the decision to violate the obligation was so blatantly indefensible as to approximate actual intent.[6]

These cases are consistent with the SEC's own assurances that it would have no cause to bring a Regulation FD claim when the materiality judgment is "close" or

---

[5] *See id.* at 709.

[6] *See, e.g., S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasizing that recklessness standard in Rule 10b-5 cases is "a state of mind approximating actual intent, and not merely a heightened form of negligence"); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope."); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (no scienter when sufficiency of public disclosures is "at least debatable"); *Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017) ("Even if Flotek could have provided clearer disclosures . . ., Flotek's actual disclosures are not so blatantly misleading as to be severely reckless."), *aff'd sub nom. Alaska Electrical Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975 (5th Cir. 2019); *see also Kalnit v. Eichler*, 264 F.3d

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                      **Page 28**

not clear-cut, and that "in the case of a selective disclosure attributable to a mistaken determination of materiality, liability will arise only if no reasonable person under the circumstances would have made the same determination."[7]  As set forth above, it is not even a close call that the information was neither material nor nonpublic.  At a minimum, however, the materiality issue is not so clear-cut in the SEC's favor to support any inference that AT&T's IR employees intended to disclose material nonpublic information, or that their judgment amounted to an extreme departure from the standards of ordinary care.  At a minimum, there existed at least some reasonable basis for concluding that the information at issue was not material or nonpublic, which is sufficient to defeat the SEC's claims.  Black also incorporates by reference the statements, assertions, and arguments contained in his First Defense as though fully set forth herein.

## THIRD DEFENSE

The SEC's claims fail in whole or in part because AT&T and the individual Defendants had a reasonable basis for believing that the information disclosed during the analyst calls at issue was neither material nor nonpublic, and because AT&T and Black therefore did not act intentionally or recklessly.  Black incorporates by

---

131, 143 (2d Cir. 2001) (claim fails where "the duty to disclose . . . was not so clear"); *Gamboa v. Citizens, Inc.*, A-17-CV-241-RP, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018) (explaining plaintiff "must show more than that it is debatable whether the disclosures were adequate"); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (finding no strong inference of scienter even if statements are arguably misleading when sufficiency of disclosures is "at least debatable.").

[7] *See* Adopting Release.

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                    **Page 29**

reference the statements, assertions, and arguments contained in his First Defense and Second Defense as though fully set forth herein.

## FOURTH DEFENSE

The SEC's claims fail in whole or in part because AT&T's and the individual Defendants' conduct was consistent with the SEC's own public statements and guidance pertaining to Regulation FD, and because AT&T had a reasonable basis for believing that it was acting in accordance with the SEC's public statements and guidance.  The SEC's claims flatly contradict the SEC's repeated public assurances that it would only pursue clear-cut "intentional or reckless" violations of Regulation FD.  In addition to the numerous assurances made by the SEC at the time of Regulation FD's adoption, the SEC's own 2010 guidance permits what AT&T's IR professionals are alleged to have done and undercuts the SEC's litigation position. The guidance states that companies can confirm public forecasts, "comment on an analyst's model" and convey "seemingly inconsequential" nonpublic data in private communications with analysts, even if such data would allow a "skilled analyst" to "form a mosaic that reveals material nonpublic information."[8]  The guidance clearly contemplates that companies have latitude in privately commenting on an analyst model that appears to misunderstand or misread the company's public disclosures, and further undermines the SEC's suggestion that the IR professionals' conduct in this case represents an "extreme departure" from the standards of ordinary care as

---

[8]*See* June 4, 2010, Regulation FD Guidance, *available at* https://www.sec.gov/divisions/corpfin/guidance/regfd-interp.htm.

required for liability under by Regulation FD.[9]  AT&T's IR employees at a minimum had a reasonable basis for believing that they were acting appropriately.  Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, and Third Defense as though fully set forth herein.

## FIFTH DEFENSE

The SEC's claims fail in whole or in part because the SEC is acting inconsistently with its own public statements and guidance pertaining to Regulation FD.  Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, Third Defense, and Fourth Defense as though specifically set forth herein.

## SIXTH DEFENSE

The SEC's claims fail in whole or in part because Regulation FD violates the First Amendment to the United States Constitution, both on its face and as applied to AT&T and the individual Defendants in this case.  Unlike other securities laws and regulations that prohibit false statements, insider trading and market manipulation (*i.e.*, deceptive activity and conduct not typically viewed as enjoying First Amendment protection), Regulation FD restricts truthful speech between issuers and analysts, even in situations where analysts are barred from trading based on the information.  And unlike other procedural provisions of the securities laws that require public companies to file periodic financial reports, prospectuses, or other information upon the occurrence of clearly defined events, Regulation FD purports to

[9] *Siebel Sys.*, 384 F. Supp. 2d at 702-03 & n.8 (internal quotation marks and citation omitted).

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**          **Page 31**

require "simultaneous" or "prompt" public disclosures of information disclosed to an analyst based solely on a murky materiality standard that the SEC acknowledges presents "difficult" judgments.[10]

As the defendants and *amici* contended in *Siebel Systems*, these features raise significant questions as to whether Regulation FD improperly infringes on a company's First Amendment rights to communicate with analysts, whether Regulation FD fails to provide companies with fair notice of what conduct is prohibited and failing to provide enforcement officials with clear guidance to prevent arbitrary enforcement, and whether Congress granted the SEC statutory authority to promulgate the types of restrictions contained in Regulation FD.   The SEC's pursuit of these claims also contradicts the SEC's previous public statements about the circumstances that would give rise to a Regulation FD enforcement action and implicates the same constitutional and statutory authority questions previously briefed by the defendants and *amici* in *Siebel Systems*.   Notably, in rejecting a previous effort by the SEC to impose a duty to refrain from trading based solely on an analyst's receipt of material nonpublic information, the Supreme Court expressed concern that such an imprecise rule would chill lawful communications and would not provide fair notice to companies as to what communications are allowed and what are prohibited:

> Imposing a duty to disclose or abstain solely because a person knowingly receives material nonpublic information from an insider and trades on it ***could have an inhibiting influence on the role of market analysts***, which the SEC itself recognizes is necessary to the

---

[10] *See* Proposing Release at 8 ("We recognize that materiality judgments can be difficult").

preservation of a healthy market.  It is commonplace for analysts to 'ferret out and analyze information,' . . . and this often is done by meeting with and questioning corporate officers and others who are insiders. And information that the analysts obtain normally may be the basis for judgments as to the market worth of a corporation's securities.  The analyst's judgment in this respect is made available in market letters or otherwise to clients of the firm.  It is the nature of this type of information, and indeed of the markets themselves, that such information cannot be made simultaneously available to all of the corporation's stockholders or the public generally.[11]

                    ***

     The SEC expressly recognized that "[t]he value to the entire market of [analysts'] efforts cannot be gainsaid; market efficiency in pricing is significantly enhanced by [their] initiatives to ferret out and analyze information, and thus the analyst's work redounds to the benefit of all investors." . . . .  The SEC asserts that analysts remain free to obtain from management corporate information for purposes of "filling in the 'interstices in analysis'". . . .  ***But this rule is inherently imprecise, and imprecision prevents parties from ordering their actions in accord with legal requirements.  Unless the parties have some guidance as to where the line is between permissible and impermissible disclosures and uses, neither corporate insiders nor analysts can be sure when the line is crossed***.[12]

     The SEC has similarly failed to provide fair notice as to what communications will give rise to a Regulation FD enforcement action.

     Judge Daniels did not reach these issues given his conclusion that the allegations failed to state a claim on the merits.[13]  The mere passage of time, however, has not mooted these questions, nor has it rendered the adoption of Regulation FD any less extraordinary or unprecedented.  Indeed, over the intervening years, the law

---

[11] *Dirks v. SEC*, 463 U.S. 646, 658-59 (1983) (emphasis added).

[12] *See id.* n. 17 (emphasis added).

[13] *See Siebel Sys.*, 384 F. Supp. 2d at 709 n. 16.

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                              **Page 33**

has only grown more unfavorable for the SEC[14].  Black intends to brief these issues at the appropriate juncture.  Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, Third Defense, Fourth Defense, and Fifth Defense as though specifically set forth herein.

## SEVENTH DEFENSE

The SEC's claims fail in whole or in part because Regulation FD violates the Fifth Amendment to the United States Constitution, both on its face and as applied to AT&T and the individual Defendants in this case.  As set forth above, the SEC has failed to provide fair notice as to what communications are permitted and which communications are prohibited.  Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, and Sixth Defense as though specifically set forth herein.

## EIGHTH DEFENSE

The SEC's claims fail in whole or in part because the SEC lacked statutory authority to promulgate Regulation FD and because nothing in the Exchange Act or in any other statute enacted by the United States Congress proscribes AT&T's or the individual Defendants' actual or alleged conduct in connection with this matter.  In

---

[14] *See, e.g., Sorrell v. IMS Health, Inc.*,131 S. Ct. 2653, 2663 (2011) (invalidating on First Amendment grounds state law prohibiting sale of prescriber identifying information for marketing purposes); *Nat. Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 553-56 (D.C. Cir. 2015) (striking down conflict minerals rule on First Amendment grounds and differentiating rule from regulations that proscribe misleading or deceptive speech); *United States v. Caronia*, 703 F.3d 149, 165-67 (2d Cir. 2012) (invalidating statutory prohibition against promotion of off-label drug use by pharmaceutical manufacturers on First Amendment grounds).

particular, as argued by the defendants and *amici* in *Siebel Systems*, nothing in Section 13 of the Securities Exchange Act authorized the SEC to promulgate a rule prohibiting alleged selective disclosures to analysts. Section 13(a), the only provision of Section 13 cited in the Complaint, authorizes the SEC to promulgate regulations regarding the filing of applications for registration, registration statements, annual reports, and quarterly reports. *See* 15 U.S.C. § 78m(a). This provision, however, says nothing about authorizing the SEC to promulgate broad and continuous "equal access to information" requirements such as those purportedly imposed by Regulation FD. The Supreme Court previously rejected a similar effort by the SEC to construe other provisions of the Securities Exchange Act as requiring all traders to have equal access to information. *See Dirks v. SEC*, 463 U.S. 646, 657 (1983) (rejecting SEC argument in insider trading case as being improperly "rooted in the idea that the antifraud provisions [in Section 10(b) of the Securities Exchange Act] require equal information among all traders"). The SEC's assertion that Section 13(a) authorizes it to promulgate an equal-access-to-information rule similarly fails. Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, and Seventh Defense as though specifically set forth herein.

## NINTH DEFENSE

The SEC's claims fail in whole or in part because AT&T and the individual Defendants did not violate Section 13(a) of the Securities Exchange Act, the sole statutory provision under which the SEC has asserted its claims, or aid and abet such

a violation.   Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, and Eighth Defense as though specifically set forth herein.

## TENTH DEFENSE

The SEC's claims fail in whole or in part because the price of AT&T's stock was not affected by the information that the SEC claims to be material and nonpublic. Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, Eighth Defense, and Ninth Defense as though specially set forth herein.

## ELEVENTH DEFENSE

The SEC's claims fail in whole or in part to the extent the SEC is premising any of its claims on conduct falling outside the applicable statute of limitations.  Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, Eighth Defense, Ninth Defense, and Tenth Defense as though specially set forth herein.

## TWELFTH DEFENSE

The SEC's claims fail in whole or in part because the SEC has failed to state a claim upon which relief can be granted.   Black incorporates by reference the statements, assertions, and arguments contained in his First Defense, Second

Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, Eighth Defense, Ninth Defense, Tenth Defense, and Eleventh Defense as though specially set forth herein.

## CONCLUSION

In sum, the allegations simply fail to show that the purported selective disclosures were either nonpublic or material, let alone that AT&T or its IR team (including Black) engaged in anything approaching intentional or reckless conduct. The SEC has failed to explain how pursuing this case is consistent with the SEC's repeated public assurances that it would only bring Regulation FD claims in clear-cut cases where the evidence actually shows intentional or reckless conduct. Companies and investors have a legitimate interest in making sure that analysts do not have an erroneous picture of a company's business before writing a report. This suit infringes on that interest and will only serve to chill companies and analysts from having productive communications. The SEC's claims should be emphatically rejected.

## REQUEST FOR RELIEF

Black respectfully requests that the Court:

(1)     Enter judgment for Black dismissing the Complaint;

(2)     Award Black costs and expenses incurred in defending this action; and

(3)     Grant Black such other and further relief as the Court deems just and proper.

**MICHAEL J. BLACK'S ANSWER TO ORIGINAL COMPLAINT**                    **Page 37**

Dated: May 7, 2021

Respectfully submitted,

*/s/ Leslie C. Thorne*
Jeffrey M. Tillotson (*Pro Hac Vice Pending*)
Texas Bar No. 20039200
TILLOTSON LAW
1807 Ross Avenue, Suite 3200
Dallas, Texas 75201
(214) 382-3040 (Direct)
(214) 382-3041 (Main)
(214) 292-6564 (Telecopier)
jtillotson@tillotsonlaw.com

Leslie C. Thorne
NY Bar No. 5339254
Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
(212) 835-4848 (Direct)
(212) 659-7300 (Main)
(212) 918-8989 (Telecopier)
leslie.thorne@haynesboone.com

**ATTORNEYS FOR DEFENDANT
MICHAEL J. BLACK**