**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

            -v-

AT&T INC., CHRISTOPHER C. WOMACK,
KENT D. EVANS, and
MICHAEL J. BLACK,

                              Defendants.

No. 1:21-cv-01951-PAE


## AT&T INC.'S ANSWER TO ORIGINAL COMPLAINT

Defendant AT&T Inc. ("AT&T" or the "Company") files this Answer to the Original Complaint filed by the Securities and Exchange Commission ("SEC" or the "Commission") for alleged violations of Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Regulation FD.

## PRELIMINARY STATEMENT

The SEC's Complaint improperly targets three mid-level AT&T Investor Relations ("IR") employees over routine conversations with analysts concerning "upgrade rates" and "equipment revenues" from the sale of smartphones—metrics that at the time pertained entirely to earnings-neutral revenue from pass-through sales of phones manufactured by other companies. In communicating with analysts about these metrics, these IR professionals did not disclose any material nonpublic information, let alone act intentionally or recklessly as required by the plain language of Regulation FD. In fact, during the four-plus year investigation conducted by the SEC, not one participant in these calls has testified that they believe any material nonpublic information was disclosed. There is no allegation that AT&T misled investors or that the earnings-neutral metrics at issue had any impact on AT&T's stock price. There is no allegation that any AT&T investors lost money because of the challenged communications. There is likewise no allegation that anyone traded based on inside information or wrongfully profited from the calls.

This case has no merit and represents a pointed departure from the SEC's public assurances on its approach to Regulation FD enforcement. When it adopted Regulation FD two decades ago, the SEC went out of its way to assure that it would not pursue companies and investor relations professionals for "close" calls where

reasonable minds could differ on whether information was material or nonpublic. The SEC promised it would instead only target clear-cut cases involving "knowing" or "reckless" conduct, where the judgment about whether the information was material or nonpublic was so indefensible that "no reasonable person under the circumstances would have made the same determination."[1]

Here, the call is not even close: the information at issue was neither material nor nonpublic. AT&T and its IR team did not violate Regulation FD in any respect, let alone intentionally or recklessly. The SEC's claims should be rejected.

**Background**

For many years, AT&T offered to subsidize customers' purchases of smartphones in exchange for signing two-year wireless service agreements. However, in 2014, 2015 and 2016, AT&T—like other wireless service providers— phased out its smartphone subsidy program, resulting in customers keeping their phones longer. Not surprisingly, the Company's promotion of its new "no-subsidy policy" led to fewer smartphone sales and lower equipment revenues and upgrade rates throughout 2015 and 2016. These decreased equipment revenues and upgrade rates continued and became more prominent as wireless service contracts expired and as customers entered new service agreements without upgrading their phones.

---

[1] *See* Final Rule: Selective Disclosure and Insider Trading, Exchange Act Release No. 34-43154, 65 Fed. Reg. 51,716, at 51,718 (Aug. 15, 2000) ("Adopting Release") (explaining that the "knowing or reckless" requirement would ensure that "issuers will not be second-guessed on close materiality judgments"). The same scienter requirement applies both to the determination about whether the information was material and whether it was nonpublic. *See* 17 C.F.R. §§ 240.101(a), (d).

These trends were publicly disclosed by AT&T and its competitors, were widely reported in the media, and were broadly known by wireless customers who experienced the transition from subsidy-based plans firsthand.  Throughout this subsidy program phase-out, AT&T explained to the market that it was in the business of selling *wireless services*, not smartphones, and that revenues from smartphone sales manufactured by the likes of Apple and Samsung had no significant impact on the Company's earnings during the relevant time period because those revenues were essentially equal to the costs AT&T incurred in procuring handsets from smartphone manufacturers.  AT&T thus made clear to investors that revenues from smartphone sales were not material or core to AT&T's business.

AT&T disclosed the existence and impact of this declining upgrade trend in multiple public statements underline before the mid-March and April 2016 analyst calls on which this suit is based.  During its January 26, 2016 fourth-quarter earnings call, AT&T disclosed "lower equipment sales" for 2015 "as customers chose to hold onto their smartphones for a longer period of time" and stated that "equipment revenues were down more than $700 million, mostly due to lower upgrade volumes" (a year-over-year decline of 14.9%).  Even though this shortfall caused AT&T to miss consensus revenue forecasts by $700 million, AT&T's stock price did not fall, as the market plainly understood the immaterial pass-through nature of equipment sales.

On March 9, 2016, shortly before the analyst calls at issue and with just three weeks left in the first quarter, AT&T's then-CFO, John Stephens, publicly reaffirmed that the same customer behavior that caused the fourth quarter decline — *i.e.*, that

customers were upgrading more slowly — was still occurring, and that he "wouldn't be surprised" (*i.e.*, would expect) to see the slowdown in the handset upgrade cycle continue in the first quarter of 2016. The plain import of these statements was that AT&T expected a similar year-over-year decline in equipment revenue and upgrade rates during the first quarter of 2016 as occurred in the prior quarters, given that the behavioral cause of this decline remained. Stephens also emphasized that this slowdown would have "very little impact at all on profitability" because, at that time, handset sales were "hedged one way or another with the handset expenses" or other costs.

### The IR Employees Did Not Disclose Material Nonpublic Information

Following the March 9, 2016 presentation, AT&T's IR employees had routine follow-up calls with individual analysts. This is a commonplace practice – not just at AT&T, but at many public companies – and it is perfectly lawful. As the SEC and courts have recognized, it is beneficial for companies and analysts to have private conversations, so that the analysts can check their understanding of the company's business and minimize the risk of errors.

AT&T's IR employees did not disclose any material nonpublic information during these calls. The SEC has publicly stated that companies may confirm public forecasts during private calls with analysts, may "comment on an analyst's model," and may convey "seemingly inconsequential" nonpublic data in private communications with analysts, even if such data would allow a "skilled analyst" to "form a mosaic that reveals material nonpublic information."

Even if one were to assume the IR personnel discussed equipment revenue and upgrade rate estimates with the analysts, and leaving aside the inherent immateriality of these profit-neutral metrics, a skilled analyst could readily calculate estimated equipment revenue and upgrade rates substantially similar to what was allegedly discussed during the calls by simply applying the same year-over-year trend in the prior two quarters to the first quarter of 2016.   Indeed, AT&T's publicly reported upgrade rate for the third quarter of 2015 (the most recent quarter before the traditional year-end holiday spike) was just 5.7%, down 1.4% year over year from the publicly reported 7.1% upgrade rate for the third quarter of 2014.   As stated above, AT&T made clear that the same trend of lower upgrade rates was expected to continue in the first quarter of 2016.   Thus, if one assumed a similar 1.4% year-over-year drop from AT&T's publicly reported 6.6% upgrade rate for the first quarter of 2015, ***that would yield a projected 5.2% upgrade rate*** for the first quarter of 2016 – ***substantially the same as what the analysts ultimately projected after the purported selective disclosures***.   The anticipated year-over-year first quarter equipment revenue decline allegedly discussed with the analysts likewise mirrors the nearly-$700 million year-over-year decline the prior quarter.   The public record (including AT&T's own prior disclosures) establishes that AT&T's IR employees had, at a bare minimum, at least a reasonable basis to conclude that the information purportedly disclosed in private calls with analysts did not significantly alter the total mix of information already publicly available.

The SEC also does not, and cannot, allege that these metrics had any material impact on AT&T's stock price.  Not only was there no stock price reaction when AT&T announced a $700 million revenue shortfall the prior quarter caused by the decline in equipment revenue, but the SEC likewise makes no allegation that AT&T's stock price materially changed when the information allegedly discussed with the analysts was later made public in the analysts' reports.  The lack of market reaction is not surprising, as AT&T had previously emphasized to investors that these metrics had no material impact on earnings during the relevant time period.  If a $700 million shortfall in the prior quarter had no impact on AT&T's stock price, there is no plausible basis for believing that any minor differences between the original analyst reports and the updated reports based on information allegedly selectively disclosed during the calls at issue would have any impact on AT&T's stock price.

Further, while at least ten analysts testified in the SEC's four-plus year investigation, there is no assertion that any of the analysts who participated in the calls at issue believed they had received material nonpublic information, or that they viewed equipment revenue and smartphone upgrade rates as having any meaningful significance to AT&T investors or to their own valuation of AT&T.  In short, there is no basis for contending that AT&T's IR employees disclosed information that was either material or nonpublic.

**The Complaint Contradicts The SEC's Own Public Assurances**

This case has no merit and represents an unwarranted departure from the Commission's public assurances on its approach to Regulation FD enforcement.

Twenty years ago, when the SEC adopted this rule to restrict public companies from intentionally disclosing material nonpublic information in private conversations with analysts, the SEC promised that it would only pursue Regulation FD claims in situations involving violations so clear cut that they demonstrated "intentional or reckless" conduct, and that the SEC would not use enforcement of the rule to second-guess "close calls" on materiality.[2]  The SEC further assured that "in the case of a selective disclosure attributable to a mistaken determination of materiality, liability will arise only if no reasonable person under the circumstances would have made the same determination."[3]  The Commission made these promises to allay concerns that Regulation FD would chill productive communications between issuers and analysts that are commonplace and beneficial to the market by ensuring that analysts understand public company disclosures.  As the SEC itself stated, "we are mindful of the concerns about chilling issuer disclosure; we agree that the market is best served by more, not less, disclosure of information by issuers."[4]  The Adopting Release expressly tied the public policy concerns against chilling legitimate speech to Regulation FD's "intentional or reckless" scienter requirement, which the SEC described as a "significant safeguard" to alleviate such concerns.[5]

---

[2] *See* Adopting Release at 51,718 (explaining that the "knowing or reckless" standard would ensure that "issuers will not be second-guessed on close materiality judgments").  The "intentional or reckless" standard is essentially the same demanding scienter requirement that applies to securities fraud claims under Section 10(b) of the Securities Exchange Act.

[3] *See* Adopting Release.

[4] *See id.*

[5] *See id.*

Here, the SEC plows straight through this safeguard and contradicts its own repeated public assurances that Regulation FD would not be used to prosecute public companies and the investment relations community for good-faith judgment calls over materiality.  Simply put, AT&T's IR employees did not disclose any material nonpublic information, let alone intentionally or recklessly.

For these reasons and those set forth below, the government's case should fail and be flatly rejected.

## RESPONSES TO NUMBERED PARAGRAPHS IN COMPLAINT

Unless otherwise defined herein, capitalized terms have the meanings assigned to such terms in the Complaint.  All references to numbered paragraphs refer to the corresponding paragraph in the SEC's Complaint.  All allegations not expressly admitted herein, including those contained in the headings and in non-numbered paragraphs, are denied.  The recitation of the SEC's headings are for organizational purposes only and shall not be construed as an admission with respect to the substance or accuracy of any such heading.

## THE COMMISSION'S SUMMARY OF THE ALLEGATIONS

1.     AT&T admits that Defendants Womack, Evans and Black were mid-level employees in AT&T's Investor Relations ("IR") Department in March and April 2016.  As to the portion of Paragraph 1 discussing the purported intent of the Commission in adopting Regulation FD, AT&T lacks sufficient knowledge to admit or deny what the Commission's subjective intent was in adopting Regulation FD.  AT&T denies that Regulation FD is lawful or constitutional.  AT&T otherwise denies

the allegations in Paragraph 1 of the Complaint and denies that it violated Regulation FD.

2.      AT&T admits that on March 9, 2016, its Chief Financial Officer ("CFO") publicly disclosed (among other things set forth in the transcripts of his remarks) that the same customer behavior that caused the fourth quarter decline in upgrade rates and equipment revenue — *i.e.*, that customers were upgrading more slowly — was still ongoing, and that he "wouldn't be surprised" (*i.e.*, would expect) to see the slowdown in the upgrade cycle continue in the first quarter of 2016.  AT&T also admits that the upgrade rate ultimately realized for the first quarter of 2016 was a record low for AT&T.  AT&T otherwise denies the allegations in Paragraph 2.

3.      AT&T denies the allegations in Paragraph 3.

4.      AT&T admits that its Director of Investor Relations sent one or more emails to Defendants Womack, Evans or Black in March 2016, including the email AT&T believes is referenced in this paragraph.  The email speaks for itself.  AT&T otherwise denies the allegations in Paragraph 4.

5.      AT&T admits that between March 9, 2016 and April 26, 2016, Defendants Womack, Evans, and Black had conversations with approximately 20 analyst firms for the purpose of ensuring that the analysts had an accurate understanding of AT&T's existing public disclosures.  AT&T denies that all of these conversations were initiated by AT&T's IR employees and otherwise denies the allegations in Paragraph 5.

6.      AT&T denies the allegations in Paragraph 6.

7.     AT&T denies the allegations in Paragraph 7.

8.     AT&T lacks sufficient knowledge to admit or deny the allegations in Paragraph 8 to the extent the allegations suggest that the analysts made internal adjustments to their forecasts at any specific time or considered any specific information pertaining to any such adjustments.  AT&T admits that analysts who cover AT&T, including analysts that AT&T contacted during March and April of 2016, published reports and forecasts pertaining to AT&T during March and April 2016.  The analysts' public reports and forecasts speak for themselves.  AT&T otherwise denies the allegations in Paragraph 8.

## **VIOLATIONS**

9.     Paragraph 9 states legal conclusions to which no response is required. To the extent any further response is required, AT&T denies the allegations in Paragraph 9.

10.    AT&T denies the allegations in Paragraph 10.

## **NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

11.    Paragraph 11 states legal conclusions to which no response is required. To the extent any further response is required, AT&T denies the allegations in Paragraph 11.

## **JURISDICTION AND VENUE**

12.    Paragraph 12 states legal conclusions to which no response is required. To the extent any further response is required, AT&T admits that this Court has jurisdiction over alleged violations of the Securities Exchange Act of 1934 (the "Exchange Act"), but denies that any such violations occurred, that the Exchange Act

properly authorized the SEC to promulgate Regulation FD, and that Regulation FD is constitutional under the First and Fifth Amendments to the United States Constitution.  AT&T otherwise denies the allegations in Paragraph 12.

13.     Paragraph 13 contains legal conclusions to which no response is required.  To the extent any further response is required, AT&T admits that it transacts business within the District, that it has issued stock that trades on the New York Stock Exchange, and that Defendants Womack, Evans, and Black have made multiple telephone calls to stock analysts located in the District.

## DEFENDANTS

14.     AT&T admits the allegations in Paragraph 14.

15.     AT&T admits that Defendant Womack is 55 years old, resides in Sparta, New Jersey, and during March and April 2016 was an Executive Director in AT&T's IR Department and worked in AT&T's Bedminster, New Jersey office.

16.     AT&T admits that Defendant Evans is 65 years old, resides in Woodstock, Georgia, and during March and April 2016 was an Associate Vice President in AT&T's IR Department and worked in AT&T's Atlanta, Georgia office.

17.     AT&T admits that Defendant Black is 56 years old, resides in Bloomsbury, New Jersey, and during March and April 2016 was a Finance Director in AT&T's IR Department and worked in AT&T's Bedminster, New Jersey office.

## BACKGROUND ON REGULATION FD

18.     Paragraph 18 contains legal conclusions to which no response is required.  To the extent any further response is required, AT&T admits that

Paragraph 18 quotes part of the Adopting Release for Regulation FD while selectively omitting other important provisions to which AT&T respectfully refers the Court, but otherwise denies the allegations in Paragraph 18.

19.     AT&T states that Paragraph 19 contains legal conclusions to which no response is required and that Regulation FD speaks for itself.  To the extent any further response is required, AT&T further denies that Regulation FD was properly authorized by the Exchange Act or that Regulation FD is constitutional or valid under the First and Fifth Amendments to the United States Constitution.  AT&T also denies that it violated Regulation FD in any respect and otherwise denies the allegations in Paragraph 19.

20.     Answering the first and second sentences of Paragraph 20, AT&T states that, as a general matter, stock analysts publish forecasts and other analyses pertaining to AT&T and other issuers, and that stock analysts consider market-wide and industry-wide trends, public disclosures, other research and other public information in preparing their forecasts.  Further answering these sentences, AT&T states that analysts also may rely on "one-on-one conversations with employees at issuers such as AT&T" as such conversations are commonplace and benefit issuers, analysts and investors alike by allowing analysts to clarify their understanding of companies' public disclosures, thus reducing the risk of mistakes in analyst reports. Answering the third sentence of Paragraph 20, AT&T states that this is a legal conclusion to which no answer is required and that Regulation FD speaks for itself. To the extent any further response is required, AT&T denies that Regulation FD was

properly authorized by the Exchange Act or that Regulation FD is constitutional or valid under the First and Fifth Amendments to the United States Constitution. AT&T also denies that it violated Regulation FD in any respect and otherwise denies the allegations in Paragraph 20.

21.     In response to the first and second sentences of Paragraph 21, AT&T states that, as a general matter, financial research companies aggregate analyst forecasts and report "consensus estimates" based on their compilations and that there are published comparisons of actual results to consensus estimates.  AT&T denies the allegations in the third sentence of Paragraph 21.  AT&T otherwise denies the allegations in Paragraph 21.

## FACTS

### A.    AT&T's IR Department

22.     AT&T admits the allegations in Paragraph 22.

23.     AT&T admits that the job responsibilities for Defendants Womack and Black included communicating with sell-side research analysts who covered AT&T. AT&T otherwise denies the allegations in Paragraph 23.

24.     AT&T admits that Evans had a thorough understanding of AT&T's wireless business.  AT&T admits the second sentence of Paragraph 24.

25.     AT&T admits that Womack, Evans, and Black received periodic training on Regulation FD and were familiar with its content concerning the selective disclosure of material nonpublic information.  AT&T again denies that Regulation

FD is constitutional or valid under the First and Fifth Amendments to the United States Constitution or was validly authorized by the Exchange Act.

26.    AT&T denies the allegations in Paragraph 26.

27.    AT&T denies the allegations in Paragraph 27.

**B.    AT&T's Reduced Smartphone Sales Resulted in Fourth Quarter 2015 Revenue Miss**

*(i)    Overview of Wireless Equipment Revenue Reporting by AT&T*

28.    AT&T admits the allegations in Paragraph 28.

29.    AT&T admits the allegations in Paragraph 29.

30.    AT&T admits the allegations in Paragraph 30.

*(ii)    Factors Resulting in Decreased Wireless Equipment Revenue for AT&T in 2015*

31.    AT&T admits the allegations in Paragraph 31 and further states that these factors, as well as the impact on wireless equipment revenue, were publicly reported by AT&T and disclosed in the public record prior to the alleged analyst calls at issue in this litigation.

32.    AT&T admits the allegations in Paragraph 32 (although not necessarily the specific pricing example employed) and further states that AT&T publicly disclosed the change in its business model referenced in this paragraph on multiple occasions and disclosed the referenced trend on multiple occasions prior to the analyst calls at issue in this case.  AT&T further states that this trend was also reported by other wireless companies and in multiple news reports.

33.    AT&T admits that in late 2015, the newest version of one manufacturer's smartphone  offered fewer improvements over the previous model than prior new

versions, which diminished the trade-in demand that accompanied that manufacturer's previous phone releases.

34.     AT&T admits the allegations in Paragraph 34.

35.     AT&T admits that in the fourth quarter of 2015   ("4Q15"), AT&T's reported revenue fell $600 million short of analysts' consensus estimate, due  in large part to analysts' overestimating AT&T's wireless equipment revenue.  AT&T's stock price was not materially affected by this miss.  AT&T's  reported revenue also fell below the consensus estimate in the first and third quarters of 2015.  AT&T's stock price was not materially affected by these misses either.  AT&T otherwise denies the allegations in Paragraph 35.

36.     AT&T admits Paragraph 36 recounts some, but not all, of the matters discussed or disclosed during a January 26, 2016 earnings call by AT&T.  AT&T further agrees with and admits the SEC's statement in Paragraph 36 that AT&T publicly disclosed the trends described in Paragraphs 32-34 during its January 26, 2016 earnings call, and that AT&T "telegraph[ed]" (*i.e.*, conveyed) during that call that these trends were likely to "persist into future quarters."  AT&T otherwise denies the allegations in Paragraph 36.

37.     AT&T admits that media and analyst reports on January 26, 2016 made reference to the fact that AT&T's overall revenue for the fourth quarter of 2015 was below consensus estimates and that some of these reports were discussed within AT&T's IR department.  AT&T otherwise denies the allegations in Paragraph 37.

38.     AT&T admits that Paragraph 38 describes and selectively quotes from an email exchange between AT&T's IR Director and Defendant Womack.   The complete emails speak for themselves.   AT&T denies the allegations in Paragraph 38 to the extent they are inconsistent with the emails and otherwise denies the allegations in Paragraph 38.

39.     AT&T admits the allegations in Paragraph 39.

40.     AT&T denies the allegations in Paragraph 40.

41.     AT&T states that by the end of February 2016, certain, although not all, analysts had published forecasts for AT&T and that those forecasts speak for themselves.   Further answering this paragraph, to the extent the SEC is referring to internal calculations by analysts, AT&T lacks sufficient knowledge to admit or deny the allegations in this paragraph and, on that basis, denies the same.

**C.     AT&T Projects Even Lower Wireless Equipment Revenue for 1Q16 and Has the CFO Make Public Remarks**

*(i)     AT&T Projects Lower than Expected Wireless Equipment Revenue for 1Q16*

42.     AT&T denies the allegations in Paragraph 42.

43.     AT&T admits that on March 7, the IR Director and Defendant Womack met with AT&T's financial controller  to review documents reflecting AT&T's actual results through February 2016.  Those interim quarterly results speak for themselves. AT&T denies the allegations in Paragraph 43 to the extent they are inconsistent with the interim quarterly results referenced in this paragraph and otherwise denies the allegations in Paragraph 43.

44.     AT&T admits that on or about March 9, 2016, after the March 7 meeting described in Paragraph 43, AT&T made a public disclosure with respect to anticipated customer trends on AT&T's upgrade rates and equipment revenue for the first quarter of 2016 for the purpose of conveying accurate information to the market.   The disclosure speaks for itself.   To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 44.

45.     AT&T admits that it considered issuing a Form 8-K to address, among other things, the continued  downward trend in its upgrade rate and wireless equipment revenue.   AT&T further admits that its CFO publicly disclosed this trend at an investor conference on March 9, 2016,  at which the CFO was already scheduled to speak.   AT&T otherwise denies the allegations in Paragraph 45.

 *(ii)  The CFO's Remarks at an Investor Conference*

46.     AT&T admits the allegations in Paragraph 46 and further states that AT&T's CFO also made clear during the call that the behavioral phenomenon that caused this trend – *i.e.*, that customers were holding their phones longer and upgrading more slowly – was still ongoing.

47.     AT&T admits the allegations in Paragraph 47 to the extent they quote AT&T's CFO during a public discussion, but further states that such quotes are selective and that the transcript speaks for itself.   AT&T otherwise denies the allegations in Paragraph 47.

48.     AT&T denies the allegations in Paragraph 48.

49.    AT&T admits that some analyst firms published revenue estimates after the March 9, 2016 conference and before that firm's call(s) with Defendants Womack, Evans, or Black at issue in this lawsuit.  Those estimates speak for themselves.  AT&T denies the allegations in Paragraph 49 to the extent they are inconsistent with the published estimates.  To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 49.

50.    AT&T admits that some of the analysts who participated in the calls with Defendants Womack, Evans, and Black at issue in this case had not published any new estimates for AT&T between the March 9, 2016 investor conference and the date of the call with Mr. Womack, Evans, or Black and that analyst.  AT&T otherwise denies the allegations in Paragraph 50, including to the extent the phrase "described below" purports to convey that the SEC's subsequent descriptions in the Complaint of the calls at issue in this case are fully accurate.

51.    AT&T admits that on March 9, 2016, the same day as the CFO's remarks, Womack internally circulated a document discussing upgrade rates and wireless equipment revenue for the first quarter of 2016.  The document speaks for itself.  AT&T denies the allegations in Paragraph 51 to the extent they are inconsistent with that document.  To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 51.

52.    AT&T admits that on March 14, 2016, Defendant Womack sent an email to other members of AT&T's IR team discussing the upgrade rate for the first quarter of 2016.  The email speaks for itself.  AT&T denies the allegations in Paragraph 52 to

the extent they are inconsistent with this email.  To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 52.

53.    AT&T admits that members of its IR Department, including Womack, Evans, and Black, received additional emails discussing estimated upgrade rates through the end of the first quarter of 2016.  The emails speak for themselves.  AT&T denies the allegations in Paragraph 53 to the extent they are inconsistent with these emails.  To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 53.

54.    AT&T denies the allegations in Paragraph 54.

55.    AT&T admits that on or about April 8, 2016, AT&T's IR Department, including Womack, Evans, and Black,  received a document containing AT&T's actual quarter-end results.  The document speaks for itself.  AT&T denies the allegations in Paragraph 55 to the extent they are inconsistent with this document.  To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 55.

56.    AT&T denies the allegations in Paragraph 56.

*(ii)    The IR Department's Plan to Induce Analysts to Lower Their Revenue Estimates*

57.    AT&T denies the allegations in Paragraph 57.

58.    AT&T denies the allegations in Paragraph 58.

59.    AT&T admits that Paragraph 59 refers in part to a report received by AT&T's CFO on or about March 22, 2016.  The report speaks for itself.  AT&T denies the allegations in Paragraph 59 to the extent they are inconsistent with this report and otherwise denies the allegations in Paragraph 59.

60.     AT&T objects to the phrase "ensure that the IR team prioritized this analyst outreach and its objectives" as vague and ambiguous.  Subject to and without waiving this objection, to the extent any further response is required, AT&T denies the allegations in Paragraph 60.

61.     AT&T admits that Black prepared a chart for each analyst firm indicating its current first quarter revenue projection but otherwise denies the allegations in Paragraph 61.

62.     AT&T admits that the IR team prepared updates of the chart described in Paragraph 61 and those updates speak for themselves.  AT&T otherwise denies the allegations in Paragraph 62.

63.     AT&T admits that AT&T's IR Director held multiple calls with other IR employees in which communications with analysts were discussed.  AT&T otherwise denies the allegations in Paragraph 63.

**E.    The Selective Disclosures Made By Womack, Evans, and Black**

64.     AT&T admits that between March 9, 2016 and April 21, 2016, Defendants Womack, Evans, and Black participated in phone calls with approximately 20 sell-side analyst firms covering AT&T.   The timing of communications is the subject of emails, referenced above, that speak for themselves. AT&T otherwise denies the allegations in Paragraph 64.

65.     AT&T denies the allegations in Paragraph 65.

66.     AT&T denies the allegations in Paragraph 66.

67.     AT&T admits that the analysts referenced in Paragraph 67 published research reports during March and April 2016. Those reports speak for themselves. AT&T denies the allegations in Paragraph 67 to the extent they are inconsistent with those reports. To the extent any further response is required, AT&T denies the allegations in Paragraph 67.

68.     AT&T objects that the table uses code names for each analyst firm instead of providing fair notice regarding the actual name of each firm. Subject to and without waiving this objection, AT&T admits that analysts published research reports during March and April 2016. Those reports speak for themselves. AT&T otherwise denies the allegations in Paragraph 68.

69.     AT&T denies the allegations in Paragraph 69.

70.     AT&T denies the allegations in Paragraph 70.

*(i)     Womack*

*(a)     Analyst Firm A*

71.     AT&T objects that the code name "Analyst Firm A" fails to provide AT&T with fair notice regarding the identity of the analyst. Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that on March 9, 2016, Defendant Womack had a call with the lead and junior analysts from the analyst firm AT&T believes the SEC has code-named "Analyst Firm A."

72.     AT&T denies the allegations in Paragraph 72.

73.     AT&T denies the allegations in Paragraph 73.

74.     AT&T denies the allegations in Paragraph 74.

75.     AT&T lacks sufficient knowledge to admit or deny the allegations in Paragraph 75, which refers to internal emails within an analyst firm referred to by a code name instead of by its actual name.  Those emails speak for themselves.  To the extent any further response is required, AT&T denies the allegations in Paragraph 75.

76.     AT&T objects that the code name "Analyst Firm A" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm it believes the SEC is referring to by code name in Paragraphs 71-75 issued a report on or about March 22, 2016.  The report speaks for itself.  AT&T denies the allegations in Paragraph 76 to the extent they are inconsistent with that report.  To the extent any further response is required, AT&T denies the allegations in Paragraph 76.

> (b)     *Analyst Firm C*

77.     AT&T objects that the code name "Analyst Firm C" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that its employees had one or more calls with various analysts during March 2016, including with the firm AT&T believes the SEC has code-named "Firm C" in Paragraph 77.  AT&T otherwise denies the allegations in Paragraph 77.

78.    AT&T objects that the code name "Analyst Firm C" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that on March 9, 2016, Defendant Womack had a call with a senior telecommunications analyst at the analyst firm AT&T believes the SEC has code-named "Analyst Firm C."  AT&T otherwise denies the allegations in Paragraph 78.

79.    AT&T lacks sufficient information to admit or deny the allegations in Paragraph 79, which refer to an internal email sent within an analyst firm that is referred to by a code name instead of by its actual name.  The email speaks for itself.  To the extent any further response is required, AT&T denies the allegations in Paragraph 79.

80.    AT&T objects that the code name "Analyst Firm C" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that on or about March 16, 2016, Defendant Womack had a call with the junior telecommunications analyst at the analyst firm AT&T believes the SEC has code-named "Analyst Firm C."

81.    AT&T admits that Womack had a call with the analyst he reasonably believes that the SEC is referring to as "Analyst Firm C" on March 16, 2016 but otherwise denies the allegations in Paragraph 81.

82.    AT&T denies the allegations in Paragraph 82.

83.    AT&T denies the allegations in Paragraph 83.

84.    AT&T objects that the code name "Analyst Firm C" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm C" issued a report on or about March 18, 2016.  The report speaks for itself.  AT&T denies the allegations in Paragraph 84 to the extent they are inconsistent with that report.  To the extent any further response is required, AT&T denies the allegations in Paragraph 84.

(c)    *Analyst Firm D*

85.    AT&T objects that the code name "Analyst Firm D" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that on March 17, 2016, Defendant Womack spoke to one or more analysts from the analyst firm AT&T believes the SEC has code-named "Analyst Firm D" in Paragraph 85.

86.    AT&T denies the allegations in Paragraph 86.

87.    AT&T denies the allegations in Paragraph 87.

88.    AT&T denies the allegations in Paragraph 88.

89.    AT&T objects that the code name "Analyst Firm D" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm D"

issued a report on or about March 21, 2016.  The report speaks for itself.  AT&T denies the allegations in Paragraph 89 to the extent they are inconsistent with that report. To the extent any further response is required, AT&T denies the allegations in Paragraph 89.

(d)     *Analyst Firm Q*

90.     AT&T objects that the code name "Analyst Firm Q" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that Defendant Womack spoke with two analysts from the analyst firm AT&T believes the SEC has code-named "Analyst Firm Q" on or about April 15, 2016.

91.     AT&T admits that as of April 15, 2016, Defendant Womack had been provided with AT&T's actual first quarter results.  AT&T denies that any material nonpublic information was disclosed and otherwise denies the allegations in Paragraph 91.

92.     AT&T objects that the code name "Analyst Firm Q" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T lacks sufficient knowledge as to whether the analyst firm AT&T believes the SEC has code-named "Analyst Firm Q" had already lowered its internal forecasted revenue estimates for AT&T as of April 15, 2016.  To the extent any further response is required, AT&T denies the allegations in Paragraph 92.

93.     AT&T denies the allegations in Paragraph 93.

94.     AT&T denies the allegations in Paragraph 94.

95.     AT&T objects that the code name "Analyst Firm Q" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T lacks sufficient knowledge to admit or deny the allegations in Paragraph 95, which appear to be based on an email that was not sent to AT&T.  The email speaks for itself.  To the extent any further response is required, AT&T denies the allegations in Paragraph 95.

96.     AT&T objects that the code name "Analyst Firm Q" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm Q" issued a report on or about April 19, 2016.  The report speaks for itself.  AT&T denies the allegations in Paragraph 96 to the extent they are inconsistent with that report. To the extent any further response is required, AT&T denies the allegations in Paragraph 96.

97.     AT&T objects that the code name "Analyst Firm Q" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T lacks sufficient knowledge to admit or deny the allegations in Paragraph 97, which appear to be based on an email that was not sent to AT&T.  The email speaks for itself.  To the extent any further response is required, AT&T denies the allegations in Paragraph 97.

98.   AT&T objects that the code name "Analyst Firm Q" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that Paragraph 98 describes and selectively quotes part of an April 19, 2016 email between AT&T's IR Director and Defendant Womack.  The email speaks for itself.  AT&T denies the allegations in Paragraph 98 to the extent they are inconsistent with this email.  To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 98.

(ii)   *Evans*

(a)   *Analyst Firm S*

99.   AT&T objects that the code name "Analyst Firm S" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that Defendant Evans spoke with two analysts from the analyst firm AT&T believes the SEC has code-named "Analyst Firm S" on or about April 15, 2016.

100.   AT&T admits that as of April 15, 2016, Defendant Evans had been provided with AT&T's actual first quarter results.  AT&T denies that any material nonpublic information was disclosed and otherwise denies the allegations in Paragraph 100.

101.   AT&T denies the allegations in Paragraph 101.

102.   AT&T denies the allegations in Paragraph 102.

103.   AT&T objects that the code name "Analyst Firm S" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm S" issued a "preview" report on or about April 7, 2016, and a report on or about April 20, 2016.  These documents speak for themselves.  AT&T denies the allegations in Paragraph 103 to the extent they are inconsistent with these documents.  To the extent any further response is required, AT&T denies the allegations in Paragraph 103.

104.   AT&T objects that the code name "Analyst Firm S" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm S" issued a "preview" report on or about April 7, 2016, and a report on or about April 20, 2016.  These documents speak for themselves.  AT&T denies the allegations in Paragraph 104 to the extent they are inconsistent with these documents.  To the extent any further response is required, AT&T denies the allegations in Paragraph 104.

(iii)   *Black*

(a)   *Analyst Firm F*

105.   AT&T objects that the code name "Analyst Firm F" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without

waiving this objection, to the extent any further response is required, AT&T admits that Defendant Black spoke by phone with the junior analyst from the analyst firm AT&T believes the SEC has code-named "Analyst Firm F" on or about March 22, 2016.

106.    AT&T admits that Black received information regarding AT&T's internal projections for its quarterly upgrade rate prior to March 22, 2016 and that such projections speak for themselves.   AT&T otherwise denies the allegations in Paragraph 106.

107.    AT&T denies the allegations in Paragraph 107.

108.    AT&T denies the allegations in Paragraph 108.

109.    AT&T denies the allegations in Paragraph 109.

110.    AT&T denies the allegations in Paragraph 110.

111.    AT&T denies the allegations in Paragraph 111.

112.    AT&T objects that the code name "Analyst Firm F" fails to provide AT&T with fair notice regarding the identity of the analyst.   Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm F" issued a report on or about March 30, 2016.  The report speaks for itself.  AT&T denies the allegations in Paragraph 112 to the extent they are inconsistent with this report. To the extent any further response is required, AT&T denies the allegations in Paragraph 112.

113.   AT&T objects that the code name "Analyst Firm F" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, AT&T admits that Paragraph 113 describes and selectively quotes from a March 30, 2016 email between AT&T's IR Director and Defendant Black.  The email speaks for itself.  AT&T otherwise denies the allegations in Paragraph 113.

(b)   *Analyst Firm G*

114.   AT&T objects that the code name "Analyst Firm G" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, AT&T admits that Defendant Black spoke by phone with an analyst from the analyst firm AT&T believes the SEC has code-named "Analyst Firm G" on or about March 22, 2016.

115.   AT&T denies the allegations in Paragraph 115.

116.   AT&T denies the allegations in Paragraph 116.

117.   AT&T objects that the code name "Analyst Firm G" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm G" issued a report on or about March 28, 2016.  The report speaks for itself.  AT&T otherwise denies the allegations in Paragraph 117.

*(c)     Analyst Firm H*

118.   AT&T objects that the code name "Analyst Firm H" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, AT&T admits that Defendant Black spoke by phone with an analyst from the analyst firm AT&T believes the SEC has code-named "Analyst Firm H" on or about March 24, 2016.

119.   AT&T denies the allegations in Paragraph 119.

120.   AT&T objects that the code name "Analyst Firm H" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, AT&T lacks sufficient knowledge to admit or deny the allegations in Paragraph 120, which appear to be based on an email that was not sent to AT&T, and thus denies the allegations on that basis.

121.   AT&T denies the allegations in Paragraph 121.

122.   AT&T denies the allegations in Paragraph 122.

123.   AT&T objects that the code name "Analyst Firm H" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm H" issued a report on or about March 31, 2016.  The report speaks for itself.  AT&T otherwise denies the allegations in Paragraph 123.

*(d)     Analyst Firm J*

124.   AT&T objects that the code name "Analyst Firm J" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving

this objection, AT&T admits that Defendant Black spoke by phone with an analyst from the analyst firm AT&T believes the SEC has code-named "Analyst Firm J" on or about March 31, 2016.

125.    AT&T denies the allegations in Paragraph 125.

126.    AT&T denies the allegations in Paragraph 126.

127.    AT&T denies the allegations in Paragraph 127.

128.    AT&T denies the allegations in Paragraph 128.

129.    AT&T denies the allegations in Paragraph 129.

130.    AT&T objects that the code name "Analyst Firm J" fails to provide AT&T with fair notice regarding the identity of the analyst.  Subject to and without waiving this objection, to the extent any further response is required, AT&T admits that the analyst firm AT&T believes the SEC has code-named "Analyst Firm J" issued a report on or about April 7, 2016.  The report speaks for itself.  AT&T denies the allegations in Paragraph 130 to the extent they are inconsistent with this report.  To the extent any further response is required, AT&T denies the allegations in Paragraph 130.

**F.**    **AT&T Narrowly Beats Revised Consensus Estimates in 1Q 2016**

131.    AT&T admits that April 25, 2016 was "the day before AT&T reported its 1Q2016 earnings," but otherwise denies the allegations in Paragraph 131.

132.    AT&T admits that Paragraph 132 describes and selectively quotes from part of an email between AT&T's CFO and AT&T's IR Director.  The email speaks for itself.    AT&T   denies   the   allegations   in   Paragraph   132   to   the   extent   they   are

inconsistent with the email.  To the extent any further response is required, AT&T denies the allegations in Paragraph 132.

133.    AT&T admits that Paragraph 133 describes and selectively quotes from part of an email between AT&T's CFO and AT&T's IR Director.  The email speaks for itself.  AT&T denies the allegations in Paragraph 133 to the extent they are inconsistent with the email.  To the extent any further response is required, AT&T denies the allegations in Paragraph 133.

134.    AT&T admits that Paragraph 134 describes and selectively quotes from part of an email between AT&T's CFO and AT&T's Chief Executive Officer.  The email speaks for itself.  AT&T denies the allegations in Paragraph 134 to the extent they are inconsistent with the email.  To the extent any further response is required, AT&T denies the allegations in Paragraph 134.

135.    AT&T admits that Paragraph 135 describes and selectively quotes from part of an email between AT&T's CFO and AT&T's CEO.  The email speaks for itself. AT&T denies the allegations in Paragraph 135 to the extent they are inconsistent with the email.  To the extent any further response is required, AT&T denies the allegations in Paragraph 135.

136.    AT&T admits the allegations in Paragraph 136.

## FIRST CLAIM FOR RELIEF

### Violations of Section 13(a) of the Exchange Act and Regulation FD

137.    AT&T denies the allegations in Paragraph 137 to the extent previously set forth in Paragraphs 1-136 and incorporates its admissions and denials to the

allegations in those Paragraphs. To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 137.

138. Paragraph 138 recites legal conclusions that do not require a response. To the extent any further response is required, AT&T denies that Regulation FD is constitutional or valid under the First or Fifth Amendments to the United States Constitution, was validly authorized by statute, or that AT&T violated Regulation FD. To the extent any further response is required, AT&T denies the allegations in Paragraph 138.

139. AT&T denies the allegations in Paragraph 139.

140. AT&T denies the allegations in Paragraph 140.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting AT&T's Violations of Section 13(a) of the Securities Exchange Act and Regulation FD

141. AT&T denies the allegations in Paragraph 141 to the extent previously set forth in Paragraphs 1-140 and incorporates its admissions and denials to the allegations in those Paragraphs. To the extent any further response is required, AT&T otherwise denies the allegations in Paragraph 141.

142. AT&T denies the allegations in Paragraph 142.

143. AT&T denies the allegations in Paragraph 143.

## THE SEC'S PRAYER FOR RELIEF

The SEC's "Prayer for Relief" asserts legal conclusions and claims for relief that do not require a response. To the extent any further response is required, AT&T denies that the SEC is entitled to any of the relief listed in the Prayer for Relief, including all

of its subparts, or that the SEC is otherwise entitled to any relief in this matter.  The SEC does not have a valid claim against AT&T.

## DEFENSES AND AFFIRMATIVE DEFENSES[6]

AT&T incorporates its Preliminary Statement into each of its numbered defenses and affirmative defenses set forth below as if fully stated therein.

## FIRST DEFENSE

The SEC's claims fail in whole or in part because the SEC has failed to allege or otherwise show facts demonstrating that AT&T or the individual defendants selectively disclosed any information that was both material and nonpublic.  Indeed, the information allegedly disclosed during the analyst calls at issue in this matter was neither nonpublic nor material.

Notably, during the twenty years since Regulation FD's adoption, the SEC has litigated only one Regulation FD primary liability case in federal court – *SEC v. Siebel Systems, Inc.* — a case that Judge Daniels dismissed on the pleadings.[7]  Judge Daniels criticized the SEC's attempt at "nit-picking" the company's disclosures and warned against using Regulation FD to chill legitimate communications with analysts.[8]  By bringing this case, the SEC follows the same meritless script it proffered in *Siebel Systems* and should meet the same outcome.  Indeed, one could

---

[6] The listing of any defense or argument in this section shall not be construed as an admission that AT&T bears the burden of proof with respect to that defense or argument.

[7] 384 F. Supp. 2d 694 (S.D.N.Y. 2005).

[8] *See id.* at 701-02, 704-05.

hardly envision a more pointed example of linguistic "nit-picking" than the SEC's contention that AT&T's March 9, 2016 public statement that it "wouldn't be surprised" to see the slower-upgrade trend continue is meaningfully different from a statement that the trend "was expected" to continue in the first quarter.

Moreover, as in *Siebel Systems*, the metrics at issue fall outside the seven categories of potentially material information enumerated in the SEC's Adopting Release, which included "earnings information" and information about major corporate events like mergers, new products, defaults, and bankruptcies.[9] During the relevant time period, pass-through equipment revenue had no material impact on AT&T's "earnings," which is the only category of financial information enumerated in the Adopting Release as potentially material, and is in no way remotely comparable to a merger, bankruptcy, default, or any of the other enumerated

---

[9] *See id.* at 708 (citing Adopting Release).  The Adopting Release enumerates the following seven categories of potentially material information:   (1) earnings information; (2) mergers, acquisitions, tender offers, joint ventures, or changes in assets; (3) new products or discoveries, or developments regarding customers or suppliers (e.g., the acquisition or loss of a contract); (4) changes in control or in management; (5) change in auditors or auditor notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities – *e.g.*, defaults on senior securities, calls of securities for redemption, repurchase plans, stock splits or changes in dividends, changes to the rights of security holders, public or private sales of additional securities; and (7) bankruptcies or receiverships.  Even for information falling within these categories, the Adopting Release cautioned that "[b]y including this list, we do not mean to imply that each of these items is per se material. The information and events on this list still require determinations as to their materiality (although some determinations will be reached more easily than others). For example, some new products or contracts may clearly be material to an issuer; yet that does not mean that all product developments or contracts will be material."  *See* Adopting Release.

categories.  As Judge Daniels aptly observed regarding the similarly immaterial statements at issue in *Siebel Systems*,

> Significantly, none of the statements challenged by the SEC falls squarely within the seven enumerated categories listed by the SEC, in the Adopting Release, as being more likely to be considered material. Applying Regulation FD in an overly aggressive manner cannot effectively encourage full and complete public disclosure of facts reasonably deemed relevant to investment decision-making. It provides no clear guidance for companies to conform their conduct in compliance with Regulation FD. Instead, the enforcement of Regulation FD by excessively scrutinizing vague general comments has a potential chilling effect which can discourage, rather than, encourage public disclosure of material information.[10]

The same concerns that Judge Daniels expressed about the SEC's claims in *Siebel Systems* apply with full force here.  Simply put, AT&T's IR employees did not selectively disclose material nonpublic information during any of the analyst calls at issue.  AT&T also incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement as though fully set forth herein.

## SECOND DEFENSE

The SEC's claims fail in whole or in part because the SEC has failed to allege or otherwise show facts demonstrating that AT&T or the individual Defendants acted intentionally, knowingly, or recklessly with respect to any purported selective disclosures.  It is well-settled that a party does not act intentionally or recklessly if the duty it is alleged to have violated "was not so clear." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).  Other courts have similarly recognized that conduct is not

---

[10] *See id.* at 709.

reckless unless the obligation at issue was clear-cut, and the decision to violate the obligation was so blatantly indefensible as to approximate actual intent.[11]

These cases are consistent with the SEC's own assurances that it would have no cause to bring a Regulation FD claim when the materiality judgment is "close" or not clear-cut, and that "in the case of a selective disclosure attributable to a mistaken determination of materiality, liability will arise only if no reasonable person under the circumstances would have made the same determination."[12]  As set forth above, it is not even a close call that the information was neither material nor nonpublic.  At a minimum, however, the materiality issue is not so clear-cut in the SEC's favor to support any inference that AT&T's IR employees intended to disclose material nonpublic information, or that their judgment amounted to an extreme departure

---

[11] *See, e.g., S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasizing that recklessness standard in Rule 10b-5 cases is "a state of mind approximating actual intent, and not merely a heightened form of negligence"); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope."); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (no scienter when sufficiency of public disclosures is "at least debatable"); *Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017) ("Even if Flotek could have provided clearer disclosures . . ., Flotek's actual disclosures are not so blatantly misleading as to be severely reckless."), *aff'd sub nom. Alaska Electrical Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975 (5th Cir. 2019); *see also Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (claim fails where "the duty to disclose . . . was not so clear"); *Gamboa v. Citizens, Inc.*, A-17-CV-241-RP, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018) (explaining plaintiff "must show more than that it is debatable whether the disclosures were adequate"); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (finding no strong inference of scienter even if statements are arguably misleading when sufficiency of disclosures is "at least debatable.").

[12] *See* Adopting Release.

from the standards of ordinary care.  At a minimum, there existed at least some reasonable basis for concluding that the information at issue was not material or nonpublic, which is sufficient to defeat the SEC's claims.  AT&T also incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement and First Defense as though fully set forth herein.

## THIRD DEFENSE

The SEC's claims fail in whole or in part because AT&T and the individual Defendants had a reasonable basis for believing that the information disclosed during the analyst calls at issue was neither material nor nonpublic, and because AT&T therefore did not act intentionally or recklessly.  AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense and Second Defense AT&T also incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, and Second Defense as though fully set forth herein.

## FOURTH DEFENSE

The SEC's claims fail in whole or in part because AT&T's and the individual defendant's conduct was consistent with the SEC's own public statements and guidance pertaining to Regulation FD, and because AT&T had a reasonable basis for believing that it was acting in accordance with the SEC's public statements and guidance.  The SEC's claims flatly contradict the SEC's repeated public assurances that it would only pursue clear-cut "intentional or reckless" violations of Regulation FD.  In addition to the numerous assurances made by the SEC at the time of

Regulation FD's adoption, the SEC's own 2010 guidance permits what AT&T's IR professionals are alleged to have done and undercuts the SEC's litigation position. The guidance states that companies can confirm public forecasts, "comment on an analyst's model" and convey "seemingly inconsequential" nonpublic data in private communications with analysts, even if such data would allow a "skilled analyst" to "form a mosaic that reveals material nonpublic information."[13]  The guidance clearly contemplates that companies have latitude in privately commenting on an analyst model that appears to misunderstand or misread the company's public disclosures, and further undermines the SEC's suggestion that the IR professionals' conduct in this case represents an "extreme departure" from the standards of ordinary care as required for liability under Regulation FD.[14]  AT&T's IR employees at a minimum had a reasonable basis for believing that they were acting appropriately.  AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, Second Defense, and Third Defense as though fully set forth herein.

## **FIFTH DEFENSE**

The SEC's claims fail in whole or in part because the SEC is acting inconsistently with its own public statements and guidance pertaining to Regulation FD.  AT&T incorporates by reference the statements, assertions, and arguments

---

[13] *See* June 4, 2010, Regulation FD Guidance, *available at* https://www.sec.gov/divisions/corpfin/guidance/regfd-interp.htm.

[14] *Siebel Sys.*, 384 F. Supp. 2d at 702-03 & n.8 (internal quotation marks and citation omitted).

contained in its Preliminary Statement, First Defense, Second Defense, Third Defense, and Fourth Defense as though specifically set forth herein.

## SIXTH DEFENSE

The SEC's claims fail in whole or in part because Regulation FD violates the First Amendment to the United States Constitution, both on its face and as applied to AT&T in this case. Unlike other securities laws and regulations that prohibit false statements, insider trading and market manipulation (*i.e.*, deceptive activity and conduct not typically viewed as enjoying First Amendment protection), Regulation FD restricts truthful speech between issuers and analysts, even in situations where analysts are barred from trading based on the information. And unlike other procedural provisions of the securities laws that require public companies to file periodic financial reports, prospectuses, or other information upon the occurrence of clearly defined events, Regulation FD purports to require "simultaneous" or "prompt" public disclosures of information disclosed to an analyst based solely on a murky materiality standard that the SEC acknowledges presents "difficult" judgments.[15]

As the defendants and *amici* contended in *Siebel Systems*, these features raise significant questions as to whether Regulation FD improperly infringes on a company's First Amendment rights to communicate with analysts, whether Regulation FD fails to provide companies with fair notice of what conduct is prohibited and failing to provide enforcement officials with clear guidance to prevent

---

[15] *See* Proposing Release at 8 ("We recognize that materiality judgments can be difficult.").

arbitrary enforcement, and whether Congress granted the SEC statutory authority to promulgate the types of restrictions contained in Regulation FD.  The SEC's pursuit of these claims also contradicts the SEC's previous public statements about the circumstances that would give rise to a Regulation FD enforcement action and implicates the same constitutional and statutory authority questions previously briefed by the defendants and *amici* in *Siebel Systems*.  Notably, in rejecting a previous effort by the SEC to impose a duty to refrain from trading based solely on an analyst's receipt of material nonpublic information, the Supreme Court expressed concern that such an imprecise rule would chill lawful communications and would not provide fair notice to companies as to what communications are allowed and what are prohibited:

> Imposing a duty to disclose or abstain solely because a person knowingly receives material nonpublic information from an insider and trades on it ***could have an inhibiting influence on the role of market analysts***, which the SEC itself recognizes is necessary to the preservation of a healthy market.  It is commonplace for analysts to 'ferret out and analyze information,' . . . and this often is done by meeting with and questioning corporate officers and others who are insiders.  And information that the analysts obtain normally may be the basis for judgments as to the market worth of a corporation's securities.  The analyst's judgment in this respect is made available in market letters or otherwise to clients of the firm.  It is the nature of this type of information, and indeed of the markets themselves, that such information cannot be made simultaneously available to all of the corporation's stockholders or the public generally.[16]

> ***

> The SEC expressly recognized that "[t]he value to the entire market of [analysts'] efforts cannot be gainsaid; market efficiency in pricing is significantly enhanced by [their] initiatives to ferret out and

---

[16] *Dirks v. SEC*, 463 U.S. 646, 658-59 (1983) (emphasis added).

analyze information, and thus the analyst's work redounds to the benefit of all investors." . . . .  The SEC asserts that analysts remain free to obtain from management corporate information for purposes of "filling in the 'interstices in analysis'". . . . **But this rule is inherently imprecise, and imprecision prevents parties from ordering their actions in accord with legal requirements.  Unless the parties have some guidance as to where the line is between permissible and impermissible disclosures and uses, neither corporate insiders nor analysts can be sure when the line is crossed**.[17]

The SEC has similarly failed to provide fair notice as to what communications will give rise to a Regulation FD enforcement action.

Judge Daniels did not reach these issues given his conclusion that the allegations failed to state a claim on the merits.[18]  The mere passage of time, however, has not mooted these questions, nor has it rendered the adoption of Regulation FD any less extraordinary or unprecedented.  Indeed, over the intervening years, the law has only grown more unfavorable for the SEC.[19]  AT&T intends to brief these issues at the appropriate juncture.  AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense,

---

[17] *See id.* n. 17 (emphasis added).

[18] *See Siebel Sys.*, 384 F. Supp. 2d at 709 n. 16.

[19] *See, e.g., Sorrell v. IMS Health, Inc.*,131 S. Ct. 2653, 2663 (2011) (invalidating on First Amendment grounds state law prohibiting sale of prescriber identifying information for marketing purposes); *Nat. Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 553-56 (D.C. Cir. 2015) (striking down conflict minerals rule on First Amendment grounds and differentiating rule from regulations that proscribe misleading or deceptive speech); *United States v. Caronia*, 703 F.3d 149, 165-67 (2d Cir. 2012) (invalidating statutory prohibition against promotion of off-label drug use by pharmaceutical manufacturers on First Amendment grounds).

Second Defense, Third Defense, Fourth Defense, and Fifth Defense as though specifically set forth herein.

**SEVENTH DEFENSE**

The SEC's claims fail in whole or in part because Regulation FD violates the Fifth Amendment to the United States Constitution, both on its face and as applied to AT&T in this case. As set forth above, the SEC has failed to provide fair notice as to what communications are permitted and which communications are prohibited. AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, and Sixth Defense as though specifically set forth herein.

**EIGHTH DEFENSE**

The SEC's claims fail in whole or in part because the SEC lacked statutory authority to promulgate Regulation FD and because nothing in the Exchange Act or in any other statute enacted by the United States Congress proscribes AT&T's or the individual defendants' actual or alleged conduct in connection with this matter. In particular, as argued by the defendants and *amici* in *Siebel Systems*, nothing in Section 13 of the Securities Exchange Act authorized the SEC to promulgate a rule prohibiting alleged selective disclosures to analysts. Section 13(a), the only provision of Section 13 cited in the Complaint, authorizes the SEC to promulgate regulations regarding the filing of applications for registration, registration statements, annual reports, and quarterly reports. *See* 15 U.S.C. § 78m(a). This provision, however, says

nothing about authorizing the SEC to promulgate broad and continuous "equal access to information" requirements such as those purportedly imposed by Regulation FD. The Supreme Court previously rejected a similar effort by the SEC to construe other provisions of the Securities Exchange Act as requiring all traders to have equal access to information.  *See Dirks v. SEC*, 463 U.S. 646, 657 (1983) (rejecting SEC argument in insider trading case as being improperly "rooted in the idea that the antifraud provisions [in Section 10(b) of the Securities Exchange Act] require equal information among all traders").  The SEC's assertion that Section 13(a) authorizes it to promulgate an equal-access-to-information rule similarly fails.  AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, and Seventh Defense as though specifically set forth herein.

### NINTH DEFENSE

The SEC's claims fail in whole or in part because AT&T did not violate Section 13(a) of the Securities Exchange Act, the sole statutory provision under which the SEC has asserted its claims.  AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, and Eighth Defense as though specifically set forth herein.

### TENTH DEFENSE

The SEC's claims fail in whole or in part because the price of AT&T's stock was not affected by the information that the SEC claims to be material and nonpublic.

AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, Eighth Defense, and Ninth Defense as though specially set forth herein.

### ELEVENTH DEFENSE

The SEC's claims fail in whole or in part to the extent the SEC is premising any of its claims on conduct falling outside the applicable statute of limitations. AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, Eighth Defense, Ninth Defense, and Tenth Defense as though specially set forth herein.

### TWELFTH DEFENSE

The SEC's claims fail in whole or in part because the SEC has failed to state a claim upon which relief can be granted.  AT&T incorporates by reference the statements, assertions, and arguments contained in its Preliminary Statement, First Defense, Second Defense, Third Defense, Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, Eighth Defense, Ninth Defense, Tenth Defense, and Eleventh Defense as though specially set forth herein.

### CONCLUSION

In sum, the allegations simply fail to show that the purported selective disclosures were either nonpublic or material, let alone that AT&T or its IR team engaged in anything approaching intentional or reckless conduct.  The SEC has failed

to explain how pursuing this case is consistent with the SEC's repeated public assurances that it would only bring Regulation FD claims in clear-cut cases where the evidence actually shows intentional or reckless conduct.  Companies and investors have a legitimate interest in making sure that analysts do not have an erroneous picture of a company's business before writing a report.  This suit infringes on that interest and will only serve to chill companies and analysts from having productive communications.  The SEC's claims should be emphatically rejected.

## **REQUEST FOR RELIEF**

AT&T thus respectfully requests that the Court:

(1)     Enter judgment for AT&T dismissing the Complaint;

(2)     Award AT&T costs and expenses incurred in defending this action; and

(3)     Grant AT&T such other and further relief as the Court deems just and proper.

Dated:  May 7, 2021                    Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

By:   */s/ Richard S. Krumholz*

Richard S. Krumholz
2200 Ross Avenue
Suite 3600
Dallas, Texas  75201
Tel:   (214) 855-8000
Fax:  (214) 855-8200
richard.krumholz@nortonrosefulbright.com

Peter A. Stokes (*pro hac vice* pending)
98 San Jacinto Boulevard
Suite 1100
Austin, Texas  78701
Tel:  (512) 536-5287
Fax:  (512) 536-4598
peter.stokes@nortonrosefulbright.com

Seth M. Kruglak
1301 Avenue of the Americas
New York, New York  10019
Tel:  (212) 318-3000
Fax:  (212) 318-3400
seth.kruglak@nortonrosefulbright.com

**WILLKIE FARR & GALLAGHER LLP**

Randall W. Jackson
Brittany Wagonheim
787 Seventh Avenue
New York, New York  10019
Tel:  (212) 728-8216
Fax:  (212) 728-8111
rjackson@willkie.com
bwagonheim@willkie.com

*Attorneys for AT&T Inc.*