**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

Plaintiff,

-- against --

**AT&T, INC.,**
**CHRISTOPHER C. WOMACK,**
**KENT D. EVANS, and**
**MICHAEL J. BLACK,**

Defendants.

**21 Civ. 1951 (PAE )**

**ECF Case**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

Victor Suthammanont
Alexander M. Vasilescu
David Zetlin-Jones
Joy Guo
U.S. Securities and Exchange Commission
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-5674 (Suthammanont)
suthammanontv@sec.gov

Thomas Peirce, Of Counsel

May 3, 2022

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... iv

Preliminary Statement ................................................................................................. 1

The Indisputable Facts ................................................................................................ 2

   I.  Defendant AT&T, the Individual Defendants, and AT&T's IR Department .................... 2

      A.  The Individual Defendants Received Training on Regulation FD .............................. 4

   II.  Background on Analysts and Consensus Estimates........................................................ 5

   III. Background on Revenue and Equipment Upgrade Metrics and Trends........................... 6

      A.  The Importance of Equipment Sales, Wireless Equipment Revenue, and Upgrade Rates............................................................................................................................ 7

          i.  Equipment Revenue Impacted AT&T's Earnings ............................................ 8

   IV. AT&T Misses Revenue Consensus in the Two Quarters Prior to 1Q16 ........................... 9

      A.  AT&T Misses Revenue Consensus Again in the Fourth Quarter of 2015 ................... 9

      B.  AT&T Projects Lower Equipment Revenue in the First Quarter of 2016 and Declines to Issue Clear Public Guidance Concerning Equipment Trends................. 10

   V.  Defendants Selectively Disclose Material Nonpublic Information in March and April 2016............................................................................................................................... 12

      A.  During March 10-22, 2016, Womack, Evans, and Black Forecast 1Q16 Upgrade Rate and Equipment Revenue and Communicate That Information to Analysts ....... 14

      B.  On March 22, 2016, the IR Team Further Refines Its Estimates................................ 17

      C.  During March 21-30, 2016, the Defendants Continued "Working the Analysts" to Change the Consensus ................................................................................................ 18

      D.  In March 30-31, 2016, As the Quarter Ends, Defendants Continue Communicating with Analysts and Working on Changing the Consensus ............... 19

      E.  In April 1-7, 2016, After the Fiscal Quarter Ended, Defendants Continued To Work to Change Consensus Revenue ........................................................................ 21

      F.  The IR Team Obtains and Uses 1Q16 Final Results (April 8-18, 2016) To Continue Changing Consensus ................................................................................. 22

      G.  In April 15-25, the Defendants Achieve Their Goal of Lowering Consensus by Getting Two More Analysts to Change Their Estimates ........................................... 25

VI. AT&T Beats Consensus Revenue Estimates ..................................................... 26

Argument ................................................................................................................. 27

   I.   The Summary Judgment Standard Supports Judgment in the SEC's Favor .................... 27

   II.   AT&T Violated Regulation FD and Section 13(a) of the Exchange Act by Selectively Disclosing Material Nonpublic Information Without a Simultaneous Public Disclosure ................................................................................................. 28

     A.  The Law Concerning Regulation FD ......................................................... 28

     B.  There is no Genuine Dispute that Defendants Made Selective Disclosures .............. 29

     C.  There is No Genuine Dispute that the Selective Disclosures were Material ............. 33

        i.   No Reasonable Jury Could Find the Information Conveyed to be Immaterial ................................................................................... 39

     D.  The Information Disclosed was Nonpublic ................................................. 42

     E.  The Selective Disclosures Were Intentional under Regulation FD .......................... 44

     F.  The Individual Defendants Acted on Behalf of AT&T ...................................... 48

   III. The Individual Defendants Aided and Abetted AT&T's Violations .............................. 49

Conclusion .............................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986) ............................................... 27, 42

*Backman v. Polaroid Corp.* 893 F.2d 1405 (1st Cir. 1990) ............................................. 38

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ............................................................... 33, 40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 27

*Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529 (2d Cir 1991) ............................... 41

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ........................... 34, 40, 48

*Horror Inc. v. Miller*, 15 F.4th 232 (2d. Cir. 2021) ........................................... 2n, 28, 31

*In re Kidder Peabody Securities Litigation*,
10 F. Supp. 2d 398 (S.D.N.Y. 1998) ............................................................... 34, 35, 36

*Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir. 1998) ......................................................... 27

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) ............................... 33, 36

*Loreley Fin (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
797 F.3d 160 (2d Cir. 2015) .......................................................................................... 49

*Niagara Mohawk Power Corp. v. Jones Chemical, Inc.*,
315 F.3d 171 (2d Cir. 2003) ................................................................................... 28, 31

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) .................................................................... 49

*SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421 (E.D.N.Y. 2016) ........................... 44

*SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) ...................... 34, 44

*SEC v. DiMaria*, 207 F. Supp. 3d 343 (S.D.N.Y. 2016) .................................... 34, 35, 39

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) ................................................................. 44

*SEC v. Huang*, 684 F. App'x 167 (3d Cir. 2017) ............................................................. 37

*SEC v. Levy*, 706 F. Supp. 61 (D.D.C. 1989) ................................................................... 33

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) ................................................................... 35

*SEC v. Monterrosso*, 768 F. Supp. 2d 1244 (S.D. Fla. 2011) ........................................ 41

*SEC v. Obus*, 693 F.3d 276 (2d Cir 2012) ...................................................................... 44

*SEC v. Penthouse Int'l, Inc.*, 390 F. Supp. 2d 344 (S.D.N.Y. 2005) ............................... 41

*SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978) ..................................... 34

*SEC v. Reyes*, 491 F. Supp. 2d 906 (N.D. Cal. 2007) ...................................................... 34

*SEC v. Stanard*, 2009 WL 196023 (Jan. 27, 2009) ......................................................... 42

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) ................................. 33, 42

*SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011) ................................................................... 36

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) ........................................ 49

*SEC v. Woodruff*, 778 F. Supp. 2d 1073 (D. Colo. 2011) ........................................................... 42

TCS Industries, Inc. v. Northway, Inc. 426 U.S. 438 (1976) ...................................................... 46

*U.S. v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ......................................................................... 33

**Other Authorities**

Final Rule: Selective Disclosure and Insider Trading,
    Exchange Act Rel. No. 43154, 65 Fed. Reg. 51,716 (Aug. 15, 2000) ........................... passim

*In re Motorola Inc. Report of Investigation Pursuant to Section 21(a) of the Securities*
    *Exchange Act of 1934*, Rel. No. 46898, 2002 WL 31650174 (Nov. 25, 2002) .......... 32, 44, 45

Proposed Rule: Selective Disclosure and Insider Trading,
    Exchange Act Release No. 34-42259, 64 Fed. Reg. 72,590 (Dec. 28, 1999) ........................ 48

Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) ................................. 33, 36, 41, 46

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................. 27

**Regulations**

17 C.F.R. § 229.301 ................................................................................................................. 33n

17 C.F.R. § 229.303 .......................................................................................................... 33n, 35n

17 C.F.R. § 243.100 ................................................................................................................... 28

17 C.F.R. § 243.101 ............................................................................................................. 44, 48

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum of law in support of its motion for summary judgment as to liability against Defendants AT&T, Inc. ("AT&T"), Christopher C. Womack, Kent D. Evans, and Michael J. Black (collectively, the "Defendants").

## PRELIMINARY STATEMENT

In March and April 2016, AT&T's Investor Relations Department, primarily through Defendants Womack, Evans, and Black (the "Individual Defendants") embarked on a campaign to selectively disclose material nonpublic information to analysts at 20 Wall Street firms. The Defendants' goal was to "manage" those analysts to lower their first quarter of 2016 ("1Q16") total revenue estimates so that AT&T would beat the consensus revenue estimate for that quarter. Prior to March 2016, analysts had published for their investor clients their best estimates of AT&T's performance for 1Q16 using the publicly available information then available to them. These estimates included AT&T's total revenue and wireless equipment revenue—i.e., revenue from its sales of smartphones and other devices to its customers. By March 2016, the 1Q16 consensus revenue estimate was at least $1 billion higher than AT&T's internal projections, the latter largely as a result of a decline in wireless equipment revenue.

Faced with the prospect of missing consensus revenue estimates in 1Q16, and having just missed revenue consensus in three of the immediately prior four fiscal quarters, Defendants set out to lower the consensus. Depending on the analyst firm, Defendants disclosed AT&T's projected or actual total revenue, equipment revenue, or equipment upgrade rates (i.e., the percentage of AT&T subscribers who upgraded their smartphones) among other metrics, provided directional signaling indicating that such metrics were below the analysts' current estimates, or both. The nonpublic information Defendants provided (sometimes disguised as

consensus) was specific and material enough that analysts *uniformly* revised their total revenue estimates downward by an average of $1 billion, in many cases closely or exactly matching figures that Defendants provided. Defendants succeeded in their efforts, moving analyst estimates down far enough that AT&T edged over the consensus revenue estimate a day prior to its 1Q16 earnings announcement by 0.1%.

As discussed below, in light of the overwhelming and incontrovertible documentary and testimonial evidence, including Defendants' own admissions which confirm improper signaling, there is no genuine dispute of material fact as to these events or any reasonable inferences that can be drawn in favor of Defendants sufficient to create a genuine dispute. At best, Defendants offer their own failures of recollection, generalized denials, and supposition that what was written and said is not what it seems. As such, no reasonable jury could return a verdict in favor of Defendants. Accordingly, the SEC respectfully requests that the Court grant it summary judgment as to liability against AT&T for violating Regulation FD and Section 13(a) of the Securities Exchange Act of 1934, and against the Individual Defendants for aiding and abetting AT&T's violations.

## THE INDISPUTABLE FACTS[1]

### I.   Defendant AT&T, the Individual Defendants, and AT&T's IR Department

**AT&T:** AT&T is a publicly traded telecommunications company. ¶ 1.[2] In 1Q16, AT&T was organized into four operating segments: Business Solutions, Entertainment, Consumer

---

[1]     The SEC submits that no genuine dispute exists as to the following facts. To the extent that any factual inferences are drawn or argued, the SEC submits that such inferences are those that can be *reasonably* be drawn in favor of Defendants as the nonmoving party. *See Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021). The SEC, however, does not concede for purposes of any trial in this action that such inferences are correct or likely to be drawn by a reasonable jury.

[2]     References "¶" are to corresponding paragraphs in Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts.

Mobility, and International. ¶ 3. Its wireless business operated primarily through its Business
Solutions and Consumer Mobility segments, and involved providing its subscribers with wireless
phone and data services and selling wireless equipment. ¶ 4.

As a public company, AT&T maintained an Investor Relations ("IR") Department whose
principal function was to provide accurate information concerning the company's affairs to
investors and investment funds (i.e., the "buy-side") and brokerage or institutional analysts (i.e.,
the "sell-side") in order to assist them in making informed decisions regarding their potential
AT&T investments and recommendations. ¶ 60. Michael Viola, the head of AT&T's IR
Department, reported to John Stephens, AT&T's CFO. ¶ 67. The Individual Defendants worked
in the IR Department. ¶¶ 25, 34, 46.

**Womack**: In 2015 and 2016, Womack was an Executive Director in the IR Department
working from AT&T's Bedminster, New Jersey office, ¶ 25, and reported to Viola. ¶ 27. Among
Womack's responsibilities was communicating with sell-side analysts. ¶ 29. Womack does not
remember the analyst calls at issue but testified that he spoke to analysts during the relevant time
to point out the statements made by AT&T's CFO on March 9, 2020. *See* ¶¶ 380, 473-74.

**Black**: Black, in 2015 and 2016, was a Finance Director in the IR Department reporting
to Womack. ¶ 34. He also worked from the Bedminster office. *Id*. Black's responsibilities
included communicating with sell-side analysts, as well as maintaining a chart tracking
consensus estimates as well as an internal AT&T average of "Top Ten" analysts' estimates.
¶¶ 36, 40-41, 280.[3] Black does not remember the analyst calls at issue but testified that he spoke
to analysts during the relevant time to point out the statements made by the AT&T CFO on

---

[3]     A chart summarizing the information in Black's charts during the relevant period is
attached as Exhibit A to the Declaration of Jordan Baker.

March 9, 2020. *See* ¶¶ 382, 473-74.

**Evans**: Evans was an Associate Vice President in AT&T's IR Department in 2015 and 2016. ¶ 46. He worked from AT&T's Atlanta, Georgia office. *Id.* Evans's role was to communicate with both buy-side investors and sell-side analysts about the wireless business and to keep others in the IR Department up to date about key trends in the wireless segment. ¶ 55. Evans does not remember the order of any particular discussion no any call, ¶ 474, but admits that he pointed out to the analysts statements made by the AT&T CFO on March 9, 2016. ¶ 381.

### A.  The Individual Defendants Received Training on Regulation FD

The Individual Defendants received regular training on Regulation FD and were familiar with its proscriptions. ¶¶ 30, 44, 58. Each Individual Defendant was directed never to reveal AT&T's internally projected results in advance of their public reporting. *E.g.*, ¶¶ 220, 223, 240. Each understood that strict prohibition precluded them from signaling or implying what AT&T's results would be on any metric before the issuance of an earnings release—including commenting privately that an analyst's estimate was too high or too low. ¶¶ 227, 235-38, 245. The Individuals Defendants were specifically trained with a law firm memo (the "Davis Polk Memo") that explicitly warned them that confirming prior public comments and managing analysts' forecasts late in a fiscal quarter could violate Regulation FD. ¶¶ 202-11.

As to materiality, in particular, AT&T's IR Group was informed explicitly through the training materials it received that material information could be "quantitative – such as revenue . . . data" or "qualitative – for example that sales are 'very strong[.]'" *E.g.*, ¶ 181. In addition, AT&T's training for its IR Department noted: "There is no magical monetary threshold below which an item would automatically be deemed immaterial." ¶ 197. The same document noted that material information included "Projections" and included as examples "Predictions of future revenues, profits, losses" among other things. ¶ 199.

## II.     Background on Analysts and Consensus Estimates

Stock analysts publish forecasts and other analyses pertaining to AT&T and other issuers. ¶ 246. Analysts write their research reports to be valuable to their clients—i.e., investors—and cover topics deemed important relevant to their investment evaluations. ¶ 247. Analysts prepare financial models to project a company's future performance. ¶ 248. Analysts may use a variety of public sources for their research and modeling, such as a company's financial and public statements, news reports, and historical data, and nonpublic sources, such as proprietary surveys and private conversations with company executives and IR employees. ¶ 249.

Analysts did not expect to receive material nonpublic information from AT&T's IR Department and relied upon the IR Department to be truthful and not to disclose material nonpublic information. ¶ 253-55. At the same time, analysts interpret context and tone of company executives for information, and understood that outreach from issuers about consensus estimates may signal information. ¶ 251. Analysts also relied on AT&T to arrange for access to AT&T's IR Department and executives, and AT&T's IR Department and executives regularly met with analysts' clients at investor conferences sponsored by analyst firms. ¶ 283.

Financial research companies such as FactSet and Bloomberg compile analyst forecasts and report "consensus estimates" based on those forecasts. ¶ 260. Consensus estimates are the average analyst estimate for all analysts covering an issuer tracked by the research companies. ¶¶ 262-63. Analysts and media publish comparisons of AT&T's actual results to consensus estimates, generally viewing "missing" consensus negatively and "beating" consensus positively. ¶ 266. In 2015 and 2016, including in 1Q16, senior AT&T executives tracked how AT&T performed relative to analysts' consensus estimates, including consensus revenue estimates, and preferred to meet or beat those consensus estimates. ¶¶ 267-68.

III.     **Background on Revenue and Equipment Upgrade Metrics and Trends**

AT&T reported revenue from the sale of smartphones and other equipment to its subscribers as "wireless equipment revenue" in annual (Form 10-K), quarterly (Form 10-Q), and current reports (Form 8-K) filed with the SEC. ¶¶ 91-92. Those reports, and the revenue metrics within them, were prepared on a current-quarter basis in accordance with U.S. generally accepted accounting principles ("GAAP"). ¶ 85. With respect to equipment revenue, both revenue from the sale of a device and equipment expense (i.e., the cost of the equipment) were recognized in the current quarter. ¶ 91. Wireless equipment revenue included revenue from all phones and other devices sold to customers, net of GAAP adjustments and promotional or other discounts. *See* ¶¶ 91-92, 99-101. AT&T did not publicly disclose its cost of wireless equipment; rather that figure was aggregated within other costs and expenses in its financial reporting. ¶ 96. On a GAAP basis, the cost of the phones sold by AT&T was greater than the equipment revenue generated by those phones throughout 2015 and 2016.[4] ¶ 95.

AT&T publicly disclosed the rate at which its subscribers upgraded their smartphones as "postpaid upgrade rate" in Investor Briefing publications released contemporaneously with its quarterly and annual results. ¶ 97. The upgrade rate was the percentage of AT&T postpaid subscribers who upgraded their cellphones in a given quarter. *Id*. Analysts addressed the upgrade rate and the handset "cycle" (i.e., the average length of time a subscriber used a phone before upgrading) and their associated impacts on AT&T's business in numerous research reports. *E.g.*, ¶¶ 286-322. Revenue and expenses from phones sold as a result of upgrade transactions were included in wireless equipment revenue and wireless equipment expense. ¶ 146.

---

[4]      In 1Q16, AT&T's equipment revenue was $3.156 billion, while its cost of equipment was $3.991 billion, resulting in a negative $835 million impact to earnings. ¶¶ 119-120.

### A.  The Importance of Equipment Sales, Wireless Equipment Revenue, and Upgrade Rates

Revenue and revenue growth were unquestionably important to AT&T's analysts, investors, and its Board of Directors. Nearly every analyst forecast and report for AT&T projected total consolidated revenue and wireless revenue, including growth metrics. *E.g.*, J. Exs. 65, 74, 77 (analyst reports). AT&T discussed revenue and trends in each of its annual and quarterly filings. *E.g.*, ¶¶ 87, 350. In 2015, AT&T's Board chose consolidated revenue as a short-term performance metric for determining executive compensation, because it was one of "the key short-term financial metrics for the operation of our business and represent important key metrics to our stockholders." ¶ 138. Revenue was a key component of determining AT&T's earnings and earnings-per-share figures, as well as its "margin," i.e., a percentage measure of the company's profitability. ¶ 157-63. Analysts reported their estimates of AT&T's revenue and highlighted when AT&T missed revenue estimates. *E.g.*, ¶¶ 286, 333.

Similarly, wireless equipment revenue was a significant metric for AT&T's analysts and investors.[5] ¶ 139. The wireless equipment upgrade rate also was an important metric for AT&T's analysts and investors. ¶ 145. Lower upgrade rates and upgrade cycles affected AT&T's revenue and earnings, and generally had the effect of lowering equipment revenue. ¶¶ 146-148. Investors communicated with analysts to request information about upgrade rates and the upgrade cycle, and analysts communicated with AT&T to request information on those same topics. ¶¶ 805-09. Analysts wrote about upgrade rates and trends and highlighted the effect of upgrade rates on

---

[5] Analysts analyzed wireless equipment revenue in their models, included the figure in their forecasts, and highlighted equipment revenue in their research, particularly declining equipment revenue in 2015 and 2016. AT&T touted higher equipment revenue from its Next plans in public filings. It also informed its investors that growth in equipment revenue "has the corresponding impact of lowering service revenues."

equipment revenue in their reports. ¶¶ 286-321. The Individual Defendants understood that upgrade rates could be used as one component to estimate equipment revenue. ¶¶ 149-51.

In addition to the effects on revenue, device upgrades were important to AT&T's business. For example, AT&T disclosed that device upgrades contributed to growth from higher wireless data usage and service revenue. ¶ 156. In addition, device sales were used to minimize subscriber "churn," i.e., a measure of how many subscribers were leaving a carrier, and itself an independently important metric to investors. ¶ 173-75. AT&T employees and analysts believed that equipment revenue was an important factor in helping churn because customers getting new phones were thought to be under contract and would stay with AT&T longer. ¶174.

### i. Equipment Revenue Impacted AT&T's Earnings

An additional reason that equipment revenue (including upgrade revenue) mattered to analysts and investors was its impact on earnings and earnings-per-share ("EPS"). ¶¶ 157-172. AT&T reported operating income and EBITDA (i.e., earnings before interest, taxes, depreciation, and amortization) for its wireless operations as a whole. ¶¶ 161-62. Wireless EBITDA margin is the wireless EBITDA divided by total wireless revenues, and is a metric analysts and investors used to measure the profitability of a business. ¶ 163.

Because AT&T incurred losses on its wireless equipment sales (i.e., its equipment revenue was lower than its equipment costs), lower smartphone sales lowered equipment expense and improved wireless margins. ¶¶ 164-72. AT&T touted this effect in communications to its investors and to its Board. ¶¶ 166, 168. It also noted the effect in internal documents used to prepare its IR Department to speak to investors. *E.g.*, J. Ex. 149 at 30 (3Q15 Investor Presentation); ¶ 170-71. Analysts noted the positive impact of lower equipment revenue and upgrade rates on margin in their research reports. *E.g.*, ¶ 95, 167, 313, 316-318.

IV.    **AT&T Misses Revenue Consensus in the Two Quarters Prior to 1Q16**

In October 2015, AT&T became aware the analysts' consensus revenue estimates were higher than its actual results due to how analysts had calculated revenue from its recent DIRECTV acquisition. ¶¶ 323-24. AT&T's senior management alerted its Board of Directors that its reported revenues would come in lower than consensus forecasts. P. Ex. 8. AT&T also issued a statement to the Wall Street Journal in advance of its earnings announcement to condition the market to expect, and blunt the impact of, this revenue miss. ¶ 325. The resulting article was headlined "AT&T Says Revenue Will Likely Miss," and described AT&T's statement as a "surprise disclosure the day before the telecom is slated to report its latest results." J. Ex. 250. Other media outlets ran negative headlines about a "miss," leading Randall Stephenson, then the CEO, to write to the CFO, among others: "Sure glad we avoided a big headline about a revenue miss :)" ¶ 326.

A.    **AT&T Misses Revenue Consensus Again in the Fourth Quarter of 2015**

When AT&T reported fourth quarter 2015 ("4Q15") financial results, its reported revenue fell $600 million short of consensus. ¶ 327. On January 26, 2017, AT&T's CEO noted on 4Q15 earnings call that "equipment revenue was down more than $700 million mostly due to the lower upgrade volumes" and that "[t]otal wireless revenue was impacted by lower smartphone sales[.]" ¶¶ 331-32. Media and analyst reports emphasized AT&T's revenue miss. ¶ 333 "CNBC: AT&T Falls on Earnings[;]" "The Wall Street Journal: AT&T Revenue Growth Falls Short of Expectations[;]" "FastFT [Financial Times]: AT&T shares slip after results;" and "Reuters: AT&T revenue below forecasts, shares fall" were some of the headlines. ¶ 342.

On January 23, 2016, before AT&T released its results for 4Q15, and knowing AT&T would miss revenue consensus estimates for that quarter, Viola emailed Womack: "we have a tendency to focus on EPS and have recently missed the mark on consolidated revenue. We need

to make sure our story gets consensus trued up for both EPS as well as revenue." ¶ 338. The next day, Viola emailed Womack: "We will have to nip 1Q in the bud otherwise we will be in the same spot we've been the last few quarters, i.e. missing revenue." ¶ 339. Womack responded to Viola: "Agreed – we need to help them figure out their equipment spread for the year. Equipment revenue is starting to become a real challenge." ¶ 340. Following the January 26, 2016 earnings announcement, Black circulated a report detailing consensus EPS estimates, leading Viola to respond: "What about revenue? I'm equally concerned about revenue." ¶ 343.

### B.  AT&T Projects Lower Equipment Revenue in the First Quarter of 2016 and Declines to Issue Clear Public Guidance Concerning Equipment Trends

By February 7, 2016, AT&T was behind its internal budget projections for wireless equipment revenue. ¶ 346. On February 8, 2016, Womack emailed Black: "Please send me a revenue report today by analyst for each quarter, exactly like the EPS report that you generate on Fridays." ¶ 347. Black provided Womack that same day with a report of revenue estimates by analyst and provided both the total consensus and the Top Ten average. ¶ 348.

On February 26, 2016, Viola, copying Womack, responded to an email from Black providing consensus revenue estimates and AT&T's Top Ten analyst estimates: "Guys, what's the plan to get first call numbers in line with 1Q and full year for revenue and eps? Let's discuss… I don't want to be in a mad dash in April." ¶ 351.

On March 2, 2016, John Stankey—then the head of AT&T's Entertainment division, now the CEO—spoke publicly at an investor conference. ¶ 355. At the conference, an analyst asked Stankey to comment on AT&T's "handset utilization rates." ¶ 356. Stankey gave no specific guidance, and answered generally that "renewal cycles . . . are extending[,]" ¶ 356(a), a trend of which analysts were already aware. *E.g.*, ¶¶ 297-98. Later in the conference, a participant asked

for specific data, including the current average on "handset renewals." ¶ 357. Stankey answered that "it's not something we publicly disclose" and pointed again to the known trend. *Id.*

On March 3, 2016, Stephens emailed Viola and AT&T's Controller:[6] "After we see Feb Results and before we present at DB conference next week let's consider an 8k that states . . . Wireless equipment unit sales down year over year – impacting equipment revenues[,]" among other items. ¶ 361-62. AT&T ultimately did not file a Form 8-K, deciding instead that Stephens would address equipment sales at the upcoming Deutsche Bank conference. ¶ 363.

On March 7, 2016, the Controller provided Stephens a report comparing AT&T's internal, projected quarterly results (which were based on actual, intra-quarter results through February) to consensus analysts' estimates. ¶ 370. That report showed that First Call—a reporting service that tracks the average of analyst estimates—consensus projected AT&T's 1Q16 total revenues to grow 26.6% year-over-year[7] (i.e., to $41.241 billion), and the Top 10 analysts were projecting AT&T's total revenues to grow 26.0%; much higher than AT&T's projected growth of 21.6% (i.e., to $39.612 billion). ¶¶ 370-71. The Controller's report also showed that analysts projected AT&T's 1Q16 wireless equipment revenues to *grow* by 4.5%, compared to AT&T's projected *decline* in equipment revenues of 25.3%. ¶ 371.

On March 9, 2016, Stephens spoke at a Deutsche Bank investor conference. ¶ 373. At the conference, Stephens stated, among other things:

> I think you saw in the fourth quarter, it was a slowdown in the handset upgrade cycle or the total sales. I wouldn't be surprised to see that continue and we will continue to see some foreign

---

[6]    Stephens previously emailed Black on February 27, 2016, requesting "consensus estimates for the first quarter" including for revenue. ¶ 352. Black responded on February 28, 2016, with a chart showing analysts projected growth in AT&T's total consolidated revenue and wireless equipment revenue of 26% and 4.5% respectively. ¶¶ 353-54.

[7]    Percentage growth/decline metrics are expressed on a year-over-year basis unless otherwise noted.

> exchange issues. . . . All of that being said, those are impacts
> possible on revenues but very little impact at all on profitability
> because those are all hedged one way or another with the handset
> expenses or with expenses in foreign countries that are
> denominated in those same foreign currencies. [J. Ex. 55 at 4.]

In response to a later question about handset cycles, Stephens said: "One, I can only talk about up through the fourth quarter. . . . What we are seeing on an overall basis though is on average customers holding their phones longer" before discussing customers "bringing their own device" or reusing their old devices. ¶ 376(b). Stephens did not reveal AT&T's actual or projected consolidated revenue, equipment revenue, or upgrade rate for 1Q16, that its upgrade rate would be a record low, or that analysts' estimates were above AT&T's projections. ¶¶ 377-78.

## V.    Defendants Selectively Disclose Material Nonpublic Information in March and April 2016

On March 4, 2016, the day after receiving Stephens's March 3, 2016 email concerning a potential Form 8-K regarding declining equipment sales and revenue among other things, Viola met with Womack and Black to discuss "consensus." ¶¶ 360, 365. Following the meeting, Viola invited Womack and Black to a "Weekly Consensus Discussion," at which they were sometimes joined by Evans. ¶ 365. On March 7, 2016, the IR Department learned that only 3.1% of AT&T's postpaid subscriber base had upgraded their phones through February, based on intra-quarter results received from AT&T's Controller. ¶ 369.

On March 9, 2016—the same day as Stephens spoke at the Deutsche Bank conference— Womack emailed Viola regarding the "Upgrade Rate impact on Equipment Revenue," noting that the combined impact of equipment installment plans ("EIP") on consumer behavior and the lack of an iconic phone launch "have the potential to drive historically-low upgrade rates in the first half of this year," which, in turn, could potentially cause AT&T's equipment revenues to decline by as much as $1.5 billion year-over-year for the first quarter of 2016. ¶ 372. Notably, as

of March 9, 2016, *no analyst* projected a 5% upgrade rate. ¶ 384. The same day, Womack spoke to JP Morgan analysts Phil Cusick and Richard Choe, as well as UBS analyst John Hodulik.

- ***JP Morgan***. Cusick and Choe each took notes of what **Womack** told them on the March 9 call. ¶ 479. Both notes reflect that Womack told them AT&T's 1Q16 upgrade rate would be 5% (*e.g.*, Cusick: "Historically low u/g [upgrade rate] next couple of quarters. <5%!!"), ¶ 480, and Cusick immediately emailed certain traders: "AT&T telling us that handset upgrades this quarter will be historic lows. <5% vs. 6.5% a year ago." ¶ 481-82. Both analysts' notes reflect that Womack told them equipment revenue would be down by more than "15%." ¶ 484. Their notes also both show that Womack told them that total consolidated revenue would be "closer to $40b from $40.7" (Choe: "$40 vs. $40.7). ¶ 485. Cusick's and Choe's notes reflect that Womack provided other commentary on their estimates across other metrics, all of which were nonpublic.[8] ¶¶ 486-89. JP Morgan ultimately updated its 1Q16 estimates in a research report dated March 22, 2016, matching the metrics Womack provided them. ¶¶ 492-93.

- ***UBS—Call I***. **Womack** spoke to UBS analyst Hodulik on March 9, 2016. ¶ 503. Following the call, Hodulik emailed other UBS analysts: "AT&T (which sells the most iPhones in the US) is saying it will prob see record low upgrade rates for the next 3 qtrs. It's due to the move to installment phone sales."[9] ¶ 504. Womack spoke to UBS again on March 16, 2016. ¶ 506.

---

[8]     Cusick testified that it was typical at the time for Womack to comment on whether consensus estimates were accurate or not based on Womack's understanding of what he understood AT&T expected to report. ¶ 491.

[9]     The "record low" language (¶ 504) and Cusick's "historic low" note (¶¶ 480-81) mirror the "historically-low" language in Womack's email to Viola of the same day. ¶ 372.

**A. During March 10-22, 2016, Womack, Evans, and Black Forecast 1Q16 Upgrade Rate and Equipment Revenue and Communicate That Information to Analysts**

On March 10, 2016, Evans emailed Womack that the 1Q16 upgrade rate "could be as low as having a 4.X% look but more in the mid to high 4%'s." ¶ 389. Womack emailed Viola and Black that "Kent has confirmed the forecasted upgrade rate for the quarter is in the 4.5% range." ¶ 391. Womack also estimated that upgrade rate would "reduce equipment revenue by ~$1B[.]" *Id.* Evans responded: "I am guessing the rate will be closer to 5% but [Womack's] math works better." *Id.*

On March 14, 2016, Womack emailed Viola, Evans, and Black with the subject "Equip Revenue" including an analysis projecting equipment revenue outcomes based upon a range of possible upgrade rates, and noted that "Kent [Evans] believes that the rate most likely will fall in the 5-5.25% range which drives a revenue decline of ~625 YoY." ¶ 394. The chart Womack circulated projected that a 5% upgrade rate would lead to a -19.4% growth rate in equipment revenue. ¶ 395. The same day, Evans spoke to analysts from R.W. Baird ("Baird").[10] ¶ 517.

The next day, March 15, 2016, Womack followed up with Viola regarding his and Evans' analysis, writing that "*the key takeaway is its looking like a ~20% decline YoY for equipment revenue.*" ¶ 398 (emphasis added). Viola replied "based on what Kent says probably a high-teen handle," meaning that equipment revenue declines would probably be in the high-teen range. Viola pointed out to Womack equipment revenue declines within these ranges would be a "huge"

---

[10]     Following AT&T's January 27, 2016 earnings call, Baird estimated AT&T's revenue for 1Q16 would be $41.111 billion. ¶ 516. After speaking to Evans, Baird revised its estimate for AT&T's revenue to $40.5 billion, ¶ 521 (the $600 million drop approximately matches Womack's projected decline that same day), describing the change: "Driven by fewer handset upgrades, we are lowering our wireless equipment revenue forecast, resulting in Q1 consolidated revenue dropping from $41.1 billion to $40.5 billion." ¶ 523.

decline "given some of the estimates," flagging specifically UBS analyst Batya Levi's estimate of an 8% increase in equipment revenues. *Id.*

During the period March 16-22, when the Individual Defendants forecasted based on internal information available to them that the upgrade rate would be 5%-5.25% and that equipment revenue accordingly would decline by as much as high-teens to 20%, *see* ¶ 394-95, the Individual Defendants held private calls with the following analysts:

- ***UBS-Call II***. On March 16, 2016, **Womack** spoke with Levi. ¶ 506. Levi's practice was to take notes of her calls with AT&T directly into the UBS model, ¶ 508, and following her call with Womack, Levi inserted "down 20%" as a note into the cell reflecting UBS's estimate for equipment revenue for 1Q16. ¶ 509. On March 18, 2016, UBS published revised estimates for AT&T, lowering its revenue projections, equipment revenue projections (from +8.1% to -18.2%), and its upgrade rate (from 6.2% to 5%). ¶ 511. The accompanying UBS report detailed at length the implications that lower upgrade rates had on wireless companies' performance. J. Ex. 64.

- ***Deutsche Bank***. **Womack** spoke to Deutsche Bank analysts Matthew Niknam and Whitney Fletcher on March 17, 2016. ¶ 527. As recently as February 23, 2016, Deutsche Bank forecasted an upgrade rate of 6.5%, equipment revenues of $3.740 billion (a 10.8% increase), and total revenues of $41.035 billion. ¶ 526. Fletcher sent Niknam notes of the call, including "High teens-20% yoy decline in equipment revenue[;]"matching precisely Womack's internal estimate of March 15, ¶¶ 530-32. Deutsche Bank updated its estimates on March 21, 2016, lowering equipment revenue estimates in line with the figure in Fletcher's notes (and AT&T's internal forecast) and

also adjusted its upgrade rate estimate from 6.5% to 5.2%, and its total revenue estimate from $41.035 billion to $39.969 billion. ¶¶ 533-35.

- *Wells Fargo—Call I*. On March 17, 2016, **Womack** participated in a call with Fritzsche. ¶ 542. Fritzsche then emailed her junior analyst Caleb Stein and another analyst to schedule a discussion about handset revenues. ¶ 543. Five days later, Fritzsche directed Stein to contact Black "re: equipment revenue thoughts[.]" ¶ 545.

- *Oppenheimer*. On March 21, 2016, Oppenheimer analyst Tim Horan emailed a copy of his model to Womack and Evans stating in part: "Let me know if you have any thoughts on the model." ¶ 570. Evans forwarded Horan's email to Black, copying Womack, and Black responded, "I have worked through their model and believe it would be a good idea to schedule time to discuss consensus. Let me know what you would like to do." ¶ 571. That day, **Womack** called Horan. ¶ 572. On March 22, 2016, Oppenheimer reduced its 1Q16 revenue estimates from $41.376 billion to $40.510 billion, revised its equipment revenue estimates from a 5% increase to a 15% decrease, and revised its upgrade rate estimate from 7% to 6%. ¶ 573.

- *Wells Fargo—Call II*. On March 22, 2016, **Black** spoke to Wells Fargo analyst Stein. ¶ 546. Stein took notes of the call and emailed them to Fritzsche. ¶ 549. Black informed Stein, among other things, that consensus equipment revenues were -18% to -21% year over year. ¶ 552. The Top Ten average for equipment revenue was actually -1.6% on that day. ¶ 405. Black also told Stein that the consensus upgrade rate was 5% in 1Q16, ¶ 553, while Black's Top Ten average was actually 6.7% on that date. ¶ 405. Black further informed Stein that consensus revenue projected 23% growth. ¶ 554. But First Call consensus revenue was actually at 26.3% and the Top Ten was at 25.3%. ¶ 405. In

sum, the numbers Black portrayed to Stein as "consensus" numbers actually were AT&T's internal projections between March 10 and March 22, 2016, *see*, *e.g.*, ¶¶ 394-95, not the actual numbers Black tracked. Wells Fargo updates its estimates on March 28, 2016, reducing its total revenue, equipment revenue, and upgrade rate estimates to levels corresponding to the numbers Black provided. ¶ 559-61.

- ***RBC***. **Black** also spoke to RBC analyst Brian Hyun on March 22, 2016. ¶ 575. Hyun took notes of the call and recalled what Black told him. ¶ 577. On the call, Black told Hyun that the consensus for AT&T's 1Q16 upgrade rate was 5%, that consensus estimates of AT&T's equipment revenue forecasted a 15%-18% decline, and that consensus revenue for AT&T was $39.905 billion—a 22.5% increase. ¶¶ 578-85. As with the Wells Fargo call, none of those false "consensus" figures matched First Call or Black's Top Ten average. ¶¶ 589-92. Instead, they aligned with AT&T's internal projections between March 10 and March 22. *See*, *e.g.*, ¶¶ 394-95.

### B.  On March 22, 2016, the IR Team Further Refines Its Estimates

The same day as Black's calls with Wells Fargo and RBC, Stephens requested from the IR Department "a comparison of AT&T's 1q outlook to current analyst estimates" for AT&T's Board. ¶ 404. That evening, Black forwarded to Womack the comparison that was sent to Stephens. ¶ 405. It showed that, through February, AT&T's total revenue and wireless equipment revenue growth were 23.8% and -16.4%, and its upgrade rate was 3.1%; based on those (nonpublic) quarter-to-date results, AT&T was forecasting its full-quarter total revenue and wireless equipment revenue growth to be 23.7% and -11.5%, and its postpaid upgrade rate to be 4.7%. ¶ 409. By contrast, consensus analyst forecasts were anticipating total and wireless equipment revenue growth of 25.3% and -1.6%, and an upgrade rate of 6.7%. *Id.*

### C. During March 21-30, 2016, the Defendants Continued "Working the Analysts" to Change the Consensus

On March 23, 2016, Evans emailed Viola, Womack, and Black: "When we were previously discussing the upgrade rate, I had been talking about a low 5% range. Volumes continued to be very low in March and the new estimate being used in the 2+1 is 4.7%. [Womack] had been initially using something closer to this number to explain revenue softness and I moved him up but should not have." ¶ 410. That same day, Stephens stopped by the IR Department to speak to Viola, who was on vacation. ¶ 411. Another IR employee, Jeston Dumas, reported to Viola: "Just talked to [Stephens]. He wants to make sure **we are working the analysts that still have equipment revenue too high**. I told him you just told me that was your top priority over the next few weeks." ¶ 413 (emphasis added).

On March 24, 2016, Viola responded to an email from Black with consensus and Top Ten EPS information showing that Top Ten average EPS had increased by $0.01: "EPS going in the wrong direction." ¶ 418. In reply, Womack explained that "Phil [Cusick of JP Morgan] adjusted his upgrade rate which brought up his EPS." *Id.*

The same day, March 24, 2016, Viola, Womack, Black, and Evans received an email attaching a presentation ("2+1 Deck") that included AT&T's actual results through February 2016 plus March projections. ¶ 419. The 2+1 Deck relayed "consensus" information "Based on 3/21/16 Report" including that the "consensus" upgrade rate was 6.4% compared with AT&T's projected 4.7% upgrade rate. ¶ 420. The 2+1 Deck also noted that AT&T's projected wireless equipment revenue for 1Q16 was $2.987 billion, compared with a cost of equipment of $3.798 billion, ¶ 421, and that same day, Womack confirmed to Viola that the Individual Defendants would "circle the wagons" and continue working on reaching out to analysts. ¶ 417.

Black continued his outreach to the analysts he was assigned:

- **_Drexel Hamilton_**. **Black** spoke to Drexel Hamilton analyst Barry Sine on March 24, 2016. ¶ 598. On the call, Black told Sine that the "consensus" upgrade rate was "around 5%" and that "consensus equipment revenue [was] down 15% to 20%[.]" ¶ 599. Neither fake "consensus" figure matched Black's most recent Top Ten average chart, which had the average upgrade rate at 6.7% and the average equipment revenue estimate at -1.6%. ¶¶ 394-95. Sine understood Black's information as a signal that his revenue estimates for 1Q16 were too high. ¶ 601. Drexel Hamilton published its revised estimates on March 31, 2016, lowering its total revenue estimate to $40.246 billion, and reporting: "we see a 5% handset upgrade rate in the first quarter[.]" ¶¶ 602-03.

### D.  In March 30-31, 2016, As the Quarter Ends, Defendants Continue Communicating with Analysts and Working on Changing the Consensus

On March 30, 2016, RBC published new estimates and lowered its total revenue projection. ¶ 593-95. Viola emailed Black and Womack, in response to an email chain discussing those revised estimates: "Michael, nice job with Jonathan [Atkin], especially getting his revenue number down to $40.3B." ¶ 597. That same day,[11] Black emailed Viola: "We should also see Evercore publish their preview note shortly based on a deep dive discussion I had with them this morning. In addition, we should see Drexel Hamilton update as well as I had the opportunity to speak with them just prior to Easter." ¶ 424. Viola responded in part: "Awesome work." _Id._

Viola also emailed Black on March 30, 2016, to ask for Black's "schedule with the latest status of where everyone is with respect to consolidated revenue and EPS[.]" ¶ 425. Black sent

---

[11]     Black spoke to Evercore analyst Justin Ages on March 30, 2016. ¶ 634. Prior to speaking with Black, Evercore estimated total consolidated revenue of $42.245 billion, wireless equipment revenue of $3.988 billion for 1Q16, and a 6.6% upgrade rate. ¶¶ 630-33. On April 11, 2016, following the call with Black, Evercore published revised estimates for AT&T, estimating that AT&T's equipment revenue of $2.824 billion and a 5% upgrade rate, as well as lowering its total revenue estimate nearly a billion dollars. ¶¶ 635-41.

Viola and Womack multiple charts with the information he requested, including one specifying which analysts had updated their estimates and which of the IR department employees were the assigned contact for those analysts. ¶ 428. Viola forwarded the chart to Evans. *Id*.

On March 31, 2016, Viola arranged to meet with Womack and Black at 1:00 PM to "Discuss Consol Rev and EPS Consensus[.]" ¶ 432. Immediately prior to the meeting, Black sent Viola and Womack his "Latest view of revenue – updated through this morning." ¶ 433. Immediately following the meeting, Black spoke to analysts from Citi:

- *Citi*. Citi analyst Adam Ilkowitz updated the AT&T model on March 11, 2016, and incorporated all public information available as of that date. ¶¶ 606-10. The March 11 model estimated 1Q16 total revenue would increase 26%, wireless equipment revenue would increase 12%, and a 6.8% upgrade rate. *Id.* **Black** spoke to Ilkowitz on March 31, 2016. ¶ 611. Ilkowitz took notes of the call. ¶ 613. Black told Ilkowitz that the consensus for total revenue was 23% growth, equipment revenue was a 10%-15% decrease, and a 5% upgrade rate. ¶¶ 616-18. Those false "consensus" figures did not match Black's most recent tracking sheet, which reflected 25.7% growth in consensus revenue, and the Top Ten average estimates of 24.8% total revenue growth, wireless equipment revenue declining by 6.4%, and a 6.1% upgrade rate. ¶¶ 619. The figures Black provided instead aligned with AT&T's nonpublic internal forecasts showing a 11.5% equipment revenue decline and a 4.7% upgrade rate. ¶ 620. Citi updated its estimates on April 7, 2016, lowering consolidated revenue to $40.566 billion, equipment revenue to $3.086 billion, and its upgrade rate to 5%. ¶¶ 622-24.

### E.  In April 1-7, 2016, After the Fiscal Quarter Ended, Defendants Continued To Work to Change Consensus Revenue

IR's focus on and sensitivity concerning consensus revenue estimates continued into April 2016. ¶ 438. On April 1, 2016, Michael Viola e-mailed Martin Sheehan (another IR employee) regarding Moffett Nathanson's estimates for AT&T for the first quarter of 2016. ¶ 439. Viola instructed Sheehan that, when he spoke to Moffett, he was to remind him that his 1Q16 revenue numbers "are way off due to his assumptions re wireless equipment revenue" and that "it would be great if he reduced his number closer to Cusick [JP Morgan], Hodulik [UBS], etc to $40B." *Id.*

The Defendants continued communicating with analysts to change their estimates:

- ***Nomura—Call I***. Nomura published updated 1Q16 estimates for AT&T on March 17, 2016—after Stephens's Deutsche Bank conference remarks and a call with Black on March 16, 2016. ¶¶ 649-51. Nomura's March 17 estimates lowered its equipment revenue estimate by over $300 million, resulting in a corresponding reduction to its total revenue estimate. ¶ 652. On April 5, 2016, **Black** spoke with Nomura analyst Greg McNiff by phone. ¶ 655. McNiff took notes of the call, recording that Black told him that the consensus upgrade rate was 5% and consensus equipment revenues projected an approximate decline of 12% year over year. ¶¶ 656-658. The "consensus" numbers did not match Black's most recent Top Ten average upgrade rate of 6.1% and an equipment revenue decline of 6.4%. ¶ 659. McNiff emailed fellow Nomura analyst Kvaal summarizing his call with Black: "Spoke with Michael Black re AT&T's (subset) consensus for 1Q16." ¶ 663. McNiff reported in his email that, based on information Black relayed, Nomura's quarterly revenue estimate was over $1 billion higher than the average of Black's "subset of analysts." *Id.* McNiff understood that by

highlighting only a "subset" of analyst numbers, Black was suggesting to him where Nomura's estimates should be. ¶ 664.

- ***Pacific Crest—Call I***. Pacific Crest issued a note containing 1Q16 estimates for AT&T on April 7, 2016, including a total revenue estimate of $41.691 billion. ¶¶ 722-23. The next day, **Evans** called Michael Bowen, a Pacific Crest analyst. ¶ 724. During the call, Evans told Bowen that AT&T's "upgrade rate would be at a record low," as confirmed by Bowen's email to his junior analyst immediately after his call with Evans. ¶ 728.

- ***Scotiabank***.[12] **Black** called Scotiabank analyst Matthew Lee on April 8, 2016. ¶ 746. Lee took notes of the call. ¶ 747. Based on Lee's notes, Black communicated to Lee that, for 1Q16, with respect to the handset upgrade rate, AT&T customers were "[n]ot upgrading as fast" and "devices being used for longer[.]" ¶ 748. Black also communicated to Lee that equipment revenue for 1Q16 for AT&T's consumer and business wireless segments had declined by approximately 10%. ¶ 749. Black also communicated to Lee that AT&T's total revenue for that quarter was in the range between $40.1 billion and $40.5 billion. ¶ 750.

### F. The IR Team Obtains and Uses 1Q16 Final Results (April 8-18, 2016) To Continue Changing Consensus

On April 8, 2016, Viola and Black received from AT&T's finance team a Top Ten tracking sheet comparing consensus estimates from that sheet to preliminary calculations of AT&T's actual 1Q16 results. ¶ 448. Black forwarded the email and attachment to Womack two minutes later. ¶ 449. According to the April 8, 2016 chart, the Top Ten average estimate for total

---

[12]     Due to the time necessary to complete the letter rogatory process in Canada (DE 49), the parties' deposition of Lee is scheduled for May 5, 2022. The parties have agreed that they will update the facts concerning Scotiabank in the parties' response briefing.

consolidated revenue was $40.54 billion, wireless equipment revenue growth was -11.3%, and a wireless equipment upgrade rate of 5.8%. ¶ 450. The First Call consensus for total revenue projected $40.75 billion. The chart also included AT&T's preliminary actual results for consolidated revenue ($40.54 billion) equipment revenue (-6.5%), and upgrade rate (5.0%). *Id.*

Armed with AT&T's actual 1Q16 results, the Individual Defendants continued communicating with analysts to further change the consensus revenue for the fiscal quarter that had just ended but which the results had not yet been made public:

- ***Bank of America***. On April 11, 2016,[13] **Black** spoke to at least one Bank of America analyst. ¶ 773. On April 12, 2016, **Womack** spoke to an analyst from Bank of America. ¶ 774. Bank of America revised its estimates on April 18, 2016, and lowered its revenue estimate from $41.798 billion to $40.41 billion, on quarterly wireless equipment revenues of $2.882 billion (a decrease of 14.6% year over year) and a quarterly upgrade rate of 5.1%. ¶ 775.

- ***D.A. Davidson.*** On April 11, **Womack** spoke with James Moorman at D.A. Davidson. ¶ 781. The firm had updated its AT&T estimates as recently as March 7, 2016. ¶ 780. Although D.A. Davidson had already reduced quarterly estimates for AT&T's total and wireless equipment revenues for 1Q16, D.A. Davidson adjusted these metrics again on April 13, 2016, two days after Womack's conversation with Moorman, to $40.044 billion total revenue on anticipated quarterly wireless equipment revenues of $2.562 (a decline of 24% year-over-year), and an upgrade rate of 5.0%. ¶¶ 782-83.

---

[13]    That same day, after Evercore adjusted their 1Q16 estimates, and Viola emailed Black: "Where are we with [Evercore] now in. He dropped about $1B?" J. Ex. 193. Black responded, in part: "we are at $40.7 for 1Q16." *Id.* Viola replied: "Still at $40.7 even with $1B less? I thought that was where we were Friday?" *Id.*

- **Buckingham**. **Black** spoke with Buckingham analyst James Ratcliffe on April 12, 2016, after emailing Ratcliffe on April 8 to set up the call. ¶¶ 759-61. On the call, Black told Ratcliffe that "they are out of range of consensus." Black reiterated to Ratcliffe's junior analyst the same information on an April 20, 2016 call. ¶¶ 762, 764. On April 25, 2016, Buckingham published revised estimates for 1Q16, changing its Wireless segment revenue to $17.660 billion (a 2.9% decrease year-over-year) and total operating revenue estimate to $40.141 billion (a 23.2% year-over-year increase. ¶ 770.

- **Pacific Crest—Call II**. On April 15, 2016, **Evans** had a second call with Bowen and his junior analyst. ¶ 730. According to Bowen, Evans told him that "upgrade rates were going to be at a record low, it was going to negatively impact revenue, that consensus was too high, that they had been talking to different analysts" and that the upgrade rate would be "somewhere around five percent. . . ." ¶¶ 731-36. Bowen's recollections are corroborated by two separate sets of contemporaneous notes. ¶ 731. On April 19, 2016, Pacific Crest lowered its total revenue estimate to $40.5673 billion from its April 7, 2016 estimate of $41.691 billion, a more than $1 billion reduction resulting principally from its revised upgrade rate estimate of 4.8%. ¶¶ 738-41.

- **Nomura—Call II.** On April 15, 2016, **Womack** spoke to Nomura analysts Kvaal and McNiff. ¶ 668. Both analysts took notes. ¶ 669-71. Their notes both reference upgrade rates at 5% levels: Kvaal's notes read: "Record low upgrade rates – low 5% range; McNiff's notes read: "Upgrade rate: 5% levels[.]" ¶ 672. Kvaal then emailed two clients: "I spoke to AT&T this morning. This is a very low quarter for handset sales. They [*sic*] upgrade rate, which has been at 8-9% historically, is at an all-time low this quarter at 5%." ¶ 673. Nomura updated its AT&T 1Q16 estimates on April 19, 2016,

lowering its total revenue estimate to $40.535 billion (matching AT&T's actual results known to Womack at the time); equipment revenue to $2.868 billion; and writing: "[w]e have heightened confidence in our metrics, including … a record low upgrade rate of ~5%."[14] ¶¶ 676-79.

### G.   In April 15-25, the Defendants Achieve Their Goal of Lowering Consensus by Getting Two More Analysts to Change Their Estimates

On April 18, 2016, in an email thread among Viola, Womack, and Dumas (another AT&T IR employee), Dumas wrote to Viola and Womack: "Should we be concerned about consensus EPS creeping up? . . . 2. Better wireless margins (fewer upgrades) over next few quarters . . . Wonder if there are any headwinds we should talk about to keep consensus down[.]" ¶ 460. Viola responded: "Agree we need to create a script as to what we should say." *Id.*

On April 19, 2016, Nomura and Cowen & Co., another analyst firm, published revised estimates. ¶ 461. Viola emailed Black and Womack: ". . . Kvaal came thru. I have us at 40.59 (right?). We really need Breen and Bowen to adjust. Can we somehow get them excluded [from consensus] because they haven't refreshed their forecasts?" *Id.* Womack responded, in part: "Bowen is updating his numbers early this week from what I understand." *Id.* When Scotiabank also updated its estimates that day, Black emailed Viola that it was "a slight help." ¶ 462.

Following this email exchange in which AT&T's IR Department fretted that, if two more analysts did not change their estimates, AT&T would miss the consensus revenue, these last two analysts changed their estimates based on calls from AT&T: Pacific Crest (¶¶ 738-41) and William Blair. William Blair's revision came only after the following outreach by Womack.

- ***William Blair***. William Blair analysts James Breen and Womack had already spoken

---

[14]      Kvaal testified the "heightened confidence" stemmed from his call with Womack. ¶ 679.

on April 7, 2016. ¶ 710. On April 20, 2016, after receiving Viola's email that "we really need Breen . . . to adjust[,]" ¶ 712, Womack emailed Breen: "Hey Jim – did you publish your preview yet? I may have missed it." ¶ 713. Breen replied, "Not yet, end of week." *Id.* On April 21, 2016, Breen responded to Womack again: "Hey, we looked through everything and not sure we need a preview as our numbers are close to consensus, let me know if you want to discuss." ¶ 714. **Womack** called Breen six minutes later. ¶ 716. On April 24, 2016—three days after Breen received this call from Womack and two days before AT&T would report its quarterly results—William Blair published revised estimates for AT&T, reducing its total revenue estimates from $41.55 to $40.51 billion, on lower equipment revenues. ¶ 718. Breen testified that he understood Womack's April 21 call as a signal to him that his revenue forecasts for AT&T's first quarter 2016 were too high and needed to be reduced. ¶ 719.

## VI.   AT&T Beats Consensus Revenue Estimates

AT&T never made a prompt or simultaneous public disclosure of the information it selectively conveyed on the private calls with analysts. ¶ 465. On April 25, 2016, the day before AT&T released its 1Q16 results, following communications with Defendants in April, ¶¶ 759-62, 64, Buckingham published revised estimates for AT&T's 1Q16 results, lowering its total revenue estimate to $40.141 billion. ¶ 770. This revision—along with William Blair's April 24, 2016 revision—pushed consensus to $40.5 billion. ¶¶ 788-92.

Stephens emailed Viola on April 25, 2016, in response to the recent estimate changes stating: "May just beat revenue consensus." ¶ 785. Viola responded: "I think we will :-)" *Id.* On April 25, 2016, after seeing the estimate reductions by William Blair and Buckingham, Stephens reported to AT&T's CEO, Stephenson: "These two updates may do it for us – we may beat revenue consensus – not by much but a beat nonetheless." ¶ 787. Stephenson replied, "Good." *Id.*

Of 25 quarters since 2006 in which analysts' estimates were initially more than 0.5% higher than AT&T's ultimate results, 1Q16 was the *only quarter* in which estimates were eventually revised to a figure lower than AT&T's revenue allowing for a revenue beat. ¶ 794.



## ARGUMENT

### I.  The Summary Judgment Standard Supports Judgment in the SEC's Favor

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant has made such a showing, the non-moving party must go beyond the pleadings and designate specific facts from the record showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). No genuine issue of material fact exists unless a reasonable finder of fact could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A material fact is one "that might affect the outcome of the suit." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). In deciding whether a genuine issue exists, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. *Horror*

*Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021). The non-moving party may not "rest upon mere . . . denials—rather he must present sufficient probative evidence to establish a genuine issue of material fact." *Id.* at 240. Such evidence must amount to more than "[t]he mere existence of a scintilla of evidence supporting the non-movant's case" and "conjecture[] and speculation . . . are insufficient to create genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (internal quotes and citations omitted).

II.   **AT&T Violated Regulation FD and Section 13(a) of the Exchange Act by Selectively Disclosing Material Nonpublic Information Without a Simultaneous Public Disclosure**

A.  **The Law Concerning Regulation FD**

Regulation FD requires that, when an issuer or person acting on its behalf, discloses any material nonpublic information regarding the issuer or its securities to any broker, dealer, or person associated with a broker or dealer, investment adviser, investment company,[15] or holder of the issuer's securities, the issuer make a public disclosure either simultaneously in cases of intentional disclosures or promptly in cases of inadvertent disclosures. 17 C.F.R. § 243.100. A public company's failure to make a required public disclosure pursuant to Regulation FD constitutes violations of both Regulation FD and Section 13(a) of the Exchange Act. *See* Final Rule: Selective Disclosure and Insider Trading, Exchange Act Rel. No. 43154, 65 Fed. Reg. 51,716, at 51,726 (Aug. 15, 2000) ("Adopting Release"). As such, it is the issuer—here, AT&T—that violates Regulation FD and Section 13(a) of the Exchange Act; individuals aid and abet such violations. Adopting Release, *id.* ("if an issuer failed to comply with Regulation FD, it

---

[15]   The analysts at issue were industry professionals associated with brokers covered by Regulation FD. ¶ 472.

would be subject to an SEC enforcement action . . . we could also bring an enforcement action against an individual at the issuer responsible for the violation . . . as an aider and abetter of the violation").[16]

The Adopting Release is clear that selective communications that the company's results will be "higher than, lower than, or even the same as what analysts have been forecasting . . . will have likely violated Regulation FD." *Id.* at 51,721. The information cannot be communicated "through indirect 'guidance,' the meaning of which is apparent though implied." *Id.* at 51,721. Nor can an issuer "render material information immaterial simply by breaking it into ostensibly non-material pieces." *Id.* at 51,721.

### B.  There is no Genuine Dispute that Defendants Made Selective Disclosures

Even drawing all reasonable inferences in Defendants' favor, the indisputable facts demonstrate that Defendants selectively disclosed information in the form of specific metrics or directional signaling concerning AT&T's projected and actual total revenue, equipment revenue, upgrade rate, and EPS as reflected in analyst notes and testimony, and in the case of Black, by misleading analysts as to whether such figures were consensus in the following manners.

*Specific Metrics*. Nearly a dozen analysts from nine separate firms took contemporaneous notes or wrote summaries of their calls with Womack, Evans and Black. *See* ¶ 813; App. D to Pl. 56.1 Statement (chart of notes). Those notes and the analysts' testimony concerning them demonstrate that Defendants conveyed specific metrics and information to the analysts, including qualitative information (*e.g.*, "record low" (UBS and Pacific Crest)) and quantitative information (*e.g.*, "Total revs closer to $40b from $40.7 out of eqpt" (J.P. Morgan)), as well as internal

---

[16]     Because showing a primary violation on the part of AT&T is an element of the aiding-and-abetting claims, and because AT&T, as a company, can only act through individuals, the following sections discuss "Defendants' violations of Regulation FD."

metrics that Black disguised as a "consensus." *Id.* There is remarkable consistency (a) between analysts who took notes of the same call; (b) among analysts across different calls (virtually all of whom recorded that AT&T's upgrade rates are "5%" or at a "record low"); and (c) between the specific metrics appearing in the notes and AT&T's own internal data as to those metrics, indicating that Defendants conveyed the information to the analysts. *E.g.*, ¶¶ 479 (Cusick); 599 (Sine); 614 (Ilkowitz); 731-37 (Bowen). Emails sent by analysts immediately following their phone calls confirm beyond doubt that the upgrade rate figures appearing in their notes came directly from their calls with AT&T,[17] as does the sworn testimony of both Pacific Crest analysts, each of whom independently remembered the call at issue and specifically recall Evans providing quantitative detail regarding AT&T's results. *E.g.*, ¶ 731-36. The consistency on these points compels only one reasonable inference: that the Defendants disclosed nonpublic information to the analysts, who recorded in their notes what Defendants told them.

 In contrast, Defendants cannot credibly deny what the contemporaneous notes show they did—Womack and Black admit they do not remember any calls with analysts, ¶ 473, and Evan's self-serving denials are contradicted by analyst notes and testimony.[18] Such denials cannot

---

[17] *See*, *e.g.* P. Ex. 11 (Cusick email) ("AT&T telling us that handset upgrades this quarter will be historic lows. <5% vs. 6.5% a year ago"); J. Ex. 296 (Kvaal email) ("I spoke to AT&T this morning … They [*sic*] upgrade rate . . . is at an all-time low this quarter at 5%.").

[18] *See* P. Ex. 63 (Nispel Inv. Tr. 114:17-117:23 ("Q. So Mr. Evans told you, and you recall this, that upgrade rates for AT&T's first quarter would be at a record low? A. I think that's fair . . . Q. Was this new news to you? A. The record low? Yes.")); P. Ex. 67 (Bowen Dep. Tr. 69:17-70:25 ("Q. . . .Do you have an independent recollection of the things said in this [April 15, 2016] call, apart from these notes? A. Well, of course. . . . I remember the conversation . . . . Q. . . . . what do you remember him saying about Mr. Stephens' comments as it mattered to you? A. That upgrade rates were going to be at a record low, it was going to negatively impact revenue, that consensus was too high, that they had been talking to different analysts, and that he had been wanting to get in touch with me")); *id.* at 74:19-75:21 ("Q. What do you recall? A. Exactly what's here [in my notes]. I recall Kent telling me that they were expecting upgrade rates to be

manufacture a genuine dispute in the face of the overwhelming and concrete contemporaneous record establishing what Defendants said. *See Horror Inc.*, 15 F.4th at 240 (party opposing summary judgment may not rest upon mere denials); *Niagara Mohawk*, 315 F.3d at 175 (conjecture and speculation are insufficient to create a genuine issue of fact). And even as to those calls for which notes do not exist, the evidence (a) from calls for which notes were kept; (b) of Defendants' intention to get analysts to lower their estimates, *e.g.*, ¶¶ 468-71, together with (c) analysts' estimate revisions following the calls to match AT&T's projections and actual results (*see* ¶¶ 810-12; Apps. A-C to Pl. 56.1 Statement (charts of adjustments)) leaves no reasonable basis for a factfinder to draw any inference that Individual Defendants acted any differently during calls for which there are no notes than those for which there are.

    *Directional Signaling*. Defendants insist that they merely directed analysts to portions of Stephens's conference remarks regarding the upgrade cycle and/or consensus estimates or AT&T's Top Ten averages.[19] *E.g.*, ¶¶ 468-71. But this version of events does not exculpate them. Defendants' direction of analysts to discrete lines from the CFO's lengthy conference transcript (among numerous conferences and other various disclosures) took place (a) well after the remarks; (b) near or after the close of the reporting period; and (c) when Defendants possessed internal and unreported results of AT&T's performance, *e.g.*, ¶¶ 371, 409, was designed to—and did—convey to analysts that their estimates of AT&T's upgrade rates,

---

really low for the fourth quarter. . . . Q. . . . Was that a consensus figure he was giving you? [objection] A. . . . No, that was what he told me that AT&T would likely experience in the … first quarter.").

[19]    There is no evidence that Black ever provided accurate consensus metrics or AT&T's own private Top Ten averages. None of the analyst notes match those figures in Black's tracking sheets, as opposed to AT&T's projections or actual results. As discussed below, even if Black had provided accurate figures, AT&T's Top Ten averages were material and nonpublic.

equipment revenues, and consolidated revenue were too high. *See* ¶¶ 601, 719 (Sine and Breen understood signal). Augmenting that signal with a privately curated subset of analyst averages provided a measure of precision as to how much analysts' estimates deviated from AT&T's projections or actual results, detail never provided (and, indeed expressly refused) the investing public more broadly.[20] *In re Motorola Inc. Rep. of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act of 1934*, Rel. No. 46898, 2002 WL 31650174, *1-2 (Nov. 25, 2002) (private, after-the-fact clarification or quantification of past public statements violates Regulation FD). The cumulative effect of these disclosures amounted to "indirect 'guidance' the meaning of which [was] apparent though implied." Adopting Release, 65 Fed. Reg. at 51,722. Analysts understood from these signals that they needed to revise their estimates lower, and significantly so based on each analyst's revised estimates.[21]

Accordingly, there is no genuine dispute of material fact concerning whether specific metrics or directional signaling was conveyed through the calls.

---

[20]     Stephens was asked specifically at the DB Conference to comment on current upgrade trends. He demurred. J. Ex. 55 at 4 ("I can only talk about up through the fourth quarter").

[21]     Defendants' interactions with Nomura illustrate this. Nomura revised its 1Q16 estimates for AT&T on March 17, 2016, eight days after Stephens's remarks. ¶ 651. Incorporating those remarks, the Nomura analysts reduced their equipment revenue estimates by over $300 million, ¶¶ 652-53, but to a level that was still well above what AT&T was expecting to report. After outreach from Black on April 5, 2016, ¶¶ 655-65, and then Womack on April 15, ¶¶ 668-74, Nomura revised its estimates yet again on April 19. ¶ 675. This time they forecast a far steeper equipment revenue decline ($800 million), and an upgrade rate of exactly 5%, and noted specifically in their published research report accompanying the revision that they now had "heightened confidence in our metrics." ¶¶ 676-79. Whatever Black and Womack said on these calls plainly conveyed information to these analysts that was distinct and more precise than what these analysts took from Stephens' public comments. And Nomura's analyst affirmatively acknowledged that it was this *new* information conveyed to him by Womack that caused his changed view of the company, confiding to a client: "[t]he genesis of the note was T [AT&T] making sure the outliers on equipment revenue were whipped back into line." ¶ 682.

### C.  There is No Genuine Dispute that the Selective Disclosures were Material

Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision or if the information would significantly alter the total mix of available information. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "Material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968). The fact that information is required to be disclosed under the Exchange Act is evidence that it is material.[22] *See U.S. v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (citing *SEC v. Levy*, 706 F. Supp. 61, 72 (D.D.C. 1989) (discussing Section 13D required disclosures as "strong evidence" of materiality)). Stock price movement can be a factor in establishing materiality. *Bilzerian*, 926 F.2d at 1298.

There is no numerical threshold that precludes a finding of materiality, *Basic*, 485 U.S. at 236 & n.14, and the Second Circuit cited the guidance set forth in Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) ("SAB 99"), as persuasive authority regarding the proper assessment of materiality. *See*, *e.g.*, *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011). "Materiality is determined in light of the circumstances existing at the time[.]" *Ganino v.*

---

[22]     Regulation S-K requires disclosure of "financial data" and the Instructions to Item 301 make clear that such financial data "highlight certain trends in the registrant's financial condition and results of operations" and that the company "may include additional items which they believe would enhance an understanding of and would highlight other trends in their financial condition and results of operations." 17 C.F.R. § 229.301 and Instructions to Item 301(1) and (2). Regulation S-K also required AT&T to "describe any other significant components of revenue or expenses that, in the registrants' judgment, should be described in order to understand the registrant's results of operations." 17 C.F.R. § 229.303(a)(3). Forms 10-K (Part II, Item 6) and 10-Q (Part I, Item 2) required AT&T to include information required by Items 301 and 303, respectively. AT&T included total revenue and equipment revenue in its financial statements.

*Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000). Summary judgment on materiality is appropriate when the matters "are 'so obviously important to the investor, that reasonable minds cannot differ on the question of materiality.'" *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002) (citing *SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978)). Under these standards, the metrics that Defendants selectively disclosed were unquestionably material to analysts and investors.

    *Total Revenue*. Courts have observed that "revenues and cash flow . . . are widely, if not universally, regarded as the best indicators of a company's financial health." *SEC v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007). AT&T included total revenue information its Form 10-K and 10-Q financial statements and commented on revenue trends in those filings (¶ 87). *See In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998) ("financial reports are relevant to investment decisions"). It touted its revenue growth at the outset of its investor presentations and earnings releases (*e.g.*, J. Exs. 25 at 3; 31 at 5). *See SEC v. DiMaria*, 207 F. Supp. 3d 343, 354 (S.D.N.Y. 2016) (noting that company highlighting data in the opening paragraphs of its earnings release was a factor to consider on materiality"). On March 11, 2016 (just as Defendants began their outreach to analysts), AT&T publicly described revenue as one of "the key short term financial metrics for the operation of our business" and an "important key metric[] to our stockholders," and on that basis, keyed its executive's incentive compensation off that metric.[23] ¶ 138. Its training documents, shared both within and outside of IR, repeatedly instructed employees that AT&T's revenues and sales were material to AT&T investors. *E.g.*, ¶¶ 181, 184, 192-93, 199, 217. Revenue was one of the metrics that consensus-tracking firms

---

[23]     This portion of AT&T's proxy statement was incorporated by reference into AT&T's 2015 Form 10-K, and, accordingly, certified by its CEO and CFO. J. Ex. 1 at 24 (Item 11 incorporating "Compensation Discussion and Analysis" from proxy), 130 (certifications).

tracked, and AT&T's revenue performance was the subject of numerous media reports. *E.g.*, ¶¶ 333, 342. Total revenue appeared in analyst models and published estimates, and analysts also reported on AT&T's total revenue performance. *See SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("a major factor in determining whether information was material is the importance attached to it by those who knew about it.").

*Equipment Revenue*. Like total revenue, AT&T reported equipment revenue in its financial statements on both a segment-level and consolidated basis (¶ 92), *see Kidder Peabody*, 10 F. Supp. 2d at 410, and addressed the metric prominently in its investor presentations and earnings calls (¶¶ 328-32). *See DiMaria*, 207 F. Supp. 3d at 354 (that a company highlighted data in the opening paragraphs of its earnings release was evidence tending to show its materiality). AT&T's move toward EIP pricing shifted its wireless revenue mix, tilting it more heavily toward equipment revenues, a trend AT&T emphasized to investors in its public filings. In its Form 10-K filed on February 18, 2016, AT&T devoted just a single paragraph to "2016 Revenue Trends."[24] ¶ 350. Within that paragraph, it disclosed that "[o]ur AT&T Next [EIP] program is expected to generate continued growth in equipment revenue, which has the corresponding impact of lowering service revenues." *Id.* Stephens specifically addressed equipment revenue in the 4Q15 earnings call, ¶¶ 328-32, and the Deutsche Bank conference, ¶ 376, a key indication that executives thought it important that analysts and investors understand equipment revenue trends.

Like total revenue, analysts modeled equipment revenues and highlighted equipment revenue trends in their reports to investors. One reason equipment revenue mattered to investors

---

[24]     Item 303 of Regulation S-K required AT&T to describe in its MD&A "any known trends . . . reasonably likely to have a ***material*** favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii) (emphasis added).

was because of implications it had on earnings (equipment revenue was unprofitable). ¶ 167.

AT&T and analysts also believed that equipment revenue revealed information about churn,

another important metric for AT&T. ¶¶ 174-75, 315, 513.

The magnitude of the anticipated revenue declines was also material. *First*, on average,

the analysts contacted by Defendants revised their total revenue estimates by nearly $1 billion.

*See* ¶ 812; App. C to Pl. 56.1 Statement (chart of revenue revisions). Drexel Hamilton reduced its

estimate by over $2 billion ($42.357 billion to $40.248 billion). *Id.* On average, analysts'

equipment revenue reductions drove more than 75% of the total revenue decrease. *See* ¶ 811;

App. B to Pl. 56.1 Statement (chart of equipment revenue revisions). *Second*, "[e]ven where a

misstatement or omission may be quantitatively small compared to a registrant's firm-wide

financial results, its significance to a particularly important [business] segment . . . tends to show

its materiality." *Litwin*, 634 F.3d at 720. Here, the equipment revenue metric disclosed pertained

entirely to AT&T's Mobility Segment—the most significant of all AT&T's operating segments.

*See* ¶ 5. In 1Q16, equipment revenue represented 17.6% of total wireless revenue (¶ 133). *See*

*Kidder Peabody*, 10 F. Supp. 2d at 411  (misstatement of subsidiary's profits "might have been

especially important to investors due to Kidder's visible role in GE's business."). *Third*, the

revenue information disclosed, regardless the precise amount, caused AT&T to meet revenue

consensus instead of miss (AT&T's reported total revenue of $40.535 billion (¶ 5) barely

exceeded consensus of $40.468 billion (¶ 789)). Financial statement impacts may be rendered

material where those impacts enable issuers to "meet analysts' consensus expectations for the

enterprise." SAB 99, 64 Fed. Reg. at 45,152; *see also Ganino*, 228 F.3d at 163 (citing this factor

from SAB 99); *SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011) (misrepresentations were

material because they enabled the company to meet analysts' expectations); *SEC v. Huang*, 684

36

F. Appx 167, 172-73 (3d Cir. 2017) (nonpublic information concerning whether a company's reported revenues will meet or miss consensus is material). Particularly on the heels of two consensus revenue misses, avoiding a third was plainly important to AT&T's management and investors. *E.g.*, ¶¶ 785-87.

*Upgrade Rates.* Upgrade rates were disclosed by AT&T in its investor presentations with each quarterly earnings release. ¶ 97. AT&T told investors in its Form 10-K in February 2016 that upgrade rates were critical to sustaining its wireless profitability, representing that "[s]ubscribers continue to upgrade their handsets to more advanced integrated devices, contributing to growth from wireless data services." ¶ 156. The same filing (a) described AT&T's shift to the EIP program as "allowing subscribers to more frequently upgrade handsets" and that the strategy was "intended to encourage existing customers to upgrade their current services . . . and minimize customer churn[,]" J. Ex. 1 at 13 (2016 Form 10-K), and (b) touted that reduced upgrade volumes contributed to over $1 billion in savings year-over-year in the form of reduced commission expenses. ¶ 165.

Analysts considered upgrade rates an important metric. *E.g.*, ¶ 145. For instance, when UBS updated its 1Q16 estimates, it published a report headlined, "What longer upgrade cycles mean for the carriers." In explaining to investors "Why Care[,]" UBS detailed that lower upgrade rates would (i) "driv[e] lower churn as handsets sales are the main trigger for customer activity;" J. Ex. 64 at 3 (ii) "put[] pressure on gross adds;" *id.*, and (iii) "put pressure on total wireless revenues as it will no longer provide a boost to declining service revenues." *Id.* at 5. Similarly, a report by Moffett Nathanson opined that whether the declining upgrade rate trends were sustainable or transitory was the "critical factor" in assessing the telecom sector's growth and profitability outlook. ¶ 315.

Numerous other analysts likewise published reports following their calls with Defendants revising their quarterly revenue estimates downward and citing upgrade rates and equipment revenues as the basis for their revised opinions. *See* ¶ 810; App. A to Pl. 56.1 Statement (chart of equipment revenue adjustments).These reports frequently highlighted upgrade rate trends in their headlines and discussed in detail why and how AT&T's upgrade rates and equipment revenues affected AT&T's business outlook and growth.[25] Analysts would not highlight this information to their investor clients if they believed that it was unimportant.

Underscoring the information's significance was that Defendants were revealing *AT&T's own projections and actual results* near or at the end of the quarter. Analyst testimony establishes that such information would be useful—and illegal—to obtain. ¶ 258 (Sine: "yes, it would be helpful. But, I mean, something like that would be illegal."). Defendants' engagement with analysts near or after quarter-end (when they would be presumed to know, and did know, what AT&T's results would be) provided detailed internal information about how AT&T actually performed. *E.g.*, ¶ 235. "Hard facts indicating that lower than projected sales actually are occurring clearly constitute material information vis-a-vis mere predictions by analysts of the likelihood of sales difficulties." *Backman v. Polaroid Corp.* 893 F.2d 1405, 1422 (1st Cir. 1990).

Likewise punctuating the materiality of this information is how Defendants treated it. AT&T considered issuing a Form 8-K to alert the market to continued declines in AT&T's upgrade rates and equipment revenues, ¶¶ 361-62, and management warned AT&T's Board of

---

[25]    *E.g.*, J. Ex. 76 (Citigroup 4/7/2016 Report) (revising its EPS estimate from $0.65 to $0.71 on lower handset expense due to lower upgrades); J. Ex. 98a at 8 (Bank of America 4/18/2016 Report) ("We also see opportunity for upside with regard to wireless profitability as upgrade rates slow"); J. Ex. 305 (JP Morgan 3/22/2016 Report) (headlined "Lower Customer Activity and Competition Results in Lower Upgrades and Lower Churn"); J. Ex. 101 (DA Davidson 4/13/2016 Report) (headlined "Lower Handset Upgrades Should Benefit EBITDA").

Directors about the slowdown in upgrades and equipment sales. ¶¶ 136, 166. The IR group's focus on avoiding a 1Q16 revenue miss began even before 4Q15 results were announced. ¶ 339. The IR team meticulously tracked revenue consensus throughout 1Q16 and developed a plan in March to methodically walk analyst revenue estimates down. *E.g.*, ¶ 365-67. In implementing that outreach plan, Individual Defendants emphasized declining upgrade rates and equipment revenues at least 20 separate calls. Defendants' intense attention to these metrics in 1Q16, coupled with their determination to avoid another revenue miss, is indisputable—if not dispositive—evidence of the materiality of the information at issue. *See DiMaria*, 207 F. Supp. 3d at 354  ("after all, if these two measures were so insignificant to the reasonable investor, why was [defendant] so focused on them?").

### i. No Reasonable Jury Could Find the Information Conveyed to be Immaterial

As discussed above, the indisputable facts themselves establish materiality—there are simply no reasonable inferences concerning this evidence to draw in Defendants' favor. This is underscored by Defendants' contentions concerning materiality, which are built upon a sleight-of-hand effort to redirect attention to a subset of equipment revenue relating to AT&T's Next program, misapprehensions of the relevant law, and inadmissible evidence.

*First*, Defendants contend that materiality cannot be established because (a) "not all revenue is material" because the size of the total revenue forecast changes were not larger than 5% of AT&T's total revenue and (b) they purportedly did not impact earnings. *E.g.*, DE 68 at 1 (AT&T pre-motion letter). The latter assertion is simply false for the reasons stated above— AT&T incurred earnings losses on equipment revenue. *See* ¶ 119-28, 164. Indeed, the evidence demonstrates that, not only were Defendants aware of the effect reduced upgrades had on AT&T's earnings, but they were so concerned about this impact on analysts' EPS estimates that

they strategized on messaging to counteract it. *E.g.*, ¶ 418 ("EPS going in the wrong direction");
¶ 460 ("Should we be concerned about EPS creeping up? . . . Wonder if there are any headwinds
we should talk about to keep consensus down"). Defendants' former contentions fail for other
reasons. AT&T's reliance on SAB 99's discussion of a 5% materiality threshold is misguided—
both SAB 99 and the Supreme Court and Second Circuit cases referencing it *reject* a strict
numerical threshold. *See*, *e.g.*, *Basic*, 485 U.S.at 236 & n.14; *Ganino*, 228 F.3d at 165. Further,
even accepting AT&T's calculation for purposes of this motion that the revenue at issue
constituted less than 1.5% of AT&T's total revenue, DE 68 at 1, AT&T only beat revenue
consensus in 1Q16 by $67 million, or 0.16% (¶¶ 5, 789). *See Ganino*, 228 F.3d at 163 (noting
SAB 99's inclusion as a potential material factor "whether the misstatement hides a failure to
meet analysts' consensus expectations for the enterprise").

 *Second*, as set forth in its pre-motion letter, AT&T contends that the disclosures are not
material because "*unsubsidized handset sales* for 1Q 2016 [did not have] a material economic
impact on AT&T's overall business, earnings, or future net cash flows[.]" *E.g.*, DE 64 at 1-2. But
this is beside the point and misleading. The disclosures at issue here related to *total* revenue,
*total* wireless equipment revenue, and *total* postpaid handset upgrade rates, which includes *all*
device sales, both subsidized and unsubsidized. Defendants' attempt to focus the materiality
analysis on only its Next EIP program is mere distraction and particularly egregious in light of
the fact that (i) it still sold subsidized phones in 1Q16, ¶¶ 82-83; (ii) its own internal accounting
documents uncontrovertibly establish that it incurred hundreds of millions of dollars in losses on
equipment sales (even before including related costs), which have an effect on earnings, ¶¶ 119-
120 (equipment revenue of $3.156 billion against cost of $3.991 billion results in $865 million
loss); and (iii) it incurred current-quarter losses even on its Next phone sales, ¶¶ 102-109.

Further, Defendants' suggestion that device sales are immaterial because they are "profit neutral" is not wrong merely as a matter of fact, but as a matter of law as well. Top-line revenue numbers are material to investors irrespective of their relative earnings impact: a proposition that AT&T itself, courts, and accounting literature recognize uniformly. J. Ex. 251 at 48 (describing "revenue," separate and apart from earnings per share, as an "important key metric[] to our stockholders"); *SEC v. Monterrosso*, 768 F. Supp. 2d 1244, 1264-65 (S.D. Fla. 2011) ("revenue is generally considered an important indicator of a company's financial health. . . . there is no requirement that a [revenue] misstatement improve a company's balance sheet in order to be material"); SAB 99, 64 Fed. Reg. at 41,154 ("To take an obvious example, if a registrant's revenues are a material financial statement item and if they are materially overstated, the financial statements taken as a whole will be materially misleading *even if the effect on earnings is completely offset* by an equivalent overstatement of expenses.") (emphasis added).

*Third*, Defendants argue that the lack of stock price movement and any ratings changes indicate that the information was not material. But Defendants' own expert identified a statistically significant stock price movement in AT&T's stock on the issuance of the UBS revision, and the SEC's expert noted statistically significant movements on the dates of UBS's and JP Morgan's estimate updates.[26] Regardless, "there is no requirement to allege or demonstrate any particular movement in a company's stock price in order to sustain the element of materiality." *SEC v. Penthouse Int'l, Inc.*, 390 F. Supp. 2d 344, 353 (S.D.N.Y. 2005); *see also Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir 1991) ("it is well-established that a material fact need not be outcome determinative"); *SEC v. Stanard*, 2009 WL 196023, at

---

[26]     *See* Exhibits 7 at ¶ 11 (Griffin Rebuttal Report); 20 at 141 (Ferrell Report) attached to Decl. of Alexander M. Vasilescu submitted with the SEC's Consolidated Motion to Exclude the Testimony of Defendants' Expert Witnesses filed contemporaneously with this motion.

*25 (Jan. 27, 2009) (opinion and order following bench trial). This is especially true here, as the entire aim of Defendants' seriatim approach to analysts was to avoid the adverse market consequences of a third successive revenue miss. *See SEC v. Woodruff*, 778 F. Supp. 2d 1073, 1087 (D. Colo. 2011)  (stock price movement not probative of materiality where information at issue was "trickled out … in phases") (internal citation omitted).

In sum, given the overwhelming amount of evidence that Defendants, analysts, and investors considered AT&T's total revenue, equipment revenue, and upgrade rate information significant to the total mix of information, and AT&T's lack of probative evidence to the contrary, no reasonable jury could find by a preponderance of the evidence that the information conveyed on the calls was immaterial. *See Liberty Lobby*, 477 U.S. at 248.

### D.  The Information Disclosed was Nonpublic

Information is nonpublic if it has not been disseminated in a manner making it available to investors generally. Adopting Release, 65 Fed. Reg. at 51721 (citing *Texas Gulf Sulphur*, 401 F.2d at 854). Here, Defendants concede that AT&T's projected or actual results were nonpublic prior to AT&T's earnings release on April 26, 2016. *E.g.*, ¶ 98. As such, there is no dispute of material fact that the specific metrics that Defendants conveyed to analysts, whether done expressly, or disguised as consensus, or whether part of AT&T's internal Top Ten average, were nonpublic. As to directional signaling, that information was also nonpublic. First, AT&T did not direct investors in general back to specific portions of Stephens's remarks concerning equipment revenue over the course of nearly 6 weeks following those remarks near and after the end of the 1Q16. Second, AT&T did not publish or make investors generally aware of its Top Ten averages. ¶ 281. Third, investors were not aware that Defendants were contacting analysts to provide them with directional signaling such as providing AT&T's Top Ten averages, informing them that they significantly deviated from consensus, or directing them to Stephens's remarks

42

because the analysts made no mention of these contacts in their published reports. There is no genuine dispute concerning these facts, which also establish that AT&T did not make the corrective disclosures required by Regulation FD. *See* ¶ 465.

Instead, Defendants argue that the information was public in light of Stephens's ambiguous remarks or because analysts and investors *could have* extrapolated the upgrade rate following a precise undisclosed methodology. First, however, Stephens indisputably provided no quantitative or new qualitative information concerning total revenue, equipment revenue, and upgrade rate. ¶ 378. Second, even assuming an inference that he provided *new* information by stating he "wouldn't be surprised to see [a slowdown in the handset upgrade cycle or the total sales] continue" is reasonable (which the SEC does not concede[27]), ¶ 376(a), the further inference Defendants ask the Court to draw—that analysts *all* derived essentially the same upgrade rate, that they *all* gleaned that AT&T's equipment revenue and total revenue would decrease by such substantial amounts—is absolutely unreasonable.[28] In fact, Citi (*see* ¶¶ 606-10), Moffett Nathanson (¶ 642), Pacific Crest (¶ 722), and Nomura (¶¶ 351-53) updated their models *following* Stephens' remarks only to change their estimates again following discussions with the Defendants, and William Blair indicated that they were not going to update their estimates following Stephens's remarks until Womack called them (¶ 714-18).

---

[27] There is no genuine dispute that analysts were aware of declining upgrade rates and equipment sales since 2015, had incorporated that information into their models by March 1, 2016, and that the trend had been the subject of in-depth analyst reports (*e.g.*, ¶¶ 297-98) prior to Stephens's ambiguous comments. In light of those facts, and the ambiguity of Stephens's misleading remarks (because handset sales *did* have significant impact on profitability (¶¶ 119-20)), the SEC submits that Stephens's remarks did not convey any new information.

[28] In addition to these inferences, Defendants' would require a reasonable jury to conclude that all of the analysts who took notes *independently* happened to arrive at estimates *on the call* that miraculously matched AT&T's internal projections. No reasonable jury would do so.

For these reasons, no reasonable jury could find that the specific metrics or directional signaling Defendants provided analysts conveyed public information.

### E.  The Selective Disclosures Were Intentional under Regulation FD

Regulation FD defines "intentional" as "when the person making the disclosure either knows, or is reckless in not knowing, that the information he or she is communicating is both material and nonpublic."[29] 17 C.F.R. § 243.101(a). Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir 2012)). Failure to investigate in the face of doubtful facts may amount to recklessness as a matter of law. *See*, *e.g.*, *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 448 (E.D.N.Y. 2016); *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 494-95 (S.D.N.Y. 2002). Here, for the reasons stated above, there is no genuine dispute that the information disclosed was both material and nonpublic. Given Defendants' own admissions, their experience at AT&T, and AT&T's policies and training, if no reasonable jury could find otherwise as to those elements, Defendants knew the same or were reckless in not knowing it. While the Court can end its analysis here, the SEC highlights the following additional points.

First, the disclosures were made pursuant to a deliberate plan to "work[] the analysts" (¶ 413) and were not unexpected incidental statements. *See Motorola*, 2002 WL 31650174, at *4; Adopting Release, 65 Fed. Reg. at 51,722 ("a materiality judgment that might be reckless in the context of a prepared written statement would not necessarily be reckless in the context of an impromptu answer to an unanticipated question."). That Defendants' intended to influence

---

[29]     The germane issue regarding scienter in the Regulation FD context is only whether Defendants knew or were reckless in not knowing that the information that they disclosed was both material and nonpublic.

consensus to allow for a revenue beat is not in genuine dispute. *E.g.*, ¶¶ 428, 466-71. Defendants understood that privately providing internal projections was impermissible as a matter of company policy because such disclosures could run afoul of Regulation FD. ¶¶ 220-245. Black, for example, was so conscious of the wrongness of disclosing this internal information that he falsely disguised it as "consensus."

Second, the Individual Defendants all admit that AT&T's actual and projected metrics were nonpublic. ¶¶ 220, 233, 240. Further, they understood the signaling was sufficient—i.e., material enough—to get analysts to act by the necessary amounts, particularly as analysts moved their estimates.[30] ¶¶ 227-28, 235-38, 242-45. Defendants understood that analysts, whose job was to ferret information, analyzed even non-verbal communications such as reading tone of voice and inflection or into the timing of the outreach. *Id.* The Individual Defendants also knew that AT&T was not publicly reinforcing Stephens's comments, publishing its Top Ten average, or disclosing it was having communications with analysts.

Third, AT&T's training and policies informed Defendants that the information that they were disclosing was material and nonpublic. An AT&T lawyer utilized a document (the "IR Training Document") to train the IR Department (¶ 196) that stated:

> "An omitted fact is material if there is a substantial likelihood that
> a reasonable investor would consider it important in deciding how
> to invest…there must be a substantial likelihood that the disclosure
> of the omitted fact would have been viewed by the reasonable

---

[30]     The SEC issued its *Motorola* Report warning of this precise fact pattern, observing that private clarifications of past public statements can convey material nonpublic information and run afoul of Regulation FD's prohibitions. *Motorola*, 2002 WL 31650174. The SEC warned issuers that "after-the-fact private communications of material nonpublic information to securities professionals are not a proper way to supplement a prior public disclosure that the issuer determined to have been misunderstood or misinterpreted" and reminded that they "may not evade the public disclosure requirements of Regulation FD by using 'code' words or 'winks and nods' to convey information during private conversations." *Id.* at *4. A lengthy discussion of the Commission's *Motorola* Report was included in Defendants' training materials (¶ 208).

> investor as having significantly altered the 'total mix' of
> information made available." TCS Industries, Inc. v. Northway,
> Inc. (426 U.S. 438 (1976)).
>
> SEC Policy: There is no magical monetary threshold below which
> an item would automatically be deemed immaterial. Rather, when
> assessing materiality, one must take into account both the
> quantitative and qualitative elements of the disclosure. (SEC Staff
> Accounting Bulletin No. 99.)

¶ 197. The IR Training Document advised that material information included "Predictions of future revenues, profits, losses, acquisitions[.]" ¶¶ 198-99. The same lawyer used a Davis Polk memo to train the IR group that confirming prior public information may convey "additional information depend[ing] upon, among other things, the amount of time that has elapsed since the original forecast or last public confirmation as well as intervening events." ¶¶ 202-08.

In addition, the Individual Defendants received materials that stated: "Material information can be quantitative – such as revenue . . . [or] qualitative – for example, statements that sales are 'very strong' . . .[,]" ¶ 181; that "Revenue or income data" was an example of material information, ¶ 184; "Material information can include . . . Financial results such as revenue, expenses or earnings[;] Operating data such as subscriber additions or network performance . . . [,]" ¶ 192; and that "implicit messages can be tantamount to explicit ones for Reg FD purposes" and that "one-on-one communications with market professionals, particularly late in a reporting period, are inherently dangerous[.]" ¶ 189.

Moreover, there is no reasonable inference to be drawn in Defendants' favor that they did not know or were not reckless in not knowing that the information was material and nonpublic. Most of the reasons are discussed *supra* Sections II.C and II.D, but a few additional points concerning Defendants' state of mind demonstrate that there are no genuine issues of material fact on this point. First, there is no contemporaneous evidence that Defendants knew or

understood that any analyst performed the hypothetical upgrade rate analysis AT&T proffered in its Answer, even if, *arguendo*, that calculation could render the information public or immaterial.

Second, there is no contemporaneous evidence that Defendants understood equipment revenue as a whole to be "profit neutral." ¶ 111 To the contrary, documents provided to Defendants demonstrate that AT&T lost at least a billion dollars on equipment sales in 1Q16. P. Ex. 37 at 19 (Apr. 18, 2016 "3+0 presentation"). There is no reasonable inference to be made that Individual Defendants—IR employees at AT&T for at least a decade prior to the disclosures at issue—conflated Next equipment revenue with *all* equipment revenue.[31]

Third, the contention that the Defendants surmised from the stock price reaction to the 4Q15 miss that investors did not care about equipment revenue is belied by their own actions leading up to and following that miss. Viola demanded a focus on getting revenue "trued up" with consensus for 1Q16 *prior to* the 4Q15 earnings announcement (¶ 338) and followed through on that focus with Individual Defendants for the rest of the quarter. There is no contemporaneous evidence that Defendants' worries eased after the 4Q15 announcement—in fact, Stephens proposed AT&T release a Form 8-K addressing the 1Q16 downturn, ¶¶ 361-62, and when that did not go forward, expected his IR team to "work[] the analysts that still have equipment revenue too high." ¶ 413. Rather than doing the right thing, Defendants instead systematically

---

[31]     In fact, they did not even have the information concerning Next sales in the aggregate to do so. The information they did have concerning Next sales—the handset-level examples to demonstrate Next accounting in the Wireless Q&A document IR used to brief analysts—showed that AT&T booked a $128 loss on the sale of a $700 device. ¶ 107.

and privately leaked information to lower consensus in 1Q16—hardly the actions of those who believe the matter of little significance to investors.[32]

Finally, despite the circumstances, AT&T's training materials, and their access to AT&T's in-house attorney, the Individual Defendants did not seek any guidance or advice concerning whether their planned disclosures might be considered material nonpublic information. ¶ 216. For these reasons, there is no dispute as to a genuine issue of material fact concerning Regulation FD's "intentional" element, no reasonable inferences to draw in favor of the Defendants, and no basis on which to conclude a reasonable jury could find Defendants did not know or were not reckless in not knowing that the information that they disclosed was material and nonpublic.

### F.  The Individual Defendants Acted on Behalf of AT&T

A person acting on behalf of an issuer includes any "employee . . . of an issuer who regularly communicates with" Industry Professionals, provided that they have not violated a duty of trust or confidence to the issuer.[33] 17 C.F.R. §243.101(c). Here, there is no genuine dispute that the Individual Defendants acted on behalf of AT&T in communicating with the analysts.

---

[32]    Moreover, Defendants had no way of predicting the effect of a third consecutive revenue miss (or any evidence that they conducted an analysis of it). Further, they initially predicted AT&T would miss consensus by multiples of the 4Q15 miss—the first concrete indications in March anticipated an approximate $1.6 billion miss (¶ 371). *Ganino*, 228 F.3d at 165 ("Materiality is determined in light of the circumstances existing at the time"). There is no reasonable inference to be drawn that Defendants decided the information was immaterial in 1Q16 or thought that analysts believed this to be the case.

[33]    The Proposing Release makes clear that this provision is intended to address instances where the employee improperly trades or tips for a personal benefit. Proposed Rule: Selective Disclosure and Insider Trading, Release No. 34-42259, 64 Fed. Reg. 72,590, at 72,594 (Dec. 28, 1999) (noting the exception "distinguishes between cases where a properly authorized employee or agent of the issuer makes a selective disclosure, and cases where an employee or agent discloses material nonpublic information for his or her own benefit—i.e. provides a 'tip' that would violate Rule 10b-5 if securities trading ensured").

First, as described above, the Individual Defendants acted within the scope of their employment, and as such, their knowledge and scienter is imputed to AT&T. *See, e.g., Loreley Fin (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 n.4 (S.D.N.Y. 2007) (scienter of employee may be imputed to company where "there is no dispute that the officer was acting within the scope of his apparent authority"). Second, as described above, Viola, the head of the IR Department, directed and monitored the outreach to analysts and the results. In addition, Stephens, the CFO, knew of the team's efforts to "work the analysts," ¶ 413, and followed the results of those efforts. *E.g.*, ¶ 785, 787. There is no breach of a duty of trust or confidence where, as here, the Individual Defendants did what they were instructed to do in furtherance of AT&T's purposes.

## III.   The Individual Defendants Aided and Abetted AT&T's Violations

To establish aiding and abetting liability, the Commission must prove: (1) a primary violation; (2) a general awareness or knowledge on the part of the aider and abettor that his or her role was part of an overall activity that was improper; and (3) reckless or knowing substantial assistance of the conduct that constitutes the violation. *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012). As discussed above, AT&T violated Regulation FD through the intentional selective disclosures of material nonpublic information without a prompt or simultaneous public disclosure. The Individual Defendants had a general awareness if not knowledge that their role in the overall activity was improper as discussed above. For the same reasons, they knowingly, if not recklessly, provided substantial assistance in the conduct—they made the disclosures. Accordingly, the Individual Defendants aided and abetted AT&T's violations of Regulation FD and Section 13(a) of the Exchange Act.

**CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court grant summary

judgment as to liability against Defendant AT&T for violating Regulation FD and Section 13(a)

of the Exchange Act and against Defendants Womack, Evans, and Black for aiding and abetting

AT&T's violations.

Dated: New York, New York
  May 3, 2022             /s/ Victor Suthammanont
                   Victor Suthammanont
                   Alexander M. Vasilescu
                   David Zetlin-Jones
                   Joy Guo
                   Attorneys for Plaintiff
                   SECURITIES AND EXCHANGE
                   COMMISSION
                   New York Regional Office
                   200 Vesey Street, Suite 400
                   New York, New York 10281
                   (212) 336-5674 (Suthammanont)
                   SuthammanontV@sec.gov

                   Thomas Peirce, Of Counsel