# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO: 1:21-cv-01951** |
| **AT&T, INC., CHRISTOPHER C. WOMACK, KENT D. EVANS, and MICHAEL J. BLACK,** | |
| **Defendants.** | |

## DEFENDANTS CHRISTOPHER C. WOMACK, KENT D. EVANS, AND MICHAEL J. BLACK'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Defendants Christopher C. Womack, Kent D. Evans, Michael J. Black submit this Statement of Material Facts Pursuant to Local Rule 56.1 in Support of Their Motion for Summary Judgment and asserts that there is no material issue to be tried as to the following facts:

1.      The Individual Defendants are mid-level employees, not executives.  App. at 90, 109, 118.

Response:

2.      All three Individual Defendants were paid a set salary and yearly bonus that was in no way tied to whether the company met, missed, or beat analyst forecasts.  App. at 90, 109, 118.

Response:


3.      The training the Individual Defendants received from AT&T regarding Reg FD clearly instructed that no metric or number may be discussed with analysts unless the metric is already public, regardless of whether it is material.  App. at 91, 110, 119.

Response:


4.      AT&T's policy, which is much stricter than Reg FD requires, established the Individual Defendants' practice of **never** disclosing non-public information on these routine analyst calls.    App. at 91, 110, 119.

Response:


5.      The Individual Defendants *routinely* communicated with the analysts at the approximately 30 "sell-side" firms that were covering AT&T in 2016.  App. at 91-92, 110-111, 119-120.

Response:

6.      In fact, someone from AT&T's IR department usually spoke with one or more analyst at each of the thirty-plus investment firm at least twice a quarter.  App. at 92, 111, 120.

Response:


7.      Each of those communications often lasted as long as an hour and many different issues were discussed.  App. at 93, 112, 121.

Response:


8.      The first contact during a quarter was usually right after AT&T published its quarterly earnings (usually the third week of the month after the quarter ended).  App. at 91-92, 111, 119-120.

Response:


9.      Those calls were often requested by the analysts themselves, who sought additional information about AT&T's just announced earnings.  App. at 93, 112, 121.

Response:


10.     When a company announces its earnings and publishes its financial results from the previous quarter, most sell-side analysts immediately publish an updated forecast but with only modest changes to their forecasts at that time, and they then

work over the course of the quarter and before earnings for that quarter are announced to digest additional information and issue a revised forecast at some point before that quarter's earnings are announced.  App. at 92-93, 111-112, 120-121.

Response:

11.    The IR individuals would then usually speak with the same analysts a second time before  AT&T announced its earnings for the then-ending quarter, at which time they would be more focused on updating their models and forecasts.   App. at 92, 111, 119.

Response:

12.    During those calls, analysts generally would seek additional "color" on publicly available information, but also alerts about public information that the analyst might have missed. App. at 92, 111, 119.

Response:

13.    Each analyst covered a dozen or more companies apart from AT&T and keeping track of what had been publicly disclosed was not always easy.  Part of IR's job was to ensure analysts were aware of such information.  App. at 92, 111, 119.

Response:

14.     As a result, before revising their forecasts, most analysts routinely talked to someone from AT&T investor relations (usually one of the Individual Defendants) as part of the "mosaic of information" they considered in forming their opinions.   App. at 93, 112, 120.

Response:

15.      Over half of the very calls identified by the SEC in its Complaint were initiated by the analyst rather than by AT&T IR.  App. at 8, 12, 18, 31, 34, 44, 48, 49, 80, 81, 82, 83.

Response:

16.     This is unsurprising because it was common for analysts reached out to AT&T.  App. at 93, 112, 121.

Response:

17.     Sometimes there would be more than two calls, particularly if AT&T had made a public disclosure such as an acquisition.  App. at 121.

Response:

18.     Consistent with the foregoing, the Individual Defendants then had dozens of calls with the analysts during any given quarter.  App. at 92, 111, 120.

Response:


19.     While all thirty plus analysts "covered" AT&T, each had his or her own "investment thesis" explaining what they thought was important in connection with their coverage of AT&T.  No analyst thesis stressed, much less was based on, the notion that equipment revenue or upgrade rates were significant to evaluating current or projecting future AT&T performance.  App. at 94, 113, 122.

Response:


20.     Largely recognizing AT&T to be a "value" stock, most analysts focused on its free cash flow and dividend coverage.  App. at 122.

Response:


21.     Further, while each investment firm developed their own financial model forecasting AT&T's projected results by quarter and annually, each model's inputs varied greatly.  For all of the models, a variety of inputs were used in combination to forecast equipment revenue besides upgrade rates.   Equipment revenue was then one of many compenents that drove total the analysts' revenue forecasts.  App. at 94, 113, 122.

Response:

22.     Based on their work with the analysts and overall training and knowledge of AT&T, the Individual Defendants believed and understood that "total revenue" had many compents of which equipment revenue was a small part.  App. at 91, 110, 119.

Response:

23.     They further understood and believed that because equipment revenue was viewed as "pass through" reveneue, it was not viewed as a significant or important metric or factor in what drove the analysts' evaluation of AT&T's stock.  App. at 91, 110, 119.

Response:

24.     No analyst ever communicated to any Individual Defendant that he or she thought upgrade rates or equipment revenue were material or important metrics in their models.  App. at 91, 110, 118.

Response:

25.     The Individaul Defendants believed that equipment revenue was largely "pass through" and therefore the metrics of upgrade rates and equipment revenue were not material.  App. at 91, 110, 118.

Response:

26.     No Individual Defendant recalls any analyst ever indicating that those metrics (upgrade rates and equipment revenue) were important to their assessment of whether to recommend buying, selling or holding AT&T's stock. App. at 91, 110, 118.

Response:


27.     The Individual Defendants knew that the analysts considered AT&T a complex business and that their models had hundreds, if not thousands, of discrete individual inputs. App. at 94, 113, 122.

Response:


28.     The analysts who were deposed testified that they (or their assistants) individually determined each input.  This included determing the inputs for upgrade rates. App. at 6, 7, 15, 16, 19, 22-24, 27, 28, 32, 35, 39, 40, 46, 50, 52, 54, 56, 57, 61, 65, 66, 69, 73.

Response:


29.     There is no agreed upon standard for developing "consensus" figures. App. at 94, 114, 123.

Response:

30.     In 2016, there were at least two third party entities that compiled "consensus" figures:Fact Set and Bloomberg. App. at 95, 114, 123.

Response:

31.     Compilations of consensus figures by third parties were based on a particular analyst preparing a report, subscribing to one of the services, then uploading his or her report.  The third party then compiled "consensus" figures (*e.g.,* the average of all of the numbers for a particular metric that were uploaded). App. at 95, 114, 123.

Response:

32.     Consensus numbers from third parties are publicly available but in 2016 were only compiled for significant metrics. App. at 95, 114, 123.

Response:

33.     No third-party service compiled consensus figures for the metrics at issue in this case: equipment revenue and upgrade rates. App. at 95, 114, 123.

Response:

34.     Apart from these third-party services, all of the major carriers at the time (AT&T, Sprint, T-Mobile, and Verizon) compiled their own set of consensus figures

that covered far more metrics that the did third-party services. App. at 95, 114-15, 123-24.

Response:


35.    Michael Black was responsible for compiling AT&T's internal consensus figures. App. at 96.

Response:


36.    He did not create the process but rather inherited a chart prepared by his predecessor that contained tracked metrics. App. at 96.

Response:


37.    The scope of metrics tracked was broad – more than sixty – so AT&T limited its consensus tracking to a "top ten" group of investment firms. App. at 96.

Response:


38.    Mr. Black did not select the ten firms on the list (Mr. Womack did). App. at 96.

Response:

39.    Mr. Black did not change his list of top ten firms during the first quarter of 2016. App. at 96.

Response:

40.    Mr. Black dutifully updated the consensus figures for the top ten every time an analyst updated their model. App. at 97.

Response:

41.    Mr. Black had been providing analysts with "top ten" consensus numbers several years prior to 2016, just like his predecessor. App. at 96.

Response:

42.    In the first quarter of 2016, many analysts contacted Mr. Black *first* to obtain consensus numbers. App. at 96.

Response:

43.    When Mr. Black shared with analysts the updated consensus numbers, he frequently identified how many firms had updated. App. at 96-97.

Response:

44.     Equipment revenue from selling smartphones is, at best, largely passthrough revenue, so it has very little if any impact on earnings per share or profitability. App. at 99-100, 115, 124.

Response:


45.     While the trend of declining upgrades was well known and publicized, not all analysts fully accounted for that trend in their forecasts and models. JSF at ¶¶ 156-59.

Response:


46.     Even after AT&T "missed" the consensus forecast for its total revenue for the fourth quarter 2015 largely because analysts had overestimated equipment revenue, most analysts did not make  many changes to their forecasts or models. JSF at ¶¶170-74.

Response:


47.     After AT&T announced its fourth quarter earnings for 2015, no analyst published any revised model or update suggesting that AT&T's declining equipment revene (and resulting total revnue "miss") was a material event or affected their assessment of the value of AT&T or its stock.

Response:

48.     The Individual Defendants by and large were not privy to the deliberate process of the AT&T executives in deciding to make this public disclosure.  App. at 100, 115, 124.

Response:

49.     AT&T's senior executives or board members never communicated or explained to the Indvidual Defendants that the issue of upgrade rates and equipment revenue was material to them or any investor.  App. at 77-78.

Response:

50.     Based on Mr. Stephens' comments and before ever speaking to anyone from AT&T, Deutsche Bank annotated a comment in its model that the upgrade rate should be "5.2-5.3%".  App. at 77-79.

Response:

51.     In internal dialogue among analysts at UBS, before ever speaking to anyone at AT&T, they noted that upgrade rates were "coming down" and published a midday update noting "the potential to have 3 quarters of record low upgrades coming for AT&T."  JSF Ex. 56.

Response:

52.     After Stephens' comments, Wells Fargo noted in its weekly newsletter before speaking with anyone from AT&T that consumers at AT&T were "holding onto devices for longer."

Response:

53.     Over the course of the quarter, whether analysts reached out to them first, or the Individual Defendants initiated the contact, they highlighted Stephens comments and answered questions about them with each analyst they talked to.  App. at 101, 116, 125.

Response:

54.     No analyst has testified that he/she believed any of the Individual Defendants told him/her material non-public information. App. at 9, 11, 14, 21, 26, 30, 35, 37, 42, 47, 54, 56, 59, 62, 64, 68, 70, 72, 73.

Response:

55.     No analyst reported the conversation to their compliance department as required by every analyst firm policy, should they even suspect it. JSF at ¶ 207.

Response:

56.    During the quarter and before AT&T announced its 1Q2016 earnings on April 26, 2016, the majority of analyst firms covering AT&T updated their forecast in some way.

Response:


57.    However, no analyst has testified in this case that the only reason they revised a forecast was because of a conversation with any of the Individual Defendants. Rather, the overwhelming testimony from analysts was that conversations with investor relations was just one piece in the "mosaic" of information they considered. App. at 6, 7, 15, 16, 19, 22-24, 27, 28, 32, 35, 39, 40, 46, 50, 52, 54, 56, 57, 61, 65, 66, 69, 73.

Response:


58.    Almost every firm, for example, updated its equipment revenue forecast (and upgrade rate, for the firms that did forecast that metric), but firms also revised numerous other forecasted metrics as well.

Response:


59.    [intentionally omitted]

Response:

60.     Lower equipment revenue forecasts were not the only reason for analysts' lower total revenue forecasts.  *See, e.g.*, JSF Ex. 70, 305.

Response:


61.     JP Morgan decreased its total revenue forecast for 1Q2016 by $642 million, $200 million of which was attributable to AT&T's entertainment and international business segments, which have nothing to do with smartphone upgrade rates or equipment revenue.  JSF Ex. 305.

Response:


62.     $238 million of Wells Fargo's $1.573 billion total revenue reduction came from those same segments, and many of the other analyst firms that decreased their revenue forecasts also included downward revisions because of other segments of AT&T's business.  JSF Ex. 70.

Response:


63.     No analyst has testified in this case that the only reason they revised a forecast was because of a conversation with any of the Individual Defendants.  Rather, the overwhelming testimony from analysts was that conversations with investor relations was just one piece in the "mosaic" of information they considered.  App. at 6, 7, 15, 16, 19, 22-24, 27, 28, 32, 35, 39, 40, 46, 50, 52, 54, 56, 57, 61, 65, 66, 69, 73.

Response:

64.     There is a well-recognized phenomenon in the analyst industry referred to as "herding behavior" that "analysts release forecasts similar to those previously announced by other analysts." App. at 76.

Response:

65.     None of the Individual Defendants thought or believed that AT&T's actual or projected internal figures for equipment revenue or upgrade rates were material.  App. at 91, 110, 119.

Response:

66.     Further, based on Mr. Stephens' comments, the Individual Defendants also believed that the information they discussed had been made public. App. at 100, 116, 125.

Response:

67.     Of the 12 analysts firms the SEC does intend to call witnesses from, they were all deposed.  Significantly, not a single analyst testified that he/she thought any of the Individual Defendants revealed MNPI in 1Q2016.  App. at 9, 11, 14, 21, 26, 30, 35, 37, 42, 47, 54, 56, 59, 62, 64, 68, 70, 72, 73.

Response:

68.     The "Top Ten" lists created by Mr. Black that tracked individual analysts' metrics during the relevant time period (March through April 2016) identified a "1Q16 Forecast' upgrade rate of 4.7% and a "1Q16 QTD Actuals through February" of 3.182%." App. at 104, 106, 108.

Response:


69.     None of the Individual Defendants had a telephone call with any analyst from Moffett Nathanson on April 1, 2016 or April 6, 2016, as alleged in the Complaint. App. at 102, 117, 126.

Response:


70.     During discovery, pursuant to an agreement among the parties, the SEC agreed that it only intended to call witnesses at trial from 12 of the 20 analyst firms identified in the Complaint, and therefore neither party deposed any witnesses/analysts from the 8 "no call" firms. Those eight firms the SEC stated it did not intend to call any witnesses from are: R.W. Baird, Oppenheimer, Evercore, Moffett Nathanson, Jefferies, Davidson, Bank of America/Merrill Lynch, and Buckingham. App. at 4.

Response:

Dated:  May 3, 2022                    **TILLOTSON JOHNSON & PATTON**


                                       */s/ Jeffrey M. Tilltson*
                                       Jeffrey M. Tillotson (*pro hac vice*)
                                       Jonathan R. Patton (*pro hac vice*)
                                       1807 Ross Avenue, Suite 325
                                       Dallas, Texas 75201
                                       (214) 382-3041 Telephone
                                       (214) 292-6564 Facsimile
                                       jtillotson@tillltsonlaw.com
                                       jpatton@tillotsonlaw.com

                                       Leslie C. Thorne
                                       Haynes and Boone LLP
                                       30 Rockefeller Plaza, 26th Floor
                                       New York, York 10112
                                       (212) 835-4848 Telephone
                                       (212) 918-8989 Facsimile
                                       Leslie.thorne@haynesboone.com

                                       *Attorneys for Defendants Christopher C. Womack,
                                       Kent D. Evans and Michael J. Black*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing is being served on all counsel of record via ECF filing.

                                        */s/ Jeffrey M. Tillotson*
                                       Jeffrey M. Tillotson