**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | No. 1:21-cv-01951-PAE |
| v. | **ORAL ARGUMENT REQUESTED** |
| AT&T INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT AT&T INC.'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

SUMMARY OF ARGUMENT ...................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

    The Phaseout of Subsidies, the Decline in Handset Upgrades and
    the Market's Understanding of These Dynamics ........................................................ 6

    The Analysts' Updated Reports Confirm the Information Was Immaterial ......... 23

    AT&T Likewise Internally Treated EIP Sales As Earnings Neutral ................... 25

    The SEC's Accounting Expert Confirmed the Declines Were Immaterial ........... 27

    AT&T's Experts Provide Further Support for Summary Judgment ..................... 29

ARGUMENT AND AUTHORITIES ........................................................................... 30

    I.    THE ALLEGEDLY DISCLOSED INFORMATION WAS NOT
    MATERIAL ........................................................................................................ 31

    II.    THE INFORMATION AT ISSUE WAS ALREADY PUBLIC ..................... 35

    III.    DEFENDANTS DID NOT ACT WITH SCIENTER .................................... 37

    IV.    REGULATION FD LACKS STATUTORY AUTHORITY ........................... 41

    V.    REGULATION FD'S TEXT RENDERS IT INOPERABLE AND
    INEFFECTIVE AS A MATTER OF LAW .................................................... 44

    VI.    REGULATION FD IS UNCONSTITUTIONAL ........................................... 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aceto Corp. Secs. Litig.*,
    2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) .................................................................3, 32

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) ..............................................................................................................47

*Baggett v. Bullitt*,
    377 U.S. 360 (1964) ..............................................................................................................49

*In re Bank of Am. AIG Disclosure Secs. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 Fed.Appx. 93 (2d. Cir. 2014) ...................39

*Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*,
    474 U.S. 361 (1986) ..............................................................................................................42

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ..............................................................................................................46

*Checkosky v. SEC*,
    23 F.3d 452 (D.C. Cir. 1994) (Randolph, J., writing separately) ...........................................42

*Chiarella v. United States*,
    445 U.S. 222 (1980) ..............................................................................................................43

*Chipman v. Aspenbio Pharma, Inc.*,
    No. 11-CV-00163 REB, 2012 WL 4069353 (D. Colo. Sept. 17, 2012) .................................37

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ................................................................................................................49

*Dingee v. Wayfair Inc.*,
    No. 15-CV-6941, 2016 WL 3017401 (S.D.N.Y. May 24, 2016) ...........................................37

*Dirks v. SEC*,
    463 U.S. 646 (1983) ..............................................................................................................43

*ECA, Local 134 IBEW Joint Pens. Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ...............................................................................................3, 32

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) ..............................................................................................................49

*Emerson v. Mutual Fund Series Trust*,
    393 F. Supp. 3d 220 (E.D.N.Y. 2019) ................................................................................35

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) ...........................................................................................................46

*In re GeoPharma, Inc. Secs. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006) ................................................................................39

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016) (Engelmayer, J.) .....................................................38

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...........................................................................................................49

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018) (Engelmayer, J.), *aff'd*, 757 F. App'x 35
    (2d Cir. 2018) ....................................................................................................................38

*Himmel v. Bucyrus Intern., Inc.*,
    No. 10-C-1104, 2014 WL 1406279 (E.D. Wisc. Apr. 11, 2014) ...........................................32

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ...............................................................................................39

*Kuebler v. Vectren Corp.*,
    No. 18-CV-00113 RLY, 2018 WL 4003626 (S.D. Ind. Aug. 22, 2018) ...............................32

*In re Lone Pine Res., Inc.*,
    No. 12 CIV. 4839 GBD, 2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) ...........................3, 32

*In re Loral Space & Communs. Ltd. Secs. Litig.*,
    No. 01 CIV. 4388 JGK, 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ...................................39

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
    797 F.3d 160 (2d Cir. 2015) .................................................................................................5

*Malik v. Network 1 Fin. Secs., Inc.*,
    No. 20-2948-CV, 2022 WL 453439 (2d Cir. Feb. 15, 2022) ................................................39

*Motion Picture Ass'n of Am., Inc. v. FCC*,
    309 F.3d 796 (D.C. Cir. 2002) ...........................................................................................42

*Nat'l Ass'n of Mfrs. v. SEC*,
    748 F.3d 359 (D.C. Cir. 2014), *subsequent opinion after reh'g*, 800 F.3d 518
    (D.C. Cir. 2015) ...........................................................................................................46, 47

*Nguyen v. MaxPoint Interactive, Inc.*,
    234 F. Supp. 3d 540 (S.D.N.Y. 2017)..........................................................35

*Pac. Gas & Elec. Co. v. Public Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986)...............................................................................46

*Safelite Grp., Inc. v. Jepsen*,
    764 F.3d 258 (2d Cir. 2014)...............................................................47

*Sanders v. AVEO Pharm., Inc.*,
    No. 13-11157-DJC, 2015 WL 1276824 (D. Mass. Mar. 20, 2015)......................39

*SEC v. Afriyie*,
    No. 16-CV-2777 JSR, 2018 WL 6991097 (S.D.N.Y. Nov. 26, 2018), *aff'd*,
    788 Fed.Appx. 59 (2d. Cir. 2019)........................................................45

*SEC v. Siebel Systems, Inc.*,
    384 F. Supp. 2d 694 (S.D.N.Y. 2005)...........................................31, 35, 47

*Speiser v. Randall*,
    357 U.S. 513 (1958)............................................................................49

*Strougo v. Barclays PLC*,
    334 F. Supp. 3d 591 (S.D.N.Y. 2018)....................................................30

*In re Take-Two Interactive Secs. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................38

*U.S. v. Contorinis*,
    692 F.3d 136 (2d Cir. 2012).................................................................37

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015)...................................................................31

**Rules and Statutes**

15 U.S.C. § 78m(a)(1) and (2) ...................................................................42

**Other Authorities**

17 C.F.R. 243.100(b) ..............................................................................47

17 C.F.R. § 243.101(a)............................................................................38

17 C.F.R. § 243.101(c)............................................................................38

Antony Page and Katy Yang, *Controlling Corporate Speech: Is Regulation Fair Disclosure Unconstitutional?*, 39 U.C. Davis L. Rev. 1, 8.....................................................46

Joseph A. Grundfest, *Regulation FD in the Age of Facebook and Twitter: Should the SEC Sue Netflix?* ............................................................................................46

Susan B. Heymann*, Rethinking Regulation Fair Disclosure and Corporate Free Speech*, 36 Cardozo L. Rev. 1099, 1134..................................................................46

Defendant AT&T Inc. ("AT&T") respectfully submits this memorandum of law in support of its motion for judgment on the pleadings and motion for summary judgment. AT&T further joins and adopts the arguments in the Individual Defendants' summary judgment motion and memorandum.[1]

## <u>SUMMARY OF ARGUMENT</u>

After more than four years of investigation and more than a year of litigation, the SEC has pled no facts and produced no evidence for a reasonable jury to conclude that the alleged selective disclosures were **material**, **nonpublic**, or **made with scienter**. The claims fail on the pleadings and evidence even if it is assumed for this motion that AT&T's IR personnel actually disclosed the information to analysts as alleged in the Complaint (which they did not). In addition to seeking summary judgment on these grounds, AT&T also seeks judgment on the pleadings, as the Complaint pleads no facts plausibly establishing these elements.

AT&T is also entitled to summary judgment because Regulation FD **lacks statutory authority**, because Regulation FD's circular "duty of trust and confidence" exemption renders the rule **inoperable and self-defeating** as written and as applied to this case, and because Regulation FD is **unconstitutional** under the First and Fifth Amendments of the United States Constitution.

---

[1] Unless otherwise noted, all capitalized terms are as defined in the Parties' Amended Joint Statement of Undisputed Facts ("JSF"), all "Joint Ex." citations refer to documents attached to Appendix A and Appendix B of the JSF. All other citations to evidence in support of this memorandum of law will refer to the declarations and exhibits filed by Defendants on May 3, 2022, and will refer to the name of the declarant through whom such evidence is offered (for e.g., Krumholz Decl. __ at __ ). Defendant AT&T Inc. will also cite to "SOF" when referring to Defendant AT&T Inc.'s Statement of Undisputed Material Facts, filed on May 3, 2022.

**The alleged selective disclosures at issue in this case were immaterial.**

The information allegedly disclosed – i.e., that AT&T anticipated a 15-20% year-over-year decline in equipment revenue and a 5% upgrade rate for the first quarter of 2016 – had no significant impact on whether a reasonable investor would buy, sell, or hold AT&T stock. It is undisputed that AT&T's announcement of below-consensus revenues for the prior quarter, which AT&T publicly attributed to the same declining upgrade trend that continued in the first quarter, caused no statistically significant impact on AT&T's stock price. There was also no material change to analysts' consensus first quarter 2016 EPS forecasts after the alleged selective disclosures, nor did analysts change their price targets or buy, sell, or hold recommendations. Not a single analyst has testified they believe they received material nonpublic information during the calls, and none told their compliance officers or anyone else at their employer that AT&T disclosed material nonpublic information on the calls. The updated analyst reports published after the calls at issue likewise show the analysts viewed the trend as profit neutral and insignificant to AT&T's earnings.

None of this is surprising. AT&T is not a smartphone manufacturer and generated less than ten percent of its overall revenue at the relevant time from the resale of smartphones. AT&T, analysts, and industry commentators treated equipment revenue from unsubsidized smartphone sales as either profit neutral or very low margin. Investors and consumers could readily compare the prices charged for phones at AT&T stores and the substantially similar prices at Apple stores or elsewhere. By any measure, reselling phones was not a core part of AT&T's business.

The SEC's own financial expert, Dominic DiBucci, conceded that, even using his own inflated and unfounded revenue and earnings calculations (which are subject to Defendants' Motion to Strike filed contemporaneously with this Motion and are not competent summary judgment evidence), the information allegedly conveyed was well below the 5% threshold courts have found to be as presumptively immaterial when, as here, there is no evidence of a "large" qualitative effect.[2]

**The allegedly disclosed information was already public.** SEC expert John Griffin admitted that the trend of declining handset upgrade rates and wireless equipment revenue from the phaseout of smartphone subsidies was already known to the market at the time of the alleged disclosures. That consumers would decide to keep their old phones longer after carriers stopped subsidizing the price of new phones is also a commonsense principle that would be familiar to consumers and investors from their own experience having to pay $600 for a new phone instead of $200, under the subsidy model, as subsidies and two-year contracts were eliminated. The CFOs of both AT&T and Verizon publicly disclosed at a March 2016 Deutsche Bank conference that they expected the same trend to continue in the first quarter and that smartphone sales have little impact on profitability. None of the SEC's five experts has offered an opinion rebutting the evidence that a reasonable investor could readily and reasonably calculate effectively the same upgrade rates from the public

---

[2] *See ECA, Local 134 IBEW Joint Pens. Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2d Cir. 2009) ("Here, the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement"); *In re Aceto Corp. Secs. Litig.*, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (less than 5% of earnings "presumed" immaterial); *In re Lone Pine Res., Inc.*, No. 12 CIV. 4839 GBD, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) ("An omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial").

record simply by carrying forward the same year-over-year trend seen in prior quarters that the CFOs had just conveyed. In short, the SEC has failed to produce competent summary judgment evidence that the information at issue was nonpublic.

**No reasonable jury could find scienter.** When it adopted Regulation FD, the SEC took pains to emphasize that it would not and could not bring an enforcement action unless the alleged selective disclosures were not only material and nonpublic, but were made "intentionally," which it described as a standard requiring a court or jury to conclude that "no reasonable person under the circumstances" could believe the disclosed information was immaterial or already public.[3] The evidence plainly establishes that, at the very least, Defendants had a reasonable basis to believe that the information at issue was not material nonpublic information.

**Regulation FD is invalid.** Defendants additionally seek summary judgment that the SEC had no authority to adopt Regulation FD, that Regulation FD is internally inconsistent and inoperable as a matter of law, and that Regulation FD is unconstitutional, all of which are more fully briefed below.

## FACTUAL BACKGROUND

AT&T is a leading provider of communications, media, and technology services.[4] The individual Defendants in this action are three mid-level AT&T Investor Relations ("IR") employees.[5] At the time of the events at issue in March-April 2016, Defendant Christopher Womack was an Executive Director in AT&T's IR

---

[3] *See* Joint Ex. 13a-d, Final Rule: Selective Disclosure and Insider Trading, Exchange Act Release No. 34-43154 at ATTINC-00417471 (Aug. 15, 2000) ("Adopting Release").
[4] *See* JSF at ¶ 4; SOF at ¶ 1; Joint Ex. 1, 2015 ATT Form 10-K at 1.
[5] *See* SOF at ¶ 2; JSF at ¶¶ 25, 33, 45.

Department, worked in AT&T's Bedminster, New Jersey office, and had ten years of experience working in IR.[6] Defendant Kent Evans was an Associate Vice President in AT&T's IR Department, worked in AT&T's Atlanta, Georgia office, and had sixteen years of experience working in IR.[7] Defendant Michael Black was a Finance Director in AT&T's IR Department, worked in AT&T's Bedminster, New Jersey office, and had five years of experience working in IR.[8] All three individual Defendants received training on Regulation FD, including periodic updates, and were prohibited under AT&T policy from providing internal financial information to analysts.[9]

At the time of the events at issue, AT&T offered wireless communications, data/broadband and Internet services, digital video services, local and long-distance telephone services, telecommunications equipment, managed networking, and wholesale services.[10] AT&T does not manufacture smartphones or other wireless phones.[11] It resells phones manufactured by other companies, including Apple, Samsung, and LG.[12] Wireless equipment revenue (which includes revenue from smartphone sales as well as from tablets and other devices, and which is reported

---

[6] JSF at ¶¶ 25-26; SOF at ¶ 3; Krumholz Decl., Ex. 1, Womack Dep. Tr. at 35:10-36:01; Womack Answer, Dkt. No. 28 at ¶ 15; Womack Decl. at ¶¶ 2, 6.

[7] JSF at ¶¶45-46; SOF at ¶ 4; Krumholz Decl., Ex. 2, Evans Dep. Tr. at 14:4-13, 27:9-14; Evans Answer, Dkt. No. 27 at ¶ 16; Evans Decl. at ¶ 2.

[8] JSF at ¶¶ 33-34; SOF at 5; Krumholz Decl., Ex. 3, Black Dep Tr. at 32:20-25, 33:13-16, Black Answer, Dkt. No. 26 at ¶ 17; Black Decl. at 2

[9] JSF at ¶¶ 30,43, 56; SOF at ¶ 92; Krumholz Decl., Ex. 1, Womack Dep. Tr. at 98:22-100:22, 104:24-107:14; Krumholz Decl., Ex. 2, Evans Dep. Tr. at 26:16-19, 28:22-29:16; Krumholz Decl., Ex. 3, Black Dep. Tr. at 64:8-10; Krumholz Decl., Ex. 4, Anderson Dep. Tr. at 26:15-19, 26:24-27:1, 27:25-28:7, 35:1-8, 37:3-38:17, 64:4-14, 67:19-68:20 (errata sheet changes "public" to "nonpublic" in line 68:16); 140:24-141:11; Womack Decl. at ¶ 4; Evans Decl. at ¶ 4; Black Decl. at ¶ 4.

[10] *See* Joint Ex. 1, 2015 ATT Form 10-K at 1.

[11] *See* JSF at ¶ 86; SOF at ¶ 6.

[12] *See* JSF at ¶ 86; SOF at ¶ 6.

across three different business segments) represented less than ten percent of AT&T's total overall reported revenue for 2015 and the first quarter of 2016.[13]

### The Phaseout of Subsidies, the Decline in Handset Upgrades and the Market's Understanding of These Dynamics

The SEC has conceded numerous facts that individually and cumulatively compel summary judgment in AT&T's favor. It is **undisputed** that "upgrade rates" – the percentage of existing AT&T customers who purchase new smartphones each quarter – **declined** after AT&T and other carriers moved away from the smartphone-subsidized two-year service contract model that previously dominated the wireless industry.[14] It is likewise **undisputed** that actual upgrade rates and wireless equipment revenues results are public information,[15] such that investors could see for themselves how these metrics compared on a year-over-year basis.

It is also **undisputed** that the market was **aware of the trends of declining upgrade rates and equipment revenues**. SEC expert John Griffin admits in his reply report that the "**downward trend**" in upgrade rates and equipment revenues "**was already known to analysts**" before the calls at issue in this litigation took place.[16] The upgrade rates of 5.8% and 5.7% for the second and third quarters of 2015 were **undisputedly** record lows.[17] The upgrade rate for the fourth quarter of 2015 was **undisputedly** the lowest fourth-quarter upgrade rate since 2005, before the first iPhone was launched.[18] There is also **no evidence** that any of the underlying

---

[13] *See* JSF at ¶¶ 93-95; SOF at ¶ 6.
[14] *See* JSF at ¶¶ 69-79; SOF at ¶ 8; Krumholz Decl., Ex. 5, Griffin Rebuttal Report at ¶ 50.
[15] *See* JSF at ¶¶ 96-97; SOF at ¶ 9.
[16] *See* SOF at ¶ 40; Krumholz Decl., Ex. 5, Griffin Rebuttal Report at ¶ 50 (emphasis added).
[17] *See* JSF at ¶ 115; SOF at ¶ 42-43.
[18] *See* JSF at ¶ 115; SOF at ¶ 44

conditions that produced these record low 2015 upgrade rates – including eliminating subsidies and no major new product launch – had moved in a different direction during the first quarter of 2016 versus the prior quarters of year-over-year decline.

The SEC had no choice but to concede these facts given the extensive public disclosures about the elimination of subsidies and the resulting impact on upgrades. Before 2013, AT&T and other U.S. wireless carriers sold wireless phones predominantly through a subsidy/fixed-contract model, in which carriers heavily discounted the price of the phone in exchange for the customer signing a services contract for a fixed period of time (often two years).[19] Under this subsidy model, consumers could purchase a $600 iPhone through AT&T for approximately $200.[20] This gave customers a significant incentive to upgrade their phones every two years.

In 2013, carriers began transitioning away from this model toward an unsubsidized "equipment installment plan" ("EIP" or "installment plans") model in which customers would bear the full cost of the phone in exchange for more flexible – and cheaper – service plans.[21] AT&T introduced its unsubsidized "AT&T Next" installment plan in July 2013.[22] Other carriers introduced similar plans and phased out subsidies.[23] The switch to unsubsidized installment plans initially caused a temporary boost in wireless equipment revenues because the full price of the phone (rather than the much lower subsidized price) could be recognized at the time of sale,

---

[19] *See* JSF at ¶ 69; SOF at ¶ 10.
[20] *See* JSF at ¶ 69; SOF at ¶ 10.
[21] *See* JSF at ¶¶ 70-74; SOF at ¶ 11.
[22] *See* JSF at ¶¶ 70-71 SOF at ¶ 12.
[23] *See* JSF at ¶ 74; SOF at ¶ 12; *see also* Entner Decl., Ex. 1 at ¶ 61; Valentine Decl., Ex. 1 at ¶ 120; Allen Decl. at ¶ 64.

but this boost likewise waned as the customer base transitioned to unsubsidized installment plans, with wireless equipment revenues declining by $714 million year-over-year in the fourth quarter of 2015.[24]

There were extensive public disclosure throughout 2014, 2015, and early 2016 regarding the transition to EIP, the lack of material earnings impact from unsubsidized EIP sales, the phenomenon of customers holding their phones longer after subsidies were phased out, and the lower upgrade rates that resulted.[25] The disclosures show that reasonable investors would be aware smartphone upgrades were declining, but that the decline had little impact on AT&T's profitability.

- On January 16, 2015, for example, Drexel Hamilton published an analyst report stating that "handsets sold on financing plans, such as AT&T Next, **are typically breakeven**."[26]

- During its 4Q 2015 earnings call on January 27, 2015, AT&T disclosed that "**more than half of our smartphone base has moved off the subsidy model pricing**," with "nearly 70% of our postpaid base now on Mobile Share plans" and "about 58% of our postpaid smartphone base" on "no-subsidy pricing."[27]

- On February 11, 2015, FierceWireless.com published an article stating that Verizon, AT&T, Sprint, T-Mobile, and other wireless carriers "have embraced" installment plans and that "[h]andset replacement **has abruptly slowed to the lowest rate since we began calculating the metric**."[28]

- On April 22, 2015, AT&T disclosed that "**70% of phone sales in the quarter didn't carry a subsidy**."[29]

---

[24] See SOF at ¶ 13; Entner Decl., Ex. 1 at ¶¶ 20(B), 85, 197; Valentine Decl., Ex. 1 at ¶ 152.

[25] See JSF at ¶153; SOF at ¶ 14; Joint Ex. 29; JSF at ¶ 155; Joint Ex. 32; JSF at ¶¶ 156-163; Joint Exs. 33–40; JSF at ¶¶ 165-169; Joint Exs. 41-45.

[26] See JSF ¶ 151; Joint Ex. 157, Jan. 16, 2015 Drexel Hamilton analyst report at 2.

[27] See JSF at ¶ 152; Joint Ex. 28, Jan. 27, 2015 AT&T Earnings Transcript at 4-5.

[28] See JSF at ¶ 153; Joint Ex. 29, Feb. 11, 2015 Fierce Wireless article at 1-2.

[29] See JSF at ¶ 154; Joint Ex. 30, AT&T 1Q 2015 Earnings Transcript at 5.

- On June 1, 2015, CNET.com published an article stating that AT&T "on Monday began its push to get its retail partners and authorized third-party retailers to switch to only offering Next," further cementing the move towards unsubsidized plans.[30]

- AT&T disclosed again on July 23, 2015 that "nearly three quarters of smartphone sales [for the second quarter of 2015] **were without subsidies**."[31]

- A July 29, 2015, Computerworld.com article noted that AT&T had a "**record low upgrade rate**" for the second quarter.[32]

- On August 13, 2015, Money.com published an article titled "Cell Phone Contracts Are Dead," which described how T-Mobile, AT&T, and Verizon had phased out two-year mobile phone contracts and noted that the elimination of subsidies gave consumers "a big incentive to protect that phone **and squeeze more than just two years out of it**."[33]

- A September 10, 2015 "BeyondDevic.es" article described equipment revenue received by AT&T for the sale of Apple smartphones as "**basically just pass-through revenue** anyway and all goes on equipment costs," and that the potential decline in AT&T equipment revenue from customers buying their phones directly from Apple will be "**profit neutral**" for AT&T.[34]

- On October 2, 2015, Citi published an analyst report noting that "**Device Replacement Remains Extended**."[35]

- During its 3Q 2015 earnings call on October 22, 2015, AT&T publicly disclosed that "[a]bout two-thirds of our postpaid smartphone base" was now on "no subsidy pricing," and that "[l]**ower year-over-year smartphone upgrade volumes impacted equipment revenues**."[36]

- On December 8, 2015, AT&T's CEO disclosed that "revenue trends are all kind of skewed this year by the equipment revenues

---

[30] *See* JSF at ¶ 155; Joint Ex. 32, June 1, 2015 CNET.com article at 1.

[31] *See* JSF at ¶ 157; Joint Ex. 34, July 23, 2015 AT&T Earnings Transcript at 3.

[32] *See* JSF at ¶ 158; Joint Ex. 35, July 29, 2015 Computerworld.com article at 4.

[33] *See* JSF at ¶ 159; Joint Ex. 36, Aug. 13, 2015 Money.com article at 2.

[34] *See* JSF at ¶ 160; Joint Ex. 37, Sept. 10, 2015 BeyondDevic.es article at 2.

[35] *See* JSF at ¶ 161; Joint Ex. 38, Oct. 2, 2015 Citi analyst report at 1.

[36] *See* JSF at ¶ 163; Joint Ex. 40, Oct. 22, 2015 AT&T Earnings Transcript at 5.

and obviously, **our upgrade cycles on smartphones is way down this year. People aren't upgrading like they have in the past**. As we've gotten into this handset financing, that has an immediate hit to top-line revenues and just **upgrades are not happening as quickly as they were**, so it's causing a suppressive view on revenues. It's a great profitability view, but it's just equipment revenues **that are really low-margin stuff**."[37]

- On December 8, 2015, Matthew Niknam from Deutsche Bank wrote that AT&T's "[u]pgrade cycles **are way down** yoy [year over year]."[38] On December 9, 2015, AT&T publicly disclosed that "almost 80% of our customers" were choosing Next or simply bringing their own device and purchasing AT&T wireless plans without buying a phone from AT&T.[39]

- AT&T announced in late December 2015 that it was **phasing out nearly all remaining subsidy plan options** for non-business customers, effective January 8, 2016.[40]

- On January 9, 2016, CNET.com reported that "**[t]he era of $200 smartphones with two-year contracts has ended**" while noting that "[y]ou can save a lot of money, though, when **you bring your own device** to the AT&T service."[41]

In addition, as Defendants' telecommunications expert Roger Entner testified, comparing the publicly available average revenue per iPhone that Apple received based on its 2015 annual report on the one hand, to the publicly available prices that the iPhones were sold by the carriers on the other hand, led to the understanding

---

[37] *See* JSF at ¶ 165; Joint Ex. 41, Dec. 8, 2015 AT&T Inc. at UBS Conference Transcript at 6.

[38] *See* JSF at ¶ 166; Joint Ex. 42, Dec. 8, 2015 Internal Deutsche Bank Email "AT&T CEO at UBS conference".

[39] *See* JSF at ¶ 167; Joint Ex. 43, Dec. 9, 2015 AT&T Inc. at Barclays Conference Transcript at 5.

[40] *See* JSF at ¶ 168-69; Joint Ex. 44, Dec. 30, 2015 Re/code article at 2; Joint Ex. 45, Dec. 30, 2015 TheVerge.com article at 2.

[41] *See* JSF at ¶ 177; Joint Ex. 49, Jan. 9, 2016 CNET.com article at 1; *see also* JSF at ¶ 176; Joint Ex. 48, Jan. 8, 2016 FierceWireless.com article at 1 (similar statement.)

during the relevant time period that AT&T's smartphone sales under the Next program were largely profit neutral.[42]

### AT&T's Fourth-Quarter Revenue Miss and Lack of Stock Price Impact

On January 26, 2016, AT&T announced that while it met consensus earnings expectations for the 4Q 2015, its 4Q 2015 revenue fell approximately $600 million short of consensus, due largely to analysts' overestimation of AT&T's wireless equipment revenue.[43] "Consensus estimates" are aggregations of various analyst forecasts for a company for certain metrics, typically reflecting the mean of the current forecasts provided by each individual analyst.[44] The SEC admits that published estimates by individual analysts, as well as consensus estimates by firms such as First Call or Bloomberg, are public information.[45] AT&T also missed analysts' consensus revenue forecasts in the first and third quarters of 2015.[46]

Specifically, on January 26, 2016, AT&T disclosed "**lower equipment sales**" for 2015 **"as customers chose to hold onto their smartphones for a longer period of time,"** that "equipment revenues **were down more than $700 million**" on a year-over-year basis, "**mostly due to lower upgrade volumes,**"[47] and that "total wireless revenue was impacted by **lower smartphone sales**. . . .  Equipment

---

[42] *See* Entner Decl. at ¶ 4(a).

[43] *See* JSF at ¶ 170; SOF at ¶ 15.

[44] *See* JSF at ¶ 138.

[45] *See* JSF at ¶ 138; SOF at ¶ 48.

[46] *See* JSF at ¶¶ 164, 175; SOF at ¶ 20; Compl., Dkt. No. 1 at ¶ 35; *see also* Viola Decl., Ex. 1, Levy Article; Viola Decl., Ex. 2, Villapaz Article.

[47] *See* JSF at ¶ 171; Joint Ex.  46, AT&T Jan. 26, 2016, Earnings Call at 4, 6 (emphasis added); *see also* Joint Ex.  7, Jan. 26, 2016 AT&T 4Q 2015 Financial and Operational Results at 19 (financial results showing $700 million drop in equipment revenue for AT&T Mobility); Valentine Decl., Ex. 1 at ¶ 152.

revenues also were impacted by an increasing [sic] number of Bring-Your-Own-Device subscribers.  We had about 700,000 in the quarter."[48]  AT&T also disclosed in its January 26, 2016, Investor Briefing that it saw "record [Bring-Your-Own-Device] customers" and "lower smartphone upgrade volumes" in 2015 and that "[wireless] equipment revenues decreased 14.9% to $4.1 billion [a drop of more than $600 million], due to lower sales volumes in the quarter."[49]

The SEC concedes that despite this approximately $600 million revenue miss versus consensus, there was **no statistically significant change in AT&T's stock price** on the first trading day after the after-hours announcement.[50] The stock price closed $0.08 higher that day – a 0.225% change that was plainly insignificant.[51] The SEC's experts have collectively failed to cite any other surprising or countervailing news in the January 26, 2016 announcement that would have masked a stock price change caused by the revenue miss. As AT&T economics expert Lucy Allen opined, the January 26, 2016 announcement provided a "natural experiment" to show whether the market viewed declining equipment revenue as material, as AT&T otherwise met EPS forecasts and did not change its guidance or "surprise" the market in any other way.[52] In other words, the only information identified by any expert that

---

[48] *See* JSF at ¶ 171; Joint Ex.  46, AT&T Jan. 26, 2016, Earnings Call at 6 (emphasis added).
[49] *See* JSF at ¶ 172; Joint Ex. 47, AT&T Jan. 26, 2016, Investor Briefing at 12.
[50] *See* JSF at ¶ 173; SOF at ¶¶ 19-20.
[51] *See* JSF at ¶ 173; SOF at ¶ 16; Krumholz Decl., Ex. 6, Griffin Dep. Tr. at 30:13-32:9; Joint Ex. 245, AT&T Stock Price Chart.
[52] *See* SOF at ¶ 19; Allen Decl. at ¶ 71. Both Allen and AT&T expert Allen Ferrell conducted event studies confirming the absence of any statistically significant stock price reaction after the January 26, 2016 announcement.  *See* Allen Decl. at ¶ 71; Ferrell Decl., Ex. 1 at ¶ 25.

could have surprised the market that day was the revenue miss. The market rendered an unequivocal verdict that the information was not material.

### *Additional 2016 Disclosures Regarding Lower Upgrade Rates*

AT&T continued to disclose the low-upgrade trend after the January 26, 2016 earnings announcement. For example, AT&T publicly disclosed in its February 18, 2016 Financial Review that "[i]n late December 2015, we announced an end to offering subsidized handsets for most of our customers" and that AT&T had "fewer upgrade transactions" in 2015.[53] On March 2, 2016, AT&T Entertainment CEO John Stankey publicly stated that many AT&T customers "are no longer thinking that they want to upgrade [their phones] every 12 months or 18 months. They are taking care of it. They are going, wow, this isn't a $199 device, this is a $600 device. I'd better care for it more carefully. I'd better do some things differently with my children and as a result of that, **renewal cycles on that very capable device are extending**."[54] AT&T further disclosed during the March 2, 2016 conference that handset renewal time periods were "shifting out and it's getting longer and I think that that is just a trend. **It's not a trend that I believe is unique to AT&T**. Everything I gather from talking to others in the industry who sell handsets and looking at what other folks have said publicly, **there's a dynamic that this is going on across the board** and I think that it's only rational as a result of that."[55] UBS likewise published

---

[53] *See* JSF at ¶ 180;  Joint Ex. 51a-51e, Feb. 18, 2016 AT&T Financial Review at 21.
[54] *See* JSF at ¶ 181; Joint Ex. 113, Mar. 2, 2016 AT&T Inc. at Morgan Stanley Conference Transcript at 9.
[55] *See* Joint Ex. 113 at 11.

an article on March 2, 2016, which stated that "**carriers generally expect upgrade cycles to continue to lengthen**" into 2016.[56]

### *AT&T's March 9, 2016 Disclosures*

As noted above, AT&T undisputedly reported record-low upgrade rates in the second and third quarters of 2015 and the lowest fourth quarter upgrade rate in ten years for the fourth quarter of 2015, with an approximate $700 million year-over-year wireless equipment revenue decline that quarter.[57] The upgrade rate for the second quarter of 2015 was 5.8%, a record low, down from 6.3% year-over-year (that is, versus the second quarter of 2014).[58] The third quarter 2015 upgrade rate was 5.7%, another record low, down 1.4% year-over-year.[59] The fourth quarter 2015 upgrade rate – which, again, was the highest of 2015 due to the historical seasonal increase in holiday phone sales – was also down sharply versus the fourth quarter of 2014, during which time Apple released its popular iPhone 6.[60] This 4Q upgrade rate was the lowest fourth quarter upgrade since 2005, before the iPhone was launched.[61]

Despite all of these disclosures, analysts covering AT&T continued to forecast higher upgrade rates and equipment revenues for 2016 than were reported during 2015,[62] notwithstanding the absence of any economic conditions, significant new smartphone models, any restoration of subsidies, or other factors that would suggest

---

[56] *See* JSF at ¶ 213; Joint Ex. 62, Mar. 2, 2016 UBS analyst report at 4.
[57] *See* SOF at ¶ 42-44; Joint Ex. 7, Jan. 26, 2016 AT&T Financial and Operational Results; JSF at ¶¶ 113 - 115; Joint Ex. 46, AT&T Earnings Call at 6.
[58] *See* JSF at ¶¶ 113 – 115; SOF at ¶ 42.
[59] *See* JSF at ¶¶ 113 – 115; SOF at ¶ 43.
[60] *See* JSF at ¶¶ 113 – 115; SOF at ¶ 44; Entner Decl., Ex. 1 at ¶ 84.
[61] *See* JSF at ¶ 115; SOF at ¶ 44.
[62] *See* SOJ at ¶ 50; Compl., Dkt. No. 1 at ¶ 68.

a reversal of the slower-upgrade trend. The analysts' upgrade rate forecasts were all over the map, ranging from 5.7% to 9.0%, with many forecasts exceeding the 6.6% upgrade rate AT&T reported in the first quarter of 2015.[63] There is no evidence plausibly explaining why analysts were forecasting higher upgrade rates other than that analysts did not view the metric as important to their value thesis and thus did not focus on it. As AT&T's telecom expert Roger Entner opined, several analysts did not include upgrade rates in their models at all, while others included them in their models even though upgrade rates did not drive any other metrics, or in an imprecise way that suggested an understanding that upgrade rates were not material to their calculations.[64] Multiple analysts likewise testified that upgrades and equipment revenues were not significant to their analysis due to the lack of earnings impact.[65]

---

[63] *See* Compl., Dkt. No. 1 at ¶ 68.

[64] *See* Entner Decl., Ex. 1 at ¶ 119; Valentine Decl., Ex. 1 at ¶ 87; *see also* SOF at ¶¶ 51-52; Krumholz Decl., Ex. 7, Entner Dep. Tr. at 85:11-24; Krumholz Decl., Ex. 8, Allen Dep. Tr. at 129:16-130:10. The SEC's expert Professor John Griffin likewise admits that at least four analyst firms did not use the handset upgrade rate in their models. Krumholz Decl., Ex. 9, Griffin Expert Report at App'x C.

[65] *See* SOF at ¶ 51; Krumholz Decl., Ex. 10, Breen, James William Blair, Dep. Tr. at 85:5-11 (equipment revenue was "a zero sum game" and "profit neutral"); Krumholz Decl., Ex. 11, Cusick, Philip, JP Morgan, Dep. Tr. at 38:15-39:7 (equipment revenue under EIP is "pass-through" and "EBITDA neutral"); *id.* at 44:14-16 ("Equipment revenue which impacts revenue and may be offset by costs typically does not impact EBITDA and so is not something that people focus on"); Krumholz Decl., Ex. 12, Fritzsche, Jennifer, Wells Fargo, Dep. Tr. at 94:13-21 (stating that equipment revenue "does not impact earnings"); Krumholz Decl., Ex. 13, Hodulik, John, UBS, Dep. Tr. at 58:6-8 (testifying that there is no profit associated with equipment revenue because is a "pass-through"); Krumholz Decl., Ex. 14, Kvaal, Jeffrey, Nomura, Dep. Tr. at 28:5-11 (agreeing that he was not interested in equipment revenue because "it either had no margin or very low margin attached to it"); Krumholz Decl., Ex. 15, McNiff, Gregory, Nomura, Dep. Tr. at 112:24-113:21 (stating that "equipment revenue is like what's called like pass-through . . . I think of it as like margin neutral, maybe slightly margin negative"); Krumholz Decl., Ex. 16, Levi, Batya, UBS, Dep. Tr. at 66:20-21 (upgrade rates under EIP are "profit-neutral"); Krumholz Decl., Ex. 17, Niknam, Matthew, Deutsche Bank, Dep. Tr. at 155:6-11 (equipment revenue "did not carry margin or profitability with it"); Krumholz Decl., Ex. 18, Piecyk, Walter, BTIG, Dep. Tr. at 69:2-4  ("upgrade rate was irrelevant to the EBITDA and earnings of the company"); Krumholz Decl., Ex. 19, Sine, Barry, Drexel Hamilton, Dep. Tr. at 195:6-11 (lower upgrade rates have a "neutral impact" on earnings for unsubsidized phones).

Consistent with public company norms and as affirmed by the SEC's own experts, AT&T's IR department routinely monitors consensus estimates of various metrics and compares what it is internally seeing and projecting. [66] AT&T management understandably did not want analysts' apparent lack of focus on the declining upgrade trend to produce incorrect consensus revenue forecasts, which can create negative headlines based on a metric of no substantive value.[67]

In March 2016, CFO John Stephens raised the possibility of filing a Form 8-K to address the slower upgrade trend (in addition to several other unrelated issues).[68] Stephens decided instead to emphasize the trend during a public March 9, 2016 presentation at Deutsche Bank's 2016 Media, Internet, and Telecom Conference (hereinafter "the March 9 Conference").[69] The Complaint does not allege that these remarks were nonpublic or otherwise not compliant with Regulation FD, and AT&T has conclusively established they were broadly available to investors.[70]

In his opening remarks at the March 9 Conference, Stephens publicly stated: "I think you saw in the fourth quarter, it was a slowdown in the handset upgrade cycle or the total sales. **I wouldn't be surprised to see that continue**...." [71]

---

[66] *See* SOF at ¶ 53; Valentine Decl., Ex. 1 at ¶ 28; Krumholz Decl., Ex. 20, Viola Dep. Tr. at 84:23-85:11; Krumholz Decl., Ex. 21, DiBucci Dep. Tr. at 261:2-62:25 (acknowledging Verizon's IR department also monitored consensus numbers when he was there); Krumholz Decl., Ex. 22, Blalock Dep. Tr. at 276:15-23 (stating that comparing actual numbers and consensus is "one of the roles of IR").

[67] *See* SOF at ¶ 54; Krumholz Decl., Ex. 20, Viola Dep. Tr. at 44:22-45:3 (testifying that missing consensus was "a media distraction for us, and we knew what the issue was").

[68] *See* SOF at ¶ 23; Joint Ex. 216, March 3, 2016 AT&T Internal Email "8K".

[69] *See* JSF at ¶ 188; SOF at ¶ 24; Joint Ex. 55, Mar. 9, 2016 AT&T Inc. at Deutsche Bank Conference Transcript; Krumholz Decl., Ex. 23, Stephens Dep. Tr. at 212:11-212:13; Krumholz Decl., Ex. 20, Viola Dep. Tr. at 104:5-22.

[70] *See* Compl. Dkt. No. 1; SOF at ¶ 25; Krumholz Decl., Ex. 23, Stephens Dep. Tr. at 229:13-22.

[71] *See* JSF at ¶ 191; SOF at ¶ 26; Joint Ex. 55, Mar. 9, 2016 AT&T Inc. at Deutsche Bank Conference Transcript at 3.

Stephens further stated that the slowdown would have "very little impact at all on profitability" because handset revenue was "hedged in one way or another with the handset expenses…."[72] In addition, Stephens reiterated that the "average customer is holding their phones longer"; that the number of subscribers who brought their own device when they purchased a new wireless plan (i.e., BYOD subscribers) rose from "90,000 to 100,000 a quarter" before the introduction of AT&T's no-subsidy "Next" plan, to "350,000 to 400,000" per quarter for most of 2015, which "show[ed] that customers are valuing that old device and reusing it"; and that the number of BYOD subscribers further rose to "700,000" during the fourth quarter 2015.[73]

Notably, one day earlier, Verizon made very similar disclosures at the same conference. Verizon's CFO publicly stated that "[i]n this world, where the customers [*sic*] is paying full price for the phone, [upgrade volume] has less of an impact… it's zero profit… [b]ecause **everyone is selling them at cost**… So, where volumes go, volumes will go. It does, obviously, have an impact to top-line because the more I sell, the more revenue growth there is. But, **there's no profit in that revenue growth**."[74] Verizon's CFO further stated that "volume in the fourth quarter" was "**less than a year ago**," and that this reduced upgrade level would likely remain

---

[72] *See* JSF at ¶ 191; SOF at ¶ 26; Joint Ex. 55, Mar. 9, 2016 AT&T Inc. at Deutsche Bank Conference Transcript at 3.

[73] *See* JSF at ¶ 191; SOF at ¶ 27; Joint Ex. 55, Mar. 9, 2016 AT&T Inc. at Deutsche Bank Conference TranscriptAt 6.

[74] *See* SOF at ¶ 28; Joint Ex. 226, March 8, 2016 Verizon at Deutsche Bank Conference Transcript at 16.

"**steady as she goes**" until "we see a massive change in technology in the handsets" that would motivate customers to upgrade their phones.[75]

Reporters and analysts who covered Stephens' remarks interpreted them as conveying that the slower upgrade rate and equipment revenue trends were expected to continue in the first quarter. For example, Bloomberg publicly noted immediately after the conference that "**AT&T Expects Slowdown in Phone Sales to Continue in 2016**."[76] Later that day, Deutsche Bank published a research note, which referenced Stephens' presentation earlier that day and stated that "[w]hile some revenue headwinds like lower handset volumes and negative F/X swings **appear to have continued in early 2016**, these do not impact margin/profitability improvements (where T remains focused)."[77] Likewise, almost immediately after Stephens had made his remarks, UBS analyst Gabriella Brown circulated an internal email within UBS with the heading "AT&T Corp.: CFO: **Expect slowdown in phone sales to continue in FY16** – conf comments – what is he referencing?"[78] At approximately 1:00 p.m. Eastern on March 9, 2016, another UBS analyst, Batya Levi, responded: "Slow volumes ie handset adds and upgrades.  Installment plans and lack of iconic device launches are keeping volumes low.  VZ said the same yesterday."[79] SEC experts Blalock and DiBucci also agreed that Stephens conveyed during the

---

[75] *See* SOF at ¶ 28; Joint Ex. 226, March 8, 2016 Verizon at Deutsche Bank Conference Transcript at 16.
[76] *See* JSF at ¶ 196; SOF at ¶ 30;  Joint Ex. 60, Mar. 9, 2016 Bloomberg alert (EVER-ATT_00015942).
[77] *See* JSF at ¶ 195; SOF at ¶ 31; Joint Ex. 59, Mar. 9, 2016 Deutsche Bank analyst report.
[78] *See* JSF at ¶ 193; SOF at ¶¶ 34-35; Joint Ex. 57, Mar. 9, 2016 UBS Internal Email (SEC-LIT-ATT-000877104).
[79] *See* JSF at ¶ 193; SOF at ¶ 36; Joint Ex. 57, Mar. 9, 2016 UBS Internal Email (SEC-LIT-ATT-000877104).

March 9 Conference that AT&T was expecting lower upgrade rates and equipment revenues in the first quarter of 2016.[80]

### AT&T's IR Employees Alert Analysts to Stephens' Public Comments

Following Stephens' public statements, AT&T's IR employees had follow-up conversations with individual analysts between March 9, 2016, and April 21, 2016, concerning what Stephens told the market.[81] These communications are not unusual.[82] The SEC's public Regulation FD guidance recognizes that IR personnel may call analysts privately to point out how their models diverge from publicly reported information.[83] As noted in Figure 2 of the report by SEC expert Lauren Cohen, AT&T's IR team had similarly high call volumes with analysts during multiple other time periods in 2015-16.[84] Many of the March-April 2016 calls moreover were inbound calls from analysts, rather than outbound calls.[85] The individual Defendants testified that they have no recollection of providing any AT&T internal numbers during the calls and would not have done so because providing internal financial information to analysts was and is prohibited under AT&T policies and practices.[86] While multiple analysts included notes suggesting a 5% upgrade rate, 15-20% year-over-year drop in equipment revenue, or a $600 million year-over-

---

[80] *See* SOF at ¶ 38; Krumholz Decl., Ex. 22, Blalock Dep. Tr. at 301:5-15; Krumholz Decl., Ex. 21, DiBucci Dep. Tr. at 241:13-42:17.

[81] *See* SOF at ¶ 55; Krumholz Decl., Ex. 20, Viola Dep. Tr. at 115:2-16.

[82] *See* SOF at ¶ 56; Krumholz Decl., Ex. 22, Blalock Dep. Tr. at 192:5-18, 279:18-280:17; Krumholz Decl., Ex. 21, DiBucci Dep. Tr. at Tr. 90:22-91:4; Krumholz Decl., Ex. 24, Wolk Dep. Tr. at 244:6-19.

[83] *See* JSF at ¶ 122; SOF at ¶ 56; Joint Ex. 15, June 4, 2010, SEC Compliance & Disclosure Interpretation: Regulation FD at 3-4.

[84] *See* SOF at ¶ 57; Krumholz Decl., Ex. 25, Cohen Expert Report at Figure 2.

[85] *See* SOF at ¶ 57; Krumholz Decl., Ex. 25, Cohen Expert Report at Figure 2.

[86] *See* SOF at ¶ 58; Krumholz Decl., Ex. 3, Black Dep. Tr. at 84:14-85:24, 321:9-322:13, 343:16-19; Krumholz Decl., Ex. 1, Womack Dep. Tr. at 104:24-107:14, 111:03-115:01:, 181:18-25, 198:4-18; Krumholz Decl., Ex. 2, Evans Dep. Tr. at 145:02-146:15, 193:3-194:3, 209:02-210:05.

year equipment revenue decline, the analysts testified that their notes did not reflect a verbatim account of what was said or who said what, but rather was an amalgamation of their own thoughts and perceptions.[87] And even assuming *arguendo* the information was communicated, it was immaterial and already public.

Notably, **not a single analyst who participated in the calls has testified they believe they received material, nonpublic information, and none told their compliance officers or anyone else at their employer that AT&T divulged material nonpublic information during the calls.**[88] Multiple analysts, including the UBS analysts who published the first post-March 9 updated forecasts on March 18, 2016, affirmatively testified they received no material nonpublic

---

[87] *See, e.g.* SOF at ¶ 60; Krumholz Decl., Ex. 26, Stein, Caleb, Wells Fargo, Dep Tr. at 35:18-37:25, 86:3-87:12; Krumholz Decl., Ex. 15, McNiff, Gregory, Nomura, Dep. Tr. at 66:2-22, 78:2-79:8, 79:21-80:2; Krumholz Decl., Ex. 14, Kvaal, Jeffrey, Nomura, Dep. Tr. at 89:24-90:23, 142:3-18; Krumholz Decl., Ex. 17, Niknam, Matthew, Deutsche Bank, Dep. Tr. at 116:1-10, 116:18-117:3.

[88] *See, e.g.*, SOF at ¶ 59; Krumholz Decl., Ex. 19, Sine, Barry, Drexel Hamilton, Dep. Tr. at 106:2-14; 112:18-23; 339:16-340:02; Krumholz Decl., Ex. 26, Stein, Caleb, Wells Fargo, Dep. Tr. at 47:22-49:19; 115:10-116:09, 123:18-124:24; Krumholz Decl., Ex. 11, Cusick, Philip, JP Morgan, Dep. Tr. at 89:4-90:04; 131:23-133:02; Krumholz Decl., Ex. 15, McNiff, Gregory, Nomura, Dep. Tr. at 86:14-87:9; Krumholz Decl., Ex. 27, Hyun, Brian, RBC, Dep. Tr. at 26:13-28:04; 102:11-103:2; Krumholz Decl., Ex. 28, Choe, Richard, JP Morgan, Dep. Tr. at 37:2-15; Krumholz Decl., Ex. 13, Hodulik, John, UBS, Dep. Tr. at 46:5-47:2; 240:19-242:08; 244:0-25; Krumholz Decl., Ex. 16, Levi, Batya, UBS, Dep. Tr. at 51:11-52:3, 99:14-100:2; Krumholz Decl., Ex. 12, Fritzsche, Jennifer, Wells Fargo, Dep. Tr. at 26:13-27:25; 111:05-112:11; Krumholz Decl., Ex. 17, Niknam, Matthew, Deutsche Bank, Dep. Tr. at 102:18-105:08; 128:23-129:06; Krumholz Decl., Ex. 10, Breen, James, William Blair, Dep. Tr. at 40:5-25; 54:01-13; Krumholz Decl., Ex. 29, Nispel, Brandon, Pacific Crest, Dep. Tr. at 77:15-78:25; Krumholz Decl., Ex. 30, Galone, Joseph, BTIG, Dep. Tr. at 38:02-39:07; Krumholz Decl., Ex. 18, Piecyk, Walter, BTIG, Dep. Tr. at 19:1-21:12, 140:02-25; Krumholz Decl., Ex. 31, Bowen, Michael, Pacific Crest, Dep. Tr. at 18:01-23; 76:21-77:10; 78:10-13; Krumholz Decl., Ex. 32, Fletcher, Whitney, Deutsche Bank, Dep. Tr. 63:16-64:07; 65:21-68:11; Krumholz Decl., Ex. 33, Ilkowitz, Adam, Citigroup, Dep. Tr. at 95:21-96:17; 102:13-21; 117:12-118:15; 155:10-23; 193:02-17.

information from AT&T.[89] The analysts instead repeatedly testified that they viewed equipment revenue from EIP upgrades as profit-neutral and unimportant:

> Q.    Explain to the ladies and gentlemen of the jury why you, as an analyst of 20-plus years covering AT&T, wouldn't think this is material?"
>
> A.    "Because I would, that is probably going to have if, if wireless equipment revenue is down 20 percent, probably my cost of equipment is going to be down a similar amount, and there will be no change to my EBITDA or EPS estimates that really drive my price target and recommendation on the day."
>
> Q.    "In your mind, as an analyst working the numbers, doing the analysis here, even if someone told you, "I think equipment revenue is going to be down 20 percent," to you that wouldn't be material, because it's going to be offset by declining costs?"
>
> A.    "That's right."[90]
>
> * * *
>
> "AT&T is just selling an Apple handset to a sub [subscriber to AT&T's service] and then passing that money back to Apple. It's not part of AT&T's -- what I think is normal course of business. Again, I think of them as a channel for Apple or Samsung."[91]
>
> * * *

---

[89] SOF at ¶ 61; Krumholz Decl., Ex. 26, Stein, Caleb, Wells Fargo, Dep. Tr. at 46:23-49:19; Krumholz Decl., Ex. 17, Niknam, Matthew, Deutsche Bank, Dep. Tr. at 50:14-52:14; 102:12-105:08; 127:17-128:09; 108:08-109:4; Krumholz Decl., Ex. 11, Cusick, Philip, JP Morgan, Dep. Tr. at 89:24-90:04; Krumholz Decl., Ex. 10, Breen, James, William Blair, Dep. Tr. at 53:06-18; 55:11-15; 99:14-24; Krumholz Decl., Ex. 13, Hodulik, John, UBS, Dep. Tr. at 45:10-47:2; 132:21-133:9; 216:1-218:6; Krumholz Decl., Ex. 27, Hyun, Brian, RBC, Dep. Tr. at 27:14-28:4; 132:24-135:08; Krumholz Decl., Ex. 16, Levi, Batya, UBS, Dep. Tr. at 49:21-53:06; 95:12-96:11; 98:09-14; Krumholz Decl., Ex. 32, Fletcher, Whitney, Deutsche Bank, Dep. Tr. at 63:04-64:07; 65:18-66:14; Krumholz Decl., Ex. 12, Fritzsche, Jennifer, Wells Fargo., Dep. Tr. at 25:20-27:25; 95:17-96:16, Krumholz Decl., Ex. 18, Piecyk, Walter, BTIG, Dep. Tr. at 20:17-21:12, 73:7-12; Krumholz Decl., Ex. 30, Galone, Joseph, BTIG, Dep. Tr. at 36:04-37:06; Krumholz Decl., Ex. 14, Kvaal, Jefferey, Nomura, Dep. Tr. at 66:18-69:15; Krumholz Decl., Ex. 15, McNiff, Gregory, Nomura, Dep. Tr. at 86:05-87:14; Krumholz Decl., Ex. 29, Nispel, Brandon, Pacific Crest, Dep. Tr. at 76:21-78:24; Krumholz Decl., Ex. 19, Sine, Barry, Drexel Hamilton, Dep. Tr. at 100:03-10; 112:18-113:19; Krumholz Decl., Ex. 33, Ilkowitz, Adam, Citigroup, Dep. Tr. at 93:08-13; 96:07-17.

[90] SOF at ¶ 62; Krumholz Decl., Ex. 16, Levi, Batya, UBS, Dep. Tr. at 97:3-25.

[91] SOF at ¶ 62; Krumholz Decl., Ex. 15, McNiff Gregory, Nomura, Dep. Tr. at 114:2-6.

"If I sell or hand a customer another phone, then that would create the revenue of that that I record in equipment revenue. It also records a fairly -- under an installment plan, a fairly similar number in cost of equipment, and so your question is how would it impact margins. It would have very little impact on margins."[92]

* * *

"[C]alling it a zero margin business made sense."[93]

* * *

"[W]e call it "EBITDA neutral," so revenue and cost are fairly close."[94]

* * *

Q:   "[D]id you understand that even though they [AT&T] were receiving revenues in the forms of purchases of these phones, they had an equivalent cost that made it a zero-sum game? That is, earnings are profit neutral?"

A.   "Yes."[95]

* * *

"[I]t's not profitable revenue but rather kind of pass-through revenue and therefore, it's no--no benefit or hurting of margin."[96]

* * *

"Equipment sales and FX [foreign exchange] are not really a key driver for any evaluation of what you do with stocks."[97]

* * *

---

[92] SOF at ¶ 62; Krumholz Decl., Ex. 11, Cusick, Philip, JP Morgan, Dep. Tr. at 114:15-21.
[93] SOF at ¶ 62; Krumholz Decl., Ex. 14, Kvaal, Jeffrey, Nomura, Dep. Tr. at 134:24-25.
[94] SOF at ¶ 62; Krumholz Decl., Ex. 11, Cusick, Philip, JP Morgan, Dep. Tr. at 39:5-7.
[95] SOF at ¶ 62; Krumholz Decl., Ex. 10, Breen, James, William Blair, Dep. Tr. at 85:5-11.
[96] SOF at ¶ 62; Krumholz Decl., Ex. 12, Fritzsche, Jennifer, Wells Fargo, Dep. Tr. at 168:10-13
[97] SOF at ¶ 62; Krumholz Decl., Ex. 29, Nispel, Brandon, Pacific Crest, Dep. Tr. at 52:6-8.

Q:     "Is it fair for the jury to conclude that what you were trying to say to your client was that although there may be a revenue miss because equipment revenue's gone down, not to worry, it's not material because it's margin neutral and largely pass-through? Is that a fair summary?"

A:     "Yeah, and it does not impact earnings."[98]

* * *

Q:     "Is there any margins or profit associated with equipment revenue?"

A:     "No. It's a pass-through."[99]

**The Analysts' Updated Reports Confirm the Information Was Immaterial**

The updated analyst reports published after the calls at issue likewise show the analysts viewed the trend as profit neutral and insignificant to AT&T's earnings. On March 18, 2016, UBS published an updated analyst report titled "Wireless Telecommunications: What Longer Upgrade Cycles Mean for the Carriers."[100] This was the first analyst report published after the calls at issue in this litigation in which an analyst revised their prior published forecasts, and is the first analyst report that the SEC contends reflects information that was disclosed during those calls.[101] The report addressed Verizon, Sprint, and T-Mobile in addition to AT&T.[102] UBS noted that "[a]part from record volumes seen in Q414, the industry's upgrade rate has been consistently flat to down over the past 2 years" and forecast a 6.2% upgrade rate for the group as a whole.[103] The report also stated that while "we are also lowering [our]

---

[98] SOF at ¶ 62; Krumholz Decl., Ex. 12, Fritzsche, Jennifer, Wells Fargo, Dep. Tr. at 94:13-21.
[99] SOF at ¶ 62; Krumholz Decl., Ex. 13, Hodulik, John, UBS, Dep. Tr. at 58:6-8.
[100] *See* JSF at ¶ 216; SOF at ¶ 66; Joint Ex. 64, Mar. 18, 2016 UBS analyst report.
[101] *See* Compl. Dkt. No. 1 at ¶ 84.
[102] *See* JSF at ¶ 216; Joint Ex. 64, Mar. 18, 2016 UBS analyst report.
[103] *See* Joint Ex. 642.

equipment revenue assumptions for the group," this reduction "should not have a meaningful impact on EBITDA as EIP accounting allows them to largely match equipment revenues with the cost of the device."[104] There is no competent evidence showing that these statements would be expected to cause a stock price decline.

Subsequent reports confirmed that the analysts viewed the trend as neutral:

- On March 21, 2016, Deutsche Bank published an analyst report titled "Record-Low Upgrade Activity in 1Q; Revenue Pressure, EPS Unchanged."[105] The report stated that "[w]hile **this is more optical in nature**, we nonetheless flag that we are reducing revenue expectations into the print given: (1) lower handset upgrade volumes, and (2) FIX headwinds. Though we believe there are cost offsets which keep **our EPS expectations unchanged**, we note our current 1Q16 revenue estimate is -3% vs. consensus, which **we expect to trend lower in upcoming weeks**."[106]

- On March 28, 2016, Wells Fargo published an "Equity Research" report for AT&T.[107] The report stated that "[w]e believe T's postpay upgrades will be 5% in Q1, 300bps below current Street expectations. […] While this is a **negative for the headline revenue print** (as equipment revenues likely will come in below where Street is currently modeling), **we note this equipment revenue is margin neutral**, or essentially a pass through. So while lower revenue is optically tough to see, it does not impact margin or EPS."[108]

- On April 19, 2016, Pacific Crest published a report titled "Upgrade Rates Hit Air Pockets; Adjusting Estimates for T and VZ."[109] The report stated that "[w]e are making changes to our estimates for AT&T and Verizon based on updated upgrade assumptions, which has the effect of lowering our equipment revenue estimates. At the same time, this should lead to a slightly more positive adjusted EBITDA margin. We do not believe that these are significant changes to the model because, as we mentioned previously, **equipment revenue is basically a pass-through** account. In

---

[104] *See* Joint Ex. 644.
[105] *See* JSF at ¶ 226; Joint Ex. 69, Mar. 21, 2016 Deutsche Bank analyst report.
[106] *See* Joint Ex. 69. at 5.
[107] *See* JSF at ¶ 230; Joint Ex. 70, Mar. 28, 2016 Wells Fargo analyst report.
[108] *See* Joint Ex. 70 at 1.
[109] *See* JSF at ¶ 267; Joint Ex. 94, Apr. 19, 2016 Pacific Crest April 19 Note.

addition, we believe FX pressures will affect AT&T's 1Q16 results and thus lead to slightly lower international revenue. [...] **Our total EPS estimates for 1Q16 and F2016 remain unchanged**."[110]

**AT&T Likewise Internally Treated EIP Sales As Earnings Neutral**

The analysts' view that EIP sales are profit neutral is consistent with AT&T's internal view. AT&T's year-over-year revenue from subsidized smartphone sales was flat during the first quarter of 2016 and represented just ten percent of AT&T's overall phone sales.[111] It was the decline in upgrades by **unsubsidized** customers that drove the upgrade rate and equipment revenue changes that were allegedly selectively disclosed, not subsidy sales.[112] The SEC has produced no competent summary judgment evidence to controvert the sworn interrogatory response (incorporated into John Stephens' declaration) demonstrating that AT&T's unsubsidized Next plan produced a total net economic loss of just $48,479,863 (before taxes) for Next sales made during 1Q 2016 when all relevant economic inflows and outflows are considered.[113] This amount is **less than 1.3%** the size of AT&T's more than $3.8 billion in net income for the first quarter.[114] Further, when the 35% federal income tax rate in effect during 2016 is applied, the amount drops to **less than 1%** the size of AT&T's net income, which is an after-tax amount.[115] This amount is the **total** economic impact of Next sales made during the quarter.[116] The difference

---

[110] *See* Joint Ex. 94 at 7.
[111] *See* JSF at ¶¶ 93-95; SOF at ¶ 69; Stephens Decl. at ¶ 31.
[112] SOF at ¶ 69; Stephens Decl. at ¶ 31.
[113] *See* SOF at ¶ 70 Stephens Decl. at ¶ 22, Ex. 1.
[114] *See* SOF at ¶ 70; Stephens Decl. at ¶ 23.
[115] *See* SOF at ¶ 70; Stephens Decl. at ¶ 23.
[116] *See* Stephens Decl. at ¶ 24.

between what the analysts were forecasting before March 9, 2016, and what Defendants allegedly selectively disclosed is a small fraction of this amount.[117]

For sales under the Next plan, AT&T sells phones for very close to the same price that they are available from the manufacturers, with the sale price and cost of the phone recognized simultaneously.[118] AT&T recognizes an imputed interest charge at the time the phone is sold, but nearly all of that is recouped as interest income as the customer makes installment payments.[119] AT&T also recognizes a "guarantee liability" based on the Next program's trade-in feature, which allows customers to trade in their phones for a new phone after a certain number of months without having to pay the remaining installments on the old phone.[120] The "guarantee liability" is a conservative estimate of the likelihood that the phone will be worth less at the time of trade-in than the balance of payments remaining.[121] There is also a "bad debt" allowance (which is a cost), as well as an activation fee (which is a customer payment to AT&T for initiating service and flows the other way).[122] When all of the inflows and outflows are tallied, the aggregate effect was patently immaterial.[123]

Stephens testified that the Next program was immaterial from an economic standpoint based on his personal analysis of the relevant inflows and outflows

---

[117] *See* SOF at ¶ 70; Stephens Decl. at ¶¶ 23-24. As noted in the Stephens Declaration, this applies a very conservative 3.5% bad debt assumption. *See id.* Applying AT&T's 1% company-wide bad debt reserve produces an even lower impact. *See id.*

[118] *See* SOF at ¶ 71; Stephens Decl. at at ¶¶ 7 (describing the company's view of the economic impact of Next phone sales).

[119] *See* SOF at ¶ 73; Stephens Decl.. at ¶¶ 7, 27.

[120] *See* SOF at ¶ 74; Stephens Decl. at ¶¶ 5, 27, Ex. 1.

[121] *See* SOF at ¶ 74; Stephens Decl. at ¶ 27, Ex. 1.

[122] *See* SOF at ¶ 75; Stephens Decl. at ¶¶ 22-23, 27-29.

[123] *See* SOF at ¶ 76l Stephens Decl. at ¶¶ 25-26.

associated with EIP sales.[124] As CFO, he was intimately familiar with AT&T's finances and had personally analyzed the economic impact.[125] Internal documents also confirm AT&T's real-time view that the revenues were immaterial.[126]

**The SEC's Accounting Expert Confirmed the Declines Were Immaterial**

The SEC has attempted to rebut Stephens' testimony through a purported expert analysis by Dominic DiBucci contending that AT&T lost an average of $100 per phone.[127] As a preliminary matter, the DiBucci report does not purport to be a formal forensic accounting analysis, but instead extrapolates from a handful of apples-and-oranges documents that do not purport to show the full aggregate accounting treatment of the EIP program or its full impact on AT&T's bottom line.[128] There is no competent summary judgment evidence supporting DiBucci's calculation. As set forth in the Stephens Declaration, the $100 drops by approximately 50% or more just by taking taxes and the activation fee into account.[129] The recoupment of interest income further reduces the alleged loss from an economic standpoint.[130]

Significantly, DiBucci's calculations admittedly do not produce a material change to earnings or revenue **even if his unfounded numbers are fully**

---

[124] *See* SOF at ¶ 77; Krumholz Decl., Ex. 23, Stephens Dep. Tr. at 153:1-3, 213:8-15.

[125] *See* SOF at ¶¶ 77-78; Krumholz Decl., Ex. 23, Stephens Dep. Tr. at 153:1-3, 213:8-15..; Stephens Decl. at ¶¶ 1, 27.

[126] *See* Viola Decl., Ex. 3, Mar. 9, 2016 "Q&A Draft" at 2 (stating that "handset sales impact revenue but not profitability"); Viola Decl., Ex. 4, Aug. 4, 2016 Sheehan Email (describing equipment revenue as having "zero profits").

[127] *See* SOF at ¶¶ 80-88; Krumholz Decl., Ex. 34, DiBucci Expert Report at ¶ 40; Stephens Decl. at ¶¶ 27-29.

[128] *See* SOF at ¶ 79; Krumholz Decl., Ex. 35, DiBucci Supplemental Report.

[129] *See* Stephens Decl. ¶ 29.

[130] *See id.*

**accepted**. DiBucci opined that AT&T lost $100 for each smartphone it sold.[131] He also acknowledged that a 1 percent decline in upgrade rate for the quarter (i.e., from 6.2% to 5.2%) would produce only a 1.2% reduction in AT&T's total revenues, that a $680 million dollar decline in equipment revenues (a 20% reduction in equipment revenues as alleged by the SEC in its Complaint to have been communicated during the phone calls in question) would be just 1.68% of AT&T's revenues, and that a 1 percent upgrade rate change would have only a $77 million impact on AT&T's bottom line for the quarter from an accounting perspective (excluding future economic inflows that would at least partially offset this amount in future quarters).[132] $77 million is just two percent of AT&T's $3.8 billion in net income for the quarter.[133] Using these same calculations, a 1.5% decline in upgrade rates would produce just a 3% impact on net income.[134] A 2% decline in upgrade rates would produce just a 4% impact (and, again, all of these percentages would be reduced if taxes are applied).[135] At bottom, even using DiBucci's own inflated numbers, the impact on earnings is still well below the 5% threshold for presumptive quantitative immateriality.

---

[131] *See* SOF at ¶¶ 80-88; Krumholz Decl., Ex. 21, DiBucci Dep. Tr. at 200:4-15. DiBucci claimed that his number did not include "other variables such as selling costs," but provides no opinion and cites no evidence as to what those costs are and does not show that they are variable costs that would materially change based on the sales volume. *Id.* at 200:1-201:16. *See also* Stephens Decl. at ¶ 28; Entner Decl., Ex. 1 at ¶ 4(b).

[132] *See* SOF at ¶¶ 80-88; Krumholz Decl., Ex. 21, DiBucci Dep. Tr. at 120:09-129:08, 203:05-205:08.

[133] *See* SOF at ¶¶ 80-88; Krumholz Decl., Ex. 21, DiBucci Dep. Tr. at 203:05-205:08.

[134] *See* SOF at ¶¶ 80-88; Krumholz Decl., Ex. 212, DiBucci Dep. Tr. at 203:05-205:08.

[135] *See* SOF at ¶¶ 80-88; Krumholz Decl., Ex. 212, DiBucci Dep. Tr. at 203:05-205:08; Stephens Decl. ¶ 23.

**AT&T's Experts Provide Further Support for Summary Judgment**

In addition to the undisputed public-disclosure record, the admissions by the SEC and its witnesses, and the uncontroverted testimony and declarations by AT&T witnesses regarding the aggregate impact of EIP sales, AT&T has also submitted expert declarations from five expert witnesses in support of this motion.

- Professor Allen Ferrell, a Harvard Law School professor and economist, has opined based on event studies that the January 26, 2016 fourth quarter revenue miss had no price impact (which the SEC admits) and that the analyst reports published after the analyst calls at issue had no statistically significant impact on AT&T's stock price.[136]

- Lucy Allen, a former economist for the national Council of Economic Advisers, has opined that the January 26, 2016 fourth quarter miss was a "natural experiment" to test the economic materiality of equipment revenue from EIP sales and demonstrated it was immaterial. She has also opined that the updated analyst reports published after the calls at issue had no statistically significant impact on AT&T's stock price, that the market understood equipment revenue to be immaterial pass-through revenue, that consensus EPS estimates did not materially change, that no analysts changed their price targets, that a reasonable analyst could have calculated materially the same upgrade rates and equipment revenues allegedly conveyed during the calls based on public information, and that SEC experts Cohen, DiBucci, Wolk, and Griffin provided no reliable evidence that the information at issue was material from an economic standpoint.[137]

- Telecommunications analyst expert Roger Entner, a well-known thought leader on trends in the wireless industry, opined that the slowdown in upgrade cycles caused by the phaseout of smartphone subsidies was well-known in the industry, that it was also well-known that equipment revenues would fall, that AT&T and others had clearly communicated this trend before the analyst calls at issue, that a reasonable telecommunications analyst would have calculated another record low upgrade rate for the first quarter of 2016 based on those communications, that it was well-understood in the industry that equipment revenue from EIP sales had little impact on earnings, and that a reasonable analyst could have calculated materially the same

---

[136] *See* Ferrell Decl., Ex. 1.
[137] *See* Allen Decl.

upgrade rates allegedly conveyed during the calls based on public information.[138]

- Analyst expert James Valentine, who authored the *Best Practices for Equity Research Analyst* guidebook (the best-selling "how to" book ever published on this topic), has opined that there was no significant movement in average EPS forecasts, that analysts actually and reasonably viewed upgrade rates and equipment revenue as earnings neutral, that analysts would have faced significant consequences had they disseminated material nonpublic information without consulting their internal compliance officers, that reasonable analysts would have viewed equipment revenue as immaterial, and that a reasonable analyst could estimate materially the same upgrade rates allegedly conveyed during the calls based on public information. [139]

- Former SEC Commissioner Paul Atkins has opined that the SEC's Blalock expert report fails to show that the NIRI best practices guidelines for investor relations professionals are a relevant industry standard for assessing Regulation FD liability, and that the SEC has failed to show how Regulation FD's text and public guidance provides fair notice that the allegations and evidence in this case would provide a legitimate basis for an enforcement claim.[140]

## ARGUMENT AND AUTHORITIES

AT&T seeks both summary judgment and judgment on the pleadings. Summary judgment is proper when, considering the evidence as a whole and viewing it in the light most favorable to the plaintiff, a reasonable jury could not find in the plaintiff's favor on a required element of their claim, or that the movant is entitled to judgment in its favor as a matter of law. *See Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 596 (S.D.N.Y. 2018). A motion for judgment on the pleadings is governed by the same standards applicable to motions under Rule 12(b)(6), which require

---

[138] *See* Entner Decl., Ex. 1.
[139] *See* Valentine Decl., Ex. 1.
[140] *See* Atkins Decl.

sufficient factual allegations to support a plausible basis for relief. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015).

## I.   THE ALLEGEDLY DISCLOSED INFORMATION WAS NOT MATERIAL

The allegations and evidence presented here do not establish a triable issue of fact on whether the statements were material. In the two decades following its adoption, the SEC has litigated only one contested Regulation FD case. Judge Daniels dismissed that case on the pleadings, criticizing the SEC for "nit-picking" the company's public and private disclosures. He warned that using Regulation FD in an "overly aggressive manner" could chill productive communications.[141] Judge Daniels also observed that "[s]ignificantly, none of the statements challenged by the SEC falls squarely within the seven enumerated categories" of potentially material information listed in the Adopting Release. [142] The upgrade rate and equipment revenue information at issue here likewise falls outside those categories, which include "[e]arnings information" and major business events, but not "revenues,"[143] much less equipment revenues that the market and analysts considered to be earnings neutral.

The SEC cannot reach a jury on materiality when (as here) the discrepancy between the public disclosures and the alleged nonpublic information implicates less than five percent of the company's earnings or revenues, a level that supports at least a presumption or preliminary assumption that the information at issue is

---

[141] *SEC v. Siebel Systems, Inc.*, 384 F. Supp. 2d 694, 705, 708 (S.D.N.Y. 2005).
[142] *See id.* at 708.
[143] *See id.* at 702.

immaterial.[144] While courts have considered qualitative factors to assess whether a sub-5% discrepancy could still be material, "[t]hese qualitative factors are intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large."[145]

As noted above, there was nothing "large" – quantitatively, qualitatively, or otherwise – about the reduced upgrade rate and equipment revenue numbers that were allegedly selectively disclosed. AT&T again derived less than ten percent of its revenues from smartphone sales during the relevant time period, and the reductions in equipment revenue allegedly selectively communicated to the analysts represent a small sliver of these revenues.[146] There is no competent evidence showing that the alleged selective disclosures conveyed anything "important," material, or even vaguely meaningful[147] about AT&T's future earnings or growth prospects.

The market reaction to the allegedly "new information," is likewise conclusive. The stock price closed only $0.08 higher – a 0.225% change that is undisputedly insignificant per the SEC's event study expert John Griffin, the JSF, and AT&T's

---

[144] *See ECA, Local 134 IBEW Joint Pens. Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2d Cir. 2009) ("Here, the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement"); *In re Aceto Corp. Secs. Litig.*, No. 18-CV-2425-ERK, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (less than 5% of earnings "presumed" immaterial); *In re Lone Pine Res., Inc.*, No. 12 CIV. 4839 GBD, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) ("An omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial.").

[145] *ECA*, 553 F.3d at 204-05 (affirming Rule 12 dismissal on materiality grounds where alleged misstatement fell below 5% threshold and where alleged qualitative factors failed to show materiality).

[146] *See supra* at 5-6.

[147] Information can be "important" without being material. *See Kuebler v. Vectren Corp.*, No. 18-CV-00113 RLY, 2018 WL 4003626, at *3 (S.D. Ind. Aug. 22, 2018) ("[J]ust because a piece of information is important does not necessarily mean it is material."); *Himmel v. Bucyrus Intern., Inc.*, No. 10-C-1104, 2014 WL 1406279, at *17 (E.D. Wisc. Apr. 11, 2014) ("Moreover, omitted facts are not material simply because some shareholders may find the information helpful.").

experts—after AT&T announced a similar fourth quarter 2015 revenue miss on January 26, 2016, that was publicly attributed to the same declining upgrade trend. AT&T has submitted event studies from two experts establishing that neither the fourth quarter 2015 "revenue miss" nor the subsequent publication of updated analyst reports after the calls at issue caused any significant stock price effect.[148]

Nor did the analysts view the information as material. The alleged selective disclosures did not cause analysts to change their buy, sell or hold recommendations or price targets for AT&T.[149] Consensus earnings-per-share forecasts likewise remained materially the same.[150] None of the analysts told their compliance or legal departments, or anyone else, that they believed AT&T told them material nonpublic information. Analyst after analyst testified in their depositions that they viewed equipment revenue as "pass-through," immaterial, and/or not important to their evaluation of AT&T.[151] As one UBS analyst aptly summarized,

> Q.   Explain to the ladies and gentlemen of the jury why you, as an analyst of 20-plus years covering AT&T, wouldn't think this is material?"
>
> A.   "Because I would, that is probably going to have if, if wireless equipment revenue is down 20 percent, probably my cost of equipment is going to be down a similar amount, and there will be no change to my EBITDA or EPS estimates that really drive my price target and recommendation on the day."
>
> Q.   "In your mind, as an analyst working the numbers, doing the analysis here, even if someone told you, "I think equipment revenue

---

[148] *See supra* at 12-13.
[149] *See* Allen Decl. at ¶¶ 8, 58-59, 77; *see e.g.*, Ferrell Decl., Ex. 1 at ¶¶ 14(b), 14(c)(vi)(Figure 1), 17, 22, 27, App. E.
[150] *See* Allen Decl. at ¶¶ 8, 57; *see e.g.*, Valentine Decl., Ex. 1 at ¶¶ 59, 104-117.
[151] *See supra* at 201-325.

is going to be down 20 percent," to you that wouldn't be material, because it's going to be offset by declining costs?"

      A.     "That's right."[152]

There is also no competent evidence that a reasonable investor could predict how many customers would buy wireless services based on changes in upgrades rates or equipment revenue, or that a reasonable investor could otherwise predict anything material about AT&T's future profitability or growth based on such changes. The number of "bring your own device" customers who purchased wireless plans without buying a phone from AT&T was growing rapidly. Customers on unsubsidized installment plans likewise routinely remained on their AT&T wireless plans after paying off their device. Whether customers upgraded their phones did not materially affect whether they were likely to keep their wireless plans.[153]

SEC expert John Griffin admitted that the alleged selective disclosures **did not produce systematic changes to analysts' published estimates of churn** (a measurement of customers leaving AT&T), **gross adds** (a measurement of new wireless plans sold), **or ARPU** (the average revenue per user).[154] By the SEC's admission, the upgrade rate and equipment revenue at issue **did not correlate** with changes in other metrics that could potentially be relevant to investors, let alone at a magnitude sufficient to be material. And even if an analyst could identify such a correlation, the SEC concedes that a company "would not be conveying [material] information if it shared seemingly inconsequential data which, pieced together with

---

[152] SOF at ¶ 62; Krumholz Decl., Ex. 16, Levi, Batya, UBS Dep. Tr. at 97:3-97:25.
[153] *See supra* at 19.
[154] SOF at ¶ 89; Krumholz Decl., Ex. 9, Griffin Expert Report at ¶ 45.

public information by a skilled analyst with knowledge of the issuer and the industry, helps form a mosaic that reveals material nonpublic information."[155] There is no record evidence showing any correlation between upgrade rates, equipment revenues, and other metrics, and any SEC argument to the contrary is foreclosed by the testimony of its own expert and by the SEC's own public guidance.

## II. THE INFORMATION AT ISSUE WAS ALREADY PUBLIC

The SEC also has not pled or adduced facts showing the information at issue was nonpublic. Estimates and financial metrics cannot be deemed nonpublic if they can be inferred from public information.[156] Despite retaining five experts, the SEC did not produce a single expert opinion directly rebutting the opinion by three different AT&T experts that a reasonable investor could readily and reasonably calculate effectively the same upgrade rates from public information by applying the publicly disclosed year-over-year trend to the first quarter after hearing Stephens' remarks.[157]  This is unsurprising. AT&T reported record-low upgrade rates of 5.8%

---

[155] JSF at ¶ 122; Joint Ex. 15, June 4, 2010, SEC Compliance & Disclosure Interpretation: Regulation FD at 2; *see also Siebel*, 384 F. Supp. 2d at 707 ("'Regulation FD will not be implicated where an issuer discloses immaterial information whose significance is discerned by the analyst . . . . The focus of Regulation FD is on whether the issuer discloses material nonpublic information, not on whether an analyst, through some combination of persistence, knowledge, and insight, regards as material information whose significance is not apparent to the reasonable investor'") (quoting Adopting Release).

[156] *See Siebel*, 384 F. Supp. 2d at 706 (holding that information is not nonpublic if "the information available to the public provides a sufficient factual basis for a reasonable investor" to infer the allegedly nonpublic facts); *Emerson v. Mutual Fund Series Trust*, 393 F. Supp. 3d 220, 248 (E.D.N.Y. 2019) (rejecting nondisclosure claim where reasonable investor could have calculated the information "through simple arithmetic" from information they already possessed); *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 547-48 (S.D.N.Y. 2017) ("Since simple arithmetic computation based on the information disclosed would have revealed [the necessary disclosure], it is not substantially likely that further specific disclosure . . . would have significantly altered the total mix of information already made available to investors").

[157] *See* Allen Decl. at ¶ 69; Valentine Decl., Ex. 1 at ¶¶ 148-151; Entner Decl., Ex. 1 at ¶¶ 147-56.

and 5.7% during the second and third quarters of 2015, followed by the lowest fourth quarter (which historically produces higher upgrade rates than other quarters due to increased phone sales over the holidays) since 2005. SEC expert John Griffin admits that the "downward trend" in upgrade rates and equipment revenues "was already known to analysts" before the calls at issue[158] -- a trend AT&T and Verizon publicly conveyed would continue at the March 8-9, 2016 conference.

Indeed, simply applying the same 1.4% year-over-year drop that occurred from 3Q 2014 to 3Q 2015 (from 7.1% to 5.7%)[159] to the 6.6% upgrade rate for the first quarter of 2015 would yield a projected 5.2% upgrade rate for the first quarter of 2016 – substantially the same as what the analysts projected after the purported selective disclosures.[160] There is no evidence suggesting analysts or investors had any reasonable basis from the public record to assume upgrade rates would be higher in the first quarter of 2016 than in those prior quarters.

Even if analysts had estimated the same 5.8% upgrade rate for 1Q 2016 as experienced in 2Q 2015 (or the same 5.7% upgrade rate as in 3Q 2015), the SEC has supplied no evidence that the difference between a 5.8% upgrade rate and a 5% upgrade rate is material. There is no evidence showing it would be reasonable to forecast a higher upgrade rate than 5.8%, given that the conditions leading to those prior low upgrade rates had not reversed. In fact, SEC expert DiBucci testified that this range of upgrade rates would lead to a reduction in revenue of less than 1.5% of

---

[158] *See* SOF at ¶ 40; Krumholz Decl., Ex. 5, Griffin Rebuttal Report at ¶ 50.
[159] The last quarter that was not impacted by holiday sales.
[160] *See* Entner Decl., Ex. 1 at ¶ 85, Figure 6 (showing historical publicly disclosed upgrade rates and citing to analyst reports disclosing same).

AT&T's consolidated revenues and would have a similarly minimal impact on earnings even using his numbers.[161] It is no wonder the SEC's experts declined to join issue on this front. The equipment revenue decline in the first quarter was likewise immaterially different from the equipment revenue decline that occurred in the fourth quarter, such that applying the same number in the first quarter would not produce a materially different forecast than what was allegedly selectively disclosed.

Lastly, while the alleged selective disclosures were immaterial and already public from the inception, they were clearly public after UBS published the first updated report on March 18, 2016. Information disclosed in analyst reports is public information.[162] The Second Circuit has applied jury instructions in material nonpublic information cases stating that "[s]ometimes a corporation is willing to make information available to securities analysts . . .even though it may never have appeared in any newspaper publication or other publication. *Such information would be public*."[163] At the very least, AT&T is entitled to summary judgment for any claims based on calls that occurred after publication of the March 18 UBS report.

## III. DEFENDANTS DID NOT ACT WITH SCIENTER

The SEC likewise cannot raise a triable issue on scienter. When it adopted Regulation FD, the SEC took pains to emphasize that it would not and could not bring an enforcement action unless the alleged selective disclosures were not only material

---

[161] *See* SOF at ¶¶ 80-88; Krumholz Decl., Ex. 21, DiBucci Dep. Tr. at 120:09-126:23.

[162] *See* Allen Decl. at ¶ 47; *Dingee v. Wayfair Inc.*, No. 15-CV-6941, 2016 WL 3017401, at *4 (S.D.N.Y. May 24, 2016) (treating analyst reports as "publicly available"); *Chipman v. Aspenbio Pharma, Inc.*, No. 11-CV-00163 REB, 2012 WL 4069353, at *6 (D. Colo. Sept. 17, 2012) ("[P]laintiff fails to provide any authority suggesting independent analysts' reports should not be considered part of the total mix of information available").

[163] *U.S. v. Contorinis*, 692 F.3d 136, 142 (2d Cir. 2012) (emphasis added).

and nonpublic, but were made "intentionally," which it described as a standard requiring a court or jury to conclude that "no reasonable person under the circumstances" could believe the disclosed information was immaterial or already public.[164] Under Regulation FD's plain language, there is no liability unless "the person making the disclosure either knows, or is reckless in not knowing, that the information he or she is communicating is both material and nonpublic."[165] The Adopting Release noted that the recklessness standard mirrors the recklessness required for securities fraud actions under SEC Rule 10b-5, a stringent requirement this Court has frequently applied.[166] Under Supreme Court precedent, surviving summary judgment on scienter is necessarily more difficult than the already-rigorous "strong inference" test for private Rule 10b-5 class actions.[167]

---

[164] *See* Joint Ex. 13a-d, Adopting Release at ATTINC-00417471.

[165] *See* 17 C.F.R. § 243.101(a). In the case of an unintentional selective disclosure of material nonpublic information, the company must publicly disclose the information within 24 hours after a senior official at the company "knows, or is reckless in not knowing" that the information is "both material and nonpublic." *See id.* § 243.101(d). Thus, there can be no liability unless the person making the disclosure or a senior official at AT&T knew or was reckless in not knowing that the allegedly disclosed information was both material and nonpublic. The SEC's Complaint alleges that the Individual Defendants acted intentionally in making the disclosures. (*See* Dkt. No. 1 at ¶¶ 138-39.) Accordingly, it does not appear the SEC is contending that AT&T is liable because of an unintentional disclosure of material nonpublic information that triggered a subsequent duty to make a disclosure within 24 hours, though any such claim would fail for the same reasons asserted in this Memorandum.

[166] Joint Ex. 13a-d, Adopting Release at ATTINC-00417472; *see, e.g., Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 414, 417 (S.D.N.Y. 2018) (Engelmayer, J.) (dismissing Section 10(b) complaint on scienter grounds despite finding "one set of statements materially misleading," noting that "it does not follow that [the disclosure] was a reckless act as opposed to an errant lapse"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 599-606 (S.D.N.Y. 2016) (Engelmayer, J.) (dismissing Section 10(b) claim on scienter grounds even assuming *arguendo* that one statement was materially misleading).

[167] While the "strong inference" pleading standard requires only that a reasonable person deem the inference of scienter ***equal to*** any competing inference of a less culpable state, the SEC must show that a reasonable jury can find the inference of scienter is **greater than** any competing inference. And they are certainly insufficient for a reasonable jury to find the scienter needed for a Regulation FD claim, which poses a more difficult test for the SEC on summary judgment than the familiar "strong inference" pleading test poses for private litigants in Rule 10b-5 suits. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326, 328-29 (2007) (discussing how preponderance standard is higher than "strong inference" standard).

The SEC made these assurances and adopted this rigorous scienter requirement in part to address public concerns that Regulation FD could chill legitimate communications, which in turn could limit the flow of information to investors while unduly restricting companies' freedom of speech. As promised in the SEC's Adopting Release, "issuers will not be second-guessed on close materiality judgments" or "mistaken materiality determinations that were not reckless."[168] As a matter of common sense and under Second Circuit law, and as acknowledged in the Adopting Release for Regulation FD, a person cannot "know" or be "reckless in not knowing" that information is material or nonpublic if reasonable minds could view the information as either immaterial or already public. In other words, facts must actually exist to permit a reasonable person to "know" with reasonable certainty that the information is material nonpublic information. Otherwise, a person could not be deemed reckless for not "knowing" such facts.[169]

---

[168] *See* Joint Ex. 13a-d, Adopting Release at ATTINC-00417467. All three individual Defendants testified that they did not believe the information at issue was material or nonpublic, given (among other things) the lack of impact on profits, the lack of stock price reaction after the fourth quarter 2015 miss, and the lack of analyst concern over the metrics. [CITE DECLARATIONS OR SOF]

[169] *See Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001) (holding that because complaint "does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness"); *Malik v. Network 1 Fin. Secs., Inc.*, No. 20-2948-CV, 2022 WL 453439, at *3 (2d Cir. Feb. 15, 2022) (repeating same proposition); *In re Bank of Am. AIG Disclosure Secs. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013) (holding that if "reasonable minds could differ" on whether information was already public, it "precludes scienter because reckless conduct must be 'highly *unreasonable*'. . . ."), *aff'd*, 566 Fed.Appx. 93 (2d. Cir. 2014); *In re GeoPharma, Inc. Secs. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope."); *Sanders v. AVEO Pharm., Inc.*, No. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (no scienter when sufficiency of public disclosures is "at least debatable"); *In re Take-Two Interactive Secs. Litig.*, 551 F. Supp. 2d 247, 281 (S.D.N.Y. 2008) (no scienter where statement reflected a "reasonable resolution of ambiguous regulatory language" and not "a reckless or knowing falsehood"); *In re Loral Space & Communs. Ltd. Secs. Litig.*, No. 01 CIV. 4388 JGK, 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) ("To plead scienter, the information alleged to be contradictory

No reasonable jury could find from the allegations or evidence in this case that the alleged selective disclosures were so indisputably material and nonpublic that "no reasonable person under the circumstances" could believe otherwise. As stated above and below, Defendants and investors plainly had reasonable grounds to view the information as both immaterial and already public, including the absence of a stock price reaction when a similar revenue miss was disclosed the prior quarter; Stephens' public statements (and sworn testimony) that the declining equipment revenue had "very little impact on profitability;" analysts consistently treating upgrade rates and equipment revenues as having little impact on profitability; the non-core nature of smartphone sales; the absence of any clear connection between upgrade rates, equipment revenues, and EPS, churn, ARPU, gross adds, or any other conceivably material metric (let alone with any magnitude that could be considered material); and the testimony by multiple analysts (including both of the UBS analysts who issued the first updated report on March 18, 2016) that they viewed equipment revenue and upgrade rates as immaterial. Multiple analysts, as well as Bloomberg, publicly characterized Stephens' March 9, 2016 remarks as clearly conveying that the slower upgrade trend was continuing in the first quarter. The SEC's accounting expert DiBucci admitted that the upgrade rates and equipment revenue declines at issue in this litigation had far less than a 5% impact on AT&T's revenues and

---

must suggest that the defendants knew, or were reckless in not knowing, that the subscriber projections were false or without any reasonable basis").

earnings, a point that AT&T expert Lucy Allen also made without rebuttal based on DiBucci's own calculations,[170] and which DiBucci conspicuously failed to rebut.[171]

In short, allowing the SEC to proceed to trial on a record as weak as this, where reasonable minds can clearly conclude the information was immaterial or already public, would effectively nullify the scienter requirement in Regulation FD cases. It would undo the SEC's official public pronouncements that it would not and could not bring Regulation FD cases unless the materiality determination is clear-cut in the SEC's favor. And it would multiply the significant constitutional concerns about unduly chilling legitimate speech that are already posed by Regulation FD's text.  The Court should grant judgment on the pleadings or summary judgment for AT&T.

As an alternative to summary judgment, the Court should grant judgment on the pleadings because the Complaint itself pleads no facts showing a material nonpublic statement or scienter.  The Complaint pleads no facts showing that the stock price reacted to the information published in the analyst reports after the selective disclosures, that the information at issue was quantitatively or qualitatively material, or that the disclosure of the information was made with scienter.

## IV. REGULATION FD LACKS STATUTORY AUTHORITY

The claims also fail because the SEC lacked authority to promulgate Regulation FD. Agencies cannot rely on generalized legislative policies as a source of

---

[170] *See supra* at 18, 35; Allen Decl. at ¶ 82.

[171] While DiBucci unconvincingly criticizes the second part of Allen's opinion in Paragraph 82 – i.e., that the analysts made much smaller changes to EPS forecasts than even DiBucci's numbers would suggest – he glaringly fails to take issue with Allen's opinion in the first part of that paragraph, which is that using DiBucci's own numbers would produce an EPS change of at most $0.020-$0.027 (less than 5% of AT&T's EPS that quarter).

regulatory authority.[172] An agency's determination that it has authority to issue regulations or restrict certain types of conduct is likewise not entitled to deference "absent a *delegation of authority* from Congress to regulate in the areas at issue."[173]

As in *Siebel*, the SEC asserted in its pre-motion response letter (Dkt. No. 69 at 3) that it had authority to promulgate Regulation FD under Section 13(a) of the Securities Exchange Act, the only statutory claim pled in the Complaint. That assertion is unsupportable. Section 13(a) requires companies to file with the SEC:

> (1)    such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents **required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title**, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

> And

> (2)    such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.[174]

Neither of these prongs authorizes the SEC to require companies to make simultaneous disclosures of all material nonpublic information disclosed to an analyst, let alone the specific information at issue here.

---

[172] *See Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373-74 (1986) (plain language of the statute governs and an agency may not rely on the "policy of the legislation as a whole"); *Checkosky v. SEC*, 23 F.3d 452, 469 (D.C. Cir. 1994) (Randolph, J., writing separately) (noting that the "necessary or appropriate" language in Exchange Act does not expand the Commission's authority to promulgate rules beyond what the substantive provisions of the Act provide).

[173] *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) (emphasis in original).

[174] 15 U.S.C. § 78m(a)(1) and (2) (emphasis added).

The first prong, Section 13(a)(1), pertains only to "information and documents required to be included in or filed with an application or registration statement. . . ." There is no allegation that the information at issue here had any bearing on any "application" or "registration statement" filed by AT&T, much less that the filing of such information would "keep current" the information required in any AT&T "application" or "registration statement." There is certainly no allegation that the disclosures here formed part of any application or registration statement or could possibly give rise to liability under Section 11 of the Securities Act. Regulation FD thus is vastly broader than the authority conferred by Section 13(a)(1), both on its face and as applied to this case. It is not limited to information required in an application or registration statement, but purports to cover any material nonpublic information disclosed to an analyst, regardless of whether it is required in an application or registration statement. This prong cannot sustain Regulation FD.

The second prong, Section 13(a)(2), pertains to "annual" and "quarterly" reports. In no way does Section 13(a)(2) purport to require continuous disclosure of material nonpublic information outside the traditional quarterly reporting process.

The SEC has thus failed to identify any statutory grant of authority that authorized it to promulgate Regulation FD. The Supreme Court previously held that the SEC may not formulate "an absolute equal information rule" "absent some explicit evidence of congressional intent," and that Section 10(b) did not give rise to any such rule.[175] If the Supreme Court could not find authority for an "absolute equal

---

[175] *See Dirks v. SEC*, 463 U.S. 646, 657 n. 16 (1983) (quoting *Chiarella v. United States*, 445 U.S. 222, 233 n.16 (1980)).

information rule" in Section 10(b)'s broad anti-fraud language, it is implausible that Section 13(a)'s narrower language could be read as creating such authority.

## V. REGULATION FD'S TEXT RENDERS IT INOPERABLE AND INEFFECTIVE AS A MATTER OF LAW

This case also fails because the "duty of trust or confidence" exception renders Regulation FD inoperable, both on its face and as applied here.

Under Regulation FD's text, the individual Defendants cannot have acted "on behalf of" AT&T if their disclosures were a "breach of a duty of trust or confidence" to the issuer, AT&T. *See* 17 C.F.R. § 243.101(c). But the SEC logically cannot prove that the individual Defendants intentionally or recklessly disclosed material nonpublic information without also establishing that the individual Defendants breached a duty of trust or confidence to AT&T, thus rendering their conduct non-imputable to AT&T. All three individual Defendants acknowledged in their depositions and declarations that they were prohibited by AT&T's policies and practices from disclosing, directly or indirectly, internal numbers to analysts.[176] Because the individual Defendants' alleged conduct is not imputable to AT&T, there is no primary claim against AT&T and no aiding and abetting claims against the individual Defendants.

The SEC asserted in its pre-motion letter (Dkt. No. 69 at 4) that the "duty of trust or confidence" exception does not apply if the individual Defendants acted within the scope of their employment. But the cited case stands only for the general proposition that an officer's scienter is imputed to the corporation under Rule 10b-5, a different rule that does not contain a similar "breach of duty" exception that

---

[176] See supra FN 89.

Regulation FD contains.[177] Whether an employee's conduct is within the scope of

employment or is purportedly authorized by senior management has no bearing on

whether it breaches a duty of trust or confidence. The duty is owed "to the issuer,"

which is not senior management but the company itself.[178] The SEC's letter further

admits that **employees** owe duties of trust and confidence to their employers, thus

negating any argument that this phrase is somehow limited to outside parties who

acquire inside information.[179] While the letter appears to assert that the exception

only applies when the disclosing party "intentionally trades or tips," nothing in the

exception requires trading, tipping, or other financial benefits any more than

Regulation FD itself requires trading on inside information as an element.[180] The

breach of a "duty of confidentiality" to one's employer is plainly sufficient to establish

a breach of the duty of trust or confidence.[181] And that, in turn, defeats any primary

or secondary claim under the exception. The SEC's Regulation FD claim thus fails.

---

[177] *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 177 (2d Cir. 2015).

[178] *See SEC v. Afriyie*, No. 16-CV-2777 JSR, 2018 WL 6991097, at *2 (S.D.N.Y. Nov. 26, 2018), *aff'd*, 788 Fed.Appx. 59 (2d. Cir. 2019) (noting that the duty can be "owed directly, indirectly or derivatively to the issuer").

[179] *See* Dkt. No. 69 at 4 (stating that the exception "was intended to carve out" instances "where an **employee** abuses his insider position and the duties owed to the corporation by misusing material nonpublic information for his personal benefit") (emphasis added).

[180] The SEC's counsel repeatedly emphasized during the deposition of former SEC Commissioner Paul Atkins that the text of Regulation FD does not require trading as an element. *See* Krumholz Decl., Ex. 36, Atkins Dep. Tr. at 94:4-7, 112:19-113:1. But nothing in the text of the "trust or confidence" exception requires trading either. The SEC cannot have it both ways.

[181] *See SEC v. Afriyie*, 2018 WL 6991097, at *2 ("The operative allegation [by the SEC] is that Afriyie breached a duty of confidentiality to his employer, MSD, which encompassed MSD's interactions with Apollo, not that he breached a separate duty of confidentiality to Apollo. And the complaint contains ample allegations that Afriyie owed and breached this duty").

# VI. REGULATION FD IS UNCONSTITUTIONAL

While summary judgment is proper on numerous other grounds, Regulation FD cannot withstand an as-applied constitutional challenge under the First and Fifth Amendments. Multiple commentators have questioned Regulation FD's constitutionality, both facially and as applied to different facts.[182]

Because Regulation FD is a content-based restriction (i.e., it only applies to material nonpublic information affecting a company's business or stock price, rather than to other topics), it is subject to strict scrutiny.[183] Strict scrutiny also applies because Regulation FD imposes a compelled-speech obligation, requiring companies to make a public disclosure following any private communication with an analyst made in violation of Regulation FD's content-based restriction.[184] Under strict scrutiny, a governmental restriction on speech must fail unless it is narrowly tailored to advance a compelling government interest.[185] Even if intermediate scrutiny applied, Regulation FD cannot proscribe communications with analysts more than necessary to "directly" advance a "substantial" government interest.[186] A restriction

---

[182] *See* Antony Page and Katy Yang, *Controlling Corporate Speech: Is Regulation Fair Disclosure Unconstitutional?*, 39 U.C. Davis L. Rev. 1, 8 (arguing that Regulation FD "should not survive a First Amendment challenge"); Susan B. Heymann*, Rethinking Regulation Fair Disclosure and Corporate Free Speech*, 36 Cardozo L. Rev. 1099, 1134 ("the constitutionality of [Regulation] FD is questionable at best"); Joseph A. Grundfest, *Regulation FD in the Age of Facebook and Twitter: Should the SEC Sue Netflix?* (Stanford Law Sch. Rock Ctr. For Corp. Governance, Working Paper Series No. 131, 2013, at 4) (arguing that "Regulation FD is vulnerable as an unconstitutional restraint on truthful speech, particularly as applied on the facts of this case").

[183] *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978).

[184] *See Pac. Gas & Elec. Co. v. Public Utils. Comm'n of Cal.*, 475 U.S. 1, 8-21 (1986).

[185] *See id.* at 19.

[186] *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564, 570-71 (1980); *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372-73 (D.C. Cir. 2014) (finding SEC conflict minerals rule unconstitutional), *subsequent opinion after reh'g*, 800 F.3d 518, 522 (D.C. Cir. 2015) (affirming prior judgment and distinguishing intervening Supreme Court authority).

will not survive intermediate scrutiny if the government fails to present evidence that a less restrictive rule would fail to achieve the interest at stake.[187]

Regulation FD fails under either standard of review. Unlike other provisions of the securities laws that directly prohibit false statements, market manipulation and insider trading, Regulation FD does not target conduct that is inherently deceptive, manipulative, fraudulent, or which results in insider trading, which is already prohibited. Regulation FD instead applies to truthful speech, and it applies regardless of whether the recipients are likely to trade on it or not.[188] The government "may not suppress lawful speech as the means to suppress unlawful speech."[189] While Judge Daniels did not need to reach the constitutional issues raised in *Siebel*, he expressed concern that the SEC's overly broad application of Regulation FD "has a potential chilling effect" on public disclosures.[190]

This case illustrates why Regulation FD cannot withstand strict or intermediate scrutiny. There is no substantial or compelling government interest to be achieved by preventing companies from disclosing truthful information to analysts who are already prohibited from trading on material nonpublic information – and certainly no substantial or compelling government interest that would warrant prohibiting AT&T from disclosing the specific information that AT&T's IR team

---

[187] *See Nat'l Ass'n of Mfrs*, 748 F.3d at 372.

[188] *See* 17 C.F.R. 243.100(b); *see Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264-65 (2d Cir. 2014) (enjoining Connecticut law compelling company to make disclosures regarding competitors, and noting that there were no allegations that the statements triggering the obligation were false, misleading, or otherwise illegal).

[189] *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *see also Safelite*, 764 F.3d at 265-66 (observing that government may not burden substantially more speech than necessary and that existing law already protected meaningful consumer choice).

[190] *Siebel*, 384 F. Supp. 3d at 701-03, 708.

allegedly selectively disclosed in this case. Nor is there any evidence that the SEC's objectives cannot be achieved through less restrictive means. There is no allegation that any investors reaped unfair profits based on the disclosures, which would have been swiftly incorporated into the stock price (making it exceedingly unlikely from an economic perspective that investors could profit from receiving the information before others).[191] Companies have a legitimate interest in making sure analysts understand their business and prior public disclosures before publishing reports about them. Just as the government cannot restrict ordinary citizens from speaking with reporters to provide their side of the story before an article is published, companies should not be required to sit back and let analysts publish erroneous forecasts or information. Nor should companies be required to file a Form 8-K every time they have a private discussion with an analyst in which anything arguably material is discussed.

    As the Adopting Release made clear, the SEC itself understood the constitutional implications of requiring companies to conduct a fact-specific materiality analysis every time they conversed with an analyst, which is why the SEC made such broad public assurances that it will only pursue clear-cut violations made with scienter.[192] Yet in *Siebel*, and again here, the SEC has inexplicably departed from these assurances. The SEC's inconsistent positions in these suits confirm that Regulation FD is unconstitutional and chills protected speech.

---

[191] *See* SOF at ¶ 18.
[192] *See* Joint Ex. 12, Proposed Rule at II.B.2 (recognizing that "[c]orporate officials may therefore become more cautious in communicating with analysts" if materiality is the only test).

For similar reasons, Regulation FD also violates the Fifth Amendment's due process clause. The government must provide clear notice of what conduct is prohibited.[193] As set forth above, the text of Regulation FD, as well as the SEC's conflicting public positions, failed to provide AT&T with fair notice of what conduct is actually prohibited and has a chilling effect on protected speech.

Accordingly, Regulation FD is constitutionally invalid. At a minimum, to the extent Regulation FD is salvageable at all, the Court should construe the materiality and scienter requirements in a manner sufficiently rigorous to avoid abridging or chilling AT&T's constitutional rights and the rights of other companies, investor relations professionals and analysts affected by Regulation FD.[194]

The Court should thus grant summary judgment for AT&T.

---

[193] *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)); *see also Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (holding that vague statutes cause citizens to "'steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked,'" and that "[f]ree speech may not be so inhibited") (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

[194] *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (narrowly construing statute to avoid a First Amendment violation).

Dated March 3, 2022

**NORTON ROSE FULBRIGHT US LLP**      **WILLKIE FARR AND GALLAGHER LLP**

_____

Richard S. Krumholz
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200
richard.krumholz@nortonrosefulbright.com

Peter A. Stokes (*pro hac vice*)
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Tel: (512) 536-5287
Fax: (512) 536-4598
peter.stokes@nortonrosefulbright.com

Seth M. Kruglak
Victoria V. Corder
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 318-3000
Fax: (212) 318-3400
seth.kruglak@nortonrosefulbright.com
victoria.corder@nortonrosefulbright.com

Randall Jackson
Brittany Wagonheim
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8216
Fax: (212) 728 9216
rjackson@willkie.com
bwagonheim@willkie.com

*Attorneys for Defendant AT&T, Inc.*

50

## <u>CERTIFICATION OF SERVICE</u>

I certify that on May 3, 2022, a copy of the foregoing was filed with the Court's

electronic case filing system, thereby effecting service on all Counsel of Record.

_/s/ Peter A. Stokes_____
Peter A. Stokes