**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE**
**COMMISSION,**

**Plaintiff,**

— against —

**AT&T INC.,**
**CHRISTOPHER C. WOMACK,**
**KENT D. EVANS, and**
**MICHAEL J. BLACK,**

**Defendants.**

**21 Civ. 1951 (PAE)**

### DEFENDANTS' RESPONSES TO PLAINTIFF SECURITIES
### AND EXCHANGE COMMISSION'S ADDITIONAL UNDISPUTED FACTS

On May 20, 2022, Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC" or the "Commission") set forth at docket entry number 129 what it purports to be "Additional Undisputed Facts" in its response to Defendant AT&T Inc.'s Local Rule 56.1 Statement of Undisputed Material Facts. The SEC numbered the Additional Undisputed Facts in paragraphs 101, 102, and 103 and stated as follows: "The parties, due to the letter rogatory process in Canada, were not able to schedule the deposition of Scotiabank analyst Matthew Lee until May 5, 2022, and agreed that the parties may update the facts concerning Scotiabank in the parties' response briefing. Accordingly, the SEC sets forth those additional facts upon it intends to rely both in opposition to Defendants' motions and in support of its motion for summary judgment." *Id.* at p.138 n.117.

Accordingly, pursuant to Rule 56.1(b) of the Local Civil Rules of the United States District Court for the Southern District of New York (the "Local Civil Rules"), AT&T Inc. ("AT&T"), Christopher C. Womack ("Womack"), Kent D. Evans ("Evans"), and Michael J. Black ("Black" and collectively with AT&T, Womack and Evans, the "Defendants") respectfully submit the following responses to the SEC's Additional Undisputed Facts at paragraphs 101, 102 and 103 of docket entry number 129.

Where applicable, Defendants refer herein to the Declaration of Seth M. Kruglak filed May 31, 2022 ("Kruglak Decl.") and the exhibits attached thereto.

## DEFENDANTS' RESPONSES TO PLAINTIFF SEC'S "ADDITIONAL UNDISPUTED FACTS"

101.    Scotiabank analyst Matthew Lee took contemporaneous notes of the call with Black in which he memorialized the sum and substance of the call. [P. Ex. 32 (Apr. 11, 2016 email); Lee Dep. Tr. (P. Ex. 148) 46:12-14 ("Q. What is this document (Lee's notes of April 8, 2016 call)? A. These are notes that I would have given to my boss, Jeff Fan, after a call with Mike Black."); *id.* at 47:7-8 ("Q. Mr. Lee, did you take these notes? A. I did."); *id.* at 47:11-12 ("Q. When did you take these notes? A. April 11, 2016."); *id.* at 48:17-20 ("Q. And why did you take these notes of this particular call with Mr. Black? A. I thought these were relevant points."); *id.* at 53:25-54:7 ("Q. What did you understand that portion [of the notes] to mean? A. My understanding here is that I received a consensus piece of information and that I

tried to add analysis for my team. Q. You received consensus information from Mr. Black here? A. I did.").]

**DEFENDANTS' RESPONSE**: Disputed. This paragraph is an incorrect and incomplete recitation of Lee's testimony, wherein Lee testified that he could not remember the call he had with Black or whether he took the notes contemporaneously with the call. Kruglak Decl., Ex. 1 (Lee Dep. Tr.) at 103:12-18 ("Q. Do you remember the call with Mr. Black in any way? A. I do not. Q. Okay. So -- so you don't have any independent recollection of what you and he talked about, is that fair? A. Not beyond what I'm seeing on this page. [Objection]."); *id.*, Ex. 1 (Lee Dep. Tr.) at 103:20-104:5 ("Q. Okay. And this email is dated April 11th. Do you recall whether you created the notes on April 11th or you created them before? Do you have any recollection of that? A. I do not. Q. Okay. So we don't know when you actually created the notes based on your recollection, is that fair? [Objection] A. Yes."). Defendants further dispute this paragraph's proposition that Lee took "contemporaneous notes of the call with Black" because Plaintiff's cited testimony shows that Lee created the notes on Monday, April 11, 2016, whereas the call with Black took place the previous Friday (April 8, 2016). *Compare* ¶ 101 (Lee Dep. Tr. at 47:11-12) *with* Amended Joint Statement of Undisputed Facts (Dkt. 84) ¶ 268.

Lee also testified that his notes included his own thoughts and opinions, rather than just those of Mr. Black. *Id.*, Ex. 1 (Lee Dep. Tr.) at 104:6-104-20 ("Q. All right. And based upon, though, your review today, now, looking at them, can

you tell us whether or not some of what's written here you believed was things you were thinking as opposed to things Mr. Black might have said to you? A. Yes. [Objection] Q. Do you believe as you sit here looking at them, although you don't recall, but looking at the words, do you believe that the -- the – the information obtained in here might include some thought process or opinions from you rather than Mr. Black? [Objection] A. I do.").

Defendants also object to P. Ex. 32 as inadmissible hearsay and as a document that cannot be presented in a form that would be admissible in evidence at trial in violation of Federal Rule of Civil Procedure 56(c)(2).  Not only are the notes inadmissible hearsay, but attributing any statement within the notes to AT&T or Black is inadmissible hearsay within hearsay.  Lee's testimony cited above supports that P. Ex. 32 is not simply a recorded recollection of the phone call and that P. Ex. 32 did not reflect a verbatim account of what was said or who said what, but rather was an amalgamation of Lee's own thoughts and perceptions.

102.    Lee regularly took notes of his calls with IR personnel from issuers that he covered, and it was his regular practice to accurately record the information provided to him, including by Black. [Lee Dep. Tr. (P. Ex. 148) 28:21-29:1 ("Q. Would you take notes of the conversations that you had with IR employees? A. I would. Q. And was it your regular practice to take notes [of calls] you had with IR people? A. It was."); *id.* at 30:3-15 ("Q. When you spoke with Mr. Black, was it your regular practice to take notes of your calls with him? A. Yes. Q. And how would you

take notes of your calls with Mr. Black? A. On my computer. Q. So would you type them up in a Word document or in an email? A. Generally email."); *id.* at 49:23-50:7 ("Q. Was it important that your notes of this call with Mr. Black be as accurate as possible? A. It was. Q. So if there was something that an IR employee told you on a call that you thought was important to your analysis, how would you note that in your notes? A. I would write it down. Q. Aside from writing it down, was there anything in addition that you would do? Would you highlight it or would you put it in a different color text? A. I might have highlighted it.").]

    **DEFENDANTS' RESPONSE**: Disputed. This paragraph is an incomplete recitation of Lee's testimony wherein Lee testified that his notes included some of his own thoughts and opinions, rather than just those of Mr. Black. Kruglak Decl., Ex. 1 (Lee Dep. Tr.) at 104:6-104-20 ("Q. All right. And based upon, though, your review today, now, looking at them, can you tell us whether or not some of what's written here you believed was things you were thinking as opposed to things Mr. Black might have said to you? A. Yes. [Objection] Q. Do you believe as you sit here looking at them, although you don't recall, but looking at the words, do you believe that the -- the – the information obtained in here might include some thought process or opinions from you rather than Mr. Black? [Objection] A. I do.").

    Defendants also object to P. Ex. 32 as inadmissible hearsay and as a document that cannot be presented in a form that would be admissible in evidence at trial in violation of Federal Rule of Civil Procedure 56(c)(2).  Not

only are the notes inadmissible hearsay, but attributing any statement within the notes to AT&T or Black is inadmissible hearsay within hearsay. Lee's testimony cited above supports that P. Ex. 32 is not simply a recorded recollection of the phone call and that P. Ex. 32 did not reflect a verbatim account of what was said or who said what, but rather was an amalgamation of Lee's own thoughts and perceptions.

Defendants also dispute the quoted portions of testimony, which are incomplete as they omit objections made by counsel. *See* P. Ex. 148, Lee Dep. Tr. 30:3-15 ("Q. When you spoke with Mr. Black, was it your regular practice to take notes of your calls with him? A. Yes. Q. And how would you take notes of your calls with Mr. Black? A. On my computer. Q. So would you type them up in a Word document or in an email? **[Objection]** A. Generally email.") (objection added); P. Ex. 148, Lee Dep. Tr. 49:23-50:7 ("Q. Was it important that your notes of this call with Mr. Black be as accurate as possible? **[Objection]** A. It was. Q. So if there was something that an IR employee told you on a call that you thought was important to your analysis, how would you note that in your notes? **[Objection]** A. I would write it down. Q. Aside from writing it down, was there anything in addition that you would do? Would you highlight it or would you put it in a different color text? **[Objection]** A. I might have highlighted it.") (objections added).

103.    After the call on April 8, 2016, Lee incorporated the consensus information that he received from Black on the call as part of the overall mix of

information for Scotiabank's coverage of AT&T, including whether or not Lee was too high or too low for a particular metric. [Lee Dep. Tr. (P. Ex. 148) 28:14-20 ("Q. And when you were obtaining clarification or engaging in consensus gathering, how would you use that information that you obtained from speaking with IR to inform your analysis of a particular company? A. It was one of a constellation of data points that we used to build our model and thesis."); *id.* 31:20-32:14 ("Q. And did you and Mr. Black ever talk about, say, whether or to what extent Scotiabank's estimates might defer or deviate from AT&T's numbers? A. Not generally. Q. And when you say "not generally," do you mean – did you ever discuss it or? A. Sometimes if my number was far off, [he] would suggest that potentially I was out of range. Q. He would suggest to you that your number was out of range? A. I would suggest to him that I was out of range. Q. And what would he say in response to that? A. Yes. Q. He would say yes? A. Yes. If I was out of range, he would say yes."); *id.* at 61:14-62:5 ("Q. Do you see the minus 10.2 percent [for equipment revenue]? A. I do not. I do now. Q. Was this a specific number that Black told you on this conversation? A. I don't recall, but I assume it's consensus. Q. Well, is there any reason to think you wouldn't have gotten this information from Mr. Black? A. No. Q. And why did you write this information down? A. I wrote every data point down. Q. And did you incorporate this information into your model for AT&T? A. This would be one of the number of various data points we would have used to determine our estimate."); *id.* at 63:8-19 ("Q. Did you revise your model for AT&T after this call on April 8th? A. We revised our model almost every quarter. Q. But in response to this call

specifically with Mr. Black, did you update your model? A. It would have been one of the many data points we would have used to update our model prior to the quarter. Q. So that's a yes? A. It would contribute, yes. Q. Did you enter the notes and opinions you took into your model for AT&T after this call? A. They helped to drive my assumptions.").]

**DEFENDANTS' RESPONSE**: Disputed. The proposition in this paragraph is not supported by the cited deposition testimony, in which Lee did not state that he incorporated whether he "was too high or too low for [the] particular metric" at issue in this case. This paragraph also is an incomplete recitation of Lee's testimony wherein he testified on multiple occasions that Black never communicated material non-public information to him during their phone call, that consensus information was only a small part of the information that Scotiabank considered when creating its model, and that consensus information was not simply inserted into Scotiabank's model.

First, Lee testified Black never communicated material non-public information on their phone call. *See* Kruglak Decl., Ex. 1 (Lee Dep. Tr.) at 129:15-24 ("Q. All right. Finally, sir, in connection with this case, as you know, they've alleged my client, Mr. Black, communicated to you material nonpublic information and did it intentionally. As best you can recall here today, did Mr. Black, to your knowledge, ever communicate to you material nonpublic information in that first quarter of 2016? [Objection] A. No."); *id.*, Ex. 1 (Lee Dep. Tr.) at 137:6-16 ("Q. And am I correct, if you ever felt that you had been

passed material nonpublic information, that would have been a situation where you would have reported it to compliance? A. Yes. [Objection] Q. That's not something that ever happened after any of your dealings with AT&T or any of its employees, correct? [Objection] A. It never happened.").

Additionally, Lee testified that Black shared only consensus information with him, not actual AT&T internal numbers, and neither Lee nor Black ever asked for or received actual numbers. *Id.*, Ex. 1 (Lee Dep. Tr.) at 91:23-92:2 ("Q. So you were not able to tell them [the SEC] before they filed this lawsuit against Mr. Black, for example, that you received only consensus numbers from Mr. Black, correct? A. Correct."); *id.*, Ex. 1 (Lee Dep. Tr.) at 112:21-114:5 ("Q. So I'm going to ask you, based on this email, on your best recollection, during those phone calls, to the extent you were given numbers, did you always receive consensus numbers? [Objection] A. Yes. Q. To -- to your knowledge as you sit here today, Mr. Lee, did Mr. Black ever communicate to you an actual internal AT&T number during any of these phone calls? [Objection] A. No. Q. Did you ever ask for one? Hey, tell me the real number or tell me what the number is? Did that ever happen to your recollection? [Objection] A. No. Q. So when we look at this exhibit, 578 [April 11, 2016 Email from Lee to Fan, Parkhani, BNS0000019276, a true and correct copy of which is attached to Kruglak Decl., Ex. 5 (with deposition exhibit stamp), P. Ex. 32 (without deposition exhibit

stamp)],[1] if a number's written down, is it a consensus number that you were given as best you can recollect? [Objection] A. Yes. Q. Okay. Now, let me ask you a slightly different question. Did you ever believe or get the sense that Mr. Black was giving you a consensus number while trying to tell you it was actually the real number internally at AT&T? Did you ever feel like that was happening? [Objection] A. No. Q. And did you always believe you were getting what was consensus information as opposed to what might be AT&T's actual internal numbers? [Objection] A. I always believed it was consensus."); Kruglak Decl., Ex. 1 (Lee Dep. Tr.) at 114:21-115:20 ("Q. Okay. Now I want to direct your attention to the 'Revenue' part. The second one down says 'Equipment revenue down minus 10 percent.' Do you see that? A. Yes. Q. First I want to ask you, when you get numbers like that, in general, are those year-over-year, quarter-to-quarter comparisons? A. Year over year, generally. Q. Okay. So, in other words, compared to last year, equipment revenue, the consensus is it's down 10 percent. Is that -- do I have that right? A. More likely compared to the same quarter of the year before. Q. Got it. Is there any doubt in your mind as you sit here today reason to -- to disbelieve that that wasn't a consensus number given to you by Mr. Black rather than him telling you the actual number that AT&T had internally? [Objection] A. I believe -- I believe it was a consensus number."); *id.*, Ex. 1 (Lee Dep. Tr.) at 117:3-18 ("Q. Okay. Now, one thing. I don't know if it

---

[1] Defendants reference Lee's notes to the extent the Court overrules Defendants' objections to such evidence on the grounds that the notes are inadmissible hearsay that cannot be reduced to admissible form at trial.

-- if it matters. But you don't write down in front of every number 'consensus.'
You just write down the number. But as you sit here today, is there -- is there
any reason to doubt that all these numbers are consensus even though you
didn't write in front of each one 'consensus'? [Objection] A. The title of the email
[in deposition exhibit 578, Kruglak Decl., Ex. 5] is 'Consensus,' so I believe that
every number here is consensus. Q. Okay. And by that you mean – and Mr. Rice
will go up -- the subject line there at the top, 'Call with AT&T on Q1 Consensus
– Mike Black'? Is that what you're referring to? A. Correct.").

Lee also testified that consensus information, whether it came from IR
representatives or third party sources, was only a small part of the information
that Scotiabank considered when creating its model. Kruglak Decl., Ex. 1 (Lee
Dep. Tr.) at 118:25-120:24 ("Q. Okay. Now, when you had this conversation with
Mr. Black on April 8th, what's the process you guys go through to get your
model finalized and do a -- a report? A. I -- he is -- like, consensus conversations
are only one small part of the analysis process. So talking to Mike Black could
have occurred prior or after I started working and doing analysis on the quarter
in my own right. But certainly we would compare our numbers to consensus to
make sure if we were different we had a rationale for being different, which was
the sperse [sic] of our investment thesis. Q. Okay. So -- so look at consensus, go
through the model based upon other work you're doing, make adjustments that
the team believes is necessary. Is that a part of the process you went through?
A. Part of it, yes. Q. Okay. And -- and I take it, like – and we can go through

this model all day, I suppose, but, you know, is it likely there are changes to other segments in the AT&T business like entertainment or international? [Objection] A. Almost certainly. Q. Okay. So, now, do you prepare – the team prepares a report. And it was previously marked as 582 [a true and correct copy of which is attached as Kruglak Decl., Ex. 6], but is this April 19th, 2016, does this appear to be the report prepared by the Scotia team sometime after you had your conversation with Mr. Black and had done all your work? [Objection] A. Yes. Q. Okay. Now, I want to ask you this, to put this in context. The report and the model we're seeing, is it true that those were the results of a lot of other information and analysis apart from anything you and Mr. Black might have talked about on April 8th, 2016? [Objection] A. Yes. Q. And a lot more is going on in this report than just whatever you and Mr. Black discussed. Is that fair? [Objection] A. Yes.").

Lee also testified that Scotiabank did not simply insert consensus information into its model. Kruglak Decl., Ex. 1 (Lee Dep. Tr.) at 120:25-122:14 ("Q. Okay.  Now, remember we saw a few minutes ago 'Equipment revenue down 10 percent.' I'm going to take you to page 2 and there's a chart there called 'Financials, Estimates versus Consensus.' The equipment revenue figure listed says down, or minus, '8.7 percent year over year.' Do you see that?  A. Yes, I do.  Q. Do you know, just based upon how you guys did these reports, is that the number you're using in your model or is that a consensus number you're using? [Objection] A. That would be our estimate. Q. Okay. So now if you

look down at the paragraph that the SEC showed you there, which is the -- one, two, three -- fourth bullet point, there's a sentence that says 'As a result of the longer cycle and tougher comparable quarter, we expect equipment revenue to decline by' -- I think that means approximately – '9 percent year over year.' Do you see that? A. I do. Q. Does that, then, match up with the 8.7 percent up there in the chart? A. Yes.  Q. All right. So now let's connect the -- the dots on this. You're told consensus equipment revenue is down 10 percent, but the number ScotiaBank came up with for its own model was something different, 8.7 percent, is that correct? [Objection] A. Yes. Q. To get that number, did the ScotiaBank go through their own independent analysis and work to come up with that 8.7 percent number? [Objection] A. Yes, we did.").

Defendants also dispute the quoted portions of testimony, which are incomplete as they omit objections made by counsel. *See* P. Ex. 148, Lee Dep. Tr. 31:20-32:14 ("Q. And did you and Mr. Black ever talk about, say, whether or to what extent Scotiabank's estimates might defer or deviate from AT&T's numbers? A. Not generally. Q. And when you say "not generally," do you mean – did you ever discuss it or? A. Sometimes if my number was far off, [he] would suggest that potentially I was out of range. Q. He would suggest to you that your number was out of range? A. I would suggest to him that I was out of range. Q. And what would he say in response to that? A. Yes. **[Objection]** Q. He would say yes? A. Yes. If I was out of range, he would say yes.") (objection added); P. Ex. 148, Lee Dep. Tr. 61:14-62:5 ("Q. Do you see the minus 10.2

percent [for equipment revenue]? A. I do not. I do now. Q. Was this a specific number that Black told you on this conversation? A. I don't recall, but I assume it's consensus. Q. Well, is there any reason to think you wouldn't have gotten this information from Mr. Black? **[Objection]** A. No. Q. And why did you write this information down? A. I wrote every data point down. Q. And did you incorporate this information into your model for AT&T? A. This would be one of the number of various data points we would have used to determine our estimate.") (objection added).

Dated:  New York, New York
       May 31, 2022

**NORTON ROSE FULBRIGHT US LLP**

/s/  *Richard S. Krumholz*
Richard S. Krumholz
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 855-8000
Fax: (214) 855-8200
richard.krumholz@nortonrosefulbright.com

Peter A. Stokes (*pro hac vice*)
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Tel: (512) 536-5287
Fax: (512) 536-4598
peter.stokes@nortonrosefulbright.com

Seth M. Kruglak
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 318-3000
Fax: (212) 318-3400
seth.kruglak@nortonrosefulbright.com

**WILLKIE FARR & GALLAGHER LLP**

/s/  *Randall W. Jackson*
Randall W. Jackson
Brittany M. Wagonheim
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8216
Fax: (212) 728-8111
rjackson@willkie.com
bwagonheim@willkie.com

*Attorneys for Defendant AT&T Inc.*

**TILLOTSON LAW**

*/s/  Jeffrey M. Tillotson*
Jeffrey M. Tillotson (*pro hac vice*)
Jonathan R. Patton (*pro hac vice*)
1807 Ross Avenue, Suite 325
Dallas, Texas 75201
Tel: (214) 382-3040
Fax: (214) 292-6564
jtillotson@tillotsonlaw.com

*Attorneys for Defendants Michael J. Black,*
*Kent D. Evans, and Christopher C. Womack*

## <u>CERTIFICATION OF SERVICE</u>

I certify that on May 31, 2022, a copy of the foregoing was filed with the Court's

electronic case filing system, thereby effecting service on all Counsel of Record.

_/s/ Richard S. Krumholz_____

Richard S. Krumholz