**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**-- against --**

**AT&T, INC.,**
**CHRISTOPHER C. WOMACK,**
**KENT D. EVANS, and**
**MICHAEL J. BLACK,**

**Defendants.**

21 Civ. 1951 (PAE )

**ECF Case**

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S LOCAL RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff Securities and Exchange Commission submits this statement under Local Rule

56.1 of the Local Rules of the United States District Courts for the Southern and Eastern

Districts of New York, to set forth the material facts as to which it contends there is no genuine

issue of material fact to be tried, in support of its Motion for Summary Judgment Against

Defendant AT&T, Inc. ("AT&T") and Christopher C. Womack ("Womack"), Kent D. Evans

("Evans"), and Michael J. Black ("Black") (the "Individual Defendants" and together with

AT&T, the "Defendants"[1]).

---

[1]     The relevant facts are in the Parties' Amended Joint Statement of Undisputed Facts
("JSF"), filed April 29, 2022 (DE 84), the exhibits attached thereto ("J Ex."), and the exhibits
appended to the Declaration of Victor Suthammanont ("P. Ex."), which include excerpts from
investigative and deposition transcripts, including admissions by the Defendants, and in those in
the Declaration of Jordan Baker filed with this motion. In addition, references to "Vasilescu
Decl." are to the Declaration of Alexander M. Vasilescu in Support of Plaintiff's Motion to
Exclude the Testimony of Defendants' Expert Witnesses filed in connection with that motion.

        To the extent that admissions in the answers of all of the Defendants are substantively
similar or the same, the statement of facts will cite to "Defs. Answers ¶ *X*," which should be read
as: "Black Answer ¶ *X* (DE 26); Evans Answer ¶ *X* (DE 27); Womack Answer ¶ *X* (DE 28);
AT&T Answer ¶ *X* (DE 30)" where "*X*" is the same paragraph number.

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 4

  I.   Background Concerning AT&T .................................................................................. 4

    A.   AT&T's Senior Management .............................................................................. 5

      i.   AT&T's CEO ................................................................................................ 5

      ii.   AT&T's CFO ................................................................................................ 6

      iii.   Other Employees ......................................................................................... 7

    B.   The Individual Defendants .............................................................................. 7

      i.   Womack ....................................................................................................... 7

      ii.   Black ............................................................................................................ 9

      iii.   Evans ......................................................................................................... 11

    C.   The Investor Relations Department ............................................................... 13

      i.   Viola ......................................................................................................... 14

  II.   AT&T's Wireless Equipment Business ................................................................... 15

    A.   Background Concerning Subsidized Plans and AT&T Next ......................... 15

  III.   AT&T Financial Reporting and Accounting ........................................................... 17

    A.   Revenue and Wireless Equipment Revenue ................................................. 17

      i.   Total Consolidated Revenue and Expenses ............................................... 17

      ii.   Wireless Equipment Revenue and Expense ............................................... 18

    B.   Upgrade Rate ................................................................................................. 19

    C.   Next Accounting ........................................................................................... 20

      i.   AT&T's Examples of Next Accounting ..................................................... 21

      ii.   Analyst Analysis of Next Accounting ...................................................... 24

    D.   Relevant AT&T Actual Financial Results .................................................... 25

    E.   The Importance of Revenue, Wireless Equipment Revenue, and Upgrade Rates ..... 27

      i.   Revenue ..................................................................................................... 28

      ii.   Equipment Revenue ................................................................................... 29

      iii.   Upgrade Rate ............................................................................................. 31

      iv.   Impact on Earnings and Churn .................................................................. 36

  IV.   Relevant AT&T Policies and Procedures ............................................................... 42

    A.   Black's Understanding Concerning Disclosures ........................................... 52

B. Evans's Understanding Concerning Disclosures ........................................................ 54

C. Womack's Understanding Concerning Disclosures ................................................... 57

V. Background on Analyst Coverage ...................................................................................... 60

A. Analysts Covering AT&T ........................................................................................ 60

B. Consensus Estimates ................................................................................................ 65

C. AT&T's "Top Ten" Analyst Average ...................................................................... 68

D. The Relationship Between AT&T and Its Analysts ................................................ 71

E. Analysts' Statements Concerning Upgrade Rates, Equipment Revenue, and Total Revenue .......................................................................................................................... 71

DEFENDANTS' VIOLATION OF REGULATION FD ......................................................... 79

I. AT&T Misses Revenue Consensus Estimates in Third and Fourth Quarters of 2015 ..... 79

II. Declines in Wireless Equipment Sales Continue in the First Quarter of 2016 ................. 83

A. January and February 2016 ....................................................................................... 83

B. March and April 2016 .............................................................................................. 86

i. Stankey's Remarks at the Morgan Stanley Conference ............................. 86

ii. Early March 2016 ...................................................................................... 87

iii. Stephens's Remarks at the Deutsche Bank Conference ........................... 91

iv. Events after Stephens's March 9, 2016 Remarks .................................... 95

v. April 1, 2016, Through April 26, 2016 ................................................... 104

C. Defendants Intended to Influence the Analysts ..................................................... 109

D. The Selective Disclosures to Analysts in March and April 2016 ........................... 112

i. JP Morgan ................................................................................................. 113

ii. UBS .......................................................................................................... 121

iii. RW Baird ................................................................................................. 124

iv. Deustche Bank .......................................................................................... 125

v. Wells Fargo ............................................................................................... 128

vi. Oppenheimer ............................................................................................ 136

vii. RBC .......................................................................................................... 138

viii. Drexel Hamilton ................................................................................... 141

ix. Citi ........................................................................................................... 143

x. Evercore .................................................................................................... 147

xi.    Moffett Nathanson ...................................................................... 149

xii.   Nomura ..................................................................................... 150

xiii.    BTIG............................................................................................ 159

xiv.   Jefferies ..................................................................................... 161

xv.   William Blair .............................................................................. 163

xvi.   Pacific Crest .............................................................................. 167

xvii.    Scotiabank ................................................................................. 174

xviii.    Buckingham ............................................................................... 175

xix.   Bank of America ........................................................................ 178

xx.    DA Davidson .............................................................................. 179

E.    AT&T Beats Consensus Revenue Estimates........................................ 180

i.    Analysis of Defendants' Calls and Consensus Movement ...................... 181

III.    Other Relevant Facts ............................................................................ 190

A.    Summary Charts ................................................................................... 192

## **BACKGROUND**

### I.   **Background Concerning AT&T**

1.     AT&T, a Delaware corporation headquartered in Dallas, Texas, is a telecommunications company. AT&T's stock is registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 and is traded on the New York Stock Exchange under the ticker "T." [Compl. ¶ 14 (DE 1); Defs. Answers ¶ 14; JSF ¶ 1 (DE 82).]

2.     During 2015-2016, AT&T provided communications and digital entertainment services in the United States and internationally. The products and services offered by AT&T included, among other things, wireless communications, data/broadband and Internet services, digital video services, wireline phone service, and telecommunications equipment. [JSF ¶ 2.]

3.      Following its acquisition of DIRECTV in July 2015, AT&T reorganized its operating subsidiaries into the following segments: Business Solutions, Entertainment Group, Consumer Mobility, and International. [JSF ¶ 3.]

4.      For fiscal year 2015, AT&T's wireless operations (reported as "AT&T Mobility") constituted 50.2% of AT&T's total revenue ($73,705 billion from Mobility of $146,801 billion total consolidated), 37.5% of its operating expenses ($45,789 billion from Mobility of $122,016 billion total consolidated), and 79.9% of its operating income ($19,803 billion from Mobility of $24.785 billion total consolidated). [JSF ¶ 4; J. Ex. 1 at 34 and 46 (2015 Form 10-K).]

5.      For the first quarter of 2016 ("1Q16"), AT&T's wireless operations (reported as "AT&T Mobility") constituted 44.3% of AT&T's total revenue ($17,954 billion from Mobility of $40.535 billion total consolidated), 31.8% of its operating expenses ($10,624 billion from Mobility of $33.404 billion total consolidated), and 74% of its operating income ($5,274 billion from Mobility of $7.131 billion total consolidated). [JSF ¶ 5; J. Ex. 2 at 3 and 32 (1Q16 Form 10-Q).]

## A.  AT&T's Senior Management

6.      AT&T had a Board of Directors ("Board"), which among other things, served as fiduciaries of the company's shareholders in supervising the company's management. [JSF ¶ 6.]

7.      AT&T's Board met regularly with management, oversaw the company's results, plans, and strategies, but it did not manage or make day-to-day decisions of the business. [Stephens Dep. Tr. (P. Ex. 85) 35:14-35:25 ("Q. . . . can you just describe what the board of directors does or did in 2015 and 2016 to manage AT&T? [objection] A. The board of directors met regularly with management, oversaw results, plans and strategies of the company. The board did not manage or make day-to-day decisions of the business."); *see also* JSF ¶ 7.]

### i.  AT&T's CEO

8.      Randall L. Stephenson was the Chairman and Chief Executive Officer ("CEO") of AT&T from 2007 until the end of June 2020. At that time, Stephenson became Executive Chairman of AT&T. [JSF ¶ 8; J. Ex. 3 ¶ 1 (Parties' First Stipulations of Fact).]

9.      As CEO, Stephenson was responsible for signing filings with the U.S. Securities and Exchange Commission ("Commission"), including Forms 10-K and 10-Q, and reviewing other filings, including Forms 8-K and proxy statements. [JSF ¶ 9.]

10.     In 2015, John Stankey became the CEO of AT&T Entertainment Group, taking control of DIRECTV, which AT&T acquired in July 2015. He was the CEO of AT&T Entertainment Group in 1Q2016. [JSF ¶ 10; J. Ex. 3 ¶ 2 (Parties' First Stipulations of Fact).]

11.     Stankey, as CEO of AT&T Entertainment, was responsible for the integration of DIRECTV and had additional responsibility for consumer wireless in 1Q2016. [JSF ¶ 11; J. Ex. 3 ¶ 2.a (Parties' First Stipulations of Fact).]

12.     On July 1, 2020, Stankey replaced Stephenson as CEO of AT&T Inc., a position Stankey currently holds at AT&T. [JSF ¶ 12; J. Ex. 3 ¶ 3 (Parties' First Stipulations of Fact).]

        *ii.   AT&T's CFO*

13.     John Stephens was the chief financial officer ("CFO") of AT&T from 2011 to 2021. [JSF ¶ 13]

14.     As CFO, Stephens reported to the CEO, Stephenson. [JSF ¶ 14.]

15.     As CFO, Stephens reported to AT&T's Board on financial results and to the Board's Audit Committee on a regular basis. [*See* JSF ¶ 15.]

16.     As CFO in 2015 and 2016, Stephens was responsible for, among other things, business planning, financial reporting, treasury operations, and managing the investor relations function. [JSF ¶ 16.]

17.     Stephens understood that he had a duty to oversee the assets of the corporation and to make prudent decisions with regard to their use. [JSF ¶ 17.]

18.     As CFO, Stephens was responsible for signing filings with the Commission, including Forms 10-K and 10-Q, and reviewing other filings, including Forms 8-K and proxy statements. [JSF ¶ 18.]

19.     As CFO, Stephens also reviewed investor materials distributed in connection with AT&T's annual and quarterly reporting. [JSF ¶ 19.]

20.     Stephens retired from AT&T in March 2021. [JSF ¶ 20.]

21.     Prior to his retirement, Stephens had worked at AT&T and its predecessor companies for approximately 29 years. [JSF ¶ 21.]

22.     Following his retirement, AT&T retained Stephens as a consultant for 12 months. [Stephens Dep. Tr. (P. Ex. 85) 27:11-22; *see* JSF ¶ 22.]

### iii.   Other Employees

23.     AT&T's controller in 2015 through March 2016 was Paul Stephens, and in March 2016, Debbie Dial become controller. [JSF ¶ 23.]

24.     The controller reported to Stephens. [JSF ¶ 24.]

## B.  The Individual Defendants

### i.   Womack

25.     Womack is approximately 55 years old, resides in Sparta, New Jersey, and was employed as an Executive Director in AT&T's Investor Relations ("IR") Department during March and April of 2016, working out of AT&T's Bedminster, New Jersey office. [JSF ¶ 25.]

26.     Womack has been employed by AT&T since 1997, and has been a member of AT&T's Investor Relations Department since July 2006. [JSF ¶ 26]

27.     During the relevant period, Womack reported to Michael Viola ("Viola"), the supervisor of the IR Department. [JSF ¶ 27]

28.     Womack was Black's supervisor during the relevant period. [JSF ¶ 28.]

29.     Womack's responsibilities in the Investor Relations Department included communicating with sell-side analysts who covered AT&T. [JSF ¶ 29.]

30.     Womack received training on Regulation FD when he joined the IR department, periodic training on Regulation FD thereafter, and was familiar with its content concerning the selective disclosure of material nonpublic information. [JSF ¶ 30.].

31.     In his role in AT&T's Investor Relations Department, Womack was privy to AT&T's nonpublic intra-quarter results, including AT&T's 2+1 forecast (which consisted of two months of actual results) as well as AT&T's actual results for full quarters before those results were publicly announced. [JSF ¶ 31; *see also* Womack Dep. Tr. (P. Ex. 88) 47:15-49:9 ("Q. And do you know what a 2 plus 1 forecast is? A. So 2 plus 1 forecast is two months of actuals with one month of forecast …. Q. The 2 plus 1 forecasts at AT&T, were those made public? A. No. Q. And after the third month of any quarter, were you also privy to final quarter end results before those results were announced publicly? A. Yes …").]

32.     At any given time in the quarter, Womack was also privy to consensus expectations of AT&T's results among analysts. [Womack Dep. Tr. (P. Ex. 88) 53:18-55:4 ("Q. Okay. But fair to say, at any given time in the quarter, you had access to what consensus expectations for AT&T's revenues were, is that right? A. Yes, I think it's fair to say that I did have access to it … Q. Sure. You could discern, at any given time in a quarter, which way consensus estimates for AT&T's revenues were trending, is that fair? [objection] A. Yes, I believe so."); Womack Dep. Tr. (P. Ex. 88) 63:19-24 ("Q. Okay. And you would have access to

where consensus among the top ten analysts were on these more granular metrics in the course of your work as an IR executive director in 2015-2016? A. Yes, I would have access to this."); *see also* JSF ¶ 32.].

33.     During the relevant period, Womack also helped develop the "IR view" of AT&T's results, which was the Investor Relations Department's internal forecast of what AT&T's results would be for a given period. [Womack Inv. Tr. (P. Ex. 55) 36:2-22 ("Q. As part of your job in 2016 did you help to develop internal forecasts for AT&T's quarterly or actual results? A. Yes. Q. What role did you play in developing internal forecasts of AT&T's quarterly or annual results? A. I vaguely recollect doing some scenario analysis, creating sensitivities to assess trends. Q. Are you familiar with something called the IR view of EPS revenues? A. Yes. Q. And what is the IR view? A. The IR view is IR's view of what the business would look like for any given year. Q. That's the internal forecast of AT&T's investor relations division? A. That's right. Q. Okay. Did you, as a matter of practice, share the IR view with either investors or analysts? A. No."); Womack Inv. Tr. (P. Ex. 55) 93:17-22 ("Q … The 2016 IR view for the first quarter [as of January 24, 2016] of $41 billion and change, is that something you worked on? A. Yes."); Womack Dep. Tr. (P. Ex. 88) 45:9-47:8.]

        *ii.  Black*

34.     Black is approximately 56 years old, resides in Sparta, New Jersey, and during March and April 2016, was a Finance Director in AT&T's IR Department and worked in AT&T's Bedminster, New Jersey Office. [JSF ¶ 33.]

35.     Black began working at AT&T in 2008 in various finance roles and, since 2011, has worked in the IR department. [JSF ¶ 34.]

36.     Black's job responsibilities included communicating with sell-side research analysts who covered AT&T. [JSF ¶ 35.]

37.     Black's work with analysts involved building relationships with them such that he would become their primary point of contact for them to understand AT&T's business. [Black Dep. Tr. (P. Ex. 66) 37:18-2 ("Q. Okay. And I think you said before, you also supported the analysts. . . . And what did you mean by that term? A. I worked with the sell side analysts in New York City, build relationships with them, and I become their single point of contact to understand AT&T's business."); *see also* JSF ¶ 36.]

38.     In 2015 and 2016, Black was primarily responsible for communicating with the smaller, boutique analyst firms. [JSF ¶ 37.]

39.     Black's responsibilities also included work on AT&T's earnings materials. [JSF ¶ 38.]

40.     Black also tracked various consensus estimates for the IR department. [JSF ¶ 39.]

41.     Part of Black's job involved working with analysts' models to extract data from them to build out the Top Ten average document he maintained (*see infra* Section V.C). [Black Dep. Tr. (P. Ex. 66) 82:8-83:10 ("Q. In fact, you reviewed the models . . . from analysts in Q1 of 2016? A. Yes. Q. It's part of your job to take those models and use them to build out the top ten consensus? A. Yes. My pause was you used the work 'reviewed.' And I'm not sure what that means. Q. . . . what's confusing to you about 'reviewed'? A. All that we did with the models, what I did with the models was extract the data from one to the other. Q. Okay. You didn't, for example, go into the formulas? A. Sometimes I did, yeah. Q. . . . what would you say then? A. Worked with. Q. . . . In terms of the models you worked with, did you see any of them perform the analysis that was on page 5 of AT&T's answer? [objection] A. That I don't recall."); *see also* JSF ¶ 40.]

42.     From when Black joined the IR department through at least 2016, Womack was his supervisor. [JSF ¶ 41]

43.     Black reported directly to Womack, who reported to Viola. [JSF ¶ 42.]

44.     Black received training on Regulation FD when he joined the IR department, periodic training on Regulation FD thereafter, and was familiar with its content concerning the selective disclosure of material nonpublic information. [JSF ¶ 43.]

45.     In his role in AT&T's Investor Relations Department, Black was privy to AT&T's nonpublic intra-quarter results, including AT&T's 2+1 forecast (which consisted of two months of actual results) as well as AT&T's actual results for full quarters before those results were publicly announced. [JSF ¶ 44.]

### iii.     Evans

46.     Since 2000, to the present, Evans has been a member of AT&T's IR Department (or AT&T's predecessor company, Cingular) and his office is located in Atlanta, Georgia where AT&T's Mobile Division's headquarter is located. [JSF ¶¶ 45-46.]

47.     During the relevant period, Evans reported to Viola. [*See* JSF ¶ 47.]

48.     Evans had a thorough understanding of AT&T's wireless business. [JSF ¶ 48.]

49.     Evans was among the more knowledgeable persons in the IR Department regarding AT&T's wireless business. [JSF ¶ 49.]

50.     One of Evans's responsibilities in the IR Department was to interface with employees and managers in the Mobile Division of AT&T headquartered in Atlanta. [Viola Dep. Tr. (P. Ex. 87) 82:6-16; *see also* JSF ¶ 50.]

51.     Evans admitted that on occasion he would walk over to the offices of the Mobilde Divisions' the financial group to obtain financial information. [Evans Dep. Tr. (P. Ex. 71) 83:6-84-2.]

52.     In his role in AT&T's Investor Relations Department, Evans was privy to AT&T's nonpublic intra-quarter results, including AT&T's 2+1 forecast (which consisted of two months of actual results) as well as AT&T's actual results for full quarters before those results were publicly announced. [JSF ¶ 51.]

53.     Evans also obtained directly from the Mobile Division's financial reporting group internal non-public financial estimates each fiscal quarter, including the Mobility Division's "2 plus 1s, and 3 plus 0s" forecasts, which were respectively two months of actual financial data results and a third month estimate of result, and three months of actual results. [Evans Dep. Tr. (P. Ex. 71) 84:1-24.]

54.     The financial group in Atlanta that Evans communicated with also tracked upgrade rates and other "operational key metrics." [JSF ¶ 52.]

55.     Evans' role was to communicate with both buy-side investors and sell-side analysts about the wireless business and to keep others in the IR department up to date about key trends within that business segment. [JSF ¶ 53.]

56.     Evans worked as an IR employee prior to the passage of Regulation FD and was aware that it was created by the SEC. [JSF ¶ 54.]

57.     Since at least 2006, Evans has regularly received Regulation FD training at AT&T, principally from AT&T's in-house attorney, Paula Anderson ("Anderson"). [JSF ¶ 55.]

58.     Evans received training on Regulation FD when he joined the IR department, periodic training on Regulation FD thereafter, and was familiar with its content concerning the selective disclosure of material nonpublic information. [JSF ¶ 56.]

59.     Evans reviewed internal presentations by AT&T executives for compliance with Regulation FD. [Evans Inv. Tr. (P. Ex. 53) 21:18-22:14 ("Q. Q I think I heard you say that as

part of your duties you review presentations that concern Reg FD. Did I hear you correctly? A. It's actually presentations that the officers present to their teams. Town halls, we call them. It might be one of our officers will have a tele-presence with thousands of his employees. We review those to make sure that they're not disclosing anything that's not already public, or saying anything that would be out of compliance with Reg FD. Q. So am I understanding that -- what's an example of an officer who would -- that you're referring to? A. Ralph de la Vega was an example back then. He was the head of Mobility, and he was vice chairman, and he would meet on a quarterly basis with his -- you know, his team and their teams. And they would have an annual kickoff meeting that they would also have presentations to, and we review those to make sure that they are within compliance.").]

### C.  The Investor Relations Department

60.     As a public company, AT&T maintained an IR Department whose principal function was to provide investors and analysts, among others, with accurate information concerning the company's affairs in order to assist investors and investment funds (i.e., the "buy-side") and brokerage or institutional analysts (i.e., the "sell-side") in making informed decisions regarding their potential AT&T investments and recommendations. [Compl. ¶ 22 (DE 1); Defs. Answers ¶ 22.]

61.     The IR Department reported to AT&T's CFO. [JSF ¶ 57]

62.     Viola became the supervisor of the IR Department in 2014 and supervised the IR Department in 2015 and 2016. [JSF ¶ 58.]

63.     During the relevant period, the IR Department that Viola supervised had approximately 12 employees, including Martin Sheehan who reported to Viola directly. [*See* JSF ¶ 59.]

64.     During the relevant time, Paula Anderson, a securities attorney in AT&T's legal department with experience with Regulation FD, also had her office in AT&T's Dallas headquarters. [JSF ¶ 60.]

65.     Among other things, Anderson provided training annually to the IR employees about Regulation FD and was available to provide legal advice to the IR employees concerning Regulation FD as needed or requested. [*See* JSF ¶ 61; *see also* Anderson Dep. Tr. (P. Ex. 65) 35:1-8 ("Q. In your role as a securities lawyer for AT&T, what were your responsibilities vis-à-vis AT&T's investor relations department? A. Well, I provided legal advice. So if they had questions on matters, I was available. I also provided training to them, and I reviewed the various disclosure documents or oral disclosures.").]

66.     During the relevant time, AT&T had the ability to record the telephone calls its IR employees made to sell-side analysts but did not record those calls. [Viola Dep. Tr. (P. Ex. 87) 33:6-13.]

        *i.  Viola*

67.     During the relevant period, Michael Viola supervised the IR Department and he reported to Stephens, the then CFO of AT&T. [JSF ¶ 62.]

68.     Viola received training on Regulation FD when he joined the IR department, periodic training on Regulation FD thereafter, and was familiar with its content concerning the selective disclosure of material nonpublic information. [JSF ¶ 63.]

69.     Viola joined AT&T in 2000 and held various jobs at AT&T prior to supervising the IR Department, including Treasurer of AT&T and CFO of various AT&T business units. [*See* JSF ¶ 64.]

70.     Viola's office was located in Dallas, Texas, the headquarters of AT&T. [JSF ¶ 65.]

71.     Viola's office was near the CFO Stephens's office. [JSF ¶ 66.]

72.     Viola's job included letting management know if AT&T would meet the analysts' consensus estimates by analysts each quarter. [Viola Dep. Tr. (P. Ex. 87) 42:25-43:6; 43:15-24.]

73.     Each morning, throughout the year, the IR department sent an email memo summarizing any recent analyst commentary concerning AT&T or its competitors to an internal distribution list that included the CEO, Stephenson, CFO, Stephens, Stankey, employees of the IR Department, including Black, Evans, Womack and Viola and others in AT&T. [*E.g.*, Viola Dep. Tr. (P. Ex. 87) 137:4-138:20 (. . ."And, would you agree with me, it looks like Mr. Anderson is updating everyone on that email list with what was the status of various analysts' estimates for the first quarter of 2016? [objection] [A.] It – it appears that that's what this is. I mean, the morning IR note from Jamie is published every morning and just highlights what any analysts within our industry had published the night before regardless if it's an update or else. . . ."); J. Ex. 4 (Mar. 22, 2016 email); *see also* JSF ¶ 67.]

74.     Viola retired from AT&T in June 2020. [JSF ¶ 68.]

## II.     **AT&T's Wireless Equipment Business**

### A.  **Background Concerning Subsidized Plans and AT&T Next**

75.     Historically, AT&T subsidized the cost of the cellphones that it sold to its subscribers through the use of substantial discounts at the time of purchase. [Compl. ¶ 32; Defs. Answers ¶ 32; J. Ex. 5 at 12 (2014 Form 10-K: "we have provided postpaid contract subscribers substantial equipment subsidies to initiate, renew or upgrade service."); *see also* JSF ¶ 69.]

76.     On or about July 26, 2013, AT&T changed the business model by which it sold smartphones to subscribers by adopting the Next program, a program through which a subscriber would pay for a smartphone in installments over a set period (an "equipment installment plan" or "EIP"). [*See* JSF ¶ 70.]

77.    As described by AT&T, the Next program "allows customers to buy handsets on an installment basis in exchange for discounted service charges, along with other benefits. . . ." [J. Ex. 5 at 12 (2014 Form 10-K at page 4); *see also* JSF ¶ 71.]

78.    Equipment installment plans such as the Next program "are intended to encourage existing subscribers to upgrade their current services and/or add connected devices, attract subscribers from other providers and minimize subscriber churn." [J. Ex. 1 at 10 (2015 Form 10-K at page 4).]

79.    When AT&T subscribers purchased a phone under the Next program, they were eligible for a discount on their service plans. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 53:15-54:1 ("[Q.] Was there promotions where, for example . . . if you upgraded to a Next plan, you would get a discount on your . . . service payments? A. There was an offering when you went up to Next that you would go up to the nonsubsidized plan offer, yes. Q. Okay. And were those nonsubsidized plans cheaper or less expensive than the comparable subsidized plan? A. All depended on the package you built, but yes, there were generally cheaper . . . ."); *see also* JSF ¶ 72.]

80.    Subscribers who purchased a phone under the Next program were generally eligible for an incentive credit which they would receive over their Next contract period, but did not receive an upfront subsidy for purchasing the phone, although the sales of such phones may have been subject to activation fees and discounts at the time of sale. [JSF ¶ 73.]

81.    In 1Q16, AT&T stopped offering smartphones under subsidized plans to most, but not all, of its customers. [JSF ¶ 76.]

82.    In 1Q16, AT&T still sold phones to customers on subsidized plans. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 99:19-100:7 ("Q. Okay. And other than Next sales, what other sales

were there? I think you mentioned that they had ended the subsidy sales by 1Q16. A. The policy

had ended the subsidy sales. There were still some subsidy sales for some grandfathered

contracts, you know, contracts that had been committed to that you couldn't change until you

renewed them. . . ."); J. Ex. 123 at 16 (1Q16 Investor Briefing "The company eliminated subsidy

plans *for consumer customers* during the quarter." (emphasis added)); *see also* JSF ¶ 77.]

83.     In 1Q16, an internal AT&T document summarizing "Postpaid Gross Adds and

Upgrades and Device Mix" showed that it sold 4,135,000 phones under "Next/EIP" plans and

482,000 phones under "Subsidized" plans.[2] [P. Ex. 37 at 21 (April 18, 2016 email and

attachments).]

84.     AT&T's transition to an EIP model from the subsidy model caused customers to

upgrade their phones less frequently. [ATT Answer ¶ 32 (AT&T Answer); *see also* JSF ¶ 78.]

## III.     AT&T Financial Reporting and Accounting

### A.  Revenue and Wireless Equipment Revenue

85.     AT&T prepares quarterly and annual reports, filed on SEC Forms 10-Q and 10-K

respectively, in conformity with U.S. generally accepted accounting principles ("GAAP"). [JSF ¶

80; *e.g.*, J. Ex. 1 at 77 (2015 AT&T Form 10-K at p. 45); J. Ex. 2 at 8 (1Q16 AT&T Form 10-Q

at p. 7).]

86.     In addition, AT&T reported quarterly and annual financial results on SEC Forms

8-K that it filed with the Commission in advance of filing its Forms 10-Q and 10-K. [JSF ¶ 81;

*e.g.*, J. Ex. 253 (Apr. 27, 2016 Form 8-K announcing quarterly results).]

### i.  *Total Consolidated Revenue and Expenses*

---

[2]     The document also shows that AT&T added 566,000 customers under "BYOD / No

Contract" plans—i.e., phones that AT&T did not sell. [P. Ex. 37 at 20 (April 18, 2016 email and

attachments).]

87.     AT&T reported its total consolidated revenue in its Forms 10-Q and 10-K in 2015 and 2016. [JSF ¶ 82; *e.g.*, J. Ex. 1 at 3 (2015 Form 10-K) and J. Ex. 6 at 3 (2016 Form 10-K).]

88.     Total wireless revenue, which consisted of both wireless service revenue (e.g. revenues gained from customers' payments for wireless service) and wireless equipment revenue (e.g. revenues gained from customers' payments for handsets, devices or other hardware or accessories), was included in AT&T's total consolidated revenue. [*See* JSF ¶ 83; *e.g.*, J. Ex. 1 at 3 (2015 Form 10-K) and J. Ex. 6 at 3 (2016 Form 10-K).]

89.     Wireless equipment revenue was included in AT&T's consolidated equipment revenue. [JSF ¶ 84.]

90.     AT&T disclosed the cost of equipment (e.g. the costs paid to acquire the equipment AT&T sold to its customers) on a consolidated basis, but did not separately report its wireless equipment costs. [*See* JSF ¶ 85.]

*ii.   Wireless Equipment Revenue and Expense*

91.     Equipment revenue from the sale of a device and equipment expense from the cost of the device sold were recognized in the current quarter. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 70:16-71:2 ("Q. . . . the sale price of the device was recognized as equipment revenue in the current quarter; is that correct? A. Yes. Q. And the cost paid by AT&T for the handset, that was recognized as equipment expense? A. Yes. Q. Okay. And was that also recognized in the current quarter? A. Yes.").]

92.     AT&T reported in its financial statements filed with the Commission on Forms 10-Q and 10-K, as well as in earnings releases filed on Forms 8-K, wireless equipment revenue that included, among other equipment revenue, the revenue it derived from the sales of smartphones to cellular subscribers. [JSF ¶ 88.]

93.     When AT&T reported its wireless equipment revenue in its quarterly earnings releases, it provided as a comparison the percentage increase or decrease from the same quarter of the prior year, e.g., 1Q16 against the first quarter of 2015 ("1Q15"). [JSF ¶ 89.]

94.     Subscribers who supply their own cell phone, i.e., bring-your-own-device or BYOD subscribers, do not generate any equipment revenue or equipment expense for the device itself. [JSF ¶ 90.]

95.     On a GAAP basis, the cost of phones sold by AT&T was higher than the revenue recognized on the phones for the Next program. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 23:15-24:4 ("Q. Okay. And it's true, isn't it, that the equipment expenses in the first quarter of 2016 were higher than the equipment revenue in the first quarter of 2016 on a GAAP basis, correct? [objection] A. On a GAAP basis, I'd suggest we go to the schedules to walk through that to answer that. Q. Are you able to answer that question without looking at the schedules? A. Yeah, I don't believe that – let me say it this way. On a GAAP basis, the cost of the phones was higher than the revenue recognized on those phones for the Next program, yes."); P. Ex. 43 (Nov. 28, 2018 letter from Sidley Austin LLP) ("In 1Q 1026, total device revenue from sales of smartphones was $2,563,214,292.61 and the total cost to AT&T to acquire those devices was $3,150,361,421.97, reflecting net equipment cost to the Company of $587,147,129,36").]

96.     In its financial statements, AT&T did not separately disclose the cost of wireless equipment; rather disclosing the aggregate "Operating expenses: Operations and support" total consisting of the aggregate total of "Cost of Services," "Cost of Equipment," and "Selling, General & Administrative" expenses. [*See* JSF ¶ 91.]

**B.  Upgrade Rate**

97.     AT&T publicly disclosed the rate at which its postpaid subscribers upgraded their smartphones through AT&T as the "postpaid upgrade rate" ("upgrade rate") in Investor Briefing

publications that it released contemporaneously on its website with the earnings releases and documents that it filed with the Commission. [JSF ¶ 96; *e.g.*, J. Ex. 149 at 31 (October 21, 2015 email attaching draft investor materials, including Investor Briefing for 3Q15 stating "The postpaid upgrade rate in the quarter was 5.7%"); J. Ex. 47 at 16 (Jan. 26, 2016 Investor Briefing for 4Q15 stating "The postpaid upgrade rate in the quarter was 7.6%"); J. Ex. 123 at 16 (April 26, 2016 Investor Briefing for 1Q16 stating "The postpaid upgrade rate in the quarter was 5.0%").]

98.      Prior to AT&T publicly announcing its 1Q16 financial results on April 26, 2016, AT&T's wireless equipment upgrade rate, wireless equipment revenue, and total consolidated revenue for 1Q16 were not publicly available. [Black Dep. Tr. (P. Ex. 66) 87:25-88:23 ("[Q.] do you know of any place that AT&T's wireless equipment upgrade rate, wireless equipment revenue, or total revenue for the first quarter of 2016 was publicly available or published between March 10, 2016, and April 25, 2016? . . . I think the earnings came out on April 26 of 2016? A. That's correct. Q. So prior to that date, would those metrics been publicly available? A. Those metrics would not be available."); *see also* JSF ¶ 97.]

### C.  Next Accounting

99.      In its public disclosures, AT&T described how it recognized revenue from its EIP (i.e., Next) plans: "For customers that elect these installment payment programs, we recognize revenue for the entire amount of the customer receivable, net of the fair value of the trade-in right guarantee and imputed interest." [J. Ex. 1 at 81 (2015 Form 10-K at page 49); J. Ex. 6 at 88 (2016 Form 10-K at page 46).]

100.      AT&T recognized imputed interest on deferred payments under the Next program (i.e., the installment payments) as an offset (deduction) to equipment revenue in the quarter the phone was sold. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 71:3-18 ("Q. . . . what's the imputed

interest? A. It's an accounting requirement under GAAP to attempt to measure the interest on the deferred payments. . . . Q. The installment payments basically? A. The installment payments, yes. Q. And the imputed interest, that's also recognized in the current quarter, correct? A. It's recognized as an offset to equipment revenue in the current quarter under GAAP accounting.").]

101.    AT&T also recognized the trade-in value of phones as a guaranteed liability at the time of sale as an offset (deduction) to equipment revenue. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 71:20-72:5 ("Q. And an estimated guarantee liability, what's that? A. If a customer traded in a phone, we measured the value of that phone based on the wholesale marketplace, and we measured the amount of installment payments by what he had left or she had left, and the difference would be a guaranteed liability. Q. Okay. And when was that recognized under GAAP? A. In the month when the sale occurred.").]

### i.   AT&T's Examples of Next Accounting

102.    A presentation prepared for new members of AT&T's Board of Directors demonstrated the accounting for a $600 phone and the gross margin impacts under the subsidy model and the Next model showing that AT&T only recognized $500 of equipment revenue from the sale of a $600 phone. [P. Ex. 7 at 15 (Sept. 23, 2015 email and attachment).]

103.    The presentation further showed service revenue impact of the discounts under the Next program totaling approximately $260, offset by $40 of imputed interest recognized over

the time, such that the "Net Next Margin Impact" was a $320 loss on the sale of a $600 phone.

[P. Ex. 7 at 15 (Sept. 23, 2015 email and attachment).]

| Traditional Subsidy Model | | |
|---|---|---|
| Equipment Revenue | $ | 240 |
| Cost of Handset | | (600) |
| Gross Margin Impact | $ | (360) |
| **Next Model** | | |
| $30 installment payments for 20 months (assumed trade-in at 13th month) | | |
| Total installments | $ | 600 |
| Imputed interest | | (50) |
| Trade-in value | 160 | |
| Forgone installments | (210) | |
| Guarantee Liability | | (50) |
| Equipment Revenue | $ | 500 |
| Cost of Handset | | (600) |
| Gross Margin Impact | $ | (100) |
| Service revenue impact | | |
| $20 price adjustment | $ | (260) |
| Interest income | | 40 |
| Net Next Margin Impact | $ | (320) |

104.    The Individual Defendants utilized a "Q&A" document prepared by Evans to speak to analysts in connection with quarterly earnings reporting. [J. Ex. 116 (Apr. 24, 2016 Evans "1Q16 Wireless Q&A" email and attachment); Black Dep. Tr. (P. Ex. 66) 311:1-9 ("Q. . . . Did you use this document to prepare yourself to speak with analysts in connection with the quarterly earnings reporting? A. Sure. . . . After we report, numbers are here and helpful to understand what's going on in the business.").]

22

105.    Evans explained that he created the "Wireless Q&A" documents and shared it with others in the IR Department "to educate the other IR staff on the business. And in a lot of cases, there is information that is public. In a lot of cases, it is not public." [Evans Dep. Tr. (P. Ex. 71) 79:17-80:7.]

106.    Evans obtained the data for his "Wireless Q&A" accounting example from AT&T's accountants. [Evans Dep. Tr. (P. Ex. 71) 138:18-139:6.]

107.    The "Wireless Q&A" document contained an example of the "accounting for AT&T Next" and showed that the equipment revenue booked on a $700 device was $572 after the loss on trade-in and imputed interest, resulting in a "Net subsidy" of $128. [J. Ex. 116 at 7-8 (Apr. 24, 2016 Evans "1Q16 Wireless Q&A" email and attachment).]

108.    The example in the "Wireless Q&A" ([J. Ex. 116 at 7-8) was used by Black to describe the accounting under the Next program. [Black Dep. Tr. (P. Ex. 66) 317:20-318:23 ("Q. . . Because were interested in how AT&T calculated the equipment revenue and equipment costs under the Next EIP plans. Correct? [objection] A. I think it was helpful for us to understand. Q. You and investor relations. Correct? A. Yes. Q. Right. Because you were talking to analysts. Right? [objection] A. We were talking with analysts but I can't recall if this [J. Ex. 116 at 7-8] was absolutely used verbatim. I don't know. . . . In the calls. Q. But it was helpful for you to know it because analysts . . . asked you questions about accounting under the Next plan. Right? A. That fair. Yeah. Q. And it was part of the information you needed to convey to them so they would understand it. Correct? [objection] A. I think it was helpful for them to understand the accounting.").]

109.    According to the "Wireless Q&A" document, the full cost of the phone would be recorded. [J. Ex. 116 at 8 (Apr. 24, 2016 Evans "1Q16 Wireless Q&A" email and attachment).]

110.     In an AT&T internal "1Q16 3+0 Wireless Financial and Operational Results" presentation discussing, among other things, factors resulting in lower "Cash Operating Expenses[,]" lower device sales is not discussed among the factors that resulted in lower expenses. [P. Ex. 37 at 19 (April 18, 2016 email and attachments).]

111.     There are no AT&T documents that demonstrate that the cost of selling smartphones is offset on a dollar-for-dollar basis by the revenue from selling the phones.



*ii.   Analyst Analysis of Next Accounting*

112.     RBC modeled the impact of the smartphone sales under the subsidy model and AT&T's Next EIP plan. [Hyun Dep. Tr. (P. Ex. 76) 175:8-176:2.]

113.     RBC explained to investors that "EIP" programs like AT&T's Next plan "have a financial impact on the income statement and cash flow." [J. Ex. 257 at 29 (Apr. 14, 2016 Communications/Infrastructure: Broadband Primer & Investment Themes).]

114.     For example, RBC stated that: "At the point of the customer transaction for EIP, carriers recognize a greater amount of equipment revenue compared to a subsidy model, which also represents a boost to EBITDA." [J. Ex. 257 at 31 (Apr. 14, 2016 Communications/Infrastructure: Broadband Primer & Investment Themes).]

115.    As an example of AT&T's EIP accounting, RBC modeled a $133 loss on the sale of a $650 cell phone. [Hyun Dep. Tr. (P. Ex. 76) 176:25-177-4; J. Ex. 257 at 32 (Apr. 14, 2016 Communications/Infrastructure: Broadband Primer & Investment Themes).]

116.    In an October 2, 2016 report, Citi noted that EIP plans "creat[ed] an initial working capital drag of $200-400 relative to the subsidized model." [J. Ex. 260 at 4 (Oct. 2, 2016 Citi Report).]

117.    In a March 2016 Citi presentation, Citi noted that "Subsidy Elimination is a Myth" and "We understand from carriers . . . that the average cost for the high-end iconic devices is around $600-$650. Hence, the subsidization of the device (excluding any charge for bad debt expense), is reflected through a permanent reduction in the monthly service cost, which impacts service revenue and ARPU over time." [J. Ex. 259 at 19 (March 2016 Citi Presentation).]

118.    In its April 11, 2016 note on AT&T, Evercore wrote: "we believe service revs growth will return to negative territory in 2H16 as legacy subs upgrade to a new handset and are moved to non-subsided pricing." J. Ex. 78 at 2.

**D.  Relevant AT&T Actual Financial Results**

119.    In 1Q16, AT&T's wireless equipment revenue was $3.156 billion. [*See* JSF ¶ 95; *see also* P. Ex. 37 at 19 (April 18, 2016 email and attachments); Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 126:2-14 ("Q. . . . And equipment revenue there says 3.156 billion, correct? A. Yes. Q. And that would have been the Q1 actuals for equipment revenue, correct? A. Yes, I believe so. I'm not sure that the books were closed at the time, but that what would have been expected. Q. Okay. But to the extent that number matches what's in AT&T's financial statement, that would have been the actual number, correct? [objection] A. Yes.").]

120.     In 1Q16, AT&T's wireless equipment costs were $3.991 billion. [P. Ex. 37 at 19 (April 18, 2016 email and attachments).]

121.     In 1Q16, AT&T's consolidated equipment revenue was $3.434 billion. [J. Ex. 2 at 3 (AT&T 1Q16 Form 10-Q).]

122.     In 1Q16, AT&T's consolidated equipment costs were $4.375 billion. [*See* JSF ¶ 95; J. Ex. 2 at 3 (AT&T 1Q16 Form 10-Q).]

123.     In 4Q15, AT&T's wireless equipment revenue was $4.071 billion. [*See* JSF ¶ 94; P. Ex. 37 at 19 (April 18, 2016 email and attachments).]

124.     In 4Q15, AT&T's wireless equipment costs were $5.366 billion. [P. Ex. 37 at 19 (April 18, 2016 email and attachments).]

125.     In 3Q15, AT&T's wireless equipment revenue was $3.234 billion. [J. Ex. 127 at 19 (Jan. 20, 2016 email and attachments).]

126.     In 3Q15, AT&T's wireless equipment costs were $4.082 billion. [J. Ex. 127 at 19 (Jan. 20, 2016 email and attachments).]

127.     In 1Q15, AT&T's wireless equipment revenue was $3.374 billion. [P. Ex. 37 at 19 (April 18, 2016 email and attachment)

128.     In 1Q15, AT&T's wireless equipment costs were $4.280 billion. [P. Ex. 37 at 19 (April 18, 2016 email and attachments).]

129.     AT&T's upgrade rates from 1Q14 to 1Q16 were: 5.0% for 1Q16, 7.6% for 4Q15, 5.7% for 3Q15, 5.8% for 2Q15, 6.6% for 1Q15, 11.3% for 4Q14, 7.1% for 3Q14, 6.3% for 2Q14, and 6.5% for 1Q14. [*See* JSF ¶ 114.]

130.    In 1Q16, AT&T's wireless equipment revenue was $3.156 billion, while its equipment costs were $3.991 billion, resulting in a negative $835 million impact to earnings. [*See* P. Ex. 37 at 19 (April 18, 2016 email and attachments).]

131.    Total wireless revenue was included in AT&T's total consolidated revenue, and in 1Q16 total wireless revenue of $17,954 represented approximately 45% of consolidated revenue of $40.535 billion. [*See* J. Ex. 2 at 3, 32.]

132.    In 1Q16, wireless equipment revenue of $3.156 billion represented approximately 92% of consolidated equipment revenue of $3.434 billion, and 8.5% of total consolidated revenue. [*See* J. Ex. 2 at 3, 32; *compare id.* (showing wireless equipment revenue of $3.156 billion) *with* J. Ex. 253 at 9 (showing total equipment revenue of $3.434 billion and total revenue of $40.535 billion).]

133.    In 1Q16, wireless equipment revenue of $3.156 billion represented 17.6% of total wireless revenue of $17.954 billion. [J. Ex. 2 at 32.]

**E.  The Importance of Revenue, Wireless Equipment Revenue, and Upgrade Rates**

134.    Analysts asked Black about total consolidated revenue, wireless equipment revenue, and upgrade rates. [Black Dep. Tr. (P. Ex. 66) 54:18-55:19 ("Q. . . . In your experience as an investor relations professional at AT&T, did analysts limit their questions to AT&T's earnings, EBITDA, free cash flow, or EPS? [objection] A. Their questions? They did not. They . . . asked more than those four items that are . . . listed there. Q. Right. Like they asked about total consolidated revenue? [objection] A. They did. Q. And that was in 2015 and 2016 they asked those questions. Right? A. I don't recall that. My answer was based on today. Q. Okay. You don't recall 2015 or 2016 what they asked about? A. No, I do not. Q. What about wireless equipment revenue? A. There would be questions on wireless equipment revenues, yes. Q. And

upgrade rate too. Right? A. Again, I'm talking about today's, what's in my mind today rather than 2015 and '16.").]

        *i.   Revenue*

    135.    Investors cared about revenue growth. [*See* Sine Dep. Tr. (P. Ex. 83) 343:14-344:5 ("[Q.] Do you see there that it says, 'What is AT&T's strategy for increasing revenues?' A. Yes. Q. . . . To your understanding, was this something that your investors might care about in 2015? A. Yes. Q. What about 2016? A. Yes."); Ilkowitz Dep. Tr. (P. Ex. 77) 188:22-189:25 ("Q. Is that something you understood investors to care about, which is revenue growth? [objection] [A.] Revenue growth was one of the things that investors would care about, yes. . . . [Q.] And why is that? [objection] [A.] I mean, there could be a variety of reasons why. But it was one of the publicly reported numbers that companies would give us to let us know . . . how they were doing and how they were performing.").]

    136.    Information concerning revenue growth was important to AT&T's Board of Directors. [Stephens Dep. Tr. (P. Ex. 85) 84:19-86:14 ("How do you decide what goes into these presentations [to the board]? [objection] A. My judgment. Q. And when you say your judgment, what are the criteria you considered in including data in these reports? A. Information I think is important to the board. . . . Q. [referring to document with chart comparing AT&T, Verizon, Sprint, and T-Mobile] And that's wireless revenue growth at the top of that chart there, correct? A. Yes. Q. And is that because investors use revenue growth as a point of comparison between the various wireless companies? [objection] A. I include it to inform the board of the revenue growth trends. Q. And is that because the board used it as a point of data for themselves? A. You'd have to ask them. I used it to inform the board, one of the many trends of the business. Q. And you informed the board of it because you thought it was important, correct? [objection] A. Yes.").; J. Ex. 154 (Feb. 24, 2016 email from Stephens to Dial ("the[n] state [in letter to board]

that wireless equipment revenues and expenses are down due to customers choosing not to upgrade"); Stephens Dep. Tr. (P. Ex. 85) 205:6-10 ("[Q.] This is information you thought the board should know, right, that the wireless equipment revenue and expenses are down due to customers choosing not to upgrade? A. Yes.").]

137.    In its 2015 and 2016 Definitive Proxy Statements, AT&T included consolidated revenue as one of three short-term performance metric for purposes of determining executive compensation. [P. Ex. 6 at 47 (AT&T Proxy Statement, dated March 10, 2015); J. Ex. 251 at 52 (AT&T Proxy Statement, dated March 11, 2016).]

138.    In AT&T's Definitive Proxy Statement dated March 11, 2016, it stated that the Compensation Committee of the Board of Directors "chose these performance metrics because they are the key short-term financial metrics for the operation of our business and represent important key metrics to our stockholders." [J. Ex. 251 at 52 (AT&T Proxy Statement, dated March 11, 2016).]

### ii.  Equipment Revenue

139.    Equipment revenue was an important metric for AT&T's analysts and investors. *See* Sine Dep. Tr. (P. Ex. 83) 345:21-348:7 ("Q. Do you recall what you asked that question [about whether AT&T was still going to break out wireless equipment revenue]? A. I asked all of these questions, because I thought they were important and helpful in modeling and coming to . . . the conclusion on revenue and EBITDA and EPS for AT&T . . . . [Q.] what was the kind of information you can infer from those trends [in equipment revenue]? [objection] [A.] So equipment revenue can come from adding a new subscriber, having an existing subscriber upgrade their phone or accessories . . . But looking at it, my assumption always is that the largest proportion of that revenue is coming from new subscribers buying a device. . . . Equipment revenue . . . is generally favorably correlated with future revenue and earnings, because if the

29

customers are buying a new phone or they're an existing customer and they're locking in, there is some positive correlation with future earnings capabilities."); J. Ex. 78 at 2 (Apr. 11, 2016 Evercore report) (a "main story" regarding AT&T was "pressure on equipment revs"); J. Ex. 71 at 3 (Mar. 28, 2016 Wells Fargo Industry note) ("Equipment revenue was historically an afterthought for many telecom investors, as service revenue was the more predominant metric used to evaluate the carriers. ***This has changed, however***, with the transition of carriers from subsidized equipment pricing to an installment-based (EIP) model." (emphasis added)).]

140.    It was important for investors to have information about lower equipment revenue. (Stephens Dep. Tr. (P. Ex. 85) 198:10-199:4 ("Q. So when you speak on that call [AT&T's 4Q15 earnings call], you're telling that audience the things you think it's important for them to know, correct? A. Yes. Q. . . . [referring to J. Ex. 46 And then you say: That growth comes even with lower equipment sales, as customers choose to hold onto their smartphones for a longer period of time. Is that correct? A. Yes. Q. And then you said that because you thought it was important for investors to know that there were lower equipment revenue there, correct? A. I said that to explain what – the results of the quarter.").]

141.    In 2014 and 2015, AT&T touted higher equipment revenue from its Next plans. [J. Ex. 5 at 36 (2014 Form 10-K: "Growth in equipment revenues reflected the continuing trend by our postpaid wireless subscribers to choose devices on installment purchase rather than the device subsidy model, which resulted in increased equipment revenue recognized for device sales."); J. Ex. 149 at 30 (3Q15 Investor Presentation: "Wireless equipment revenues increased 11.0% to $3.2 billion, as more customers chose equipment installment plans versus subsidized devices.").]

142.     When AT&T reported its results for fiscal year 2015 in its Form 10-K, filed with the Commission on February 18, 2016, AT&T informed investors and analysts that growth in equipment revenue "has the corresponding impact of lowering service revenues." [JSF ¶ 92.]

### iii.   Upgrade Rate

143.     Upgrade rates reflect the percentage of existing AT&T customers who purchase new smartphones. [JSF ¶ 112.]

144.     The upgrade rate is a metric that was used by AT&T and analysts to monitor the health of AT&T's business. [Evans Inv. Tr. (P. Ex. 53) 72:7-73:13 ("Q. . . . what relevance for your job does the handset upgrade rate have? A. Um -- what relevance does it have. I mean, it's just one of many metrics. Q. How do you use it? A. Um, I -- I guess I'm -- I don't really use it, um, except for when actuals, for example, are disclosed. You know, there's discussion points by the analyst community in trying to speculate why the upgrade rates are going up or down, consumer-behavior-type issues. Q. So when you say, When actuals are disclosed, what does that mean? A. We report that number externally. Q. So is the only upgrade rate that's relevant to your function, your job function, the actual handset upgrade rate? A. It's -- I mean, that's -- that's putting it fairly simplistic. Q. All right. So if you could explain to me. A. I mean, it's a metric, like churn -- I'm sorry. You know, churn is something we kind of monitor off and on, the direction it's going. You know, it kind of tells you the health of the business. Upgrade rates is another one of these metrics. It -- it -- you know, is it the health of the business or more consumer behavior? And that's -- you know, we had gone off of the subsidy model, so that's why we kind of monitored it, to see which direction it was going at.").]

145.     The wireless equipment upgrade rate was an important metric for AT&T's analysts and investors. [Black Dep. Tr. (P. Ex. 66) 152:8-12 ("Q. . . . In terms of the handset renewal cycle, is that something that you would discuss with analysts? A. There would be a

discussion about that, certainly, yes."), 313:25-315:4 (". . . Q. And the first bullet point says: 'The upgrade rate for 1Q16 was a record low 5 percent as customers are choosing to slow their replacement cycle under the no subsidy policy.' Do you see that? A. I do. Q. And that question is in there because analysts would ask about the upgrade rate. Correct? A. Yes, they would . . . . Q. And you needed to be able to provide them information that would be helpful to their assessment of the upgrade rate. Right? [objection] A. I think that's fair."); Sine Dep. Tr. (P. Ex. 83) 350:5-351:6 ("[Q.] Now, just focusing down to -- from revenue generally, equipment revenue generally, to the upgrade revenue . . . how would that particular metric affect your analysis of things other than revenue for AT&T's business? [objection] [A.] As we talked a minute ago, to the extent the equipment revenue -- it's 0 percent financing on a 24- to 30-month contract, so you're providing some way to lock in a customer, and that should -- to the extent that those customers are locked in, that should reduce churn. So you'll have fewer customers leaving on the whole. You'll have more revenue, more -- and greater earnings in future periods unless, of course, the customer is free to pay off the contract and leave whenever they want. But because it's 0 percent financing, they tend to stay through the contract term."); Ilkowitz Inv. Tr. (P. Ex. 59) 51:8-15 ("[Q.] Can you tell me why you decided to highlight that trend to your investor client base? A. It's hard to recall exactly why, but obviously that must have been a topic of interest at the time."); Ilkowitz Dep. Tr. (P. Ex. 77) 185:25-187:4 ("[Q.] [Y]ou had been working on that trend [the length of the handset cycle] for at least six months; is that fair? [objection] [A.] That had been part of our research, the written research we've reviewed. . . . [Q.] And why did you research that? [A.] It was a topic of interest or it came from some financial impact to the companies. There was some reason why, but I believe it was because it was a wireless was a competitive space and this was part of the competitive landscape. Q. And the analysis is

something you thought your investors would want to see? [objection] [A.] Yes, this was a topic

of interest. . . . [Q.] And when you say, 'a topic of interest,' a topic of interest to whom? A. To

our investing clients in the market."); J. Ex. 258 (June 14, 2016 email from Hyun) (RBC analyst

Brian Hyun responded to a colleague's question "What are the three biggest questions to focus

on for T, relative to what you get the most questions on from clients?" by listing five questions

including "Will the upgrade rate go back higher or is the mid-5% the new norm?").]

146.    Lower upgrade rates affected AT&T's revenue and earnings. [P. Ex. 48 (Jan. 16,

2016 emails from Stephens) ("need to understand upgrade rte – 500 bp [basis point] drop is a big

deal for long term profits – as long as churn is stable)[.]"); Evans Inv. Tr. (P. Ex. 53) 52:10-12

("Q. And so, is there a connection between the handset upgrade rates and revenue? A. They're

part of it."); Ilkowitz Inv. Tr. (P. Ex. 59) 51:16-52:17 ("[Q.] What impact does a lengthening

handset cycle have on the wireless sector generally? A. Generally speaking, if the handset cycle

were to lengthen the company would sell fewer handsets. . . . So, it would cause them to lose

some revenue because sales were down, but their profitability would improve because they

would sell fewer loss making items. . . . [Q.] What's the impact on revenue for the lengthening of

the handset cycle in your understanding [in April 2016]? A. All else equal, revenue would

decline because fewer units were sold. [Q.] And that would be true not just of the sector

generally, but of AT&T in particular; is that right? A. Correct."); Ilkowitz Dep. Tr. (P. Ex. 77)

77:20-78:5 ("Q. And that [customers holding on to their phones longer] could lead to decreased

equipment revenue for the telecom companies? [objection] [A.] All else equal, if you sell less

phones, you'll have less equipment revenue."); ATT Answer ¶ 31-35 (DE 30).]

147.    AT&T's handset renewal average or "cycle" (i.e., the average length of time its

subscribers held onto their handsets before upgrading) was nonpublic information. [Black Dep.

Tr. (P. Ex. 66) 152:24-153:2 ("Q. Okay. Is the handset renewal average the kind of intra-quarter metric you wouldn't disclose under AT&T's policy? A. That's correct."); J. Ex. 113 at 12 (Tr. of Mar. 2016 Morgan Stanley conference) (Audience Participant: "I wonder if you could put some data around the point you made on handset renewals. I'm interested in terms of what's the average currently? How is that shifting up and how long do you think that could become?" Response by Stankey: "Yes, it's not something we publicly disclose.").]

148.    Declining upgrade rates generally had the effect of lowering equipment revenue. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 63:2-5 ("Q. Okay. Now, declining upgrade rates did have an effect on equipment revenue, correct? A. Yes, in the sense that if you didn't have an upgrade, you didn't have equipment revenue.").]

149.    Womack understood that upgrade rates could be used to calculate wireless equipment revenue, which in turn was a component of total consolidated revenue. [JSF ¶ 99; Womack Inv. Tr. (P. Ex. 55) 108:2-109:3 ("Q. What would – what would a relatively low upgrade rate mean for AT&T's equipment revenues? A. A low upgrade rate would suggest that equipment revenue would be lower as well, comparatively speaking.").]

150.    Evans understood that upgrade rates could be used to calculate wireless equipment revenue, which in turn was a component of total consolidated revenue. [JSF ¶ 100.]

151.    Black understood that upgrade rates could be used to calculate wireless equipment revenue, which in turn was a component of total consolidated revenue. [JSF ¶ 101; Black Dep. Tr. (P. Ex. 66) 315:5-316:7 (". . . Q. Okay. Well, you understood the equipment rate affected the equipment revenue. Correct? [objection] A. It affected the revenue, yes. . . . Q. And revenue affects earnings. Correct? A. Not all revenue affects earnings especially with equipment revenue. Q. Do you have an understanding of how AT&T calculated its EBITDA in its financial

reporting? A. Yes. Q. Okay. And what was the first step there? A. The first line item of the income statement? Q. Correct. A. Revenue."); 330:15-331:11 ("Q. Okay. And data concerning upgrade rates is the kind of data that analysts use to calculate equipment revenue. Correct? A. They do. Q. And you knew that from working with their models. Right? A. Yeah . . . it's one of aspect of how they calculate the equipment revenues. There is other components that run within that equipment revenue. Q. Right. And then equipment revenue itself was used to calculate total wireless revenue. Right? [objection] A. It is a component of total wireless. Q. Yes, and total wireless revenue is a component of total consolidated revenue. Correct? [objection] A. Total wireless revenue is a component of total consolidated revenues."); 216:5-9 (referring to J. Ex. 163 at 2) ("Q. . . . And so you understood at the time [March 22, 2016] that changes in upgrade rates would be reflected in lower equipment revenues. Correct? A. That's what it says, yes.").]

152.    Womack discussed the handset renewal cycle with analysts in 2015 and 2016. [JSF ¶ 102.]

153.    Evans discussed the handset renewal cycle with analysts in 2015 and 2016. [JSF ¶ 103.]

154.    Black discussed the handset renewal cycle with analysts in 2015 and 2016. [JSF ¶ 104; Black Dep. Tr. (P. Ex. 66) 152:8-12 ("Q. . . . In terms of the handset renewal cycle, is that something that you would discuss with analysts? A. There would be a discussion about that, certainly, yes.").]

155.    On various occasions prior to March 2016, analysts emailed Evans specifically to obtain AT&T's upgrade rate for the fiscal quarter that AT&T had publicly disclosed and Evans provided that specific percentage. [*See* JSF ¶ 105; J. Ex. 8 (Analyst Q on April 22, 2015: "Quick Question. I didn't seen an upgrade rate for the quarter. Did I miss it? [Evans A:] Richard, Think

35

it was buried in one of the documents but it was 6.6%"); J. Ex. 9 (Analyst Q. on October 22, 2015: "Can we get an upgrade rate? Thank you. [Evans A:] 5.7%"); J. Ex. 10 (Analyst Q. on January 26, 2016: "Was a Next take rate given? Upgrade rate? % of base on Next and MSV? Thank you. [Evans A.:] Richard, Upgrade rate was 7.6% ....").]

156.     Device upgrades contributed to growth from higher wireless data usage and service revenue. [J. Ex. 1 at 13 (FY 2015 Form 10-K at page 7: "Wireless data services continue to be a growing area of Consumer Mobility's business, representing an increasing share of overall subscriber revenue. Subscribers continue to upgrade their handsets to more advanced integrated devices, contributing to growth from wireless data services."); [J. Ex. 6 at 14 (FY 2016 Form 10-K at page 6 (same)).]

*iv.   Impact on Earnings and Churn*

157.     AT&T disclosed GAAP net income, which is the sum of its operating revenues, operating expenses, and other income and expense categories and GAAP accounting adjustments on a consolidated basis in its Forms 10-K and 10-Q and earnings releases filed on Forms 8-K. [*E.g.,* J. Ex. 6 at 36 and 37 (2016 Form 10-K); J. Ex. 2 at 3 (1Q16 Form 10-Q); J. Ex. 253 at 9 (Apr. 26, 2016 Form 8-K); *see also* JSF ¶ 106.]

158.     Consolidated net income was used to calculate AT&T's earnings per share ("EPS"). [*E.g.,* J. Ex. 6 at 36 (2016 Form 10-K); J. Ex. 2 at 3 (1Q16 Form 10-Q); J. Ex. 253 at 9 (Apr. 26, 2016 Form 8-K).]

159.     AT&T reported GAAP consolidated "operating income" which was the sum of its total operating revenues, including service and equipment revenue, and operating expenses, including costs of services and sales, equipment expense, and selling, general, and administrative costs, as well as other expenses, in its Forms 10-K and 10-Q and earnings releases filed on

Forms 8-K. [*E.g.,* J. Ex. 6 at 37 (2016 Form 10-K); J. Ex. 2 at 3 (1Q16 Form 10-Q); J. Ex. 253 at 9 (Apr. 26, 2016 Form 8-K); *see also* JSF ¶ 107.]

160.    AT&T reported segment-level operating income, calculated as the sum of the segment-level revenue, including service and equipment revenue, and segment operating expenses, on its Forms 10-K and 10-Q and earnings releases filed on Forms 8-K. [*E.g.,* J. Ex. 6 at 45 (2016 Form 10-K Consumer Mobility Segment Results); J. Ex. 2 at 24 (1Q16 Form 10-Q Business Solutions Segment Results); J. Ex. 253 at 10 (Apr. 26, 2016 Form 8-K); *see also* JSF ¶ 108.]

161.    AT&T reported operating income for its wireless operations as whole, calculated as the sum of the segment-level revenue, including service and equipment revenue, and segment operating expenses, on its Forms 10-K and 10-Q and earnings releases filed on Forms 8-K. [*E.g.,* J. Ex. 6 at 49 (2016 Form 10-K AT&T Mobility Results); J. Ex. 2 at 32 (1Q16 Form 10-Q AT&T Mobility Results); J. Ex. 253 at 18 (Apr. 26, 2016 Form 8-K Supplemental AT&T Mobility Results); *see also* JSF ¶ 109.]

162.    AT&T also reported EBITDA (i.e., earnings before interest, taxes, depreciation, and amortization) for its wireless operations as a whole on its Forms 10-K and 10-Q. [JSF ¶ 110.]

163.    Wireless EBITDA margin is the segment-level EBITDA divided by total wireless revenues. [*E.g.,* J. Ex. 6 at 93 (2016 Form 10-K); Womack Dep. Tr. (P. Ex. 88) 231:4-9 ("Q. Okay. And EBITDA margin is taking the EBITDA number in the numerator and putting it over the total revenue in the denominator, that's how somebody would calculate wireless EBITDA margins? A. That's correct.").]

164.     Because AT&T's cost of acquiring handsets exceeds the revenues it earns from them, reduced handset sales and upgrade rates can improve profitability. *See* Vasilescu Decl. Ex. 3 ¶¶ 34-50 (Feb. 15, 2022 DiBucci Report); P. Ex. 48 (Jan. 16, 2016 email from J. Stephens to M. Viola and others observing that a 500 basis point drop in quarterly upgrade rates "is a big deal for long term profits").

165.     Reduced upgrade rates could also contribute to AT&T's profitability by reducing associated commission expenses that AT&T paid for device sales, both to its direct employees and to indirect, third party sales channels acting on its behalf. In its Form 10-K for fiscal year 2015, AT&T's Business Solutions and Consumer Mobility segments reported year-over-year cost savings of $995 million and $861 million, respectively, in lower selling and commission expenses, citing "fewer upgrade transactions" as a basis. [J. Ex. 1 at 39, 44 (2015 Form 10-K).] In 1Q16, AT&T's Business Solutions segment reported a $161 million decrease in wireless commission costs, citing "a decrease in sale volumes and upgrade transactions" as a basis; its Consumer Mobility segment reported selling and commission expense decreases of $205 million, citing "lower sales volumes … combined with fewer upgrade transactions" as a basis. [J. Ex. 2 at 26, and 30 (1Q16 Form 10-Q); Vasilescu Decl. Ex. 46 ¶¶ 9-10 (Apr. 7, 2022 Dibucci Report).]

166.     AT&T's CEO informed the Board in 1Q16 that declining handset volumes had positive effect on earnings. [P. Ex. 92 (Apr. 26, 2016 letter to Board: "the wireless industry as a whole is seeing a shift to lower handset upgrade volumes. While this certainly impacts revenue growth rates, we continue to see the offsetting, positive effect to earnings."); P. Ex. 91 (Mar. 23, 2016 letter to Board: "operating contribution [of Consumer Mobility to earnings] is up 23% due to lower equipment upgrade costs.").

167.     Analysts understood lower upgrades improved EBITDA. [*E.g.*, J. Ex. 126 at 4 (Apr. 26, 2016 Moffett Nathanson Report "EBITDA is growing, due to . . . lower-than-expected handset upgrades."); J. Ex. 236 (Jan. 27, 2016 email from Sine: "AT&T margin strength and Apple's revenue weakness are interrelated … customers are either bringing old iPhone 5s or just not upgrading, both of which are very profitable."); J Ex. 244 at 3 (Jan. 26, 2016 Pacific Crest Research Report noting that its "Bull Case" is premised on AT&T "generat[ing] lower upgrade rates than we anticipate" and that its "Bear Case" contemplates "upgrade rates increase[ing] above our high-single-digit percentage rate estimates"); *see also infra* Section V.E.]

168.     Lower smartphone volumes improved wireless margins. [J. Ex. 149 at 30 (3Q15 Investor Presentation: "As expected, wireless margins improvement reflects strong adoption of AT&T Next, BYOD customers, lower upgrade volumes and continued focus on driving operating costs out of the business."); Stephens Dep. Tr. (P. Ex. 85) 173:4-174:15 ("Q. But isn't it true that lower smartphone upgrade volumes was a factor in wireless margins' improvement? [objection] A. Yeah, wireless margins were impacted by many items. Q. One of which was lower smartphone upgrade volumes, correct? [objection] A. One of which could have been upgrade volumes, could have been a mix of BYOD, could have been a variety of – the pricing. Could have been a variety of things. Q. Okay. Now this document here, this investor briefing, this is something AT&T publicly gave, right? A. Yes. Q. This is what you told your investors, correct? A. Uh-huh. Q. And you told your investors the truth, correct? A. Yes. Q. And not just partial truths. You told them all of the truth so that they would have – so that what you told them wasn't materially misleading, correct? A. Correct. Q. So here, one of the factors you're telling them led to wireless margins' improvement was lower smartphone upgrade volumes, correct? [objection] A. I believe this time the answer is correct. That is not what I understood you to say

previously."); J. Ex. 148 (Mar. 23, 2016 CEO letter to board: "revenues are down slightly due to lower wireless equipment revenues. The drop off in equipment upgrade volumes continues to suppress revenue growth rates, but it's important to remember that is good news on profitability."); P. Ex. 97 at 5 (AT&T 1Q16 Earnings Call Transcript: "Our laser focus on cost efficiencies and fewer upgrades drove our best ever first-quarter wireless EBITDA margins").]

169.    Lower upgrade rates and equipment revenue affected at least EBITDA percentage. [Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 64:1-25 ("Q: What was the impact of that [as upgrade rates went down and lower handsets were sold, under Next, we had lower revenues and lower costs] on EBITDA? [objection] A. From a – theoretically, from a dollar perspective, an elimination of revenues and costs would not change – and costs of an equal amount would not change your EBITDA. On a percentage basis it could affect your EBITDA. . . . Q. . . . And if they weren't [equal], you could see a different kind of effect, is that fair? [objection] A. You could.").]

170.    In 1Q16, AT&T's wireless "EBITDA margins were 390 bps better year over year due to lower postpaid volumes" including -23% upgrades. [J. Ex. 118 at 13 (Apr. 26, 2016 email attaching "Detailed Questions and Answers 1Q16 Earnings Release").]

171.    In 1Q16, higher wireless EBITDA helped AT&T's EPS by approximately $0.06 per share. [J. Ex. 118 at 10 (Apr. 26, 2016 email attaching "Detailed Questions and Answers 1Q16 Earnings Release").]

172.    Plaintiff's expert, Dominic Dibucci, a licensed CPA who worked in financial reporting and investor relations functions for over 20 years for Verizon Communications, provided an opinion regarding the various impacts upgrade rate and equipment revenue trajectories had across AT&T's financial results, business operations and subscriber trends.

Based on his experience, as well as his detailed review of AT&T's financial statements and their underlying support, he concluded that AT&T's handset upgrade sales during the first quarter of 2016 were not "profit neutral," and explained further how declining upgrade rates and equipment revenues could, and did, have a negative impact on a AT&T's revenue and ARPU (inclusive of Next program installment payments), while simultaneously improving its margins and profits and functioning as a key barometer for churn trends. *See* Vasilescu Decl. Exs. 3 (Feb. 15, 2022 Dibucci Report) and 46 (Apr. 7, 2022 DiBucci Reply Report).

173.    Churn—the measure of how many subscribers were leaving a carrier—was an important metric for analysts and investors. [Ilkowitz Dep. Tr. (P. Ex. 77) 51:4-13 ("Q. [Churn] means people who are leaving one carrier and going to another? A. . . . Yes. They are subscribers who are leaving a carrier. Q. . . . That could be important because it would tell you how many potential subscribers a carrier might lose or gain during a particular quarter? A. Correct."); *see also* JSF ¶ 111.]

174.    AT&T employees believed that equipment revenue was an important factor in helping churn because customers getting new phones were thought to be under contract and might stay with AT&T longer. [J. Ex. 155 (Aug. 1, 2015 email from Nick Jones to John Stephens stating "Additional revenues – even equipment – are important going forward > Particularly helping churn"); Stephens Dep. Tr. (P. Ex. 85) 137:21-138:9 ("Q . . . . What does that mean, particularly helping churn? A. Providing customers – customers getting new phones were thought to be under contract and might stay with us longer.").]

175.    AT&T's Next plan was intended, in part, to minimize subscriber churn. [J. Ex. 1 at 10 (2015 Form 10-K at page 4); J. Ex. 1 at 14 (2016 Form 10-K at page 8).]

**IV.**     **Relevant AT&T Policies and Procedures**

176.     AT&T had internal policies and practices governing the disclosure of AT&T's internal actual and projected results. Among other things, under those policies and practices, no employee could disclose AT&T's internal actual or projected results. [*See* JSF ¶ 116.]

177.     The Individual Defendants received periodic training on Regulation FD and were familiar with its content concerning the selective disclosure of MNPI. [JSF ¶ 117.]

178.     Paula Anderson, a lawyer at AT&T, emailed a May 28, 2004 document entitled "Guidelines for Internal Dissemination of Financial and Operating Information" (2004 Policy") to Womack on June 19, 2012, and Womack forwarded it to Black on July 26, 2013. [J. Ex. 143 (July 26, 2013 email from Womack to Black ).]

179.     On September 19, 2014, Anderson emailed to Viola seventeen pages of documents with an email heading "Background for our call on Tuesday", containing a 2007 legal memo from a New York law firm concerning Regulation FD entitled "Analysis of Regulation FD Enforcement Actions and Their Impact on Companies' Policies and Practices," a June 5, 2007 settled SEC Order issued by the SEC against another public company for a Regulation FD violation, and other prior legal memorandum concerning SEC enforcement cases. [J. Ex. 141 (Sept. 13, 2014 memos).]

180.     Viola admitted being aware of AT&T's internal compliance memo entitled "Guidelines for Disclosing and Managing Material Information Within AT&T" but claims he doesn't remember when he knew about it; he also claims it did not apply to the IR Department, but cannot remember who told him it does not apply to the IR Department. [Viola Dep. Tr. (P. Ex. 87) 34:7-35:20; J. Ex. 158 (compliance rules).]

181.     AT&T's 2004 Policy stated that "Material information can be quantitative – such as revenue or access line data. It can also be qualitative – for example, statements that sales are

'very strong' or that a new initiative 'is not going well.'" [J. Ex. 143 at 4 (July 26, 2013 email from Womack to Black ).]

182.    AT&T's 2004 Policy stated that "Current-quarter data almost always creates a problem. Information relating to the current quarter results should not be given out prior to the release of SBC's [an AT&T predecessor company] earnings." [J. Ex. 143 at 4 (July 26, 2013 email from Womack to Black ).]

183.    AT&T utilized a training presentation, dated August 13, 2009 and titled 'Complying with Reg FD – An Overview," to train its employees on Regulation FD ("Complying with Reg FD Training Document"). [J. Ex. 267.]

184.    The Complying with Reg FD Training Document stated that "'Materiality' can be either quantitative (a big number) or qualitative (big news/changes in a trend," and cautioned employees that "[i]f we tout something as a big deal, it is likely the SEC will treat it as a big deal." [J. Ex. 267 at 7]. It also provided as examples of material information: "Revenue or income data, including for business units" and "Sales for a significant product or service (e.g., U-verse, iPhone)" and "Any updates to guidance (e.g., net income, capex, margins, cash flow)[.]" [J. Ex. 267 at 13.]

185.    The Complying with Reg FD Training Document further advised employees: "If you know material insider information: Be very careful to whom you tell it and how you tell it (use the phone versus email)[.]" [J. Ex. 267 at 12.]

186.    On November 3, 2010, Womack, Evans and others at AT&T were sent by email an article for the then supervisor of the AT&T IR Department with subject line "SEC Gets Tough With Reg FD." [J. Ex. 142 (Nov. 3, 2010 email).]

187.    The November 3, 2010 email that Womack and Evans received attached a PDF article from the publication "Agenda "(A Financial Times service), dated November 1, 2010. Of the two lead stories on the first page, one was headlined "SEC Gets Tough With Reg FD. Strict approach leads to third case in just over a year." [J. Ex. 142 (Nov. 3, 2010 email and article).]

188.    The "SEC Gets Tough" article discussed the SEC's settlement with Office Depot, Inc. for violations of Regulation FD filed that year. Someone circled the headline "SEC Gets Tough With Reg FD" by hand and wrote "This article's worth a read by your team." [J. Ex. 142 at 3 (Nov. 3, 2010 email and article).]

189.    In the version of the article sent to Womack, Evans, and others, someone highlighted by hand the following paragraph and quote from the article's discussion of the SEC's Office Depot Regulation FD settlement: "'The Office Depot settlement is a reminder that implicit messages can be tantamount to explicit ones for Reg FD purposes. . . . This is also a reminder that one-on-one communications with market professionals, particularly late in a reporting period, are inherently dangerous.'" [J. Ex. 142 at 4 (Nov. 3, 2010 email and article).]

190.    The "SEC Gets Tough" article summarized the facts of the SEC's Office Depot Regulation FD settlement as follows: "The violations stem from conversations company officials had toward the end of the second quarter of 2007 with certain analysts and institutional investors. The officials allegedly signaled that the company would not meet earnings estimates and encouraged analyst to revisit their analysis of the company without explicitly asking them to do so." [J. Ex. 142 at 4 (Nov. 3, 2010 email and article).]

191.    AT&T's policies included a "Guidelines for Disclosing and Managing Material Information within AT&T Updated March 2012" document ("2012 Policy"). [J. Ex. 286.]

44

192.    AT&T's 2012 Policy stated that "Material information can include . . . Financial results such as revenue, expenses or earnings[;] Operating data such as subscriber additions or network performance . . . ." [J. Ex. 286 at 2.]

193.    AT&T's 2012 Policy stated that:

> Material information is not limited to quantitative data. It can be qualitative as well. For example, a statement that we've seen "strong sales" in wireless could be considered material.
>
> In addition, even information that might usually be considered non-material may be treated differently close to quarterly earnings announcements. This is particularly true for data that might be used to help analysts or investors calculate expected results (e.g., store traffic numbers).

[J. Ex. 286 at 2.]

194.    AT&T's 2012 Policy warned: "Don't conduct pre-briefings or release under embargo anything that might be considered material – this is a clear violation of Reg FD." [J. Ex. 286 at 3.]

195.    AT&T's 2012 Policy warned: "Never reiterate or update guidance to investors without prior approval – even saying our guidance has not changed can be considered an update. Even if we have provided guidance on a quarterly earnings call, the later in the quarter it gets the more likely it is that leadership has information about our financial position and/or operation that might cause us to change that guidance." [J. Ex. 286 at 4.]

196.    Anderson, an AT&T lawyer, used a document ("IR Training Document") to train IR employees on, among other things, materiality and Regulation FD. [J. Ex. 268; Anderson Dep. Tr. (P. Ex. 65) 59:19-61:4 ("Q. Okay. And how was Exhibit 117 [J. Ex. 268] used? A. I used this document for investor relations training. This was the document I used when someone

joined the team. . . . Q. And did you use it in connection with their training with respect to Reg

FD compliance? A. (Perusing document) Yes, I did.").]

197.    The IR Training Document provided the following "Definition of 'Materiality'"

to the IR Department:

> "An omitted fact is material if there is a substantial likelihood that
> a reasonable investor would consider it important in deciding how
> to invest…there must be a substantial likelihood that the disclosure
> of the omitted fact would have been viewed by the reasonable
> investor as having significantly altered the 'total mix' of
> information made available." TCS Industries, Inc. v. Northway,
> Inc. (426 U.S. 438 (1976)).

> SEC Policy: There is no magical monetary threshold below which
> an item would automatically be deemed immaterial. Rather, when
> assessing materiality, one must take into account both the
> quantitative and qualitative elements of the disclosure. (SEC Staff
> Accounting Bulletin No. 99.)

[J. Ex. 268 at 2.]

198.    The IR Training Document advised that material information included "Two

Types of Forward-Looking Information: (a) Statements of Known Trends (b) Projections[.]" [J.

Ex. 268 at 3.]

199.    The IR Training Document gave "Predictions of future revenues, profits, losses,

acquisitions" as examples of "Projections[.]" [J. Ex. 268 at 4.]

200.    The IR Training Document stated: "Company can not disclose material

information to only a few individuals or entities or to such persons in advance aka 'selective

disclosure' -- Company must disclose such information to the general public and to everyone at

the same time. (Regulation FD)." [J. Ex. 268 at 2.]

201.    The IR Training Document, under the title "Regulation FD" stated that the

regulation "Applies to public companies and their directors, executive officers and investor

relations and public relations groups" and "Provides that any oral or written disclosure by a company of material information to a securities professional or a holder of company stock or debt also must be disclosed to the general public simultaneously. . . ." [J. Ex. 268 at 3.]

202.    Anderson also used an April 7, 2015 memorandum from the law firm Davis Polk & Wardwell ("Davis Polk Memo") to train the IR Department on Regulation FD's requirements. [JSF ¶ 118; J. Ex. 11 (Apr. 7, 2015 Davis Polk Memorandum); Anderson Dep. Tr. (P. Ex. 65) 62:5-14 ("Q. How, if at all, was this document [J. Ex. 11 used within AT&T? A. It is used solely for the investor relations team. And I used it in – as part of their initial training – training when they joined the team. Q. Okay. And this document was used to train investor relations employees with respect to compliance with Regulation FD? A. Yes, it was.").]

203.    The Davis Polk Memo used to train the IR Department cautioned that reaffirming previously disclosed guidance almost a month after that guidance was issued could trigger Regulation FD obligations. [J. Ex. 11 at 2-3 (Apr. 7, 2015 Davis Polk Memorandum).]

204.    The Davis Polk Memo used to train the IR Department summarized the SEC's FAQ on Regulation FD, advising that "whether the confirmation conveys additional information depends upon, among other things, the amount of time that has elapsed since the original forecast or last public confirmation as well as intervening events. The FAQ stated that confirmation of quarterly earnings made near the end of a quarter might, for example, appear to convey information as to actual performance and may therefore be significantly different from the inference an investor would draw from a confirmation made at the beginning of the quarter." [J. Ex. 11 at 3 (Apr. 7, 2015 Davis Polk Memorandum).]

205.    The Davis Polk Memo used to train the IR Department advised: "The Motorola Section 21(a) report indicated that companies may not use 'code' words or 'winks and nods' to

selectively disclose information that they could not selectively disclose expressly to securities professionals." [J. Ex. 11 at 4 (Apr. 7, 2015 Davis Polk Memorandum).]

206.    The Davis Polk Memo used to train the IR Department described the facts in the Motorola Section 21(a) report, stating that after a public announcement about "'significant' weakness in sales and orders" analysts did not lower their estimates sufficiently, that Motorola then contacted analysts individually to inform them of quantitative information concerning the term "significant," and that the SEC considered such guidance to be additional nonpublic information. [J. Ex. 11 at 4 (Apr. 7, 2015 Davis Polk Memorandum).]

207.    The Davis Polk Memo used to train the IR Department advised: "Company officials should also be careful of providing a different perspective, or an indication of a possible outcome, to general statements made in public disclosures." [J. Ex. 11 at 4 (Apr. 7, 2015 Davis Polk Memorandum).] AT&T's IR officials, including Evans, Black and Womack, were specifically trained on this concept. [Anderson Dep. Tr. (P. Ex. 65) 133:10-23.]

208.    The Davis Polk Memo used to train the IR Department noted: "According to the SEC, the fact that analysts in that case [i.e., the Motorola case] did not sufficiently downgrade their estimates . . . indicated that they did not understand [the public announcement], and the IR Directors plans to contact analysts demonstrated that it was important to communicate this level of detail. These two factors made the information material." [J. Ex. 11 at 5 (Apr. 7, 2015 Davis Polk Memorandum).]

209.    Womack, Black and Evans were cautioned specifically in their Regulation FD training to avoid conveying material nonpublic information by supplementing a general disclosure with a different or more specific description.[ Anderson Dep. Tr. (P. Ex. 65) 134:1-19.]

210.    The Davis Polk Memo used to train the IR Department summarized cases in which IR professionals "Manag[ed] the Street's Estimates" and stated: "Through these actions, the SEC has indicated that companies that believe that analysts did not understand or absorb the full scope of the message they were trying to convey through their public disclosures should not attempt to correct those analysts through private conversations." [J. Ex. 11 at 5-6 (Apr. 7, 2015 Davis Polk Memorandum).]

211.    The Davis Polk Memo used to train the IR Department noted that "[t]he SEC also disapproves of commenting about the Street's estimates at a private meeting." [J. Ex. 11 at 6 (Apr. 7, 2015 Davis Polk Memorandum).]

212.    The IR staff was trained not to comment favorably or unfavorably about consensus information. [Anderson Dep. Tr. (P. Ex. 65) 148:9-20 ("Q. Ms. Anderson, back to our prior discussion: Would you expect investor relations employees in a private conversation with a sell-side analyst to say that consensus was too high or too low compared to AT&T's internal numbers? [objection] A. Compared to AT&T's internal numbers? So we're not comparing .. I – that sounds as if we – our person would be providing potentially non-public, material information in which case they would be trained not to do that").]

213.    AT&T's policies made clear that if it disclosed material information about its business even to "general groups of employees . . . federal securities law require us to disclose that same information broadly to the public at the same time." [P. Ex. 44 at 8 (Guidelines for Internal Dissemination of Financial and Operating Information); *see also* J. Ex. 267 at 3 (Regulation FD applies to "Internal communication to employees" and "External communications to the public"); J. Ex. 268 at 3 ("There is no general exception [to Regulation FD] for disclosures that are limited to only employees.").].]

214.    AT&T employees were not permitted to disclose actual or projected results during a quarter. [Stephens Dep. Tr. (P. Ex. 85) 41:15-42:9; Anderson Dep. Tr. (P. Ex. 65) 67:19-68:20.]

215.    Womack, Evans, and Black were not permitted to disclose the upgrade rate because the disclosure would not comply with Regulation FD. [Viola Dep. Tr. (P. Ex. 87) 130:20-131:4 ("Q. Now, is it your position that Mr. Womack, Mr. Evans, and Mr. Black could communicate to analysts on their calls the percentage upgrade rate that was being internally tracked by AT&T? A. No. Q. That is something that would not be Reg. FD compliant? [objection] [A.] That -- that's correct. Not public information.").

216.    In March and April 2016, none of the Individual Defendants contacted AT&T's in-house counsel concerning whether the disclosures they made between March 9, 2016, and April 25, 2016, were material or nonpublic. [Black Inv. Tr. (P. Ex. 52) 178:6-13 ("Q. . . . Did you consult with any attorneys regarding what was or was not appropriate to say to analysts regarding upgrade rates or equipment revenues during this time? A. No. Q. Did you get any guidance from anyone regarding what you could or could not say to analysts regarding upgrade rates or equipment revenues during this time? A. No."); Evans Inv. Tr. (P. Ex. 53) 38:5-10 ("Q. Okay. During this period of time, did you seek legal guidance before reaching out to any of those analysts you just mentioned; Will Power, Mr. Piecyk, and Mr. Bowen? A. Not that I remember. . . ."); Womack Inv. Tr. (P. Ex. 55) 137:11-24 ("Q. Did you consult with legal regarding what you could or could not say to analysts regarding upgrade rates or equipment revenues? A. No. . . . Q. The questions I've just asked about whether you were provided a script or talking points, whether you were provided guidance and whether you consulted with legal, I was referring to the first quarter of 2016, just to be clear, and is your answer the same? A. Yes.").]

217.     An AT&T presentation dated April 2017 titled "Financial Communications 101"

contained the following slide listing revenues first among the metrics most important to AT&T's

investors:

Financial Communications 101

## What metrics are important to our investors for AT&T as a whole?

| Metric | Definition |
| --- | --- |
| Revenues | Money AT&T receives for sales to our customers |
| Operating expenses | The money AT&T spends to sell products/services to customers |
| Operating income | Revenues minus operating expenses |
| Operating income margin | Operating income divided by revenues – given as a percentage |
| EBITDA | Earnings before interest, tax, depreciation and amortization |
| Net income | Earnings/profit available after all expenses |
| Earnings per share (EPS) | Net income (earnings) divided by number of shares outstanding |
| Dividends | Quarterly payments made to our shareholders – paid on a per share basis |
| Capital expenditures (capex) | Investments in items such as networks, equipment, buildings, etc. |
| Cash from operations | Cash generated by the day-to-day operation of the business |
| Free cash flow (FCF) | Cash remaining after capital expenditures – can be used to pay dividends, pay debt, repurchase shares |



[J. Ex. 269 at 5 (April 2017 "Financial Communications 101" Presentation).]

218.     In a section of the presentation concerning "[W]hat causes AT&T's stock price to

rise and fall[,]" notes accompanying the slide stated "Stock prices react to any number of things.

. . . Not just earnings . . . ." [J. Ex. 269 at 12 (April 2017 "Financial Communications 101"

Presentation").]

219.     In a section of the presentation concerning Regulation FD, the slide stated

"merely repeating a qualitative trend is providing an update and that [is] a problem … An

example would be merely repeating that our launch of the unlimited plan was a big success.

Since anyone who speaks for the company is presumed to know the current (i.e. Post quarter)

status, this statement could be taken that the success had continued (otherwise we would have

said something else." [J. Ex. 269 at 14 (April 2017 "Financial Communications 101"

Presentation").]

**A. Black's Understanding Concerning Disclosures**

220.    Black understood that it was AT&T's policy not to disclose intra-quarter financial

information, including total consolidated revenue, wireless equipment revenue, and upgrade rate,

whether actual or projected. [Black Dep. Tr. (P. Ex. 66) 64:5-65:12 ("Q. Okay. What was

AT&T's policy regarding not disclosing intra-quarter financial information? A. AT&T's policy

was that we do not disclose intra-quarter financial information. . . . Q. And it's against AT&T's

policy for you to disclose the wireless equipment upgrade rate. Correct? A. Yes, that is

correct.").]

221.    Black understood that providing commentary on consensus information, such as

whether it was reasonable, was impermissible. [Black Dep. Tr. (P. Ex. 66) 308:23-309:8 ("Q. . . .

When you spoke to analysts about consensus estimates, do you ever provide commentary on it?

A. I don't recall. Q. Like, if you were giving them a revenue consensus number, let's say X

dollars, would you say X dollars is reasonable? A. No. Q. Would that be okay to do? [objection]

A. I don't believe so.").]

222.    Black was aware that reiterating or updating guidance, even saying AT&T's

guidance had not changed, could be considered an update. [Black Dep. Tr. (P. Ex. 66) 332:24-

333:11 ("Q. And if you go to [J. Ex. 286 at 4] it says: 'Never reiterate or update guidance to

investors without prior approval – even saying our guidance has not changed can be considered

an update.' Do you see that? A. Yes. Q. You were aware of that in the first quarter of 2016.

Correct? [objection] A. I believe I was, yes.").]

223.    Black understood that the principles concerning materiality outlined in AT&T's

policies applied to the IR Department. [Black Dep. Tr. (P. Ex. 66) 334:16-335:13 ("Q. [referring

to [J. Ex. 286 at 2], for example, is there a reason that financial results such as revenue, expenses, or earnings would be material to someone in corporate communications if they were to speak about it but not material if you spoke about it? Is that what you're saying? [objection] A. No, that's not what I'm saying. You are asking about that specific item, and I was responding to that specific line item in there. Q. Okay. I just want to make sure that what we discussed, though, still applies . . . To the extent that corporate communications had come to IR or the SEC attorneys for advice, it was important that you knew the principles and concepts outlines in this document, in [J. Ex. 286]. Correct? A. I can't speak for the whole document. Looking at this, there are certain aspects of it that transcend into the IR role.").]

224.    Black was aware that material nonpublic information could not be disclosed, even if only to AT&T employees, and that such disclosures were illegal. [Black Dep. Tr. (P. Ex. 66) 323:7-324:3 ("Q. And it says here [in [J. Ex. 286 at 2] 'Selective Disclosure – where an investor or group of investors receives material information before other investors – is illegal and is taken very seriously.' Do you see that? A. I do see that. Q. And you were aware of that in 2016. Correct? A. Yes. Q. And if you go down . . . it says: 'Nonpublic, material information may not be selectively disclosed, even if only to AT&T employees.' Do you see that? A. I do see that. Q. And you were aware of that in 2016. Correct? A. Yes.").]

225.    Black was aware that revenue, expenses, or earnings could be material information. [Black Dep. Tr. (P. Ex. 66) 324:12-22 ("Q. . . . And you were aware that revenue, expenses, or earnings could be material information in 2016. Correct? A. Could be, yes.").]

226.    Black understood that qualitative characterizations could be material. [Black Dep. Tr. (P. Ex. 66) 326:10-327:5 ("Q. (Reading) 'A statement that we've seen 'strong sales' in wireless could be considered material.' Do you see that? A. Yes. Q. There are no numbers in that

statement. Correct? A. That's Correct. Q. It's just a characterization of the sales as strong. Right? A. That's correct. Q. And you understood that characterizations like that could be material. Correct? [objection] A. Could be. Q. And you understood that in 2016. Right? [objection] A. Yes.").]

227.    Black understood that signaling an analyst without explicitly telling them AT&T's own numbers might violate Regulation FD. [Black Dep. Tr. (P. Ex. 66) 337:23-338:4 ("Q. Did you have an understanding in the first quarter of 2016 that signaling an analyst without explicitly telling them AT&T's own numbers might violate Regulation FD? [objection] A. I did have an understanding of that, yes.").]

228.    Black understood that his tone or demeanor could convey information to an analyst. [Black Dep. Tr. (P. Ex. 66) 343:8-12 ("Q. Okay. Did you have an understanding in the first quarter of 2016 that your tone or demeanor could convey information to an analyst? A. Yes, I did.")

229.    Black understood that information that applies to a single initiative, like the Next program, could be material. [Black Dep. Tr. (P. Ex. 66) 351:7-13 ("Q. . . . And you understood in the first quarter of 2016 that information that applies to a single initiative, like the Next program, could be material. Correct? [objection] A. It depends on the information that we're talking about with respect to Next.").]

**B.  Evans's Understanding Concerning Disclosures**

230.    Evans understood that reaching out to speak to analysts during the fiscal quarter to "manage expectations" could violate securities laws, as on January 2, 2016, when Viola wanted input from Evans, Black, Womack and other IR employees regarding what Viola should tell his supervisor were the goals for the IR Department, Evans replied: "I would start the 5th

point with something like 'manage expectations….' As that is what we have the ability to influence (of course within legal parameters)." [J. Ex. 205 (Jan. 2, 2016 email chain).]

231.     Evans wrote this in response to this 5th goal that Viola wrote to Evans, Black, Womack and other IR employees: "Minimize surprises with analysts on information, data and umbers on Earnings Release materials." [J. Ex. 205 (Jan. 2, 2016 email chain).]

232.     Later on January 2, 2016, Viola responded to the Womack, Evans and other IR employees on the "2016 Goals" by sending six goals rather than five goals and incorporating Evans point into the six goals for the IR Department: "(6) Manage expectations (within legal parameters) thereby minimizing surprises with analysts on information, data and numbers on Earnings Release materials." [J. Ex. 204 at 2-3 (Jan. 3, 2016 email chain).]

233.     Evans understood that the practice at AT&T was not to disclose any internal or intra-quarter metrics, such as upgrade rate percentages, to analysts. [Evans Dep. Tr. (P. Ex. 71) 146:8-14 ("Q. Before the quarterly results come out, was it AT&T's practice not to publicly disclose the percentage upgrade rate for that quarter . . . before the results came out for the quarter? [objection] A. It's our practice not to disclose any internal – or intraquarter metrics.").]

234.     Evans understood that even disclosures to AT&T employees could implicate Regulation FD. [Evans Inv. Tr. (P. Ex. 53) 23:8-13 ("Q Okay. So why is there the concern about Reg FD in relationship to employees? A. Because it's widespread. There's, you know, thousands of employees, so they're considered non-insiders when it's that wide of distribution.").]

235.     Evans understood that calls near the end of the quarter presented a greater risk of material nonpublic disclosures. [Evans Inv. Tr. (P. Ex. 53) 42:24-44:19 ("Q. Okay. Does the timing of a call – in other words, where it falls in a quarter, whether it's in January, February, March, or the month subsequent to the quarter -- have any bearing or impact on what policies

and procedures you would follow in 2016 in regard to a call with a sell-side analyst? A. Um, yes. Q. How so? A. If it's closer to the end of the quarter, where I know results, there's a heightened sense of awareness or concern not to say anything related to the quarter. You know, especially when I've seen, in some cases, actual results. . . . Q. . . . what does that mean? You're less likely to have a call, then; you're less likely to share certain information; or what? A. I make sure that I'm very stoic – Q. What does that mean? A. -- on the calls. I'm without emotion. . . . Because I found out, historically, they try to read your voice. . . . So that's why you minimize those – you know, those types of discussions. I am -- I am guarded on what I say, just to make sure that nothing -- there's no influence.").]

236.     As an IR professional, Evans understood that on telephone calls with analysts, analysts could infer nonpublic information just by the tone in his voice or how Evans was communicating the information. [Evans Dep. Tr. (P. Ex. 71) 37:9-17.]

237.     As an IR professional, Evans has long understood that in his communications with analysts, analysts "would sometimes try to read [his] voice, and so [he] would act stoic or try not to show any emotion that could be read by the analyst." [Evans Dep. Tr. (P. Ex. 71) 37:3-8.]

238.     Evans explained how he first learned that analysts could infer information if he wasn't careful to be stoic on telephone calls:

> "Early in my career, someone made a remark to me that, you know, was actually wrong. They said they tried reading, you know, that I was happy about something. And it was probably something completely unrelated. And so when you start realizing people will try to ask you – and some analysts will ask the same question multiple ways, tro to read how your respond. They try to look at, at time, your, you know facial expression. And they can get it wrong as many times as they get it right. So I feel if you're stoic, you know, as much as you can be, it won't send a signal right or wrong

56

to them. And, like I said, it was probably in the early 200 – or
2000s that that example came to be. I can't remember exactly
where it was."

[Evans Dep. Tr. (P. Ex. 71) 39:4-40:4.]

239.    Evans understood that for any difficult Regulation FD questions he could obtain

advice from internal attorneys familiar with Regulation FD. [Evans Dep. Tr. (P. Ex. 71) 51:17–

52:4.]

### C.  Womack's Understanding Concerning Disclosures

240.    Womack understood that it was AT&T's policy not to disclose intra-quarter

financial information. [Womack Dep. Tr. (P. Ex. 88) 104:24-105:3 ("Q. Did AT&T have policies

in place with respect to Regulation FD as of 2016? A. AT&T had a policy or I would say more

so a practice not to disclose intra-quarter numbers.")]

241.    Womack understood that T&T's policies prohibited him from disclosing to

analysts selectively within a range was AT&T's results would be. [Womack Dep. Tr. (P. Ex. 88)

105:18-21 ("Q. And under AT&T's policies, could you tell an analyst within a range what

AT&T's results would be? A. No.").].

242.    Womack understood that he could not selectively signal to analysts implicitly

what he was prohibited from selectively disclosing explicitly. [Womack Dep. Tr. (P. Ex. 88)

296:7-297:6 ("Q. [Reading] 'The violations stem from conversations company officials had

toward the end of the second quarter of 2007 with certain analysts and institutional investors.

The officials allegedly signaled that the company would not meet earnings estimates and

encouraged analysts to revisit their analysis of the company without explicitly telling them to do

so.' In 2016, were you aware that you could signal material nonpublic information to analysts

without expressly conveying it or disclosing it? [objection] A. 2016 is a long time ago. I'm not

sure if I can answer that. Again, I think generally I have an understanding that, yes, certainly you would not want to signal anything.").]

243.     Womack understood that AT&T's Regulation FD's policies and practices prohibited him from selectively telling an analyst that its estimate on any particular metric was too high or too low relative to what AT&T was then estimating. [Womack Dep. Tr. (P. Ex. 88) 106:18-107:14 ("Q. Under AT&T's practices, was it your understanding that you could tell an analyst that the analyst's estimate on any particular metric was higher or lower than what AT&T was estimating at that time? A. No. We would never do that. Q. Why not? A. Because it was our practice. We would never assign any value to an analyst estimate. Q. Why was that practice in place? Was it because of Regulation FD? [objection] A. I would say it was part of our practice but also, too, I mean, I think to be as cautious as possible, I would say that it would be consistent with Reg FD. Q. And this practice was communicated to you in your FD trainings, to the best of your recollection? A. I believe so. It would – in my belief, it's self-evident.").]

244.     Womack understood that commenting favorably or unfavorably on either consensus estimates in a private setting with an analyst could signal to that analyst what AT&T's internal estimate of its numbers was, and was therefore impermissible under AT&T's Regulation FD policies. [Womack Dep. Tr. (P. Ex. 88) 111:9-17 ("Q. Would it have been your practice to comment favorably or unfavorably on consensus data in your catch up calls with analysts? [objection] A. Not that I'm aware of. Q. Why not? A. Because that would be assigning value to a number."; Womack Dep. Tr. (P. Ex. 88) 111:23-113:23 ("Q. Did you ever tell an analyst in a private phone call whether consensus was accurate or inaccurate relative to what AT&T was expecting to report? A. No. Q. You would never have done that? A. No. Q. Why not? [Objection] A. Because that would be indicating to them what our intra-quarter numbers might

look like. Q. Did you ever tell an analyst the consensus on any particular metric was in the ballpark of what AT&T expected it would report? A. No … Q. Would telling an analyst that consensus on a particular metric is in the ballpark of what AT&T expects to report be consistent or inconsistent with AT&T's policies? A. I should be clear that I would have never suggested that a consensus number is close to what AT&T's estimate is internally. Q. In any way? [objection] A. As I understand it, yes. "); Womack Dep. Tr. (P. Ex. 88) 113:25-115:1 ("Q. Would you ever tell an analyst that the number they were modeling was closer to internal – AT&T's internal forecast than consensus was? A. No. Q. Why not? [objection] A. Because we do not discuss intra-quarter numbers or estimates. Q. Did you ever tell an analyst that their modeled number on a particular metric was more reasonable than consensus or vice versa? A. No, not that I'm aware of …. Q. Would you ever tell an analyst that their modeled estimate of any particular metric was better than consensus or vice versa? [objection] A. I don't recall doing anything like that.").]

245.     Womack understood that signaling to an analyst what AT&T"s upgrade rate, equipment revenues, and total revenues would be was not permissible under AT&T's Regulation FD policies. [Womack Dep. Tr. (P. Ex. 88) 182:19-190:25 ("Q … did you tell JP Morgan analysts on your March 9 call with them that AT&T's upgrade rate for the first quarter would be historically low? A. I do not recall saying anything like that. Q. Would you have said that? A. No, I would not have … Q. I want to understand, would it be consistent with AT&T's policy for you to tell Mr. Cusick on March 9 that AT&T would report a record low upgrade rate for the first quarter of 2016? [objection] A. It would not have been … Q. In your March 9 call with Mr. Cusick and Mr. Choe, did you tell them that J.P. Morgan's then current estimate of AT&T's equipment revenues was too high? A. I would not have done that. Q. Why not? A. Because I

would never have given – ascribed any sort of value to their estimates. Q. Did you tell Mr.

Cusick on March 9 that AT&T's consolidated revenue for the quarter would be around $40

billion? No, I would not have said that. Why not? A. Because it is against our practice and policy

…. A. …. as I've stated earlier and I've said many times, I would not assign any sort of value or

judgment to consensus or their [analysts'] estimates Q. For any metric? [objection] A. For

anything that you just asked me [including upgrade rates, equipment revenues and total

revenues]").]

## V.   <u>Background on Analyst Coverage</u>

### A.   **Analysts Covering AT&T**

246.    Stock analysts publish forecasts and other analyses pertaining to AT&T and other

issuers. [JSF ¶ 127.]

247.    Analysts wrote their research reports to be valuable to their clients—i.e.,

investors—and wanted to cover topics that were relevant to them. [Sine Dep. Tr. (P. Ex. 83)

310:24-312:3 ("when you're writing a report, . . . you want it to be as valuable . . . to the

audience, so you want to consider, every time you're writing the report, what are the relevant

topics . . . that you should cover."); Ilkowitz Inv. Tr. (P. Ex. 59) 50:8-13 ("[Q.] So, when you

publish something on AT&T the idea is you are trying to help institutional investors evaluate

AT&T as an investment; is that right? A. Correct. From our—from our viewpoint."); Ilkowitz

Dep. Tr. (P. Ex. 77) 75:11-23 (investor presentation was intended for clients); Stein Dep. Tr. (P.

Ex. 84) 13-17 ("Our clients are institutional investors, investors professionally who would read

our research.") 78:22-79:11 ("[Q.] It [the information that Wells Fargo included in its reports]

was the materials you thought they – they would be interested or -- or would want to – should

know about? [objection] [A.] That's correct. Correct. The information that they would find most

valuable, correct.").]

248.     Analysts prepare financial models to project a company's future performance. [JSF ¶ 129.]

249.     Analysts may use a variety of public sources for their research and modeling, such as a company's financial and public statements in quarterly and annual reports, in 8-Ks, at earnings calls, at investor conferences, in news reports, and through historical data, and nonpublic investigation of facts or trends they conduct through their own efforts. [JSF ¶ 130.]

250.     The role of an analyst is to ferret out information. [*E.g.*, Sine Dep. Tr. (P. Ex. 83) 99:12-25 ("Q. Did you ever base any of your analyst reports on any material nonpublic information for any of the companies that you followed? [objection] [A.] I want to clarify. Never improperly. My role, as an analyst, is to try and ferret out – it's the mosaic theory – you know, as much information as possible, whether that's, you know, a retail store, quasi-nonpublic or public. But never illegally obtain. Never illegally obtained.").]

251.     Analysts interpret context and tone of company executives and employees for information. [*See* Ilkowitz Dep. Tr. (P. Ex. 77) 73:2-8 ("Q. . . . But when you read this and the language they use, do you pay careful attention to how they say things to try and understand perhaps, where things are headed or what it might mean? A. I think context and tone are certainly part of . . . the speaking that they do.").]

252.     Analysts understood that outreach from issuers about consensus estimates may signal information. [Sine Dep. Tr. (P. Ex. 83) 331:13-332:12 ("Q. And again, what's the benefit to you of speaking to him about consensus during that period? A. Well, when a company proactively is reaching out, there's a reason. . . .[t]here's obviously, a reason, you know, for them to reach out. . . . so you may get a reminder from an issuer saying, 'Hey, don't forget . . . we talked about . . . this item. I'm not trying to change your number, but just, you know, keep it –

keep it in mind that we've said this.'"); Sine Dep. Tr. (P. Ex. 83) 332:16-333:20 ("Q. And you viewed that, that kind of receipt of such a call, as a signal that somehow there was something in your numbers that you should be looking at; is that fair? [objection] [A.] It could be. Yes, it definitely could be. . . ."); Breen Inv. Tr. (P. Ex. 56) 223:16-225:7 ("if a company is calling me multiple times on a piece of public information, they then they clearly think it's important. And if the company thinks it's important, you know, it implies that I should think it's important … They were – you know, clearly they were working toward a number."); Breen Dep. Tr. (P. Ex. 68) 141:25-142:16 ("Q. Is it fair to say that if you hadn't discussed or if Mr. Womack hadn't raised with you those issues, you wouldn't have lowered your revenue estimate? [objection] [A.] . . . If he had not -- if he had not directed me to that conference information and -- which then, in turn, led to looking at consensus and what the other analysts had done with their numbers, no, I would not have. Q. Okay. Now, let's say that you lowered it to 40 and a half billion, and AT&T came in and reported 41.5 billion, so your original -- if your January numbers would have been correct, would you have been happy? A. No."); Vasilescu Decl. Ex. 5 at 54 (Wolk Report).]

253.     Analysts did not expect to receive material nonpublic information from AT&T's Investor Relations Department. [Sine Dep. Tr. (P. Ex. 83) 334:21-335:8 ("[Q.] Would you be surprised if you received material nonpublic information from Mr. Black? [objection] [A.] Yes. [Q.] And why is that? A. Well, I'm familiar with the basic outlines of Reg FD, and an issuer is not supposed to be selectively disseminating material nonpublic information to select individuals, including analysts."); *see also* Ilkowitz Dep. Tr. (P. Ex. 77) 96:19-25 ("I don't know what [Black] chose to do. I just know that I thought he was a good person and I could trust him.").]

254.     Analysts relied upon AT&T's Investor Relations Department to not provide them with material nonpublic information. [Stein Dep. Tr. (P. Ex. 84) 115:2-116:9 ("Q. Now stepping away from the models for a second, you testified earlier that Mr. Black or Mr. Womack or whoever from AT&T would provide you with consensus information; is that correct? A. Yes. Q. . . . and that's [what] you understood the information they gave you to be; is that right? A. Correct. Q. Would you have wanted to know if they were providing you with AT&T's actual projection – projected results or actual results by telling you it was consensus? [objection] [A.] I mean, that, in the root of it, is an issue that would have to report to compliance. So in the context of these conversations, I always presume it is consensus. Q. Because if you had known if it wasn't[,] if it was AT&T's actual results or projected results, you would have reported it to compliance; is that fair? [objection] [A.] Yes. Q. And why would you have reported it to compliance? [objection] [A.] Because it is our policy that if it is not information that is made publicly available, to err on the side of caution and report it internally and allow our compliance people to handle it from there.").]

255.     Analysts relied upon AT&T's Investor Relations Department to be truthful. [Ilkowitz Dep. Tr. (P. Ex. 77) 184:2-8 ("Q. Is it fair to say that you relied upon Mr. Black for him to be correct and accurate in the consensus he provided you? [objection] [A.] I would say that I rely on my conversation with IR people to be truthful and fair, yes."); Stein Dep. Tr. (P. Ex. 84) 115:10-25 ("Q. Would you have wanted to know if they were providing you with AT&T's actual projection – projected results or actual results by telling you it was consensus? [objection] [A.] I mean, that, in the root of it, is an issue that would have to report to compliance. So in the context of these conversations, I always presume it is consensus.").]

256.     Analysts expected that if an average of a subset of analysts was presented, it would be disclosed. [Ilkowitz Dep. Tr. (P. Ex. 77) 181:8-17 ("Q. Would you have expected Mr. Black to tell you if his consensus estimate . . . consisted of only a subset of the broker-dealers who had updated their research? [objection] [A.] If it was a number that wasn't the expected broad consensus that would be discussed, then I would expect something . . . I would have thought that it would have been discussed.").]

257.     Black testified that he would never provide only a subset of consensus. [Black Inv. Tr. (P. Ex. 52) 294:3-20 ("Q. Mr. Black, earlier we were talking about conveying consensus information. I think there was a question around the fact that did you ever convey the consensus was only two analysts that had recently updated. Were you ever providing information to analysts about consensus that was less than the top 10 average, and how do you do that? A. So when I provided consensus, I always provided the total consensus. And then if there are a couple that have updated, I would provide that as well … .Q. Did you ever only give information about recently updated analysts? A. No, no.").]

258.     Obtaining AT&T's estimates of its performance at various dates prior to quarter end would be helpful to analysts. [Sine Dep. Tr. (P. Ex. 83) 368:22-369:16 ("Q. Would that kind of information [AT&T's estimates of its performance] assuming you could receive it, be helpful to you in estimating—forming your estimates of what AT&T's actual results would be? [objection] [A.] No. Because I probably would wind up in prison and they don't let you have laptops in prison. But, yes, it would be helpful. But, I mean, something like that would be illegal.").]

259.     Obtaining AT&T's estimates of its equipment revenue at dates prior to quarter end would be helpful to analysts. [Sine Dep. Tr. (P. Ex. 83) 369:20-370:17 ("[Q.] With respect to

equipment revenue, would AT&T's estimate of its equipment revenue on March 24, 2016, be something that you would find interesting to know as an analyst? [objection] [A.] . . . If AT&T hypothetically were to tell me on March 24 what their internal expectations were based on knowing what they knew at the time what the number would be for the quarter, would that number be helpful in my deriving my estimates? Apart from the fact that it might be illegal, would that be helpful? Yes.").]

### B.  Consensus Estimates

260.    Financial research companies such as FactSet and Bloomberg compile analyst forecasts and report "consensus estimates" based on those forecasts. [JSF ¶ 137.]

261.    There is a common understanding of what "consensus" means. [Ilkowitz Dep. Tr. (P. Ex. 77) 176:3-10 ("There's no precise definition, but . . . there's certainly a common understanding of what consensus means.").]

262.    "Consensus estimates" are aggregations of various analyst forecasts for a company for certain metrics, typically reflecting the mean of the then-current forecasts provided by each individual analyst. Published estimates by individual analysts, as well as consensus estimates by firms such as First Call or Bloomberg, are public information. [JSF ¶ 138.]

263.    The FactSet and Bloomberg Consensus estimates are the average analyst estimate for various analysts covering an issuer. [JSF ¶ 139.]

264.    Analysts understood "consensus" estimates are the average analyst estimate for all analysts covering an issuer. [See, e.g., Hyun Dep. Tr. (P. Ex. 76) 29:7-13; Ilkowitz Inv. Tr. (P. Ex. 59) 96:16-97:20 ("Q. Do you know how AT&T or Mr. Black derived consensus? A. No. . . . [Q.] What did you believe them to be? A. I believed them to be averages of my peer's estimates publicly available that they published to clients that he had access to. . . . Q. Did you have an understanding as to whether the consensus numbers that Mr. Black provided you were the

average of all 30 plus analysts covering AT&T or was it some subset of them? A. I don't have a specific answer to what he actually did, but I believe they were a fair representation of the publicly available information. . . ."); Ilkowitz Dep. Tr. (P. Ex. 77) 181:8-182:3 ("[Q.] What do you mean by [broad consensus]? A. Broad consensus? . . . 'broad' meaning everyone was included."); Stein Dep. Tr. (P. Ex. 84) 34:7-18 ("Q. . . . Now, for the consensus information that you might have gotten from a particular IR team, were you ever told by any of those IR teams who comprised or made up their consensus? A. I don't recall. But in general, the IR teams do not share who comprises that. . . . The general context is that it's the amalgamation of all the analyst community, and that's kind of how it's phrased. . . . I don't recall ever hearing an individual analyst or brokerage called out individually."); Stein Dep. Tr. (P. Ex. 84) 117:13-118:10 ("Q. And if Mr. Black excluded somebody from that consensus number, would you want to know that information? [objection] [A.] I would have no way of knowing that. I would just presume that it's consensus. . . . We don't ask for individuals . . . . It's the collective whole. It's the consensus information.").]

265.     Analysts and media publish comparisons of AT&T's actual results to consensus estimates. [*E.g.*, J. Ex. 65 at 2 (Jan. 27, 2016 Baird note) ("Mixed Q4. Adjusted EPS of $0.63 was right in line with our estimate though total revenue of $42.1 billion missed our $43.8 billion estimate and consensus due to weaker wireless revenue."); J. Ex. 244 at 3 (January 26, 2016 Pacific Crest note); J. Ex. 320 at 2 (Jan. 27, 2016 Wells Fargo note); *see* JSF ¶ 140.]

266.     Missing consensus is generally viewed negatively by management, analysts, investors, and the media. [Fritzsche Inv. Tr. (P. Ex. 58) 194:16-195:5 ("Q. And why would a revenue miss not look good? …. A … any time a company reports revenues lower than where the street consensus is, it's not a – it's not a great data point for that company reporting. Q. Why

not? A. Well, if – if people think they're going to report a hundred dollars and they do 90, people worry that they haven't hit – that there might be a flaw in the business or something like that."); Viola Inv. Tr. (P. Ex. 54) 224:20-225:9 ("Well, we didn't want to – we were attempting not to miss revenue because we had a preference that we'd rather not miss, we'd rather meet or beat.").]

267.    In 2015 and 2016, including in 1Q2016, senior AT&T executives generally were made aware of how AT&T performed with respect to analysts' consensus estimates, including consensus revenue estimates. [JSF ¶ 142.]

268.    Senior management, including AT&T's CEO, preferred to meet or beat consensus at all times. [JSF ¶ 143; *see* Stephens 30(b)(6) Dep. Tr. (P. Ex. 86) 109:12-22 ("Q. In 2016, . . . the chief executive officer did not want to miss consensus; is that correct? [objection] A. Senior management, you know, would have preferred to meet or beat consensus, you know, at all times. Q. And senior management includes the chief executive officer, correct? A. Yes."); Viola Dep. Tr. (P. Ex. 87) 44:1-7.]

269.    Senior AT&T executives, and from time to time the Board of Directors, reviewed information regarding AT&T's performance compared to consensus estimates. [JSF ¶ 144.]

270.    Senior AT&T executives generally reviewed certain analysts' estimates and ratings, including which analysts had a "Buy" rating on AT&T and where certain analysts' price targets were. [JSF ¶ 131.]

271.    Black reached out to analysts because they were out of line of consensus and alert them to the fact their numbers were outside the consensus range. [Black Inv. Tr. (P. Ex. 52) 55:15-56:7 ("Q. . . . . Would you reach out to an analyst because his or her numbers were out of line with where other analysts were projecting the quarter to come out? A. There would be

conversations about consensus, yes. Q. What would the purpose of your call to an analyst, be it to alert them to the fact that their numbers were outside the range of where a consensus was? A. The purpose of the call is, especially is we're talking about this period of time [i.e., 1Q16], of course, you have this relationship with the analysts, but it's also to inform them of the recent messaging from the Deutsche Bank conference.").]

### C.  AT&T's "Top Ten" Analyst Average

272.    AT&T's IR Department tracked an average of a subset of analysts covering AT&T called the "Top Ten." [JSF ¶ 145; *e.g.*, J. Ex. 163 (Mar. 22, 2015 email providing EPS consensus and Top Ten average); J. Exs. 151 and 152 (Sept. 13, 2015 email with Top Ten averages and attachment); Stephens Dep. Tr. (P. Ex. 85) 74:23-75:13 ("Q. Now, the investor relations group also tracked something called the Top Ten; is that correct? A. Yes. Q. Okay. And what was the Top Ten? A. The ten analysts who followed our stock and generally published on it. Q. Now, you said earlier with respect to consensus that there was about 30 analysts who might – consensus might consist of their estimates. Do I remember that correctly? A. That's what I recall, yes. Q. Okay. So who were the ten of those 30 that were in the Top Ten? [objection] A. A subset established by the IR group.").]

273.    The Top Ten analysts' average included estimates from both analysts who had recently updated their estimates and those who had not updated recently. [JSF ¶ 146.]

274.    The analyst firms included in the "Top Ten" average were the "bulge bracket" firms, meaning large institutional firms. [Black Dep. Tr. (P. Ex. 66) 99:3-13 ("Q. . . . if there was a First Call consensus, why was it necessary to have a top ten consensus? [objection] A. Top ten consensus is of the bulge bracket. And it gives a view of the large institutional firms, whereby First Call give all 30 or so of 30 analysts. Q. And when you say, 'bulge bracket,' what do you mean by that term? A. Large institutional firms.").]

275.    Black used analyst models to compile the Top Ten averages. [JSF ¶ 147; Black Dep. Tr. (P. Ex. 66) 171:13-21 ("Q. I think you said earlier that you worked with analyst models as part of your job, right? A. That is correct. Q. And, in fact, you used those models to compile the top ten charts that you were sending around in the first quarter of 2016. Right? A. That is correct.").]

276.    From January 2016 through April 26, 2016, Black maintained sheets tracking consensus estimates and the Top Ten average estimates for AT&T's revenue, wireless equipment revenue, and upgrade rates. [*See* JSF ¶¶ 137 and 148; J. Ex. 207 (Jan. 28, 2016 email); J. Ex. 206 (Feb. 5, 2016 email from Black to Viola and Womack); J. Ex. 208 (Feb. 8, 2016 email from Black to Womack); J. Ex. 217 (Feb. 26, 2016 email from Black to Womack and Viola); J. Ex. 215 (Mar. 4, 2016 email chain re: consensus revenue and EPS); J. Ex. 136 (Mar. 4, 2016 email with consensus tracking charts); J. Ex. 180 at 5 (Mar. 10, 2016 Black email and tracking charts); J. Ex. 159 (Mar. 14, 2016 email and tracking charts); J. Ex. 163 (Mar. 22, 2016 email chain); J. Ex. 184 (Mar. 30, 2016 email and tracking charts); J. Ex. 170 (Apr. 7, 2016 email and tracking sheet).]

277.    Black shared his tracking sheets with Womack and Evans, among others. [*Id.*; Womack Dep. Tr. (P. Ex. 88) 63:9-24.]

278.    In 1Q16, the Top Ten average revenue estimate was lower than the consensus revenue estimates. [J. Ex. 180 at 4 (Mar. 10, 2016 Black email and tracking charts); J. Ex. 170 (Apr. 7, 2016 email and tracking sheet).]

279.    The firms included in AT&T's "Top Ten" average were more likely to have a "Buy" rating on AT&T's stock than the total universe of analysts within First Call consensus. [J. Ex. 207 at 4 (Jan. 28, 2016 email and attachments chart showing Buy/Hold/Sell ratings); Black

Dep. Tr. (P. Ex. 66) 105:10-106:24 ("Q. And what is that chart indicating? . . . The one in the middle of the page below the – I think what you said was the First Call? A. Thank you. It's the number of buys, the number of holds, sells, and not rated. . . . Q. And you if you look at the ones down below . . . Is that the same information for those top ten analysts? A. That would be correct. Q. And you would agree with me that the top ten analysts, 80 percent of them rated AT&T a buy versus approximately 50% of the analysts in the First Call all of the analyst chart. Is that fair? A. I think it's fair to say it's about 80% of the top ten, and it's just short of 50% of the analysts that are represented on this page . . . .").]

280.     The Top Ten average revenue estimate was closer to the IR view than the First Call consensus average. [J. Ex. 217 at 2 and 4; Black Dep. Tr. (P. Ex. 66) 126:1-4 ("Q. . . . And so the top ten consensus average is closer to the IR view than the First Call consensus average? A. Yes.").]

281.     AT&T did not publicly disclose that it tracked a Top Ten analysts' average or what the averages were. [Stephens Dep. Tr. (P. Ex. 85) 76:2-76:5 ("Did AT&T make public which firms were in its Top Ten tracking? [objection] A. Yeah, I did not discuss it publicly."); Black Dep. Tr. (P. Ex. 66) 128:23-129:23 ("Q. . . . Did you tell people who specifically were on the top ten list? A. That I don't recall. Q. And other than your calls with analysts, did you put this list up somewhere somebody could find it publicly? A. Could you define 'publicly'? Are you saying outside of AT&T? Q. Correct. A. The answer would be no. Q. . . . In terms of the average that you would work up of the top ten analysts, were those posted publicly by AT&T or you anywhere? A. Again, could you define 'publicly'? Q. On a website, in a news release or -- A. No. Q. – SEC filing? A. No.").]

282.     AT&T's CFO, Stephens, reported to the CEO, Stephenson, AT&T's performance against both consensus and the Top Ten average. [JSF ¶ 149; J. Ex. 145 at 2 (June 14, 2015 email stating, among other things, "Consensus/Top Ten remain at $.63/$.64 and $2.51/$2.54 for 2Q and full year '15. We remain on track to beat both.").]

### D.  The Relationship Between AT&T and Its Analysts

283.     Analysts arranged access for clients to AT&T's Investor Relations Department and executives. [Ilkowitz Dep. Tr. (P. Ex. 77) 178:14-24 ("[Q.] While you were at Citi was part of . . . the services you provided to Citi's clients arranging for access to AT&T investor relations staff and executives? A. Yes, that's something we tried to do."); Stein Dep. Tr. (P. Ex. 84) 66:17-67:17 ("Q. . . . Wells Fargo hosts an investor conference that relates to telecommunications; am I correct in that? A. That's correct. Q. . . . Okay, and you have AT&T executives come and speak at that conference? A. Pending their availability, yes. AT&T is generally one of our participants. Q. Generally, who are the types of executives you recall having hosted at the Wells Fargo conference? A. In general, it's C-suite, so it's CEO, CFO, sometimes CIO, potentially IR staff.").]

284.     AT&T Investor Relations department would meet with analyst firm clients at investor conferences. [Sine Dep. Tr. (P. Ex. 83) 324:25-325:7.]

285.     Evans had been invited by Pacific Crest to several conferences for Pacific Crest's customers and Evans had attended those Pacific Crest hosted conferences on behalf of AT&T. [Evans Dep. Tr. (P. Ex. 71) 68:18-69:1.].

### E.  Analysts' Statements Concerning Upgrade Rates, Equipment Revenue, and Total Revenue

286.     In its January 27, 2016 research report to investors summarizing AT&T's 4Q15 results, RBC highlighted: "4Q15 revenue and [*sic*] were shy of expectations. . . . Wireless

revenue missed slightly on lower equipment revenue from record BYOD gross adds and lower upgrade rates." [J. Ex. 288 at 2 (Jan. 27, 2016 RBC note).]

287.    In its January 27, 2016 research report, under the heading "Key Points[,]" RBC noted that consolidated revenue had missed RBC's estimates and that "lower revenue was primarily driven by lower equipment revenue . . . ." [J. Ex. 288 at 2 (Jan. 27, 2016 RBC note).]

288.    RBC's January 27, 2016 research report also flagged for its readers the effect of AT&T's lower upgrade rate in 4Q15 under the heading "Key Points[.]" [J. Ex. 288 at 2 (Jan. 27, 2016 RBC note).]

289.    In its January 26, 2016 research report, Pacific Crest stated that its "Bull Case" for AT&T depended upon AT&T "generat[ing] lower handset upgrade rates than we anticipate," and that its "Bear Case" contemplated AT&T's "upgrade rates increas[ing] above our high-single-digit percentage rate estimates." [J. Ex. 244 at 3 (Jan. 26, 2016 Pacific Crest note).]

290.    In RBC's March 30, 2016 research report, the first page of the report, under the heading "Key points[,]" highlighted that it was "lowering equipment revenue from $3.6B to $2.9B for decline of 15% Y/Y on a lower upgrade rate (5% vs. previous 6.5%) and fewer smartphone sales . . . ." [J. Ex. 74 at 2 (March 30, 2016 RBC report).]

291.    RBC's March 30, 2016 research report also highlighted on the first page under the heading "Key points[,]" that it "expect[ed] the upgrade rate to remain moderate in 2Q/3Q and then rebound in 4Q with the anticipated iPhone refresh." [J. Ex. 74 at 2 (March 30, 2016 RBC report).]

292.    RBC noted under the heading "Key points" on the first page of its report its April 27, 2016 report to investors that AT&T's consolidated revenue for 1Q16 of "$40.5B bettered

RBC $40.3B" and that "equipment revenue of $3.2B bettered RBC $2.9B[.]" [J. Ex. 287 at 2 (April 27, 2016 RBC report).]

293.    Drexel Hamilton noted in its March 31, 2016 report on AT&T that: "We expect AT&T to have a reasonably good first quarter with light revenue due to fewer handset upgrades, but strong margins and EBITDA due to lower upgrade costs than expected." [J. Ex. 75 at 2 (March 31, 2016 Drexel Hamilton Report).]

294.    Drexel Hamilton analyst Barry Sine included the point because it was something investors should consider. [Sine Dep. Tr. (P. Ex. 83) 365:5-17 ("Q. Why did you include that bullet point in the note? A. Because I thought that that was one of the salient points that investors should have in mind as they were considering what AT&T—in my opinion, what AT&T was likely to report. . . . And in the commentary, I'm providing some salient points that I think investors should keep in mind.").]

295.    Drexel Hamilton noted in its March 31, 2016 report on AT&T that while fewer upgrades would "eat into revenue, it should also be beneficial for margins." [J. Ex. 75 at 3 (March 31, 2016 Drexel Hamilton Report).]

296.    In its April 27, 2016 report on AT&T's 1Q16 earnings announcement, Drexel Hamilton discussed AT&T's upgrade rate in connection with EBIDTA margin growth. [J. Ex. 105 at 3 (Apr. 27, 2016 Drexel Hamilton Report).]

297.    In an October 2, 2016 report, Citi discussed the extended device replacement cycle and noted that it expected it to nevertheless shorten to 24-26 months. [J. Ex. 260 at 2 (Oct. 2, 2016 Citi Report).]

298.    In the October 2, 2016 report, Citi analyzed the upgrade rate and upgrade cycle for its investor clients. [J. Ex. 260 at 8 (Oct. 2, 2016 Citi Report).]

299.     In its January 19, 2016 report, Citi noted in its "Key Areas to Explore" for AT&T that one of the key areas was "Impact of EIP plans on income statement[.]" [J. Ex. 306 at 5 (Jan. 19, 2016 Citi Report).]

300.     In a March 2016 Citi presentation (titled "Telecom Services: Back to the Strategic Drawing Board"), Citi described its "Stock Picking Thesis[,]" noting that its "Stock Selection Focuses on Restructuring Opportunities, ***Revenue Momentum*** & Considers M&A as Option Value." [J. Ex. 259 at 6 (March 2016 Citi Presentation) (emphasis added).]

301.     In the March 2016 Citi presentation, Citi discussed the slowing device upgrade cycle, noting that its reduction of churn rates was an "unintended positive" and also that it "could push the cost of customer acquisition higher for insurgents" [J. Ex. 259 at 20 (March 2016 Citi Presentation).]

302.     In its "Wireless 1Q16 Preview" published on April 7, 2016, Citi noted that "We find that longer replacement cycle is also helping the rate of postpaid churn . . . ." [J. Ex. 76 at 2 (Apr. 7, 2016 Citi Report).]

303.     Citi noted in its April 7, 2016 report that it had "updated our estimates for AT&T and Verizon to reflect our expectation for a longer device replacement cycle" among other factors. [J. Ex. 76 at 2 (Apr. 7, 2016 Citi Report).]

304.     The handset replacement cycle was "a topic of interest at the time." [Ilkowitz Inv. Tr. (P. Ex. 59) 51:8-15 ("[Q.] Can you tell me why you decided to highlight that trend to your investor client base? A. It's hard to recall exactly why, but obviously that must have been a topic of interest at the time.").]

305.     Citi downgraded AT&T in a July 7, 2016 report. [J. Ex. 164 at 2 (July 7, 2016 Citi Report).]

306.    Citi's report downgrading AT&T from "Buy" to "Neutral" discusses the longer device replacement cycle. [J. Ex. 164 at 2 (July 7, 2016 Citi Report).]

307.    Evercore, in their January 27, 2016 "Earnings Report" on AT&T highlighted that "T's results were marred by misses on consolidated revs (-1.3%), EBITDA (-5.4%), and EBITDA margins (-126 bps)." [J. Ex. 77 at 2 and 3 (Jan. 27, 2016 Evercore Note).]

308.    Evercore, in their January 27, 2016 "Earnings Report" on AT&T noted that "Early EIP Push Causes Improvement in Cash Results." [J. Ex. 77 at 2 (Jan. 27, 2016 Evercore Note).]

309.    Evercore, in their January 27, 2016 "Earnings Report" on AT&T noted that "Fewer Upgrades and BYOD Impacts Equipment Revs. We believe the fewer upgrades and a record number of BYOD customers (672K) led to lower equipment revs ($4.1B, 11.4% short of our estimate)." [J. Ex. 77 at 6 (Jan. 27, 2016 Evercore Note).]

310.    Evercore, in its April 11, 2016 preview for AT&T, stated that one of "three main stories" for AT&T was "pressure on equipment revs and (brief) service revs inflection[.]" [J. Ex. 78 at 2 (Apr. 11, 2016 Evercore Note).]

311.    Wells Fargo, in its January 27, 2016 report on AT&T's 4Q15 results, highlighted that "Wireless Standalone Results [were] Light," and noted that "service and equipment revenue each declined -1.7% and -14.9% y/y, respectively." [J. Ex. 320 at 2 (Jan. 27, 2016 Wells Fargo note).]

312.    In its March 28, 2016 report, Wells Fargo highlighted lower equipment revenue and upgrade rates as the bases for updating its revenue forecasts for AT&T. [J. Ex. 70 at 2 and 3 (Mar. 28, 2016 Wells Fargo Note); Stein Inv. Tr. (P. Ex. 64) 60:7-12 ("Q. Fair to say that the focal point of this note is related to AT&T's equipment revenues? A. Yes.").]

313.     Nomura, in its April 19, 2016 research report regarding AT&T, noted that "[a] benign competitive quarter should reduce smartphone equipment revenue and drive greater confidence into AT&T's rising wireless services margins." [Dep. Ex. 194, 2016.04.19 Nomura AT&T Report, at 2-4.] It noted that "We have heightened confidence in our metrics, including … a record low upgrade rate of ~5%." *Id.*  In the same report, Nomura observed that its revised upgrade rate forecasts reduced its estimated equipment revenues, but "improve[s] our margin forecast as equipment installment plans typically have a ~15% negative margin associated with them" and raised its price target on AT&T from $39 to $44 "to reflect improving margins." *Id.*

314.     In its April 18, 2016 research report, Bank of America highlighted that "[g]ross additions across the industry were light, on our view, on limited promotional activity and the lack of new must have devices. We believe these factors also led to lower upgrade rates and have reduced our 1Q16 upgrade rate [estimate for AT&T] from 6.6% to 5%. Our 1Q16 EPS [earnings per share] forecast increases from $0.68 to $0.71 on lower handset expense." [J. Ex. 98a at 9 (Bank of America Research Report, April 18, 2016).]

315.     In its May 4, 2016 research report, Moffett Nathanson wrote that "Upgrade rates in Q1 were at historic lows," and opined that the reduced upgrade rates for telecom carriers was "almost entirely positive" because "[l]ow upgrade rates mean lower transaction costs (sales commissions, calls to customer service, inventory, etc.) and fewer churn occasions. One need look no further for an explanation why churn rates in Q1 approached all-time lows for the quarter…." Moffett Nathanson attributed carrier profitability in 1Q16 low upgrade rates, and stated that the prospects for continued carrier profitability were dependent upon whether the trend toward declining upgrade rates was secular or cyclical, concluding that "going forward, upgrade rates will be the 'other' critical factor beyond ARPU." [J. Ex. 111 at 9-10.]

316.    On April 7, 2016 Jefferies published an earnings preview for the four major wireless carriers, including AT&T, reporting that "[w]e expect lower volumes as upgrades hit record lows, supporting stronger industry margins." [P. Ex. 30 at 2 (Apr. 7, 2016 Jefferies report).] As to AT&T in particular, Jefferies commented that "[c]ommentary suggests historically low upgrade rates" noting "[w]e this dynamic and improving ARPU declines to drive upside to margins," and increased its year-end target price for AT&T to $44 from $40. *Id.*

317.    On April 13, 2016, DA Davidson published a research report concerning AT&T. The report noted that "While a lower upgrade rate means lower equipment revenue, it also means higher EBITDA margins due to the absence of the cost of the handset upgrade." It added that, accordingly, "[w]e have lowered our Q1 revenue estimate, but raised our EBITDA and EPS estimates, largely due to lower expected handset upgrades," and it raised its EBITDA estimate for AT&T's first quarter by approximately $500 million. [J. Ex. 101 at 2 (Apr. 13, 2016 D.A. Davidson Report).]

318.    On March 18, 2016, UBS published a research report titled "What longer upgrade cycles mean for the carriers." [J. Ex. 64.] The March 18 UBS research report that reduced upgrade rates would reduce equipment revenues which "will put pressure on total wireless revenues as it [equipment revenue] will no longer provide a boost to declining service revenues." [*Id.* at 5.] The March 18 UBS report also stated that lower upgrade rates were driving improvements in customer churn and increased profitability among the major telecommunications carriers, including AT&T. [*Id.* at 3 ("Longer upgrade cycles are driving improved churns and lower gross adds while boosting carrier profitability").] Concerning longer upgrade cycles, UBS wrote "[w]e believe this will be a key theme for 1Q earnings, driving another quarter of strong sector profitability, especially at AT&T…"). [*Id.* at 2.]

319.    On September 9, 2016, UBS published an industry research report titled "Wireless clouds starting to gather," which attributed declining upgrade rates to increased profitability among the major telecommunications companies, and predicted that the reversal of that trend to lead to higher churn and lower margins. [J. Ex. 311 at 4-5 (Sept. 9, 2016 UBS Research Report) (noting that "[w]ireless margin expansion has been the primary driver of EPS growth for AT&T and Verizon for the past decade … [but] … further margin expansion looks increasingly doubtful, putting LT [long-term] EPS growth for the Bells at risk," in part, because "industry upgrades and churn have likely bottomed."); *id.* at 6-7 ("". . . the current pace of upgrades is likely unsustainable . . . Upgrades are the biggest driver of smartphone sales … More upgrades, coupled with increased competition, will likely lead to flattening churn, preventing these drivers from being a further tailwind to margins.").]

320.    On September 28, 2016, UBS downgraded AT&T from "Buy" to "Neutral." [J. Ex. 312.]

321.    Part of the rationale for the downgrade was that upgrade rates were no longer going to continue to decline and that the margin improvement AT&T enjoyed from slowing upgrades would abate; in the report accompanying explaining its downgrade, UBS wrote to investors, "**AT&T has benefitted from longer upgrade cycles and the shift away from handset subsidies**. The upgrade rate fell to 4.6% in 1Q, the lowest instance on record, while subsidized plans now account for ~30% of AT&T's postpaid phone base, down from 80% two years ago. Both of these factors have contributed to a streak of record wireless margins despite the ongoing challenges in the industry … With 80%+ of smartphone sales already taking no subsidy plans and the implied smartphone life approaching 3.8 years, we thing **savings from these efforts are unlikely to improve going forward.**" [J. Ex. 312 at 5-6 (emphasis in original);

Hodulik Dep. Tr. (P. Ex. 75) at 204:6-205:22 ("Q. So you believe – you're saying in this note [J. Ex. 312], you believe that, you know, there's decline in upgrade rate, the upgrade rates have bottomed out, and is that part of the rationale for downgrading AT&T stock? A. I think it is part of the rationale. Q. Okay. So the trajectory of upgrade rates played a factor in your recommendation as to whether to buy or sell AT&T stock? A. Yeah … Q. Okay. So upgrade rates are a part of your investment these for AT&T; is that fair? [objection] A. I would say it's – yeah, it's – it's one of many. Again, it's – it's a driver of other things, but in and of itself it's relatively minor. But in this case, it – in our view, it led to a change in margins which led to a change in earnings which we – is – you guess, is a pretty meaningful driver").]

322.    All but one analyst forecast that AT&T lost money on wireless equipment sales; the one outlier later corrected his model to forecast losses. [Vasilescu Decl. Ex. 5 at 53 (Wolk Feb 14, 2022 Report).]

## DEFENDANTS' VIOLATION OF REGULATION FD

### I.    AT&T Misses Revenue Consensus Estimates in Third and Fourth Quarters of 2015

323.    AT&T missed consensus revenue estimates in third quarter of 2015 ("3Q15"). (Stephens Dep. Tr. (P. Ex. 85) 165:2-11 ("Q. And to be clear, AT&T, in fact, missed the consensus revenue estimates in the third quarter of 2015, right? [objection] A. I believe we did.").]

324.    AT&T was aware prior to reporting its 3Q15 results that analysts' revenue estimates were too high and provided advance notice of its impending revenue miss to its Board. [P. Ex. 8 at 2 (Oct. 22, 2015 letter to Board) ("One note regarding our quarterly revenue of $39B – First Call will likely have analyst consensus revenue estimates of $41B. A majority of analysts covered by First Call modeled a full 3 months of revenue from DIRECTV in their estimates. In

reality, we only had a little over 2 months of combined revenue, as the deal closed on July 24th. . . . I only mention this because you may hear some in the media call it a 'revenue miss.'").]

325.    AT&T had tried to warn the market and analysts that their revenue estimates were too high through a public statement to the Wall Street Journal. [J. Ex. 250 (Oct. 21, 2015 Wall Street Journal article); J. Ex. 137 (Oct. 21, 2015 email forwarding Wall Street Journal article to Individual Defendants among others); Stephens Dep. Tr. (P. Ex. 85) 178:2-23 (". . . Q. Were you involved in the decision to have Mr. Burns [the AT&T spokesman] speak to whoever he spoke to, to give that quote? A. I was – I believe I was aware that discussions took place.").]

326.    Media reported on AT&T's warning of a revenue miss, leading AT&T's CEO to facetiously write: "Sure glad we avoided a big headline about a revenue miss :)" [J. Ex. 146 (Oct. 22, 2015 email from Stephenson to Stephens and others:); Stephens Dep. Tr. (P. Ex. 85) 180:6-21 (". . . "Q. He's [Stephenson] being facetious there [in the email]? A. You'd have to ask him. Q. Did you understand him to be facetious in – A. I understood him to be facetious.").]

327.    When AT&T reported its 4Q15 financial results, its reported revenue fell $600 million short of analysts' consensus estimate, due in part to analysts' overestimates of AT&T's wireless equipment revenue. [*See* Compl. ¶ 35; Defs. Answers ¶ 35; *see also* JSF ¶ 170; J. Ex. 106 (Jan. 24, 2016 email from Black with consensus tracking chart compared to actuals).]

328.    During the earnings call in which AT&T announced its 4Q15 results, the CFO touted, among other things "double-digit growth in consolidated revenues, adjusted earnings, and free cash flow" and that AT&T continued "to see margin expansion in every segment of our domestic business." [J. Ex. 46 at 5 (Jan. 26, 2016 earnings call transcript); *see also* JSF ¶ 171.]

329.    The CFO went on to say during the earnings call that "Consolidated revenues grew to $42.1 billion. That's up more than 22% year over year, mostly due to our acquisition of

DIRECTV. That growth comes even with lower equipment sales, as customers chose to hold only their smartphones for a longer period of time." [J. Ex. 46 at 5 (Jan. 26, 2016 earnings call transcript); *see also* JSF ¶ 171.]

330.     On January 16, 2016, Stephens, the CFO, emailed Viola among others in connection with AT&T's 4Q15 results, stating: "need to understand upgrade rte – 500 bp [basis point] drop is a big deal for long term profits – as long as churn is stable)[.]" P. Ex. 48 (Jan. 16, 2016 emails from Stephens).]

331.     During the January 26, 2016 earnings call, the CFO stated: "Our relentless efforts to drive efficiency and move our smartphone customer base to the no-subsidy Next model once again drove record EBITDA margins. You can see this clearly in our operating expenses. While equipment revenue was down more than $700 million, mostly due to the lower upgrade volumes, total cash operating costs were down $1.8 billion, thanks to our sharp focus on cost management and efficiency." [J. Ex. 46 at 7 (Jan. 26, 2016 earnings call transcript); *see also* JSF ¶ 171.]

332.     The CFO also stated on the January 26, 2016 earnings call: "Total wireless revenue was impacted by lower smartphone sales. . . Equipment revenues were also impacted by an increasing number of bring-your-own-device subscribers." [J. Ex. 46 at 7 (Jan. 26, 2016 earnings call transcript); *see also* JSF ¶ 171.]

333.     Media and analyst reports noted that AT&T's consolidated revenue for 4Q15 missed consensus estimates. [Compl. ¶ 37; Defs. Answers ¶ 37; *see also* JSF ¶ 174; *see also*, *e.g.*, J. Ex. 320 at 2 ("T reported mixed Q4 2015 results . . . . The quarter in a word, 'eh.' Could have been better, in our view . . . ."); *see also supra* Background Section V.E.]

334.     After AT&T missed consensus revenue estimates for 4Q15, there was a sensitivity associated with revenue, equipment revenue, and the consensus. [Black Dep. Tr. (P.

Ex. 66) 89:14-90:15 ("Q. . . . In fact, after the miss of the fourth quarter 2015 consensus for revenue, wasn't there more focus on consensus revenue in the first quarter of 2016? . . . At any time in the first quarter of 2016. A. At any time? Q. Yes. A. Thank you. I believe there was a sensitivity associated with the equipment revenue and the consensus. . . . [Q.] And that involved revenue. Correct? [objection] A. I can't say exclusively, but I believe revenue was one of the elements. Q. Not just EPS? A. Not just EPS.").]

335.    After AT&T missed consensus revenue estimates for 4Q15, Viola and Womack expressed concern over missing consensus revenue in 1Q16. [Black Inv. Tr. (P. Ex. 52) 90:9-91:1 ("Q. What was the response among the Investor Relations Department to missing revenue consensus in . . . January 2016? A. There was a sensitivity in the group about missing . . . the revenue number, the revenue expectation. . . . Q. Who expressed that sensitivity and how? A. I talked with Chris Womack and Mike Viola. Q. And what did they say? A. Just looks like, you know, we're going to come short on the revenue side versus consensus. . ."); Black Inv. Tr. (P. Ex. 52) 145:13-146:3 ("Q. Did you have any concerns at or around the time you received this analysis [March 6, 2016] that analysts hadn't adequately accounted for the extent to which upgrade rates would be negatively impacted in the first quarter? A. I'm not sure if at that time I drew a correlation. But I think that concern was there already, that the equipment revenue was going to be impacted negatively by the upgrade cycle. Q. And was there a concern that analyst estimates of equipment revenue were, sort of, unrealistically high? A. I think there was a concern that the analyst estimates were high.").]

336.    Media and analyst reports discussing AT&T's 4Q15 revenue miss were discussed within AT&T's IR department. [Compl. ¶ 37; Defs. Answers ¶ 37.]

337.    AT&T's revenue consensus miss in 4Q15 was its third revenue miss in the last four fiscal quarters. [JSF ¶ 175.]

## II.    Declines in Wireless Equipment Sales Continue in the First Quarter of 2016

### A.  January and February 2016

338.    On January 23, 2016, before AT&T released its results for 4Q15 which resulted in AT&T missing the consensus revenue estimates, Viola and Womack discussed that the IR Department needed to do a better job preventing AT&T missing the consensus revenue for 1Q16. Viola emailed Womack: "Chris, we have a tendency to focus on EPS and have recently missed the mark on consolidated revenue. We need to make sure our story gets consensus trued up for both EPS as well as revenue." [J. Ex. 203 at 5 (Jan. 24, 2016 email chain).]

339.    On January 24, 2016, Viola emailed Womack: "We will have to nip 1Q in the bud otherwise we will be in the same spot we've been the last few quarters, i.e. missing revenue." [J. Ex. 203 at 2 (Jan. 24, 2016 email chain).]

340.    That same day, January 24, 2016, Womack responded to Viola: "Agreed – we need to help them figure out their equipment spread for the year. Equipment revenue is starting to become a real challenge." [J. Ex. 203 at 2 (Jan. 24, 2016 email chain).]

341.    As of late January, 2016, AT&T's internal "IR View" forecast expected AT&T's wireless equipment revenues to grow 22% year-over-year in 2016, a larger increase than analysts were forecasting. [J. Ex. 301 at 4 (Jan. 24, 2016 email chain and attachment).]

342.    On January 27, 2016, AT&T's Head of Communications sent an email to AT&T's CEO, CFO and Viola, among others, with the subject line "Earnings coverage." The email summarized reactions to AT&T's earnings announcement from various media outlets. Among the headlines listed under the email's section excerpting "Notable Coverage" were the following: "CNBC: AT&T Falls on Earnings;" "The Wall Street Journal: AT&T Revenue

Growth Falls Short of Expectations;" "FastFT [Financial Times]: AT&T shares slip after results;" "Reuters: AT&T revenue below forecasts, shares fall;" "Associated Press: AT&T Misses Street 4Q Forecasts;" "Zack's: AT&T (T) Slips on Q4 Earnings Miss;" "24/7 Wall Street: AT&T Earnings Report Doesn't Measure Up to Expectations;" "RTT News: AT&T Inc. (T) Is Losing Ground After Q4 Revenues Fall Short." J. Ex. 299 at 3-4 (Jan. 27, 2016 email).

343.   On January 27, 2016, Viola emailed the Individual Defendants in response to an email from Black conveying EPS consensus information: "What about revenue? I'm equally concerned about revenue[.]" [J. Ex. 213 at 3 (Jan. 27, 2016 email chain).]

344.   On January 28, 2016, Black emailed Womack a "view I [Black] put together of the revenue and EPS consensus for 2016 that we can use to review with Mike V[iola] tomorrow." [JSF ¶ 178; J. Ex. 50 (Jan. 28, 2016 email and attachment).]

345.   Viola expressed concern to Womack and Black about missing revenue consensus early in 1Q16. [Black Inv. Tr. (P. Ex. 52) 91:23-92:9 ("Q. Did Mr. Viola express concern to you about revenues and revenue consensus? A. Yes. Q. In January 2016? A. It was in the early part of the quarter, January, February, in that time frame. Q. How did he express his concern to you? A. I believe it was a telephone conversation with Chris [Womack] and myself. Q. And what did he say? A. Just that. The revenues were, you know, coming in light to the consensus view.").]

346.   By February 7, 2016, AT&T was missing its internal budget projections for wireless equipment revenue. [J. Ex. 153 (Feb. 7, 2016 email from Stephens to Stephenson ("Revenue of $13.3B missed budget by $240M – wireless equipment missed by $250M . . .")); Stephens Dep. Tr. (P. Ex. 85) 200:12-23 ("Q. And the next point in that paragraph says: Wireless equipment revenue missed by 250 million? A. Yes. Q. And the budget miss you're pointing out here in terms of total consolidated is 240 million, right? A. I'm pointing out that the budget miss

was 240 million. Q. So the wireless equipment rev miss is larger than that $240 million miss, right? A. It's $10 million larger than that, yes.").]

347.    On February 8, 2016, Womack emailed Black: "Please send me a revenue report today by analyst for each quarter, exactly like the EPS report that you generate on Fridays." [J. Ex. 212 (Feb. 8, 2016 email from Womack to Black).]

348.    Black provided Womack that same day with a report of revenue estimates by analyst and provided both the total consensus and the Top Ten average. [J. Ex. 208 (February 8, 2016 email from Black to Womack).]

349.    By February 8, 2016, both Viola and Womack had requested Black to create charts tracking revenue consensus. [Black Dep. Tr. (P. Ex. 66) 115:8-14 ("Q. And so by February 8, 2016, both your supervisor and your supervisor's supervisor had asked you to create charts tracking revenue consensus. Is that fair? A. Both Mike Viola and Chris Womack required analysis of revenue and EPS – revenue, I should say. Yes."); *see also* JSF ¶ 179.]

350.    When AT&T reported its results for fiscal year 2015 in its Form 10-K, filed with the Commission on February 18, 2016, AT&T informed investors and analysts under the header "2016 Revenue Trends": "Our AT&T Next program is expected to generate continued growth in equipment revenue, which has the corresponding impact of lowering service revenues." [J. Ex. 1 at 48 (FY 2015 Form 10-K).]

351.    On February 26, 2016, Viola, copying Womack, responded to an email from Black providing consensus revenue estimates and AT&T's Top Ten analyst estimates: "Guys, what's the plan to get first call numbers in line with 1Q and full year for revenue and eps? Let's discuss… I don't want to be in a mad dash in April." [J. Ex. 218 (Feb. 26, 2016 email chain).]

352.     On February 27, 2016, Stephens, the CFO, responded to an email from Black relaying First Call consensus estimates and the Top Ten analysts' average for EPS, copying AT&T's Controller: "Mike[,] Can you send me a summary sheet of where we are on consensus estimates for the first quarter – top 10 and consensus. Need all the regular numbers – revenue, customer metrics, FCF, CAPEX, EPS etc. Debbie, once received let's compare to 1Q outlook – with updates for Feb actual – want to have info before I speak at DB conference on March 9th." [J. Ex. 219 (Feb. 27, 2016 email chain between Black, Stephens, and Dial).]

353.     On February 28, 2016, Black emailed a chart showing the First Call consensus and Top Ten average estimates (but excluding Barclays and Oppenheimer, who had not yet update their models for 1Q16). [J. Exs. 220-22 (Feb 28, 2016 email from Black to Stephens and Dial and attachments).]

354.     According to Black's February 28, 2016 chart, the Top Ten average (excluding Barclays and Oppenheimer) estimates of AT&T's total consolidated revenue projected growth in total consolidated revenue and wireless equipment revenue of 26% and 4.5% respectively, and a wireless equipment upgrade rate of 6.5%. [J. Exs. 220-22 (Feb 28, 2016 email from Black to Stephens and Dial and attachments); J. Ex. 222 (see native file, cell CC16, showing 6.5% upgrade rate, but cell hidden in printout).]

**B.  March and April 2016**

                *i.  Stankey's Remarks at the Morgan Stanley Conference*

355.     On March 2, 2016, Stankey—then the head of AT&T's Entertainment division—spoke publicly at the Morgan Stanley Conference regarding AT&T's business. J. Ex. 3 ¶ 7 (Parties' First Stipulations of Fact); *see also* JSF ¶ 181.]

356.    At the Morgan Stanley conference, an analyst asked Stankey to comment on

ATT's "handset utilization rates" and Stankey answered that question without providing

numerical upgrade rates. J. Ex. 3 ¶¶ 7(b), (c), & (d) (Parties' First Stipulations of Fact).]

      a.   Instead, Stankey answered it by giving general guidance for a trend: "Stankey

          responded to that question in part by stating that many of AT&T's customers

          'are no longer thinking that they want to upgrade it every 12 months or 18

          months.  They are taking care of it.  They are going, wow, this isn't a $199

          device, this is a $600 device.  I'd better care for it more carefully.  I'd better

          do somethings differently with my children and as a result of that, renewal

          cycles on that very capable device are extending.'" J. Ex. 3 ¶ 7(c) (Parties'

          First Stipulations of Fact).]

357.    At a March 2, 2016 investor conference, a participant asked Stankey, at the time

CEO of AT&T's Entertainment group, "I wonder if you could put some data around the point

you made on handset renewals. I'm interested in terms of what's the average currently? How is

that shifting up and how long do you think that could become?" Stankey responded: "Yes, it's

not something we publicly disclose. I will tell you it's shifting out and it's getting longer and I

think that that is just a trend." [J. Ex. 113 at 12 (Tr. of Mar. 2016 Morgan Stanley conference).]

358.    AT&T has never publicly stated that Sankey's statements at the March 2

Conference were incorrect, including regarding AT&T's policy not to publically state the

upgrade rate numbers. J. Ex. 3 ¶ 8 (Parties' First Stipulations of Fact).]

      *ii.  Early March 2016*

359.    As of March 2, 2016, AT&T generally did not publicly disclose intra-quarter

numeric results it was achieving or intra-quarter numeric projections it was making concerning

wireless equipment upgrade rate, wireless equipment revenue, total wireless revenue, or total consolidated revenue. [JSF ¶ 182.]

360.     On March 2, 2016, Viola emailed Womack, Black, and an assistant to have a meeting, the subject of which was "Consensus Discussion" at 2:00 PM on March 4, 2016. [JSF ¶ 183; J. Ex. 52 (Mar. 2, 2016 calendar invite).]

361.     In early March, AT&T's CFO and others, including Viola, considered issuing a Form 8-K to address, among other things, its lower equipment revenues. [JSF ¶ 186.]

362.     On March 3, 2016, AT&T's CFO emailed Viola and Dial: "After we see Feb Results and before we present at DB conference next week let's consider an 8k that states . . . Wireless equipment unit sales down year over year – impacting equipment revenues" among other items. [J. Ex. 216 (Mar. 3, 2016 email from Stephens to Viola and Dial re: "8K").]

363.     AT&T ultimately elected not to issue a Form 8-K addressing equipment revenue and rather that Stephens would address the topic at the upcoming Deutsche Bank conference. [Stephens Dep. Tr. (P. Ex. 85) 211:9-212:4 ("Q. Okay. So in March 2016, you were considering doing an 8-K to point out that trend, correct? A. Yes. Q. And, ultimately, you decided not to put out that 8-K, correct? A. Correct. . . . Q. And because it was already scheduled, instead of doing an 8-K, you decided to work at least the information about wireless equipment unit sales being down year over year impacting equipment revenues into what you were going to address at the Deutsche Bank conference, correct? A. Yeah. We believed we could make the information publicly available in many ways and chose to do it at the Deutsche Bank conference.").]

364.     On March 4, 2016, Viola forwarded to Dial Black's consensus tracking chart dated March 3, 2016, showing that the Top Ten average estimates of AT&T's total consolidated revenue projected increases in total consolidated revenue and wireless equipment revenue of

26.1% and 4.6% respectively, and a wireless equipment upgrade rate of 6.6%, all of which were increases compared with Black's February 27, 2016 chart. [J. Ex. 215 at 5 (Mar. 4, 2016 email and Top Ten chart dated Mar. 3, 2016); Black Dep. Tr. (P. Ex. 66) 156:12-157:6 ("Q. The top ten average for total consolidated revenue went up between February 27 and March 3. Correct? A. The year-over-year growth rate increased. . . . Q. And the way the year-over-year growth rate would increase is if the revenue estimates went up. Correct? A. That would be correct. Q. Okay. And if you look at the equipment revenue estimate, that went from 4.5 percent to 4.6 percent. Correct? A. Yes, total wireless equipment revenue, it's now 4.6 percent. Q. Right. And the wireless equipment upgrade rate went from 6.5 percent to 6.6 percent. Correct? A. That would be correct.").]

365.    On March 4, 2016, at 6:00 PM, Viola emailed Womack and Black a calendar invitation to set up a "Weekly Consensus Discussion" beginning on March 10, 2016. [JSF ¶ 184; J. Ex. 53 (Mar. 4, 2016 calendar invitation).]

366.    AT&T's IR Department had not set weekly consensus meetings before the first quarter of 2016. [Womack Dep. Tr. (P. Ex. 88) 163:25-164:3 ("Q. Okay. Do you recall weekly consensus meetings at any other quarter besides the first quarter of 2016?" A. No, I don't.").]

367.    Viola, Womack, and Black held weekly meetings, sometimes joined by Evans, from March 10, 2016, through April 26, 2016, to discuss Bloomberg and FactSet consensus. [JSF ¶ 185.]

368.    On March 4, 2016, Black sent an email to the IR department, including Viola, Womack, and Evans, stating among other things: "**The Total Consensus 1Q16 revenue estimate** is slightly higher from prior week at $41.25B . . . . The **Top Ten Consensus 1Q16 revenue consensus** is slightly higher from last week at $41.07B . . . . The week over week

change in revenue consensus was due to the inclusion of Oppenheimer's quarterly estimates." [J. Ex. 136 at 2 (Mar. 4, 2016 email) (emphasis in original).]

369.    On March 7, 2016, the IR Department learned that only 3.1% of AT&T's postpaid subscriber base had upgraded their phones through February, based on intra-quarter results received from AT&T's Controller. [P. Ex. 109 (Mar. 7, 2016 email from D. Dial); Womack Dep. Tr. (P. Ex. 88) 165:17-166:1 ("And she [AT&T's Controller] writes next line, 'QTD through Feb '16 upgrade rate is 3.1 percent' That means that quarter to date through February 2016 the – AT&T's upgrade rate was 3.1%. Correct? A. That's how I read it, yes. Q. And Ms. Dial [AT&T's Controller] has access to month-end numbers. Correct? A. As the controller, I believe she does.").]

370.    On March 7, 2016, AT&T's Controller provided Stephens a report comparing AT&T's internal, projected quarterly results (which were based on actual, intra-quarter results through February) to consensus analysts' estimates. [JSF ¶ 187; J. Exs. 223-25 (Mar. 7, 2016 email and attachments from D. Dial to J. Stephens)].

371.    The Controller's March 7, 2016 report showed that according to First Call, analysts were projecting AT&T's 1Q16 total revenues to grow 26.6% year-over-year ($41.241 billion), and the Top 10 analysts were projecting AT&T's total revenues to grow 26.0% ($41.0405 billion): that compared to AT&T's projected quarterly revenue growth of 21.6% year over year ($39.612 billion). The Controller's March 7, 2016 report also showed that analysts were projecting AT&T's 1Q16 wireless equipment revenues to grow by 4.5% year-over-year, compared to AT&T's projected decline in equipment revenues of 25.3% year-over-year. [J. Exs. 223-25 (Mar. 7, 2016 email and attachments from D. Dial to J. Stephens)]

372.     On March 9, 2016, Womack sent an email to Viola with the subject line "Upgrade Rate impact on Equipment Revenue," writing to Viola that the combined impact of EIP plans on consumer behavior and the lack of an iconic phone launch "have the potential to drive historically-low upgrade rates in the first half of this year," which, in turn, could potentially cause AT&T's equipment revenues to decline by $1.5 billion year-over-year for the first quarter of 2016. [P. Ex. 12 (Mar. 9, 2016 email).] Womack forwarded the same content to Black that day. [J. Ex. 161 (Mar. 9, 2016 email).]

### iii.   Stephens's Remarks at the Deutsche Bank Conference

373.     Stephens spoke at an investor conference hosted by Deutsche Bank—a large broker-dealer whose analysts covered AT&T—on March 9, 2016. [*See* JSF ¶ 188; J. Ex. 55 (Transcript of Mar. 9, 2016 Stephens Remarks).]

374.     Evans travelled to Florida from Atlanta to attend the Deutsche Bank Conference with Stephens in person. [JSF ¶ 189.]

375.     Prior to Stephens's speaking at the Deutsche Bank conference on March 9, 2016, Evans was aware that Stephens planned to use that speech to make comments on equipment revenue. [JSF ¶ 190.]

376.     At the Deutsche Bank conference, Stephens spoke twice about equipment revenue and the sales volumes:

      a.   He stated in response to a request to "talk about your top priorities for the organization" among other things: "I think you saw in the fourth quarter, it was a slowdown in the handset upgrade cycle or the total sales. I wouldn't be surprised to see that continue and we will continue to see some foreign exchange issues in the fourth quarter. . . . All of that being said, those are impacts possible on revenues but very little impact at all on profitability

because those are all hedged one way or another with the handset expenses or with expenses in foreign countries that are denominated in those same foreign currencies." [*See* JSF ¶ 191(a); J. Ex. 55 at 3-4 (Transcript of Mar. 9, 2016 Stephens Remarks).]

b. Stephens responded to a question about handset cycles, and stated: "One, I can only talk about up through the fourth quarter. . . . What we are seeing on an overall basis though is an average customers holding their phones longer and probably what I would suggest is a more important fact that I can point to is prior to Next, we had about 90,000 to 100,000 a quarter of customers bringing their own device and saying can you hook up this device? . . . Now most recently last year for most of the year we were at 350,000 to 400,000 a quarter showing that customers are valuing that old device and reusing it. I think that is as much a sign of what is happening." [JSF ¶ 191(b); J. Ex. 55 at 7 (Transcript of Mar. 9, 2016 Stephens Remarks).]

377.   Stephens's remarks at the Deutsche Bank conference did not reveal what AT&T's projected or actual equipment revenue was for 1Q16. [Sine Dep. Tr. (P. Ex. 83) 356:13-21 ("Q. Does anything in those parts of the transcript that counsel directed your attention to [in which Stephens addressed equipment revenue trends] tell you what AT&T's actual equipment revenue is going to be for the first quarter of 2017? [objection] [A.] Nothing directly tells me what the actual revenue number is going to be for equipment revenue."); Ilkowitz Dep. Tr. (P. Ex. 77) 191:1-7 ("Q. . . . Is there anything in the numbers here or in . . . what Mr. Stephens says here that tells you what AT&T's upgrade rate or equipment revenue was going to be in the first quarter of 2016? [objection] [A.] No.").]

378.    Stephens's remarks at the Deutsche Bank conference did not reveal what AT&T's actual upgrade rate was for 1Q16. [Sine Dep. Tr. (P. Ex. 83) 356:23-357:5 ("Q. And does anything in here [i.e., Stephens's remarks] tell you what the equipment upgrade rate is going to be for the first quarter of 2016? [objection] [A.] Nothing directly tells me what the actual upgrade rate will be."); Ilkowitz Dep. Tr. (P. Ex. 77) 191:1-7 ("Q. . . . Is there anything in the numbers here or in . . . what Mr. Stephens says here that tells you what AT&T's upgrade rate or equipment revenue was going to be in the first quarter of 2016? [objection] [A.] No.").]

379.    Black testified that there was an instruction in 1Q16 to ensure that analysts understood the information at the Deutsche Bank conference. [Black Inv. Tr. (P. Ex. 52) 91:6-12 ("Q. . . . Was there any instruction to make sure that AT&T worked on a moving forward basis to make sure that they were doing a better job of messaging revenues with the sell side community? A. In the first quarter of 2016, yes, there was a conversation to ensure that the analysts understood the information at the Deutsche Bank conference.").]

380.    Womack testified that the focus in 1Q16 was to ensure that the analysts were aware of Stephens's comments at the Deutsche Bank conference concerning the upgrade rate cycle and to understand the impact of equipment revenue, EIP (i.e., Next), and sales. [Womack Inv. Tr. (P. Ex. 55) 191:25-192:19 ("Q. In this mid to late March time period that we have been discussing, was reaching out to analysts to discuss issues related to upgrade rates and equipment revenues a priority for AT&T's Investor Relations Division? A. Yes . . . Q. Any my question is more specifically, was it a priority to, you know, highlight that particular comment about upgrade rates to the sell side? A. Yes.").]

381.    Evans testified that the focus in 1Q16 was to ensure that the analysts were aware of Stephens's comments at the Deutsche Bank conference concerning the upgrade rate cycle and

to understand the impact of equipment revenue, EIP (i.e., Next), and sales. [Evans Inv. Tr. (P. Ex. 53) 37:7-22; 56:20-57:18 ("Q. Okay. Did you discuss with Mr. Womack what you would specifically communicate to these three analysts? A. No. . . . I don't believe so. Q. So how did you know what he wanted you to tell him? A. Um, there was -- no, I real didn't. I mean, there was one key point that was – that John -- new point that John Stephens said at the Deutsche Bank, and that was on the upgrade trends. Q. So what was that point? A. That the trend, the trends that we'd been seeing going into the first quarter were continuing. Q. . . . The trends, meaning the trends of what? A. The upgrade rates were down year over year and continuing to go down year over year. Q. And are you talking about the handset upgrade rates? A. Yes.").]

382.    Black testified that the focus in 1Q16 was to ensure that the analysts were aware of Stephens's comments at the Deutsche Bank conference concerning the upgrade rate cycle and to understand the impact of equipment revenue, EIP (i.e., Next), and sales. [Black Inv. Tr. (P. Ex. 52) 100:23-101:21 (". . . THE WITNESS: I think the focus in the first quarter was to ensure that the analysts . . . after the Deutsche Bank Conference, that they're aware of the comments from John [Stephens], understand the impact of the equipment revenue."); 137:4-11 ("Q. Wasn't this a primary focus of your conversations with Mr. Womack and Mr. Viola for the rest of the first quarter, was the types of information that's reflected here [J. Ex. 161 (March 9, 2016 email)]? A. The primary focus was to inform the analysts and point to the comments that John Stephens made at the Deutsche Bank Conference talking about the upgrade rate cycle, talking about the impact of EIP and sales. That's what we did. That's what we did.")]

383.    On and after March 9, 2016, one or more senior AT&T executives were aware that AT&T's Investor Relations Department was calling analysts to emphasize slower upgrade activity and its impact on equipment revenue. [JSF ¶ 197; Viola Dep. Tr. (P. Ex. 87) 122:2-8

("Q. And it's your position that they were allowed to just point out analysts to a specific statement in Mr. Stephens' Deutsche Bank speech as opposed to just saying to the analyst, hey, look at his entire speech? [objection] [A.] That -- that's my understanding as to what -- what they did.").]

       *iv.   Events after Stephens's March 9, 2016 Remarks*

384.    As of March 9, 2016, no analyst projected a 5% upgrade rate on a year-over-year basis. [JSF ¶ 135.]

385.    On March 9, 2016, Womack spoke with JP Morgan analysts Phil Cusick and Richard Choe for approximately 30 minutes. [JSF ¶ 210; *see also infra* Section II.D.i for detail concerning JP Morgan and the call.]

386.    UBS analyst John Hodulik spoke with Womack on March 9, 2016 at 11:31 am EST for approximately 15 minutes. [JSF ¶ 214; *see also infra* Section II.D.ii for detail concerning UBS and the call.]

387.    According to Black's March 10, 2016 chart, the Top Ten average estimates of AT&T's total consolidated revenue projected increases in total consolidated revenue and wireless equipment revenue of 26.1% and 4.6% respectively, and a wireless equipment upgrade rate of 6.8%. The First Call consensus for total consolidated revenue projected a 26.7% increase. [J. Ex. 180 at 4 (Mar. 10, 2016 Black email and tracking charts); *see also* JSF ¶ 198.]

388.    According to Black's March 10, 2016 charts, the "total consensus" for consolidated revenue was $41.22 billion, while the Top Ten average was $41.07 billion. [J. Ex. 180 at 5 (Mar. 10, 2016 Black email and tracking charts).]

389.    On March 10, 2016, in an email with the subject line "Upgrade Rates" Evans reported the following to Womack: "Chris, the upgrade rate will not be in the 3% range. Waiting for the forecast but I discussed with Ed and it could be as low as having a 4.X% look but more in

the mid to high 4%. Not sure what Dial [AT&T's comptroller] is looking at. I should get the 2+1 forecast in the next few days." [J. Ex. 197 (Mar. 10, 2016 email).]

390.    Shortly after, on March 10, 2016, Evans sent another email to Womack with the subject line "Debbie Dial Upgrade Comment" in which he wrote the following to Womack: "Chris, I think I know what drove the Debbie Dial upgrade number. She saw the Quarterly Upgrade % Schedule to be used for the 2+1 and it said 3.5% for 1Q16 2+1. She incorrectly thought this was the forecast where the schedule really shows actual results for January and February in the numerator but still a quarterly number in the denominator (her people do not forecast March as that is done by Nick's people.) I have not seen the forecast but am guessing that 1Q16 upgrade forecast will be 5.1-5.5% when we see it." [J. Ex. 198 (Mar. 10, 2016 email).]

391.    On March 10, 2016, Womack emailed Viola, Black and Evans, informing them that "Kent [Evans] has confirmed the forecasted upgrade rate for the quarter is in the 4.5% range," which, Womack calculated, would result in a year-over-year decline in equipment revenues of approximately $1 billion. [J. Ex. 181 (Mar. 10, 2016 email chain)]. Evans replied to the group, that his guess was that the upgrade rate "will be closer to 5% but Chris's [Womack] math works better." [*Id.*].

392.    Evans obtained internal upgrade rate data from the Atlanta office at Womack's request. [Evans Dep. Tr. (P. Ex. 71) 167:7-11.]

393.    Within the IR Department, Evans "would normally be the person they [other IR people] would contact for that information." [Evans Dep. Tr. (P. Ex. 71) 156:22-157:6.]

394.    On March 14, 2016, Womack sent an email to Viola, Evans, and Black with the subject "Equip Revenue" containing a chart projecting equipment revenue based upon a range of

upgrade rates, and noted that "Kent [Evans] believes that the rate most likely will fall in the 5-5.25% range which drives a revenue decline of ~625 YoY." [J. Ex. 165 (Mar. 14, 2016 email).]

395.    The chart Womack circulated to Viola, Evans, and Black projected that a 5% upgrade rate would lead to a 19.4% decline in equipment revenue on a year-over-year basis. [J. Ex. 165 (Mar. 14, 2016 email).]

396.    Evans participated in a call with sell-side analysts from Baird on March 14, 2016. [JSF ¶ 220; *see also* Section II.D.iii for details concerning Baird and the call.]

397.    By March 14, 2016, either Viola or Womack instructed Black to direct analysts to Stephens's comments at the Deutsche Bank conference. [Black Dep. Tr. (P. Ex. 66) 152:24-153:22 ("Q. Was there a plan as of March 14th to reach out to analysts or contact analysts who had equipment revenue estimates that were considerably higher than AT&T was forecasting internally? A. I think there was a conversation which basically said that when we have our conversations with the analysts, we make sure that we make reference to, and make sure they heard, John [Stephens] at the Deutsche Bank Conference. . . . [Q.] And who was it that conveyed that understanding to you? A. It was Mike Viola or Chris Womack. Either one. . . .").]

398.    The next day, March 15, 2016, Womack followed up with Viola regarding his and Evans' March 14, 2016 analysis of upgrade rates and equipment revenues, writing that "the key takeaway is its looking like a ~20% decline YoY for equipment revenue." Viola replied "based on what Kent says probably a high-teen handle," meaning that equipment revenue declines year-over-year would probably be in the high-teen range. Viola pointed out to Womack year-over-year equipment revenue declines within these ranges would be a "huge" decline "given some of the estimates," flagging specifically Batya Levi's (an analyst at UBS) estimate of an 8% increase

in year-over-year for AT&T's equipment revenues. [J. Ex. 194 (Mar. 15, 2016 email); Viola Dep. Tr. (P. Ex. 87) 136:1-20.]

399.    Womack spoke with Levi by phone on March 16, 2016. [JSF ¶ 215; *see also infra* Section II.D.ii for detail concerning UBS and the call with Levi.]

400.    Black spoke to Nomura analyst Greg McNiff on March 16, 2016. [JSF ¶ 248; J. Ex. 254 (Mar. 16, 2016 email chain); *see also infra* Section II.D.xii for detail concerning Nomura and the call.]

401.    On March 17, 2016, beginning at approximately 10:05am Womack spoke with Deutsche Bank analysts Whitney Fletcher and Matthew Niknam for approximately 56 minutes. [JSF ¶ 225; *see also infra* Section II.D.iv for detail concerning Deutsche Bank and the call.]

402.    On March 17, 2016, Womack participated in a call with Jennifer Fritzsche, an analyst at Wells Fargo. [*See* JSF ¶ 228; *see also infra* Section II.D.v for detail concerning Wells Fargo and the call.]

403.    On March 21, 2016, Womack called Oppenheimer analyst Timothy Horan. [*See* JSF ¶ 234; *see also infra* Section II.D.vi for detail concerning Oppenheimer and the call].

404.    On March 22, 2016, Stephens requested from the IR Department "a comparison of AT&T's 1q outlook to current analyst estimates – need for board so tomorrow at latest[.]" [J. Ex. 162 (Mar. 22, 2016 email chain with Viola, Dumas, Black, and McCracken).]

405.    On March 22, 2016, Black forwarded to Womack the comparison of consensus and Top Ten estimates to AT&T's quarter-to-date actuals and projections that was sent to Stephens for his use with the Board. The First Call consensus estimate for AT&T's total revenues was a 26.3% year over year increase. The Top Ten consensus for total revenue was a

25.3% year over year increase, a 1.6% decrease in equipment revenue, and a 6.7% upgrade rate. [J. Ex. 163 (Mar. 22, 2016 email).]

406.    Black participated in a call with Wells Fargo analyst Caleb Stein on March 22, 2016. [JSF ¶ 229; *see also infra* Section II.D.v for detail concerning Wells Fargo and the call.]

407.    Black participated in a call with RBC analyst Brian Hyun on March 22, 2016. [JSF ¶ 236; P. Ex. 42 ¶ 4 (Dec. 18, 2020 Hyun Decl.); *see also infra* Section II.D.vii for detail concerning RBC and the call.]

408.    According to Black's March 22, 2016 chart, the Top Ten average estimates of AT&T's total consolidated revenue projected total consolidated revenue and wireless equipment revenue growth to be 25.3% and -1.6% respectively, and a wireless equipment upgrade rate of 6.1%. The First Call consensus for total consolidated revenue projected a 26.3% increase. [J. Ex. 163 at 3 (Mar. 22, 2016 email).]

409.    According to Black's March 22, 2016 chart, the "1Q16 Forecast (2+10)" of total consolidated revenue projected total consolidated revenue and wireless equipment revenue growth to be 23.7% and -11.5%, and wireless equipment upgrade rate of 4.7%; and "1Q16 QTD Actuals thru February" reflected total consolidated revenue and wireless equipment revenue growth to be 23.8% and -16.4%, and wireless equipment upgrade rate of 3.1%. [J. Ex. 163 at 3 (Mar. 22, 2016 email).]

410.    On March 23, 2016, Evans emailed Viola, Womack, and Black: "When we were previously discussing the upgrade rate, I had been talking about a low 5% range. Volumes continued to be very low in March and the new estimate being used in the 2+1 is 4.7%. Chris [Womack] had been initially using something closer to this number to explain revenue softness and I moved him up but should not have." [J. Ex. 201 (Mar. 23, 2016 email).]

411.    On March 23, 2016, while Viola was on vacation, he was informed by one of his IR employees that CFO Stephens stopped by to speak to him, and that when Stephens realized Viola was still on vacation, Stephens stated he would speak to IR employee Jeston Dumas. The subject line of that email was "JJS was looking for you." [J. Ex. 178 (Mar. 23, 2016 email chain.).]

412.    Later on March 23, 2016, Viola emailed Dumas and told him that if he spoke to Stephens before Viola did, Dumas should tell Viola what Stephens wanted to know. [J. Ex. 178 (Mar. 23, 2016 email chain.).]

413.    Later on March 23, 2016, after Dumas spoke to Stephens, Dumas reported the following to Viola: "Just talked to [Stephens]. He wants to make sure we are working the analysts that still have equipment revenue too high. I told him you just told me that was your top priority over the next few weeks." [J. Ex. 178 (Mar. 23, 2016 email chain.).]

414.    Between March 17, 2016, and March 24, 2016, the Top Ten average EPS increased by $0.01. [J. Ex. 276 (Mar. 24, 2016 email); Black Dep. Tr. (P. Ex. 66) 235:14-20 ("Q. So between March 17 and the 24th, EPS went up a penny. Is that correct? [objection] A. That would be correct. Q. And to be specific, for the top ten analyst calculation? A. That's correct.").]

415.    On March 24, 2016, Viola emailed Womack to check if he reached out to an analyst at Raymond James: "Chris, have you had a chance to talk to Louthan and his analyst? Thanks Mike." [J. Ex. 191 (March 24, 2016 email chain).]

416.    Later on March 24, 2016, Womack responded to Viola: "Spoke with them yesterday and reviewed consensus. They're all good." [J. Ex. 191 (March 24, 2016 email chain).]

417.    Later on March 24, 2016, after Viola thanked Womack for his response, Womack further responded to Viola: "I also circled the wagons with Michael [Black] and Kent [Evans] yesterday to make sure we are being thorough." [J. Ex. 191 (March 24, 2016 email chain).]

418.    On March 24, 2016, Viola responded to an email from Black with consensus and Top Ten EPS information: "EPS going in the wrong direction." In reply, Womack explained that "Phil [Cusick of JP Morgan] adjusted his upgrade rate which brought up his EPS." [J. Ex. 276 (Mar. 24, 2016 email); Black Dep. Tr. (P. Ex. 66) 237:14-238:6 ("Q. . . . And it's because Mr. Cusick adjusted his upgrade rate, it brought up his EPS. Correct? A. That's what Chris [Womack] is stating, yes.").]

419.    On March 24, 2016, Viola, Womack, Black, and Evans received an email attaching a "1Q16 2+1 Mobility Deck FINAL.pdf" presentation ("2+1 Deck") that included information based on AT&T's actual results for January and February 2016 plus March 2016 projections. [J. Ex. 133 (March 23, 2016 email and Mobility 2+1 Deck).]

420.    The March 24, 2016 2+1 Deck relayed "consensus" information "Based on 3/21/16 Report" including that the "consensus" upgrade rate was 6.4% compared with AT&T's projected 4.7% upgrade rate. [J. Ex. 133 at 6 (March 23, 2016 email and Mobility 2+1 Deck).]

421.    The March 24, 2016 2+1 Deck also noted that AT&T's projected wireless equipment revenue for 1Q16 was $2.987 billion, compared with a cost of equipment of $3.798 billion. It also listed actual figures for those categories for 4Q15. [J. Ex. 133 at 7 (March 23, 2016 email and Mobility 2+1 Deck).]

422.    Black participated in a call with Drexel Hamilton analyst Barry Sine on March 24, 2016. [*See* JSF ¶ 238; *see also infra* Section II.D.viii for detail concerning Drexel Hamilton and the call.]

423.    On March 30, 2016, Viola emailed Black, Womack, and Sheehan, in response to an email chain discussing revised estimates by RBC: "Michael, nice job with Jonathan [Atkin], especially getting his revenue number down to $40.3B." [J. Ex. 183 (Mar. 30, 2016 email); Black Dep. Tr. (P. Ex. 66) 250:9-251:8 ("Q. So Mr. Viola was very pleased that you got Mr. Atkin's revenue number down to 40.3 billion. Correct? [objection] A. I think he was pleased that – I can't speak to the email, and I'm not going to speak to Mike, but what my impression of the email was that he – it was a compliment to me, a pat on the back whereby I was able to communicate AT&T's messaging to Jonathan, publicly available messaging to Jonathan. Q. That got his revenue number down to 40.3 billion. Correct? [objection] A. Jonathan does his own estimates with respect to that.").]

424.    On March 30, 2016, Black emailed Viola: "We should also see Evercore publish their preview note shortly based on a deep dive discussion I had with them this morning. In addition, we should see Drexel Hamilton update as well as I had the opportunity to speak with them just prior to Easter." Viola responded in part: "Awesome work." [J. Ex. 167 (Mar. 30, 2016 Black and Viola email chain).]

425.    On March 30, 2016, Viola emailed Black to ask for Black's "schedule with the latest status of where everyone is with respect to consolidated revenue and EPS[.]" [J. Ex. 168 (Mar. 30, 2016 email chain re: Status).]

426.    On March 30, 2016, Black forwarded to Viola a "summary of EPS and revenue changes since last Thursday." [J. Ex. 184 (Mar. 30, 2016 email and tracking sheets).]

427.    According to Black's March 30, 2016 chart, the Top Ten average estimates of AT&T's total consolidated revenue were $40.65 billion, and the consensus of all analysts

covering AT&T for total consolidated revenue was $40.93 billion. [J. Ex. 184 at 3 (Mar. 30, 2016 email and tracking sheets).]

428.     Shortly after, on March 30, 2016, Black sent Viola and Womack another consensus and Top Ten average chart with additional information, specifying which analysts had updated their estimates and which of the IR department employees would be the point of contact for those analysts who had yet to update. [J. Ex. 185 at 3 (Mar. 30, 2016 email and tracking sheet).] Viola sent this chart to Evans separately. [P. Ex. 98 (Mar. 31, 2016 email from Viola to Evans)]

429.     On March 30, 2016, Black emailed Viola, Womack, Evans, and others from the IR department his tracking sheet of the Top Ten analysts' average and First Call consensus. [J. Ex. 132 (Mar. 30, 2016 email and tracking sheet).]

430.     According to Black's March 30, 2016 chart, the Top Ten average estimates of AT&T's total consolidated revenue projected total consolidated revenue and wireless equipment revenue growth to be 24.8% and -6.4% respectively, and a wireless equipment upgrade rate of 6.1%. The First Call consensus for total consolidated revenue projected a 25.7% increase. The chart also included AT&T's "2+1 Results" for equipment revenue (-11.5%) and upgrade rate (4.7%). [J. Ex. 132 at 3 (Mar. 30, 2016 email and tracking chart).]

431.     Black participated in a call with Evercore analyst Justin Ages on March 30, 2016. [JSF ¶ 243; *see also infra* Section II.D.x for detail concerning Evercore and the call.]

432.     On March 30, 2016, Viola sent a meeting invite, for 1:00 PM on March 31, 2016, to Black and Womack with the subject: "Discuss Consol Rev and EPS Consensus[.]" [J. Ex. 160 (Mar. 31, 2016 calendar invitation).]

433.     On March 31, 2016, at 12:54 PM, Black sent to Viola and Womack an email with the subject "Fwd: Discussion" stating: "Latest view of revenue – updated through this morning." [J. Ex. 190 (Mar. 31, 2016 email and tracking charts).]

434.     Black planned to speak to McNiff from Nomura at 2:00 PM on March 31, 2016, after his 1:30 meeting with Viola and Womack. [J. Ex. 255 (Mar. 31, 2016 email); Black Dep. Tr. (P. Ex. 66) 271:25-272:12 ("Q. . . . And 2 p.m. is after the meeting with you and Mr. Womack and Mr. Viola on March 31 that was at 1 p.m. – right? . . . [objection] A. (document review) Yes.").]

435.     On March 31, 2016, Black planned to speak to Ilkowitz at 2:30 pm. [Black Dep. Tr. (P. Ex. 66) 273:8-17) ("Q. And in this e-mail chain, you plan with Mr. Ilkowitz to speak at 2:30 p.m. Right? A. That would appear so, yes. Q. So on March 31, your schedule in the afternoon was a 1 p.m. meeting with you and Mr. Viola and Mr. Womack, a 2 p.m. call with Mr. McNiff, and then a 2:30 call with Mr. Ilkowitz. Correct? A. It appears to be that way, yes.").]

436.     Black participated in a call with Nomura analyst Greg McNiff on March 31, 2016. [JSF ¶ 199.]

437.     Black participated in a call with Citi analyst Adam Ilkowitz on March 31, 2016. [JSF ¶ 240; *see infra* Section II.D.ix for detail concerning Citi and the call.]

>            *v.   April 1, 2016, Through April 26, 2016*

438.     Viola's focus on and sensitivity concerning consensus revenue estimates continued into April 2016. [Black Inv. Tr. (P. Ex. 52) 229:13-22 ("Q. At this time, this is now into April of 2016, was Mr. Viola paying particularly close attention to consensus estimates of AT&T's revenues? A. I think there was a focus on it. There was a continued focus on it, yes. Q. . . . Did you have an understanding of what was driving Mr. Viola's focus? A. Again, it comes back to the sensitivity of not hitting the revenue number.").]

439.    On April 1, 2016, Viola e-mailed Martin Sheehan from AT&T's Investor

Relations Department regarding Moffett Nathanson's estimates for AT&T for the first quarter of

2016. Viola instructed Sheehan that, when he spoke to Moffett, he was to remind him that the

analyst's first quarter revenue numbers were "way off due to his assumptions re wireless

equipment revenue" and that "it would be great if he reduced his number closer to Cusick [JP

Morgan], Hodulik [UBS], etc to $40B." Sheehan responded that he had also spoken to Black "as

Moffett has some other crazy numbers in his report," including $24 billion of free cash flow for

that year. [J. Ex. 186 (Apr. 1, 2016 email); *see also infra* Section II.D.xi for detail concerning

Moffett Nathanson and the call.]

440.    On April 5, 2016, Black spoke with Nomura analyst Greg McNiff by phone. [JSF

¶ 250; *see also infra* Section II.D.xii for detail concerning Nomura and the call].

441.    Evans participated in a call with sell-side analysts from BTIG on April 5, 2016.

[JSF ¶ 253; *see also infra* Section II.D.xiii for detail regarding BTIG and the call.]

442.    On April 6, 2016, Sheehan participated in a call with Moffett Nathanson analysts

Craig Moffett and/or Cathy Yao, and left a message for Viola regarding Moffett Nathanson. [*See*

JSF ¶ 245; J. Ex. 169 (Apr. 6, 2016); *see also infra* Section II.D.xi for detail concerning Moffett

Nathanson and the call.]

443.    On April 7, beginning at 11:00 am EDT, Womack spoke to William Blair analyst

James Breen for approximately 45 minutes. [JSF ¶ 262; *see also* Womack Dep. Tr. (P. Ex. 88)

252:23-254:19; *see also infra* Section II.D.xv for detail concerning William Blair and the call.]

444.    On April 7, 2016, Black emailed Dial, Viola, and others a chart with the Top Ten

analysts' estimates. [J. Ex. 170 (Apr. 7, 2016 email and tracking sheet).]

445.     According to Black's April 7, 2016 chart, the Top Ten average estimates of AT&T's total consolidated revenue projected total consolidated revenue and wireless equipment revenue growth to be 24.6% and -8.7% respectively, and a wireless equipment upgrade rate of 5.8%. The First Call consensus for total consolidated revenue projected a 25.3% increase. The chart also included AT&T's "2+1 Results" for equipment revenue (-11.5%) and upgrade rate (4.7%). [J. Ex. 170 at 7 (Apr. 7, 2016 email and tracking sheet).]

446.     The next day, on April 8, 2016, Evans spoke with Michael Bowen, the senior analyst at Pacific Crest, by phone. [J. Ex. 176 (Apr. 8, 2016 email); *see also infra* Section II.D.xvi for detail concerning Pacific Crest and the April 8 call.]

447.     Black participated in a call with Scotiabank analyst Matthew Lee on April 8, 2016. [JSF ¶ 268.]

448.     On April 8, 2016, Ralph Emke emailed Dial and Viola, copying Black, attaching a Top Ten tracking sheet comparing consensus estimates from that sheet to AT&T's actual 1Q16 results as calculated on the fifth workday following the quarter close. [J. Exs. 171-72 (Apr. 8, 2016 email and tracking sheet).]

449.     Black forwarded Emke's email and attachment showing consensus data compared to AT&T's quarter-end results to Womack two minutes after receiving it, with the note, "Chris – FYI, per my voicemail" [P. Ex. 31 (Apr. 8, 2016 email).]

450.     According to the April 8, 2016 chart, the Top Ten average estimate for AT&T's total consolidated revenue was $40.54 billion, for its wireless equipment revenue to be down 11.3%, year-over-year, and for a wireless equipment upgrade rate of 5.8%. The First Call consensus for total consolidated revenue projected $40.75 billion. The chart also included AT&T's "1Q16 Actuals thru March Preliminary flash" for consolidated revenue ($40.54 billion)

equipment revenue (-6.5%), and upgrade rate (5.0%). [J. Exs. 171-72 (Apr. 8, 2016 email and tracking sheet).]

451.   Black participated in a call with at least one sell-side analyst from Bank of America on April 11, 2016. [JSF ¶ 201; *see infra* Section II.D.xix for detail concerning Bank of America.]

452.   On April 11, 2016, Womack spoke to D.A. Davidson analysts James Moorman by phone. [JSF ¶ 202; J. Ex. 302 (Apr. 8, 2016 email btwn Womack and Moorman setting up call for April 11); *see infra* Section II.D.xx for detail concerning D.A. Davidson.]

453.   On April 11, 2016, Viola emailed Black following an estimate update from Evercore: "Where are we with [Evercore analyst] Schildkraut now in. He dropped about $1B?" Black responded, in part: "Mike-we are at $40.7 for 1Q16." Viola replied: "Still at $40.7 even with $1B less? I thought that was where we were Friday?" [J. Ex. 193 (Apr. 11, 2016 email); Black Dep. Tr. (P. Ex. 66) 288:4-6 ("Q. . . . And Schildkraut was the analyst at Evercore? A. Yes, at the time.").]

454.   On April 11, 2016, Black emailed Womack a spreadsheet with each analysts' estimates for total consolidated revenue and a model including, among other things, a "probability adjustments, probability percent, and adjusted probability." [J. Ex. 195 (Apr. 11, 2016 email and spreadsheet).]

455.   Black participated in a call with sell-side analysts from Buckingham Research on April 12, 2016. [JSF ¶ 271; *see infra* Section II.D.xviii for detail concerning Buckingham and the call.]

456.   Womack had a call with Bank of America analyst David Barden on April 12, 2016. [JSF ¶ 203; *see infra* Section II.D.xix for detail concerning Bank of America.]

457.    Evans participated in a call with Pacific Crest analysts Michael Bowen and Brandon Nispel on April 15, 2016. [*See* JSF ¶ 266; *see also infra* Section II.D.xvi for detail concerning Pacific Crest and the April 15 call.]

458.    On April 15, 2016, Womack spoke by phone with Nomura analysts Greg McNiff and Jeffrey Kvaal. [*See* JSF ¶ 204; *see also infra* Section II.D.xii for detail concerning Nomura and the call.]

459.    On April 15, 2016, in response to an update from Womack concerning his call with analysts from Nomura seeking to have AT&T executives speak at a Nomura conference, Viola replied to Womack: "When will he change his revenue number?" [J. Ex. 187 (Apr. 15, 2016 email chain).]

460.    On April 18, 2016, in an email thread among Viola, Womack, and Dumas commenting on a blast email by UBS, Dumas wrote to Viola and Womack: "Should we be concerned about consensus EPS creeping up? . . . 2. Better wireless margins (fewer upgrades) over next few quarters . . . Wonder if there are any headwinds we should talk about to keep consensus down. . . ." Viola responded: "Agree we need to create a script as to what we should say.") [J. Ex. 277 (Apr. 18, 2016 email chain).]

461.    On April 19, 2016, Viola emailed Black and Womack: "Colby didn't help but [Nomura analyst] Kvaal came thru. I have us at 40.59 (right?). We really need [William Blair analyst] Breen and [Pacific Crest analyst] Bowen to adjust. Can we somehow get them excluded because they haven't refreshed their forecasts?" Womack responded, in part: "Bowen is updating his numbers early this week from what I understand." [J. Ex. 175 (Apr. 19, 2016 email chain); Black Dep. Tr. (P. Ex. 66) 298:13-300:18 (". . . [Q.] Colby is who? A. That would be Colby Synesael of Cowen & Company. Q. And that's an analyst. Right? A. Yes. . . [Q.] And Kvaal is . .

. an analyst. Correct? A. Jeff Kvaal, at the time, he was with Nomura, yes. . . . Q. Okay. And

Breen and Bowen are two analysts. Right? A. That's correct.").]

462.    On April 19, 2016, Black emailed Viola in response to an estimate update from

Scotiabank: "This was one that I reached out to last week as a 'just in case' they start to report on

a quarterly basis . . . a slight help." [J. Ex. 188 (Apr. 19, 2016 email).]

463.    On April 21, 2016, in response to a query from Womack as to when he would

publish his earnings preview, William Blair analyst James Breen emailed Womack that: "we

looked through everything and not sure we need a preview as our numbers are close to

consensus. . . ." [J. Ex. 304 (Apr. 21, 2016 email chain).] Six minutes after being informed that

Breen was "not sure we need a preview," Womack called Breen; the two spoke for 17 minutes.

[*See* JSF ¶ 263; *infra* Section II.D.xv for detail concerning William Blair and the call.]

464.    On April 21, 2016, Black emailed Viola an update on consolidated revenue

consensus calculated from analyst models, First Call, and Bloomberg. Black wrote that "[f]or

William Blair, Chris W. spoke with Breen this afternoon and he indicated that they are planning

on adjusting their estimates – they report in both First Call and Bloomberg." [J. Ex. 189 (Apr. 21,

2016 email).]

465.    AT&T never made a prompt or simultaneous public disclosure of the information

it selectively conveyed on the private calls with analysts. [May 3, 2022 Declaration of Victor

Suthammanont ¶ 4(c).]

C.  **Defendants Intended to Influence the Analysts**

466.    Viola was aware that his IR employees were making calls to analysts during

the period between March 9, 2016 through April 26, 2016, but his employees did not tell

him what they told exactly to the analysts and Viola never asked his employees what exactly

they told the analysts. [Viola Dep. Tr. (P. Ex. 87) 117:3-16.]

467.    The AT&T IR employees who called analysts from March 9, 2016 to April 25, 2016, were not given by their supervisor a script or document as to what to say to the analysts that were told to call. [Viola Dep. Tr. (P. Ex. 87) 121:18-23.]

468.    Black's goal on his calls with analysts was to inform them of the upgrade rate change. [Black Inv. Tr. (P. Ex. 52) 156:1-7 ("Q. . . . And that [lowering revenue expectations] was your hope and goal in conducting those conversations? A. My goal was to inform – Q. Was it not? A. My goal was to inform them . . . my goal was to inform them of the upgrade rate change.").]

469.    Black intended and expected that, by directing them to Stephens's comments concerning the upgrade rate at the Deutsche Bank conference, analysts would lower their revenue estimates. [Black Inv. Tr. (P. Ex. 52) 154:8-156:21 (". . . Q. And what did you hope would ensue as a result of providing that information [i.e., making sure that analysts knew that Stephens made comments such as the upgrade rates]? A. They would take that information and make their assumptions associated with that. . . . Q. Didn't you hope that they would lower their estimates? A. Their estimates . . . did not reflect the trend of the business. So the comment [Stephens] had made was that – to remind analysts that the trends will continue. Q. With the hope that they would lower their estimates, isn't that correct? A. I think the expectation is that they're going to go ahead and make their adjustments accordingly. It's their assumption. . . . Q. Was it personally your hope that they would lower their estimates as a result of the information conveyed? Or were you indifferent to what direction they made an adjustment, or if they made an adjustment at all? A. I mean, if they do – if those analysts that had a higher upgrade rate looked at the comments from [Stephens] they're going to come to their own conclusion. Q. Did you hope that that conclusion would be one that resulted in them lowering their revenue

expectations. A. I think just by the math, it would lower their revenue expectations. . . . [Q.] And you were indifferent as to what they did with that information? A. They're going to have to put the piece parts together. And if they have a higher upgrade rate, then if you were to trend the business, the math would dictate . . . the revenue would go lower. Q. . . . Is it true that that's what you hoped would happen? A. Well, I think the expectation – yes. I think the expectation is that when they got their upgrade rates correct . . . .").]

470.    Evans intended and expected that, by directing them to Stephens's comments concerning the upgrade rate at the Deutsche Bank conference, analysts would lower their revenue estimates. [Evans Inv. Tr. (P. Ex. 53) 195:5-23 ("Q. Was it a goal of the conversations with analysts after the Deutsche Bank conference with respect to equipment revenue to get them to adjust their equipment revenue estimates downward? A. I mean, the goal was to give them all the information that we could to let them make that decision.").]

471.    Womack intended and expected that, by directing them to Stephens's comments concerning the upgrade rate at the Deutsche Bank conference, analysts would lower their revenue estimates. [Womack Inv. Tr. (P. Ex. 55) 200:19-201:17 ("Q. Was it your expectation that a downward revision of their upgrade rate or equipment revenue estimates would be a byproduct of those conversations? A. Yes.); 191:25-192:5 ("Q. In this mid to late March time period that we have been discussing, was reaching out to analysts to discuss issues related to upgrade rates and equipment revenues a priority for AT&T's Investor Relations Division? A. Yes."); 272:12-22 (Q… did AT&T meet or miss consensus revenue expectations in the first quarter of 2016? A. I believe we met revenue expectations. Q. Do you believe that your outreach to sell side analysts contributed to AT&T's meeting of consensus revenue estimates? I believe

making the analyst community aware of what we had said in public forum helped them consider estimates in their models.").

### D.  The Selective Disclosures to Analysts in March and April 2016

472.    Each of the analysts to whom Defendants made the selective disclosures described below were persons associated with a broker or dealer. [*See* May 3, 2022 Declaration of Jordan Baker ¶ 7 and Exhibit B thereto.]

473.    Womack and Black do not remember any of the calls with analysts. [*E.g.*, Womack Dep. Tr. (P. Ex. 88) 187:20-25 (J.P. Morgan Mar. 9 call "I do not recall the conversation"); 198:4-6 (Holulik (UBS) Mar. 9, 2016 call "I don't recall"); Womack Inv. Tr. (P. Ex. 55) 141:20-142:8 (Levi (UBS) Mar. 16, 2016 call "I don't recall what we discussed"); 171:25-172:9 (Deutsche Bank Mar. 17, 2016 call "I don't recall our conversation that day")); 179:8-15 (Wells Fargo Mar. 17, 2016 call "I don't recall our conversation"); 212:18-22 (D.A. Davidson April 11, 2016 call "I don't recall the conversation"); 247:2-6 (Apr. 15, 2016 Nomura call "I do not recall the conversation"); 263:10-15 and 267:8-17 (William Blair Apr. 7 and 21, 2016 calls "I do not recall" and "I do not recall the conversation"); Black Dep. Tr. (P. Ex. 66) 85:14-24 ("Q. Okay. And we can come to those later. I was just trying to understand if the answer was trying to convey something or not. A. Just to clarify -- Q. Yes. A. -- saying that I don't recall the conversations from those calls. Q. Sorry. Your -- what you wanted to clarify is that you don't remember the conversations from those calls? A. Yes, that is correct.").]

474.    None of the Individual Defendants recall the specific order of any particular discussion on any particular call with analysts between March 1, 2016, and April 26, 2016. [P. Ex. 93 at 9 (Evans Interrogatory Resp. No. 6); P. Ex. 94 at 9 (Womack Interrogatory Resp. No. 6); P. Ex. 95 at 9 (Black Interrogatory Resp. No. 6).]

i. *JP Morgan*

475.　The analysts with primary responsibility for covering AT&T for JP Morgan were Philip Cusick and Richard Choe. [JSF ¶ 208.]

476.　On March 8, 2016, Cusick emailed Womack to set up a time to speak; the two agreed to speak by phone on March 9, 2016 at 9:00 AM. [JSF ¶ 209; J. Ex. 61 (JPMC_00116494).]

477.　Before March 9, 2016 JP Morgan estimated that AT&T would report a quarterly upgrade rate of 6.5%, quarterly wireless equipment revenues of $3.382b per year (roughly flat on a year over year basis) and quarterly consolidated revenues of approximately $40.665 billion. [J. Ex. 241 at 5 ("% of base upgraded" estimate for 1Q16 at 6.5%; "Equipment revenue" estimate for 1Q16 at $3.382 billion) and 11 ("Total Revenues – Reported" estimate for 1Q16 at $40.665 billion).]

478.　On March 9, 2016, Womack spoke with JP Morgan analysts Phil Cusick and Richard Choe for approximately 30 minutes. [JSF ¶ 210.]

479.　Cusick and Choe took notes of the call in which they memorialized the sum and substance of what Mr. Womack told them. [P. Ex. 14 (Cusick's notes of March 9, 2016 Call); Cusick Inv. Tr. (P. Ex. 51) 123:7-13 ("Q. When you take notes of your calls with investor relations personnel from AT&T or calls with Mr. Womack, are you attempting to accurately record the information Mr. Womack was conveying to you? A. It would be wise that that's what I would be doing. Yes."); *id.* at 123:25-124:11 ("Q. And the page on the right[referring to P. Ex. 14] does appear to be your notes of the call on March [9], 2016? A. Yes, that's what it looks like. Q. And are these notes a reflection of what Mr. Womack said on this call of … March 9, 2016? A. As far as I can tell from my notes."); *Id.* at 125:3-6 ("The March 9, 2016 notes, I just want to confirm, these – these are your notes of what Mr. Womack is saying to you, is that correct? A.

Yes."); Cusick Dep. Tr. (P. Ex. 70) 102:22-105:13; P. Ex. 15 (Choe's notes of Mar. 9 call); Choe

Inv. Tr. (P. Ex. 57) 51:22-52:21 ("Q… why do you take notes of your calls with AT&T's

Investor Relations Department? A. Generally just so we can refer back to them to – when we

review of discuss the call, we have an idea of what we talked about and – whether it's later that

day, or weeks or months later, it's just hard to remember a specific call …. Q. So the purpose of

your note taking is so that you can have an accurate record of what was said so that you can refer

to it at a later point? A. Correct."); *id.* at 72:14-73:1 ("The header of this [exhibit] is '3/9/16

AT&T'; does that reflect that these are your notes from a March 9, 2016 call with AT&T? A.

Correct. Q. In taking [these] notes, did you follow your general note taking practices that we

discussed earlier this morning? A. Yes. Q. Okay. So to the best of your knowledge, do these

notes reflect your effort to summarize accurately what Mr. Womack told you on this March 9

call? A. Yes."); *id.* at 107:25-108:12 ("And these notes, based on your practices, you understand

to be your effort – by 'these notes, I mean Exhibit 273 [P. Ex. 15 (Choe's March 9 call notes)] –

these notes reflect your effort to summarize accurately information that Mr. Womack conveyed

to you on March 9, 2016? A. Correct."); Choe Dep. Tr. (P. Ex. 69) 70:9-73:12.]

480.    Womack told Cusick and Choe on the March 9 call that AT&T would report a

historically low upgrade rate for the quarter of 5% or less. [P. Ex. 14 (Cusick's notes of the call:

"Historically low u/g [upgrade rate] next couple of quarters. <5%!!"); Cusick Inv. Tr. (P. Ex. 51)

131:23-132:11 ("And the 5 percent [figure in his March 9, 2016 notes], that's not something that

sprung into your head, that's something that passed through Mr. Womack's list [*sic*]? A. Very

likely. It looks like it. Q. Why would you say 'very likely'? A. Because I wouldn't have written

two exclamation points [in the call notes] if there hadn't' been some statement from him that that

was the case."); *Id.* at 138:5-8 ("Q. Mr. Womack told you the upgrade rate would be 5 percent or

lower; is that correct? A. That's what it looks like, yeah."); P. Ex. 15 (Choe's notes, "Upgrade rate of 5%").]

481.    Immediately after the call ended, Cusick emailed certain telecom traders and the analyst covering Apple from JP Morgan: "AT&T telling us that handset upgrades this quarter will be historic lows. <5% vs. 6.5% a year ago." [P. Ex. 11 (March 9, 2016 email from Phil Cusick to Corey Popham et al).]

482.    When Cusick wrote "AT&T telling us that handset upgrades this quarter will be historic lows. <5% vs. 6.5% a year ago[,]" he was referring to the information Womack told him on the March 9, 2016 call. [Cusick Inv. Tr. (P. Ex. 51) 160:13-161:2 ("the historic lows comment and the less than 5 percent comment [in P. Ex. 11] are far too representative of my – of my notes [P. Ex. 14] . . . to be anything else [other than the March 9, 2016 conversation with Mr. Womack]"); Cusick Dep. Tr. (P. Ex. 70) 109:21-110:9 ("Q. Does the fact that you are sending this [email] the very minute you got off the call with Mr. Womack suggest to you that when you say 'AT&T is telling us,' you were referring to what Mr. Womack told you? [objection] A. That makes sense.").]

483.    The quarterly upgrade rate figures Womack provided Cusick and Choe on the March 9 call were lower than what Cusick expected based on publicly available information. [Cusick Inv. Tr. (P. Ex. 51) 132:8-11 ("Q. And why did you add two exclamation points to the 5 percent? A. Because it's lower than what I would have otherwise expected."); *id.* at 133:15-134:4 ("Q. You indicated the 5% that Mr. Womack referenced with respect to upgrade rates was lower than you had expected? A. Yes. Q. And – and you had kept current on AT&T's public statements regarding upgrade rates to that point, correct? A. This was … Q. That's your general practice? A. Yes. I – I generally keep current as to what my company's [*sic*] have said. Q. Okay.

And – and the 5 percent figure was – was a surprise to you? A. It was lower than I probably would have otherwise expected."); *id.* at 150:5-23 ("Q. Would you agree that it looks like on this call he is giving you more precision – A. This is more precision than we would typically want to get, yeah. Q. In particular, the 5 percent figure? A. The 5 percent, if I can add some context. Q. Uh-huh. A. The exclamation points [in my notes] – if it was – so we were at 6.5. if it was six or 5.5 for – versus five for AT&T, not that different, but 5 percent in the context of the industry was pretty different for how we thought about the – the overall ecosystem. Q. Right. It was pretty different compared to the 6.5 percent? A. And where – and where that number had been historically"); *id.* at 154:14-155:1 ("Q. the email subject line [in [P. Ex. 11] is 'AT&T telling us that handset upgrades in this quarter will be historic lows, [less] than 5 percent versus 6.5 percent years ago. I bet similar next quarter.' Why did you provide that information to these traders? A. Probably because it – I don't recall sending the email. Probably because it relates to, again, the wider conversation about handset sales we were having at the time. And back to your point, sir, the historic lows – this is lower than they had ever been before. And less than 5 percent, again, is – is a number to be – to remark on").]

484. On the March 9, 2016 call, Womack told JP Morgan's analysts that AT&T's equipment revenue for the first quarter would be lower than JP Morgan was then forecasting. [P. Ex. 14 (Cusick's notes stating "Eqpt revenue could be down more than our 15% y/y."); P. Ex. 15 (Choe Notes: "Equipment revenue could be fairly negative, JPM down 15% y/y and could be worse … Could be down 20% y/y"); Cusick Inv. Tr. (P. Ex. 51) 134:14-23 ("Q. Two lines down from that, Mr. Womack said, "equipment revenue could be down more than our 15% year over year." What does that mean? A. So we went back to our model, equipment revenue is something

we model, and we – we must have been down 15 percent year over year. He's saying it could be down more than that. I don't know. I think it's pretty direct").]

485.     On the March 9, 2016 call, Womack told JP Morgan's analysts that AT&T's quarterly consolidated revenues would be closer to $40 billion than JP Morgan's then-current estimate of $40.7 billion due to lower equipment revenues. [P. Ex. 14 (Cusick's notes: "Total revs closer to $40b from $40.7 out of eqpt"); P. Ex. 15 (Choe's notes: "$40 vs $40.7, $700m equipment revenue").]

486.     On the March 9, 2016 call, Womack told JP Morgan's analysts that their estimates of AT&T's quarterly postpaid net adds (the number of postpaid wireless customers joining AT&T less the customers leaving AT&T) of 200,000 was more accurate than the consensus postpaid net add estimate of 339,000. [P. Ex. 14 (Cusick's notes: "1Q Consensus 339k, more reasonable is our 200K. Don't lower"); P. Ex. 15 (Choe's notes: "339k postpaid net adds, 250k makes more sense"); Cusick Inv. Tr. (P. Ex. 51) 141:8-143:19 ("Q. . . . what did Mr. Womack mean by 'reasonable'? A. Probably more accurate. Q. More accurate based upon what? A. Probably on his knowledge business at the time . . . Q. Did Mr. Womack convey to you that the consensus estimates of almost 340,000 post paid net adds were less accurate than your then current estimate? A. That's what it looks like, yes.").]

487.     On the March 9, 2016 call, Womack told JP Morgan's analysts that their estimate for AT&T's quarterly churn rate of 1.1% was more accurate than the consensus estimate of 1.05%. [P. Ex. 14 (Cusick's notes: "Churn consensus 1.05% - our 1.1% is closer"); P. Ex. 15 (Choe's notes: "1.1% churn in the ball park"); Cusick Inv. Tr. (P. Ex. 51) 143:20-144:8 ("Q. Okay. Next line in – in your notes talks about churn consensus. It says '1.05, 1.1 is closer.' A. Yeah. Q. Closer to what? A. Probably closer to being the state of the business at that point. Q.

Okay. So based on what Mr. Womack understood at the time, your estimate was closer to accurate than where consensus was? A. Makes sense. Q. And that's that he conveyed to you on the March 9th call? A. That's what it looks like.").]

488.    On the March 9, 2016 call, Womack told JP Morgan's analysts that JP Morgan's estimate of a net loss of 275,000 postpaid phone subscribers was closer to what AT&T expected to report than the consensus estimates of a 200,000 phone subscriber loss. [P. Ex. 14 (Cusick's notes: "-200k phones. Our -275k is reasonable"); Cusick Inv. Tr. (P. Ex. 51) 144:13-145:3 ("Q. Okay. And is Mr. Womack telling you that consensus is a loss of 200,000 in postpaid phone subscribers, but that your estimate of 275,000 is more reasonable based on his then current understanding of where AT&T was in the quarter? A. That's what it sounds like.").]

489.    On the March 9, 2016 call, Womack told JP Morgan's analysts that the consensus estimate for AT&T's wireless service margins (calculated as AT&T's wireless EBITDA divided by AT&T's wireless service revenue) of 46.2% was closer to what AT&T expected to report than JP Morgan's estimate of 43%. [P. Ex. 14 (Cusick's notes: "EBITDA 46.2% of service rev vs our 43%. Could be 46.2%."); P. Ex. 15 (Choe's notes: "46.2% service margin, low upgrades, could be higher"); Cusick Inv. Tr. (P. Ex. 51) 145:4-17 ("Q. Last line I want to go over is two lines down from that, 'EBITDA 46.2 percent of service revenue versus our 43 percent could be 46.2%.' What did Mr. Womack tell you in – that is reflected in that line? A. That would indicate that our EBITDA margin numbers were too low and that consensus sounds about right. And it would be consistent with fewer handset sales as we talked about before. Q. And consensus sounds about right based upon his understanding of where AT&T is within the quarter? A. Right.").]

490.     As of March 9, 2016, AT&T had not publicly disclosed the figures and/or level of detail regarding the metrics Womack discussed for AT&T's first quarter on his call with JP Morgan's analysts. [Cusick Inv. Tr. (P. Ex. 51) 145:18-24 ("Q. Did AT&T release intra quarter numbers on EBITDA, phone adds and the like? A. They had – as I mentioned earlier, the CFO had spoken this morning of March 9th and had mentioned that upgrade rates were low, but I don't remember that he had given any indication on financials at the time.").]

491.     It was typical for Womack to selectively inform JP Morgan when consensus was accurate or inaccurate based upon what he understood AT&T expected to report on various financial and operational metrics. [Cusick Inv. Tr. (P. Ex. 51) 147:14-149:4 ("Q. And it was typical in the quarter for you to receive consensus information from Mr. Womack; is that correct? A. Correct. Q. Is it also typical for him to indicate where consensus is reasonable or unreasonable based on his knowledge of where AT&T is in the quarter? A. It's – that's fairly typical … Q. My question pertains more to a suggestion to you that a consensus number might not be accurate based on where he understands AT&T has performed to date. Is that typical? A. At the time it was fairly typical. Q. Okay. So he would not just say, consensus is 339,000 postpaid net adds, full stop. He would also typically say, your model is more reasonable based on, you know, how we performed in the quarter? A. And I see that word – the phrase ballpark here, that is a phrase he would say … Q. And in the ballpark of how he expects AT&T to perform based on the 70 days of the quarter that have already passed? A. Yeah.").]

492.     JP Morgan adjusted its estimates on March 22, 2016 to forecast an upgrade rate of 5%, quarterly wireless equipment revenues of $2.60B (a year-over-year decline of approximately 23%) and total revenues of approximately $40 billion. [J. Ex. 305 at 1 (JP Morgan Research Report, dated March 22, 2016) ("We … lower our upgrade rate to 5.0% from 6.5%"); *id.* at 4

(chart showing estimate change in wireless equipment revenue for AT&T's first quarter 2016 from $3.382B to $2.60B); *id.* at 6 (chart showing estimate change in total revenue for AT&T's first quarter 2016 from $40.665B to $40.023B); *see also* JSF ¶ 211.]

493.    JP Morgan also in its March 22, 2016 report (a) adjusted its postpaid net add estimate to 250,000 (below consensus of 339,000); (b) kept its postpaid churn estimate at 1.10% (above consensus of 1.05%); (c) kept its postpaid phone net add estimate at -275,000 (below consensus of -200,000), and (d) raised its EBITDA service margin estimate to be in-line with consensus at 46.2%–each of which was consistent with the information Womack provided on the March 9, 2016 call. [*Compare* J. Ex. 305 at 2, 5 (JP Morgan March 22nd Research Report reflecting JP Morgan's revised estimates); *with* P. Ex. 14 (Cusick's notes of March 9, 2016 call with Womack).]

494.    In its March 22, 2016 report, JP Morgan raised its earnings-per-share estimate for AT&T's first quarter as a result of its reduction in its upgrade rate estimate. [J. Ex. 305 at 2 (JP Morgan March 23 Report) ("our adj. EPS estimate goes to $0.69 from $0.67. We maintain our 2016 adj. EPS estimate of $285 as we push upgrades to 2H16"); Cusick Dep. Tr. (P. Ex. 70) 120:23-121:23 (Q. Focusing on the last sentence, you're saying you're maintaining your EPS estimate for the full year, is that – is that right? A. That's what it says. Q. Okay. So even though you raised EPS two cents in the first quarter, you're bringing it back down in the second half so the net – you know, through the full year is unchanged? A. That's what it looks like. Q. The reason you're reducing – According to this note, the reason you're reducing your EPS estimates in the second half of the year is because you expect upgrades to rise? [objection] A. That's what it says. I would – I would add to this that in some years AT&T provides guidance as to where – as to a range of EPS in public guidance and we may have been trying to stay within that range,

but I – I don't know today. Q. But at least what this note says is that EPS may adjust depending on the increase or decrease in upgrade rates? A. Yes.").]

> ii.  UBS

495.    The analysts principally responsible for covering AT&T for UBS were John Hodulik and Batya Levi, with support from associates Christopher Schoell and Lisa Freidman. [JSF ¶ 212.]

496.    Before March 9, 2016, UBS estimated that AT&T would report a quarterly upgrade rate of 5%, an increase in quarterly equipment revenues of 8.0% year-over-year, and total revenues of $40.614B for the first quarter of 2016. [J. Ex. 274 (UBS model showing its quarterly estimates for AT&T before March 18, 2016), at 5 ("GAAP Revenues" estimate for 1Q16 at $40.614B), 20 ("Equipment Revenues" estimate for 1Q16 at 8.0%), and at 23 ("% upgrade" estimate for 1Q16 at 6.2%.]

497.    While Stephens was giving his remarks at the Deutsche Bank conference on March 9, 2016, Gabriella Brown sent an email to Hodulik, Levy and Schoell asking the following: "AT&T Corp: CFO: Expect slowdown in phone sales to continue in FY16 – conf comments – what is he referencing?" [J. Ex. 266 (Mar 9, 2016 email).]

498.    Hodulik responded by email to Brown: "Upgrade rates coming down. This is not a comment re subscriber growth. It means existing customers are buying fewer phones – i.e. slower to upgrade. … Has been a theme from the US carriers for a couple of months." [J. Ex. 56 (Mar. 9, 2016 email from Hodulik).]

499.    Levi responded by email to Brown: "Slow volumes ie handset adds and upgrades. Installment plans and lack of iconic device launches are keeping volumes low. VZ said the same yesterday." [J. Ex. 57 (Mar. 9, 2016 email chain).]

500.    Schoell, another UBS employee, responded by email to Brown: "This is consistent with what they have prev said about upgrade cycles being prolonged under EIP. We have written volumes will be down until the next iPhone refresh …" [J. Ex. 273 (March 9, 2016 email chain).]

501.    At 9:02 a.m. on March 9, 2016, after Stephens' remarks at the Deutsche Bank conference had concluded, Brown sent Hodulik, Levy, Friedman and Schoell an email with the subject line "AT&T – di you guys pick up on this?" asking the analysts whether they had heard Stephens' comments from the Deutsche Bank conference that AT&T "now ha[s] 2m subs from dtv on wireless up from 500K on February." [J. Ex. 272 (Mar. 9, 2016 email chain).]

502.    Hodulik responded to Brown: "I didn't hear that. That is interesting . . . I'll follow up with AT&T on that comment." Brown then asked Hodulik, "Can you let me know what the follow up is?" [J. Ex. 272 (Mar. 9, 2016 email chain).]

503.    Hodulik spoke with Womack on March 9, 2016 at 11:31 am EST for approximately 15 minutes. [JSF ¶ 214.]

504.    At 3:36 pm, after speaking with Womack, Hodulik emailed Steven Milunovich and John Roy, sell-side analysts for UBS whose coverage sector included Apple: "Hey guys, **AT&T (which sells the most iPhones in the US) is saying it will prob see record low upgrade rates for the next 3 qtrs**. It's due to the move to installment phone sales. Record low upgrades translates into continued decline in smartphone sales, prob until the iPhone refresh in 4Q." [P. Ex. 13 (Mar. 9, 2016 email) (emphasis added).]

505.    On March 15, 2016, Viola pointed out to Womack that the equipment revenue estimate that Evans and Womack prepared of a high-teens to 20% year-over-year decline was a

"huge" decline compared to Batya Levi's estimate of an 8% increase year-over-year. [J. Ex. 194 (Mar. 15, 2016 email); Viola Dep. Tr. (P. Ex. 87) 136:1-20.]

506.    Womack spoke with Levi by phone on March 16, 2016. [JSF ¶ 215.]

507.    Womack does not remember the call. [Womack Inv. Tr. (P. Ex. 55) 141:20-142:8.]

508.    It was Levi's practice to take notes of her calls with investor relations staff of companies she covered either in a notebook or directly into the current version of UBS' model of that company. [Levi Inv. Tr. (P. Ex. 61) 13:23-14:6; Levi Dep. Tr. (P. Ex. 79) 126:15-19 ("Q. To the extent you did take notes of your call with Mr. Womack [on March 16, 2016], you would have taken those notes directly in your model? A. Yes.").]

509.    Following her March 16 call with Womack, Levi inserted into her AT&T model "down 20%" as a note into the cell within UBS' model reflecting AT&T's equipment revenues for the first quarter of 2016. [J. Ex. 278 at 13 (UBS March 18, 2016 Model).]

510.    At the time of his call with Levi, based on nonpublic, actual results to-date, Womack believed AT&T would likely report equipment revenues year-over-year declines for the first quarter of 2016 in the range of the high teens to twenty percent. [J. Ex. 194 (March 15, 2016 email from Womack to Viola. "I think the key takeaway is its looking like a ~20% decline YoY for equipment revenue."); Womack Inv. Tr. (P. Ex. 55) 131:19-24 ("Q. you write: 'The key takeaway is it's looking like a 20 percent decline year over year for equipment revenue." Was that your understanding as of the middle of March 2016? A. I don't recall my understanding from March, but as I read this, that's what it says.").]

511.    On March 18, 2016 UBS published revised estimates for AT&T's first quarter of 2016, revising its quarterly upgrade rate estimate from 6.2% to 5.1%, its equipment revenue

estimates from an increase of 8.1% year-over-year to a decrease of 18.1% year-over-year, and its total revenues for the first quarter from $40.614B to $39.954B. [*Compare* J. Ex. 274 (UBS model showing its quarterly estimates for AT&T before March 18, 2016) *with* J. Ex. 278 (UBS model showing its quarterly estimates for AT&T after March 18, 2016).]

512.    In connection with its estimate revision on March 18, 2016, UBS published a research report titled "What longer upgrade cycles mean for the carriers." J. Ex. 64. The March 18 UBS research report that reduced upgrade rates would reduce equipment revenues which "will put pressure on total wireless revenues as it [equipment revenue] will no longer provide a boost to declining service revenues." [J. Ex. 64 at 5; *see also* JSF ¶ 216-217.]

513.    The March 18 UBS report also stated that lower upgrade rates were driving improvements in customer churn and increased profitability among the major telecommunications carriers, including AT&T. [J. Ex. 64 at 3 ("Longer upgrade cycles are driving improved churns and lower gross adds while boosting carrier profitability").]

       *iii.   RW Baird*

514.    On January 27, 2016, RW Baird, whose analysts covered AT&T, published a note with estimates for AT&T's 1st Quarter of 2016 ("Baird January 27 Note"). [JSF ¶ 218; J. Ex. 65 (Jan. 27, 2016 Baird Note).]

515.    The Baird January 27 Note estimated AT&T's revenue for the 1st Quarter of 2016 would be $41.111 billion. [J. Ex. 65 at 4 (Jan. 27, 2016 Baird Note).]

516.    On February 3, 2016, Baird published another note on AT&T but did not change its revenue estimate for AT&T from $41.111 billion. [JSF ¶ 219; J. Ex. 209 at 4 (Feb. 3, 2016 Baird Note).]

517.    Evans participated in a call with sell-side analysts from Baird on March 14, 2016. [JSF ¶ 220.]

518.    Evans's call with Baird on March 14, 2016, lasted approximately 14 minutes.
[JSF ¶ 221.]

519.    Evans does not remember his call with Baird on March 14, 2016. [Evans Dep. Tr.
(P. Ex. 71) 169:6-11 ("Q. And do you have a memory of what you discussed with [Baird analyst]
Mr. Power? A. Not really. I mean, it was related to making sure that he saw what or had heard
what John Stephens had said at the Deutsche Bank conference.").]

520.    Evans admits that it would not take him 14 minutes to just point out to an analysts
Stephen's comments at the Deutsche Bank Conference on March 9, 2016. [Evans Dep. Tr. (P.
Ex. 71) 170:5-14.]

521.    On March 31, 2016, the very last day of the fiscal quarter for AT&T, Baird issued
a note adjusting its estimate for ATT's revenue for that quarter to $40.5 billion from $41.115
billion. [J. Ex. 67 at 2, 5 (Mar. 31, 2016 Baird note); *see also* JSF ¶ 222.]

522.    Of the three notes that Baird published between January 1, 2016, and March 31,
2016, with estimates for AT&T's 1Q16 revenue, the only note mentioning AT&T's upgrade rate
was the Baird March 31 Note. [*Compare* J. Ex. J. Ex. 65 and J. Ex. 209 *with* J. Ex. 67.]

523.    In its March 31 note, Baird described its estimate change for AT&T revenue as
follows: "-T. Driven by fewer handset upgrades, we are lowering our wireless equipment
revenue forecast, resulting in Q1 consolidated revenue dropping from $41.1 billion to $40.5
billion. No change to our $0.68 EPS estimate." [J. Ex. 67 (Mar. 31, 2016 Baird note).]

            *iv.   Deustche Bank*

524.    The analysts with primary responsibility for covering AT&T for Deutsche Bank
were Matthew Niknam and Whitney Fletcher. [JSF ¶ 223]

525.     On March 16, 2016, Niknam emailed Womack to set up a time to speak "to catch up on recent data points / current 1Q consensus"; the two agreed to speak by phone on March 17, 2016 at 10:00 am. [JSF ¶ 224; J. Ex. 68 (Mar. 16, 2016 email).]

526.     Before March 17, 2016, Deutsche Bank was forecasting AT&T to report a postpaid upgrade rate of 6.5%, wireless equipment revenues of $3.740 billion (a 10.8% increase year-over-year), and total revenues of $41.035 billion for the first quarter of 2016. [J. Ex. 246 (Deutsche Bank Model as of February 23, 2016) ███████████████████████████████ ████████████████████████████████████████████████████).]

527.     On March 17, 2016 beginning at approximately 10:05am Womack spoke with Fletcher and Niknam for approximately 56 minutes. [JSF ¶ 225.]

528.     Womack does not remember the call. [Womack Inv. Tr. (P. Ex. 55) 171:25-172:9 ("Q. On your March 17th call with Mr. Niknam and Ms. Fletcher, did you tell them that AT&T would report a wireless equipment revenue number of somewhere in the neighborhood of 15 to 20 percent lower than it was in the first quarter of 2015? A. No. I don't recall our conversation that day. [Q.] Is that a no, you didn't or you don't recall? [A.] I don't recall our conversation that day.").]

529.     It was Fletcher's practice to take notes of calls she and Mr. Niknam had with investor relations professionals from issuers she covered by typing them while the call was ongoing and then to email those notes to either herself or her team (or both) so she could refer to them later. [Fletcher Dep. Tr. (P. Ex. 72) 78:13-79:10.]

530.     On March 17, 2016, at approximately 11:15 am, Fletcher sent her notes of her conversation with Womack in an email to Niknam with the subject line "Call with T 3/17/16 [I]". [P. Ex. 16; Fletcher Tr. 91:24-94:2 (P. Ex. 72) ("Does [P. Ex. 16] appear consistent with the

general – with your general practice of taking and sending notes of your conversations with investor relations employees of the companies you covered? [objection]. A. I would usually take notes in email form with calls with people, so this looks like that.").]

531.     Fletcher wrote in her notes of the call March 17 call with Womack "High teens-20% yoy decline in equipment revenue." [P. Ex. 16 (Mar. 17, 2016 email containing Fletcher notes).]

532.     Two days before his call with Niknam and Fletcher, Womack wrote to Viola that "its [sic] looking like a ~20% decline YoY for equipment revenue." Viola responded, "Yes, based on what Kent [Evans] says, probably a high teen handle." [J. Ex. 194.]

   a.   This internal estimate was based upon nonpublic, actual results for the quarter-to-date. [Womack Inv. Tr. (P. Ex. 55) 129:21-130:2 ("Q. You had learned from Ms. Dial [AT&T's Financial Controller] by this time that the upgrade rate through February was 3.1 percent, right? A. That's correct. Q. And so did you have the benefit of that information when you were preparing this analysis? A. I did have the benefit of Debbie Dial's information, yes.").]

533.     On March 21, 2016 Deutsche Bank published a research report revising its estimates for AT&T's first quarter of 2016. [*See* JSF ¶ 226; J. Ex. 69 (Deutsche Bank March 21, 2016 Research Report).]

534.     In connection with its forecast revisions on March 21, Deutsche Bank adjusted its equipment revenue estimates to within the "High teens-20% yoy decline" reflected in Fletcher's notes of the March 17 call with Womack. [J. Ex. 279 (Deutsche Bank model as of March 21, 2016, reflecting a revised equipment revenue forecast of a 19.8% year-over-year decline) ███); Nknam

Dep. Tr. (P. Ex. 81) 194:3-16 (Q. [Referencing J. Ex. 279] The second line there is the equipment revenue line. Do you see that, second row? A. Yes. And estimates as of March 21, 2016 are $2.7 billion; is that right? A. That's correct. Q. Okay, and that reflects, as indicated in the line beneath that, a 19.8 percent decline year-over-year? A. That is correct, yes. Q. So that is within the range of high teens to 20 percent that is reflected in Ms. Fletcher's notes of the March 17 call with AT&T? [objection] A. Yes.").]

535.    In its estimate revisions on March 21, 2016, Deutsche Bank also adjusted its quarterly postpaid upgrade rate estimate for AT&T from 6.5% to 5.2%, and its total quarterly revenue estimate for AT&T from $41.0353 billion to $39.969 billion. [J. Ex. 279 (Deutsche Bank model as of March 21, 2016) ███████████████████████████████████████ ████████████████████████████████).]

### v.   Wells Fargo

536.    The analysts with primary responsibility for covering AT&T for Wells Fargo were Jennifer Fritzsche and Caleb Stein. [JSF ¶ 227.]

537.    On March 10, 2016, Wells Fargo analyst Caleb Stein sent a copy of Well Fargo's AT&T model, with a "last modified date" of January 27, 2016, to an employee at a hedge fund. [J. Ex. 313 and J. Ex. 314 (Mar. 10, 2016 email and attachment).]

538.    The January 27, 2016 Wells Fargo model estimated that AT&T's consolidated revenue for 1Q16 would be $41.753 billion, a 28% increase year-over-year. [J. Ex. 314 ████ ████████████████████████████████).]

539.    The January 27, 2016 Wells Fargo model estimated that AT&T's wireless equipment revenue for 1Q16 would be $3.964 billion, a 17.5% increase year-over-year. [J. Ex. 314 (████████████████████████████████████████████).]

540.     Wells Fargo's estimated upgrade rate directly affected its equipment revenue projection. The January 27, 2016 Wells Fargo model calculated its equipment revenue estimate by ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ ; Stein Dep. Tr. (P. Ex. 84) 75:16-77:11 ("Q. . . . in your model here, in cell AY18, can you describe what the formula there is attempting to do? [objection] [A.] In general, that line is attempting to project the amount of equipment revenue recognized for that quarter. . . . Q. . . . cell AY18 refers to AX57 in the formula there? Do you see in that in the formula bar? A. Yes. Q. Okay, so scrolling down, a few other cells are highlighted here, including . . . AY110, AY118, and AY199? A. Correct. Q. . . . and AY118 – that's the row for postpaid upgrade estimate? A. Correct. Q. And that's the nine percent we were discussing earlier, correct? A. That's correct.").]

541.     The January 27, 2016 Wells Fargo model estimated that AT&T's upgrade rate for 1Q16 would be 9%. [J. Ex. 314 (█████████████████████████████); Stein Dep. Tr. (P. Ex. 84) 73:2-11 ("[Q.] and the upgrade rate in that column [row AY], in cell AY118 is nine percent. Do you see that? A. I do."); Stein Dep. Tr. (P. Ex. 84) 77:6-11 ("Q. . . . and AY118 – that's the row for postpaid upgrade estimate? A. Correct. Q. And that's the nine percent we were discussing earlier, correct? A. That's correct.").]

542.     On March 17, 2016, Womack participated in a call with Fritzsche. [JSF ¶ 228.]

543.     Later that afternoon, after her call with Womack, Fritzsche emailed Stein and Wells Fargo analyst Eric Luebchow (who covered Verizon with Ms. Frizsche) asking if they had time to speak regarding the topic of handset revenues. [J. Ex. 319 (Mar. 17, 2016 email).]

544.     Also later that afternoon, following her call with Womack, Fritzsche sent an email

to personnel from Verizon's investor relations department requesting "time to catch up on

equipment revenue for Q1," noting that she "heard from one of your peers it will likely be

paused a bit given this is a low volume quarter," adding "I know you are later to the EIP than

AT&T but just wondering if you are seeing a similar trend." [J. Ex. 321 (Mar. 17, 2016 email).]

545.     On March 22, 2016, Friztsche emailed Stein: "Caleb can you check w/ Michael

Black today re: equipment revenue thoughts for Q1." Stein responded, "Yes, will do." [J. Ex.

316 (Mar. 22, 2016 email).]

546.     Black participated in a call with Wells Fargo analyst Caleb Stein on March 22,

2016. [JSF ¶ 229.]

547.     The figures in Black's March 22, 2016 consensus and Top Ten tracking chart was

Black's view of consensus at that time. [Black Dep. Tr. (P. Ex. 66) 231:10-232:11 (discussing J.

Ex. 163 at 3 (March 22, 2016 email) ("[Q.] If you had given Mr. Stein a number of March 22, it

would have been the number from the sheet in [J. Ex. 163]. Correct? . . . A. Yes. That would be –

this would be the view of consensus at that point of time.").]

548.     Prior to his call with Black, Stein did not know AT&T's projected wireless

equipment upgrade rate, wireless equipment revenue, or total consolidated revenue for 1Q16.

[Stein Dep. Tr. (P. Ex. 84) 134:5-135:22 ("Q. . . . prior to speaking with Michael Black on March

22, 2016, did you know what AT&T was projecting as its upgrade rate for the first quarter of

2016? A. Not to my – my knowledge. . . . Q. And prior to speak to Michael Black on March 22,

2016, did you know what AT&T was projecting for its consolidated revenue for that quarter? A.

Not that I can recall. . . . Q. . . . and before speaking with Mr. Black on March 22, 2016, did you

know what AT&T's wireless equipment revenue for that quarter was going to be? A. I don't

believe so. Q. Okay. Did you have an understanding of what AT&T projected for that quarter their wireless equipment revenue to be? A. I don't recall. But if it was AT&T's projection, I likely would not have known. Q. Okay, and is that because it wasn't public? A. Correct.").

549.    Stein took notes of his call with Black and emailed them to Fritzcche. [P. Ex. 21 at 2-3 (Mar. 22, 2016 email at 5:50 PM).]

550.    Stein took notes of his call to help him recall what was discussed on the call and counted on them to be accurate. [Stein Dep. Tr. (P. Ex. 84) 89:23-90:17 ("Q. And why do you make those notes? A. Frankly, just to help me recall what we went through and/or refer back; if – you know, my team wasn't all on the call. . . . Q. And so you're counting on your notes to be accurate as to what was said on a call so that you could remember it later; is that fair? A. That's my general use of the notes, yes."); Stein Inv. Tr. (P. Ex. 64) 37:3-6 ("Q. . . . is it your goal to record accurately what is being communicated to you from the investor relations team? A. That's my goal."); Stein Inv. Tr. (P. Ex. 64) 118:25-119:4 ("Q. And do these notes reflect your attempt to capture accurately what Michael Black told you on the March 22nd phone call? A. This – yes. As I've said before, I type quickly in attempt to be accurate with what's conveyed.").]

551.    From his call with Black, Stein understood that Black conveyed the "Big picture messag[e]" that "UGs [upgrades]/gross adds lower given all-EIP and pent up demand for iPhone expected Q4'16 (lowers top line, net benefit to EBITDA/EPS)[.]" [P. Ex. 21 at 2 (Mar. 22, 2016 email at 5:50 PM); Stein Inv. Tr. (P. Ex. 64) 119:25-120:8 ("Q. So on March 22, 2016, Mr. Black emphasized to you the gross add and upgrades would be lowered give[n] the shift to equipment installment plans and demand for an iPhone release later in the year? A. Those are – those are the big picture notes from the call. Q. And those are the big picture notes of what Mr. Black told you; correct? A. Yes."); Stein Dep. Tr. (P. Ex. 84) 36:15-37:12 ("I don't recall [the

notes]. But in general, this follows kind of the – the pattern and structure of how my notes are taken during calls with folks at IR. . . . It's difficult to decipher whether or not – that first part, big picture messaging was something shared from Michael during that call or it was my interpreting for [Fritzcche]. So often in the construct of the notes that I assemble and send to her, some would either be – you know, direct from the conference and others would be – you know, my takeaways to her . . . . Then the supporting notes below.")]

552.    Black also informed Stein that consensus equipment revenues were -18% to 21% year over year. [P. Ex. 21 at 2 (Mar. 22, 2016 email at 5:50 PM: "Equip revs -18 to -21% y/y"); Stein Inv. Tr. (P. Ex. 64) 121:3-20 ("Q. So Mr. Black told you on March 22, 2016, that street estimates or consensus estimates of equipment revenues were contemplating a decline of 18 to 21 percent, year-over-year? A. That's correct.").]

553.    Black also told Stein that the consensus upgrade rate was 5% in 1Q16. [P. Ex. 21 at 2-3 (Mar. 22, 2016 email at 5:50 PM: "UG rate 5% in Q1"); Stein Inv. Tr. (P. Ex. 64) 122:5-23 ("Q. So what did Mr. Black tell you that this notes purports to reflect? A. Of those models that have been updated, the street consensus is trending towards 5 percent in the first quarter. Q. So Mr. Black told you on March 22nd, that a consensus estimates of upgrade rates were over 5 percent? A. Correct. [Stein's lawyer:] I just want to clarify: Do you remember this or are you – [A.] I don't – I don't remember it. I'm going based on my notes. [Stein's lawyer:] What the notes mean to you? [A.] Correct.").]

554.    Black also informed Stein that consensus consolidated revenue was up 23% on a year-over-year basis, and that EPS would be $0.69 to $0.70 per share. [P. Ex. 21 at 3 (Mar. 22, 2016 email at 5:50 PM: "Revenue +23% y/y" and "EPS $0.69-0.70)".]

555.    Black also provided Stein with information or at least confirmed to him concerning wireless service revenue, that "less decline in 2016, moving to stability/growth in 2017 was reasonable." [P. Ex. 21 at 2 (Mar. 23, 2016 email at 7:25 AM); Stein Dep. Tr. (P. Ex. 84) 94:10-95:10 ("Q. . . . When you say his message was that "less decline in 2016 moving to stability[/]growth in 2017 was reasonable," regardless of the words he used, that's . . . information you understood from Mr. Black; is that correct? [objection] [A.] It's difficult to parse whether that was direct from Michael or if it that was confirmation of something that I asked him, right? So I would be speculating as to what the actual source of that was. [Q.] But as we discussed earlier, if you had – if it was something you sought confirmation about, the – the takeaway for you was that it was reasonable and that was the confirmation from Mr. Black? [objection] A. Yes.").]

556.    Within one day of his call with Black, on March 23, 2016, Stein emailed Fritzsche a draft note revising Wells Fargo's estimates for AT&T for the first quarter of 2016, proposing to revise AT&T's quarterly upgrade rate to 5%, AT&T's equipment revenue to -20.2% year over year, and AT&T's quarterly total revenue $40.2 billion (a 23% increase year-over-year). [J. Ex. 315 (Mar. 23, 2016 email from C. Stein to J. Fritzsche).]

> a.   These figures correspond exactly to the figures and ranges for these metrics contained in Stein's email notes of his call with Black on March 22, 2016. [*Compare* J. Ex. 315 *with* P. Ex. 21; Stein Dep. Tr. (P. Ex. 84) 121:8-122:24 ("Q … Is it far to say that as of March 23, 2016, you had decided to change your upgrade rate to five percent for Q1 2016? A. That is what I had drafted in the text then gave to Jennifer [Fritzshce] for her editorial privilege … Q. Okay, and is it fair to say that as of March 23, 2016, you were recommending

to Ms. Fritzsche that you change your equipment revenue down to be approximately 20 – negative 20 percent year over year? A. That's fair.").]

557.    Also on March 23, 2016, Fritzsche emailed Paige Hanson and Christopher Ferrara, Wells Fargo employees who coordinated Wells Fargo's conference calls between Wells Fargo's research analysts and its institutional sales force, to let them know that she planned to reduce her revenue estimates for AT&T and Verizon "driven by a lower handset upgrade cycle (and therefore lower equip sales)." [J. Ex. 281.]

   a.   Fritzsche noted in her email that "the good news of this is the equip revenue is pretty margin neutral," but cautioned that "a 'revenue miss' headline would not look good." [J. Ex. 281 (Mar. 23, 2016 email from J. Fritzsche); *see also* Fritzsche Inv. Tr. (P. Ex. 58) 194:2-196:11 ("Q. What is a revenue miss? A. Revenue miss implies that the revenue comes in below street expectations … Q. And why would a revenue miss not look good? A. Well, any time a company reports revenues lower than where the street consensus is, it's not a – it's not a great data point for that company reporting … Q. Why not? A. Well, if – if people think they're going to report a hundred dollars, and they do 90, people worry that they haven't hit – that there might be a flaw in the business, or something like that").]

558.    On March 24, 2016, Stein responded to an email from Black to ask: "can you remind me where Street consensus is currently for Equip revs on wireless standalone? I know we're bringing numbers down for lower UGs/gross adds, but curious the delta." [J. Ex. 282 (Mar. 24, 2016 email at 12:19 PM).]

559.    On March 28, 2016, Wells Fargo published a report updating its 1Q16 earnings estimates for AT&T, in which it stated: "Revenue story is a good news bad news one" and noted that it was lowering its "Q1 equipment revenue estimate to $2.7B (-20% yoy)." [J. Ex. 70 at 2 (Mar. 28, 2016 Wells Fargo Note); *see also* JSF ¶ 230.]

560.    In its March 28, 2016 report, Wells Fargo stated, "We believe T's postpay upgrades will be 5% in Q1, 300 bps below current Street expectations." [J. Ex. 70 at 2 (Mar. 28, 2016 Wells Fargo Note).]

561.    In its March 28, 2016 report, Wells Fargo lowered its consolidated revenue estimates for AT&T's 1Q16 from $41.753 billion to $40.180 billion. [J. Ex. 70 at 4 (Mar. 28, 2016 Wells Fargo Note).]

562.    On March 28, 2016, Stein circulated AT&T model, with a last modified date of the same day to other Wells Fargo email addresses. [J. Ex. 317 (Mar. 28, 2016 email and attachment).]

563.    Wells Fargo's estimated upgrade rate ███████████████████ projection in the March 28, 2016 Wells Fargo model, ███████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████ [J. Ex. 318 ████████████████████████).]

564.    The March 28, 2016 Wells Fargo model estimated that AT&T's upgrade rate for 1Q16 would be 5%. [J. Ex. 318 (████████████████████████).]

565.    Stein and Fritzsche's AT&T model had historically ████████████ ████████████████. Wells Fargo's model as of March 2016 reported ███████

████████████████████████████████████████. For the first quarter of 2015, Wells Fargo's model reported AT&T's upgrade rate as ████, when AT&T's actual, reported upgrade rate was 6.6%. For the second quarter of 2015, Wells Fargo's model reported AT&T's upgrade rate as ████, when AT&T's actual, reported upgrade rate was 5.8%. For the third quarter of 2015, Wells Fargo's model reported AT&T's upgrade rate as ████, when AT&T's actual reported upgrade rate was 5.7%. For the fourth quarter of 2015, Wells Fargo's model reported AT&T's upgrade rate as ████, when AT&T's actual reported upgrade rate was 7.6%. [*Compare* J. Ex. 318 (Wells Fargo Model as of March 28, 2016) ██████████████ ███████████████████████████ *with* JSF ¶ 114.]

566. On March 28, 2016, the same day that Wells Fargo published its research report on AT&T revising its quarterly estimates, Wells Fargo also published an industry report titled "Equipment Revenue Note." [JSF ¶ 231; J. Ex. 71 (Mar. 28, 2016 Wells Fargo note).]

  a. This industry note, which described the causes and impacts of declining equipment revenues across the telecom sector, stated, "Equipment revenue was historically an afterthought for many telecom investors, as service revenue was the more predominant metric used to evaluate the carriers. This has changed, however, with the transition of carriers from subsidized equipment pricing to an installment-based (EIP) model." [J. Ex. 71 at 3 (Mar. 28, 2016 Wells Fargo note).]

  *vi. Oppenheimer*

567. The analyst primarily responsible for covering AT&T from Oppenheimer was Timothy Horan. [JSF ¶ 232.]

568. Before March 22, 2016, Oppenheimer forecast AT&T would report total revenues of $41.375 billion on quarterly wireless equipment revenues of $3.541 (a 5% increase year over

year) and a quarterly upgrade rate of 7%. [J. Ex. 72 at 3, 5 (March 21, 2016 email chain and attachment).]

569.    On March 14, 2016, Black sent Viola an analysis of Oppenheimer's model, "highlight[ing] the Service and Equipment revenues and associated drivers (i.e) upgrade rates smartphone sales, etc." He reported to Viola that Oppenheimer was "assuming consolidated revenue of 1Q16 of $41.4B about $307M above consensus with flat wireless service revenue YoY and a 5% growth in wireless equipment revenues driven by higher smartphone sales (7M vs. consensus of 6.4M) and a higher than consensus upgrade rate of 7%." [J. Ex. 159 (Mar. 14, 2016 email).]

570.    On March 21, 2016, Horan emailed a copy of his then-current model to Womack and Evans, noting in his cover email to them: "I was looking to put a brief note out tonight updating our wireless outlook. Let me know if you have any thoughts on the model." [J. Ex. 72 (March 21, 2016 email chain); *see also* JSF ¶ 233.]

   a.   The model Horan sent to Evans and forecast $41.376 for AT&T's total revenue and $3.541B for AT&T's equipment revenue (a 5% increase YoY) and an upgrade rate of 7.0%. [J. Ex. 72 at 3, 5 (March 21, 2016 email chain).]

571.    Evans forwarded Horan's email to Black, copying Womack, and writing, "Michael, I think you have looked at Tim's model in the past. Thoughts?" Black responded, "Kent – I have worked through their model and believe it would be a good idea to schedule time to discuss consensus. Let me know what you would like to do." [J. Ex. 199 (Mar. 21, 2016 email chain).]

572.    Later in the day, on March 21, Womack called Horan. [JSF ¶ 234.]

573.     On March 22, 2016, Horan reduced Oppenheimer's estimates of AT&T's total revenues for the first quarter of 2016 from $41.376 billion to $40.510 billion, Oppenheimer's estimates of AT&T's quarterly equipment revenues from a 5% increase year-over-year to a 20.1% decrease year-over-year, and Oppenheimer's upgrade rate estimate from 7% to 6%. [P. Ex. 89 (Oppenheimer Model (metadata in file information in Excel indicates a last modified date of March 22, 2016) at cells V14 (total revenue), V318 (and AW318) (equipment revenue), and V354 (upgrade rate)).]

574.     In connection with Oppenheimer's estimate revision on March 22, 2016, Oppenheimer published a research report titled "Wireless Industry Updated Thoughts and Models." In the report, Horan wrote that "we are seeing a slowdown in the handset upgrade cycle and weak gross adds," under the section of his report titled, "Industry Concerns." [J. Ex. 73 at 4 (March 22, 2016 Oppenheimer Report); *see also* JSF ¶ 235.]

        vii.   RBC

575.     Black participated in a call with RBC analyst Brian Hyun on March 22, 2016. [JSF ¶ 236; P. Ex. 42 ¶ 4 (Dec. 18, 2020 Hyun Decl.).]

576.     The same day as his call with RBC, Black received information regarding AT&T's internal projections for its quarterly upgrade rate. Black Answer ¶ 106 (DE 26).]

577.     Hyun took notes of the call with Black in which he memorialized the sum and substance of the call. [P. Ex. 42 ¶ 5 (Dec. 18, 2020 Hyun Decl.); P. Ex. 20 (Mar. 22, 2016 Hyun notes).]

578.     On the call, Black told Hyun that the consensus for AT&T's 1Q16 upgrade rate was 5%. [P. Ex. 42 ¶ 8 (Dec. 18, 2020 Hyun Decl.); P. Ex. 20 (Mar. 22, 2016 Hyun notes).]

579.     The 5% figure was not Black's understanding of what consensus estimates of AT&T's upgrade rates were at the time. *See infra at* ¶¶ 589-92.

580.    Instead, the 5% figure was the Individual Defendants' estimate of the upgrade rate formed on March 10, 2016 [J. Ex. 181 (Mar. 10, 2016 email from Evans to Womack, Black, and Viola)], and reiterated on March 14, 2016. J. Ex. 165 (Mar. 14, 2016 email from Womack to Viola, copying Evans and Black).]

581.    Black's information was a significant factor in Hyun's recommendation to Atkin that RBC revise its financial model for AT&T to reflect a 5% upgrade rate in 1Q16. [P. Ex. 42 ¶ 9 (Dec. 18, 2020 Hyun Decl.); J. Ex. 285 (March 27, 2016 email from Hyun); J. Ex. 252 at 5 (excerpt from RBC model showing 5% "Postpaid subscriber upgrade rate" for 1Q16); Hyun Dep. Tr. (P. Ex. 76) 171:5-18.]

582.    Black told Hyun on the call that consensus estimates of AT&T's wireless equipment revenue forecasted a decline of 15%-18% year over year. [P. Ex. 42 ¶ 10 (Dec. 18, 2020 Hyun Decl.); P. Ex. 20 (Mar. 22, 2016 Hyun notes).]

583.    This figure did not match internal AT&T calculations of consensus or Top Ten averages for wireless equipment revenue circulated on March 22, 2016. *See infra at* ¶¶ 589-92.

584.    Black's information was a significant factor in Hyun's recommendation to Atkin that RBC revise its financial model to reflect a decline in AT&T's wireless equipment upgrade rate for 1Q16 of 15%. [P. Ex. 42 ¶ 11 (Dec. 18, 2020 Hyun Decl.); J. Ex. 285 (March 27, 2016 email from Hyun); J. Ex. 252 at 4 (excerpt from RBC model showing -15% "y/y change" in "Equipment Sales" for 1Q16).]

585.    On the March 22, 2016 call, Black told Hyun that consensus revenue for AT&T were $39.905 billion—a 22.5% increase year-over-year. [P. Ex. 42 ¶ 12 (Dec. 18, 2020 Hyun Decl.); P. Ex. 20 (Mar. 22, 2016 Hyun notes).]

586.    This figure did not match internal AT&T calculations of consensus or Top Ten averages for total revenue circulated on March 22, 2016. *See infra at* ¶¶ 589-92.

587.    Black's information was a significant factor in Hyun's recommendation that RBC revise its financial model to reduce its consolidated revenue estimates for 1Q16. [P. Ex. 42 ¶ 13 (Dec. 18, 2020 Hyun Decl.); J. Ex. 285 (March 27, 2016 email from Hyun).]

588.    Hyun made his recommendations to Jonathan Atkin, RBC's lead analyst, in a March 27, 2016 email. [J. Ex. 285 (March 27, 2016 email from Hyun).]

589.    The figures that Black provided Hyun did not match Black's last updated "Top Ten" average tracking sheet, dated March 10, 2016 and circulated in an email as recently as March 14, 2016, which had the Top Ten average upgrade rate at 6.6%, wireless equipment revenue growing by 4.6%, and total revenue growing by 26.1%. [J. Ex. 159 at 8 (March 14, 2016 email from Black attaching consensus and Top Ten tracking).]

590.    Nor did the figures that Black provided match the total consensus revenue ($41.22 billion) or Top Ten average revenue figures ($41.07 billion) in Black's March 10, 2016 calculations. [J. Ex. 159 at 7 (March 14, 2016 email from Black attaching consensus and Top Ten tracking).]

591.    The figures that Black provided Hyun also did not match Black's calculations from a "Top Ten" average tracking sheet dated March 22, 2016, which had the Top Ten average upgrade rate at 6.1%, wireless equipment revenue declining by 1.6%, and total revenue growing by 25.3%, and First Call Total Consensus revenue growth at 26.3%. [J. Ex. 163 at 3 (March 22, 2016 email from Black to Viola attaching tracking spreadsheet).]

592.    The figures that Black provided Hyun also did not match a table that Black sent to Womack on March 22, 2016, that showed consensus revenue estimates to be $41.1 billion and

the Top Ten average to be $40.8 billion. J. Ex. 200 at 3 (March 22, 2016 email from Black to Womack).]

593.    On March 30, 2016, RBC published a research report in which it revised its upgrade rate from 6.5% to 5% and wireless equipment revenue from +7.5% to -15% year over year for 1Q16. [P. Ex. 42 ¶¶ 9, 11 (Dec. 18, 2020 Hyun Decl.); *see also* JSF ¶ 237.]

594.    In its March 30, 2016 report, RBC lowered its consolidated revenue estimates by $1.193 billion for AT&T's 1Q16 to approximately $40.3 billion. [P. Ex. 42 ¶ 13 (Dec. 18, 2020 Hyun Decl.); J. Ex. 74 at 5 (March 30, 2016 RBC report); Hyun Dep. Tr. (P. Ex. 76) 169:22-170:11.]

595.    In its March 30, 2016 report, RBC lowered its wireless equipment revenue by $759 million for AT&T's 1Q16 to approximately $2.868 billion. [P. Ex. 42 ¶ 13 (Dec. 18, 2020 Hyun Decl.); J. Ex. 74 at 5 (March 30, 2016 RBC report); Hyun Dep. Tr. (P. Ex. 76) 170:12-14.]

596.    RBC highlighted the lower consolidated revenue estimate on the first page of its March 30, 2016 report under the heading "Key points[.]" [J. Ex. 74 at 2 (March 30, 2016 RBC report).]

597.    On March 30 2016, after RBC reduced its revenue estimates, Viola emailed Black, Womack, and Sheehan: "Nice job with Jonathan [Atkin], especially getting his revenue number down to $40.3B." [J. Ex. 183 (Mar. 30, 2016 email from Viola to Sheehan, Black, and Womack).]

       *viii.   Drexel Hamilton*

598.    Black participated in a call with Drexel Hamilton analyst Barry Sine on March 24, 2016. [JSF ¶ 238.]

599.    On the call, Black communicated to Sine that the "consensus" upgrade rate was "around 5%" and that "consensus equipment revenue [was] down 15% to 20%[.]" [P. Ex. 103 ¶¶

8 and 9 (June 17, 2020 Sine Decl.) and Sine Ex. A (P. Ex. 103 at 5 (Mar. 24, 2016 email from Sine).]

600. Neither figure matched Black's most recent Top Ten average of 6.7% upgrade rate or a 1.6% decline in equipment revenue. [J. Ex. 163 at 3 (March 22, 2016 email from Black to Viola attaching tracking spreadsheet).]

601. Sine understood Black's information to be a signal to him that his revenue estimates for 1Q16 might be too high and played an important role in Sine's decision to reduce his revenue estimates for AT&T. [P. Ex. 103 ¶ 12 (June 17, 2020 Sine Decl.).]

602. Following the call with Black, on March 31, 2016, Sine published a report updating Drexel Hamilton's 1Q16 estimates for AT&T, in which he lowered his 1Q16 total revenue estimate to $40.248 billion. [P. Ex. 103 ¶ 15 (June 17, 2020 Sine Decl.); J. Ex. 75 at 2; *see also* JSF ¶ 239.]

603. Sine also lowered Drexel Hamilton's 1Q16 wireless equipment revenue estimates for AT&T and reported an estimated quarterly upgrade rate of 5%. [P. Ex. 103 ¶ 15 (June 17, 2020 Sine Decl.); J. Ex. 75 at 3 ("we see a 5% handset upgrade rate in the first quarter").]

604. Prior to his call with Black, Sine did not know what the consensus upgrade rate was. [Sine Dep. Tr. (P. Ex. 83) 367:9-21 ("[Q.] Prior to this call, did you have an understanding of what the consensus phone upgrade rate in 1Q was? [objection] [A.] I had a sense of trends, but not a sense that it would be 5 percent versus 4 or 6.").]

605. Prior to his call with Black, Sine did not know what AT&T's actual postpaid upgrade rate in the 1Q16 would be. [Sine Dep. Tr. (P. Ex. 83) 367:23-368:20 ("Q. Prior to this call, did you have any understanding of what AT&T's actual phone upgrade rate in the first

quarter of 2016 was? [objection] [A.] So the first quarter . . . has not yet been reported. . . . But they had not reported it, so I had no idea what the actual number was. . . .").]

ix.   Citi

606.    On March 11, 2016, Citi analyst Adam Ilkowitz sent an updated AT&T model, consisting of two spreadsheets, for uploading to a Citi repository for such models. [J. Exs. 228-231 (Mar. 11, 2016 email from Ilkowitz to Citi Research Models with models).]

607.    The model Ilkowitz sent on March 11, 2016 reflected Citi's 1Q16 projections that AT&T's consolidated revenue would be $40.944 billion, an increase of 26% year over year. [J. Ex. 235 (see native "Consolidated IS" tab Cells CK54 and 55).]

608.    The model Ilkowitz sent on March 11, 2016 reflected Citi's 1Q16 projections that AT&T's wireless equipment revenue would be $3.786 billion, an increase of 12% year over year. [J. Ex. 234 (see native "Income Statement" tab Cells CK43 and CK44).]

609.    The model Ilkowitz sent on March 11, 2016 reflected Citi's 1Q16 projections that AT&T's "% of Replacement Handsets Sold" (i.e., its upgrade rate) would be 6.8%. [J. Ex. 234 (see native "Projections" tab Cell GF1192).]

610.    Ilkowitz's March 11, 2016 model incorporated all of the public information available to Ilkowitz as of that date. [See Ilkowitz Inv. Tr. (P. Ex. 59) 112:1-112:6 ("Q. Would this be the working model as of . . . March 11, 2016? A. Yes. Q. And does it incorporate the most recent updates as reflected in Exhibit No. 203 [A March 10, 2016 research note]? A. It should be, yes.").]

611.    Black participated in a call with Ilkowitz on March 31, 2016. [JSF ¶ 240.]

612.    Prior to his call with Black, Ilkowitz did not know AT&T's actual or projected upgrade rate or wireless equipment revenue. [Ilkowitz Dep. Tr. (P. Ex. 77) 192:2-23 ("Prior to your call with Mr. Black, did you have an understanding of what AT&T's actual upgrade rate

was for the first quarter of 2016? A. I would have no reason to know that. Q. . . . Did you have

an understanding of what their wireless equipment revenue was for the first quarter of 2016? A.

No. Q. . . . Did you have an understanding of what AT&T's projected upgrade rate for the first

quarter of 2016 was? [objection] [A.] I don't believe they had given a specific estimate for

something like upgrade rates, so I don't believe so. . . . [Q.] And as of March 31 of 2016, did you

have an understanding of what AT&T's internal projections of its wireless equipment revenue

were going to be was? A. No.").]

  613. Ilkowitz took notes of the March 31, 2016 call with Black. [Ilkowitz Inv. Tr. (P.

Ex. 59) 135:10-12 ("[Q.] These are your notes of that conversation? A. I believe that that is

correct."); P. Ex. 22 (Mar. 31, 2016 Ilkowitz Notes).]

  614. Ilkowitz attempted to record the information from the call accurately in order to

record the information he received from Black, which he believed to be consensus. [Ilkowitz Inv.

Tr. (P. Ex. 59) 136:7-13 ("[Q.] do these notes reflect your effort to record accurately what

Michael Black was conveying to you on the March 31st, 2016 call? A. Yes. I would be asking for

consensus and that's what I would be attempting to record."); Ilkowitz Dep. Tr. (P. Ex. 77)

116:24-117:4 ("Q. Okay, so what's your best belief as to what information you believe Mr.

Black was communicating to you when you wrote that [Mobile, five percent upgrade rate]

down? A. Based on my practice and what I did with AT&T and other companies in my coverage,

we were seeking the consensus.").]

  615. Ilkowitz used the information from Black to include in Citi's research reports.

[Ilkowitz Inv. Tr. (P. Ex. 59) 136:14-25 ("[Q.] you were going to include some of the consensus

figures that Mr. Black provides you in the cheat sheet included in your April 7th report; is that

right? A. Yeah. Just looking back at [the April 7 report], it does appear that we have a cheat sheet in this one as well.").]

616.    On the March 31, 2016 call with Ilkowitz, Black communicated that the "consensus" upgrade rate was 5% for 1Q16. [P. Ex. 22 (Mar. 31, 2016 Ilkowitz notes stating "5% upgrade rate"); Ilkowitz Dep. Tr. (P. Ex. 77) 118:10-15 ("Q. So as best as you can say here today, if Mr. Black did in fact say something, it was giving you the consensus as he expressed it to you that the upgrade rate was five percent, correct? A. That would – that is my belief of what I received."); 123:3-6 ("Q. So these, you believe, as you sit here today – your testimony is these were given to you as consensus estimates and not as actual numbers? A. Correct.").]

617.    On the March 31, 2016 call, Black told Ilkowitz that consensus reflected that AT&T's equipment revenue for 1Q16 would decrease 10%-15%. [P. Ex. 22 (Mar. 31, 2016 Ilkowitz notes stating "equip (10)-(15%)"); Ilkowitz Dep. Tr. (P. Ex. 77) 120:5-16 ("Q. . . . Now, can you help us decipher what's on the right-hand side with your . . . handwriting what numbers you're giving us? A. Yes, so on the right side of that upgrade rate comment is a series of other mobile business items and either an estimate or a range that would also have been the consensus for those figures. Q. . . . And is the next one 'equipment revenue' in your mind? A. Yes."); 123:3-6 ("Q. So these, you believe, as you sit here today – your testimony is these were given to you as consensus estimates and not as actual numbers? A. Correct.").]

618.    On the March 31, 2016 call, Black told Ilkowitz that consensus reflected that AT&T's total revenue for 1Q16 would increase 23%. [P. Ex. 22 (Mar. 31, 2016 Ilkowitz notes stating "Consolidated rev 23%").]

619.    The numbers Black provided Ilkowitz did not match Black's calculations from a "Top Ten" average tracking sheet dated March 30, 2016, which had the Top Ten average

upgrade rate at 6.1%, wireless equipment revenue declining by 6.4%, and total revenue growing by 24.8%, and First Call Total Consensus revenue growth at 25.7%. [J. Ex. 132 at 3.]

620.    The March 30, 2016 tracking sheet reflected that AT&T's 2+1 Results (i.e., two months of actual results plus one month of projections) for equipment revenue was -11.5% and upgrade rate was 4.7%. [J. Ex. 132 at 3.]

621.    If Ilkowitz understood he was receiving AT&T's projected upgrade rate, he would have taken action. [Ilkowitz Dep. Tr. (P. Ex. 77) 117:12-118:3 ("Q. . . . If [Black] had said, 'I'm just going to tell you the upgrade rate,' that would have been a huge problem for you right? [objection] [A.] Correct. . . . [Q.] A call to compliance is the next that that happened, correct? [objection] [A.] There would be – there would be some action I would take as soon as the call ended."); 193:2-17 ("Q. Would it have been of interest to you to know whether Mr. Black had given you what AT&T's projected wireless equipment upgrade rate was on the March 31st call? [objection] [A.] It . . . would have been of interest to me to know that I was receiving something I shouldn't have. . . . Q. Because as I think that your questions and answers with defendants made clear, you would have gone to compliance, is that fair? A. If I received – if I knowingly received nonpublic information, I would have gone to compliance.").]

622.    Citi published its "Wireless 1Q16 Preview" updating its estimates for certain wireless companies, including AT&T, on April 7, 2016. [J. Ex. 76 (Apr. 7, 2016 Citi report); *see also* JSF ¶ 241.]

623.    In its April 7, 2016 report, Citi raised its EPS estimate for 1Q16 from $0.66 per share to $0.71 per share. [J. Ex. 76 at 7 and 8 (Apr. 7, 2016 Citi report).]

624.    In its April 7, 2016 report, Citi lowered its consolidated revenue estimate for 1Q16 to $40.566 billion. [J. Ex. 76 at 7 and 8 (Apr. 7, 2016 Citi report).]

625.    In its April 7, 2016 report, in a table labeled "Key Metrics," Citi lowered its wireless equipment revenue estimate for 1Q16 to $3.086 billion, an ~8.5% decrease year over year. [J. Ex. 76 at 11 (Apr. 7, 2016 Citi report).]

626.    On April 8, 2016, Ilkowitz sent an updated AT&T model, consisting of two spreadsheets, for uploading to a Citi repository for such models. [J. Exs. 228-231 (Apr. 8, 2016 email from Ilkowitz to Citi Research Models and attachments).]

627.    The model Ilkowitz sent on April 8, 2016 reflected Citi's 1Q16 projections that AT&T's consolidated revenue would be $40.566 billion, an increase of 25% year over year. [J. Ex. 231 (see native file "Consolidated IS" tab Cells CK54 and 55).]

628.    The model Ilkowitz sent on April 8, 2016 reflected Citi's 1Q16 projections that AT&T's wireless equipment revenue would be $3.086 billion, a decrease of approximately 8.5% year over year. [J. Ex. 230 (see native file "Income Statement" tab Cells CK43 and CK44).]

629.    The model Ilkowitz sent on April 8, 2016 reflected Citi's 1Q16 projections that AT&T's "% of Replacement Handsets Sold" (i.e., its upgrade rate) would be 5%. [J. Ex. 230 (see native file "Projections" tab Cell GF1192).]

                    *x. Evercore*

630.    Evercore published estimates on January 27, 2016, for AT&T's projected 1Q16 performance in which it estimated total consolidated revenue of $42.245 billion (a 29.7% year over year increase) and wireless equipment revenue of $3.988 billion. [J. Ex. 77 at 6 (Jan. 27, 2016 Evercore Note); *see also* JSF ¶ 242.]

631.    On March 28, 2016, Evercore analyst Justin Ages sent Evercore's AT&T model, dated January 27, 2016, to Insynch Analytics with the message "Please find our T model attached." [J. Ex. 291 (Mar. 28, 2016 email from Justin Ages).]

632.    The model Ages sent on March 28, 2016, contained estimates for AT&T's 1Q16 total revenue and equipment revenue matching the estimates in Evercore's January 27, 2016 earnings report. [*Compare* J. Ex. 77 *with* J. Ex. 292 (█████████████████████ █████████████████████████████).]

633.    Evercore modeled AT&T's wireless upgrade rate for 1Q16 at 6.6% in its January 27, 2016 model. [J. Ex. 292 ████████████████).]

634.    Black participated in a call with Ages on March 30, 2016. [JSF ¶ 243.]

635.    Following the call with Black, on April 11, 2016, Evercore published revised estimates for AT&T for 1Q16. [J. Ex. 78 (Apr. 11, 2016 Evercore Note); *see also* JSF ¶ 244.]

636.    Evercore's model, dated April 11, 2016, reflected a revised estimate for AT&T's wireless upgrade rate of 5%. [J. Ex. 290 ████████████████); J. Ex. 78 at 2 ("given a combination of (a) lower upgrades (we project 5.0% vs. 6.6% a year ago), (b) increasing BYOD, and (c) seasonality, we model 1Q equipment revs down 16.3% to $2.8B.").]

637.    ████████████████████████████████████████████ ████████████████████████ ████████████████████████████ ████████████████████.]

638.    Total Upgrades in Evercore's April 11, 2016 model was a factor in the model's calculation of equipment revenue. [J. Ex. 290 ██████████████████████████ ████████████████████.]

639.    Evercore lowered its 1Q16 estimate for equipment revenue for AT&T to $2.824 billion (compared with its former estimate of $3.988 billion (a 29.2% decrease)). [J. Ex. 290 ████████████████); J. Ex. 78 at 6 (Apr. 11, 2016 Evercore Note).]

640.    Evercore's new equipment revenue estimate reflected a 16.3% decrease year-over-year. [J. Ex. 290 (████████████████████████████████████████ ██████████); J. Ex. 78 at 2 ("given a combination of (a) lower upgrades (we project 5.0% vs. 6.6% a year ago), (b) increasing BYOD, and (c) seasonality, we model 1Q equipment revs down 16.3% to $2.8B.").]

641.    Evercore's total consolidated revenue estimate for 1Q16 was $41.349 billion (compared with its prior estimate of $42.245 billion). [J. Ex. 290 ████████████████); J. Ex. 78 at 6 (Apr. 11, 2016 Evercore Note).]. After learning of Evercore's update on April 11, Viola emailed Black: "Where are we with [Evercore analyst] Schildkraut now in. He dropped about $1B?" Black responded, in part: "Mike-we are at $40.7 for 1Q16." Viola replied: "Still at $40.7 even with $1B less? I thought that was where we were Friday?" [J. Ex. 193 (Apr. 11, 2016 email); Black Dep. Tr. (P. Ex. 66) 288:4-6 ("Q. . . . And Schildkraut was the analyst at Evercore? A. Yes, at the time.").]

    xi.    Moffett Nathanson

642.    On April 1, 2016 Moffett Nathanson published updated estimates, including an estimated quarterly revenue of $41.714 billion for AT&T, in connection with a report it published downgrading its investment recommendation for AT&T from "Hold" to "Sell." [P. Ex. 23 at 36 (Apr. 1, 2016 Moffett Nathanson Report).]

643.    On April 1, 2016, Michael Viola e-mailed Martin Sheehan from AT&T's Investor Relations Department regarding Moffett Nathanson's estimates for AT&T for the first quarter of 2016. Viola instructed Sheehan that, when he spoke to Moffett, he was to "remind him" that the analyst's "1Q16 revenue numbers are way off due to his assumptions re wireless equipment revenue" and told Sheehan "it would be great if he reduced his number closer to Cusick [JP Morgan], Hodulik [UBS], etc to $40B." Sheehan responded that he had also spoken to Black "as

Moffett has some other crazy numbers in his report," including $24 billion of free cash flow for that year. [J. Ex. 186 (Apr. 1, 2016 email).]

644.    Sheehan participated in a call with Moffett Nathanson analysts Craig Moffett and/or Cathy Yao on April 6, 2016. [J. Ex. 79 (Apr. 5, 2016 email) (Sheehan to Yao planning call for April 6); J. Ex. 81 (Apr. 6, 2016 email from Moffett to Sheehan: "Thanks for the conversation this afternoon."); *see also* JSF ¶ 245.]

645.    On April 7, 2016, in an updated note, Moffett Nathanson made several adjustments to its estimates for AT&T's performance for the first quarter of 2016, including reducing its estimates for the Company's total revenue from $41.7 billion to $40.9 billion. [J. Ex. 82c at 51 (Apr. 7, 2016 note); *see also* JSF ¶ 246.]

646.    On or around April 7, 2016, Moffett Nathanson also reduced its estimates for the Company's equipment revenue from approximately $3.557 billion to approximately $2.883 billion for the first quarter of 2016. [*Compare* P. Ex. 24 (April 1, 2016 model) (Cell AN1520 in the "Model" Tab) *with* P. Ex. 28 (April 7, 2016 model) (Cell AN1520 in the "Model" Tab).

> *xii.   Nomura*

647.    The analysts with primary responsibility for covering AT&T for Nomura were Jeffrey Kvaal and Gregory McNiff. [JSF ¶ 247.]

648.    Before Stephens' remarks at the Deutsche Bank conference on March 9, 2016, Nomura estimated that AT&T would report wireless equipment revenues of $3.711 billion (a ~10% increase year over year), and total revenues of $41.58 billion for the first quarter of 2016. [J. Ex. 248 at 7, 12 (Nomura Model updated as of Jan. 26, 2016).]

649.    Black spoke to McNiff on March 16, 2016. [JSF ¶ 248; J. Ex. 254 (Mar. 16, 2016 email chain).]

650.    McNiff asked Black to discuss his "subset of consensus" on the call. [J. Ex. 254 at 3 (Mar. 16, 2016 email chain).]

651.    On March 17, 2016, after Mr. Stephens' comments at the Deutsche Bank conference, Nomura published revised its quarterly estimates for AT&T's first quarter of 2016. [J. Ex. 83 (March 17, 2016 Nomura Research Report); *see also* JSF ¶ 249.]

652.    In connection with its March 17, 2016 estimate revision, Nomura reduced its quarterly wireless equipment revenue estimate for AT&T by over $330 million to $3.374 billion (flat year over year), and reduced its total quarterly revenue estimate to $41.372 billion. [J. Ex. 83 (March 17, 2016 Nomura Research Report); P. Ex. 17 at 8, 14 (Nomura AT&T Model as of March 17, 2016 reflecting revised quarterly equipment and total revenue estimates of $3.374 billion and $41.372 billion, respectively).]

653.    Nomura's revised revenue estimates published on March 17, 2016, including its reduction in wireless equipment revenues, took into account Stephens' comments from the March 9, 2016 Deutsche Bank conference. [J. Ex. 83 at 2 (March 17, 2016 Nomura AT&T research report noting that Nomura was revising its numbers "[f]ollowing … a roster of conferences"); Kvaal Inv. Tr. (P. Ex. 60) 92:19-93:13 ("Q. Okay. So on March 17 – by March 17, you had already sort of factored in comments by Mr. Stephens regarding upgrade rates, is that right? A. Well, yes. I'm not sure that we had necessarily gotten all of it in there, but, you know, we have taken our tab at it – taken a stab at it in the first pass. Q. Based on all information available to you, this is sort of where you came out; is that right? A. Yes. Q. And your objective sort of analysis of that was that equipment revenue would decline from 3.7 billion to … 3.3, 3.4 billion, right? So you took down $300 million of equipment revenue to account for statements made by AT&T investor relations personnel and AT&T's CFO, is that right? A. Yes. Q. And

that's as of March 17, 2016? A. Yes.); Kvaal Dep. Tr. (P. Ex. 78) 120:8-13 ("Q. So fair to say

that by March 17th, it appears to you that you had heard what Mr. Stephens said on March 9th,

incorporated that into your results, and published a revised estimate? [objection]. A. Yes.");

McNiff Inv. Tr. (P. Ex. 62) 136:4-136:8 ("Q. Okay, and so this [testimony re: Stephen's remarks

at the March 9 Deutsche Bank conference at 128:22-136:3] is something you considered in

evaluating your model update as of March 17, 2016? A. Yes, along with any other public

commentary they've made before or after this conference."); McNiff Dep. Tr. ("P. Ex. 80")

150:14-151:6.]

654.    Black participated in a call with Nomura analyst Greg McNiff on March 31, 2016.

[JSF ¶ 199.]

655.    Black spoke with McNiff by phone again on April 5, 2016. [JSF ¶ 250; J. Ex. 294

(April 5 email from McNiff to Kvaal: "Spoke with Michael Black…"); J. Ex. 256 (April 5 email

from McNiff to Black: "Michael, Thanks for your time.")].

656.    McNiff took notes of this April 5, 2016 call with Black. [P. Ex. 26 (McNiff

notes); McNiff Inv. Tr. (P. Ex. 62) 148:14-22; 154:4-13 (Q. Okay, you testified – earlier today,

you said it was your practice to try to record what you deem relevant that, you know, AT&T

investor relations tells you on calls. That's what you do in your practice of note taking, right? A.

Yeah. Q. Okay. So this [document, P. Ex. 26] appears to reflect what Mr. Black is telling you,

and you're trying to write down what you deem relevant? A. Yeah. That seems correct. I mean,

I'm recording my notes from my conversation with Michael Black.").]

657.    It was McNiff's practice to record accurately information conveyed by Black to

him in his notes of such phone calls so that McNiff could refer to it later, and he followed his

general practice with respect to his notes of his April 5, 2016 call with Black. [McNiff Inv. Tr.

(P. Ex. 62) 91:23-92:16; McNiff Dep. Tr. (P. Ex. 80) 119:12-121:5; McNiff Inv. Tr. (P. Ex. 62) 154:4-13.]

658.    Black told McNiff on April 5, 2016 that the consensus estimates for AT&T's first quarter 2016 upgrade rate were 5% and consensus estimates for AT&T's equipment revenues were for an approximate decline of 12% year over year. [P. Ex. 26 (McNiff's notes: "upgrade rate – 5%... Equipment rev: -10-15 = ~12% Y/Y").]

659.    At the time of his call with McNiff, AT&T's consensus tracking sheet reported that consensus among the "Top 10" analysts for AT&T's were forecasting an upgrade rate was 6.1% and an equipment revenue decline of 6.4%. [J. Ex. 132 (Mar. 30, 2016 Black email and tracking chart).]

660.    On April 5, 2016, following his call with Black, McNiff emailed Black: "Quick clarification: where is consensus on 1Q handset upgrade rate? 5%?" Black responded: "That is where the folks that have updated recently 5%." [J. Ex. 256 (Apr. 4, 2016 email chain).]

661.    Black's most recently updated Top Ten average sheet prior to his call with McNiff reflected that the Top Ten average upgrade rate was 6.1%. [J. Ex. 132 at 3 (Mar. 20, 2016 email and tracking sheet); Black Dep. Tr. (P. Ex. 66) 275:8-24 ("Q. Do you see the top ten consensus upgrade rate . . . on that sheet on the second page is 6.1 percent? A. I see that, yes. Q. And that's different from 5%. Right? A. That's correct. Q. Is there any document that shows how you got to the 5% you write to Mr. McNiff here? A. Not that I recall.").]

662.    McNiff had no visibility into how Black chose which analysts to include or exclude from the "consensus" metrics that Black provided to McNiff. [McNiff Dep. Tr. (P. Ex. 80) 144:10-16 ("Q. Did you have any visibility into how Mr. Black chose the subset of analysts on which he based consensus? A. I did not.").]

663.    On April 5, 2016, McNiff emailed Kvaal summarizing his call with Black: "Spoke with Michael Black re AT&T's (subset) consensus for 1Q16." McNiff reported in his email that, based on information he obtained from Black, Nomura's quarterly revenue estimate was over $1 billion higher than the consensus estimates among Black's "subset of analysts." McNiff added that half of that difference was attributable to equipment revenue. [J. Ex. 294 (April 5, 2016 email from McNiff to Kvaal).]

664.    McNiff understood that by highlighting only a "subset" of analyst numbers, Black was suggesting to him where Nomura's estimates should be. [J. Ex. 294 (April 5, 2016 email from McNiff to Kvaal: "When I spoke to Michael Black in mid-feb, he suggested equip rev was flat to down 5%, vs. now down 10-15%".)]

665.    Responding to McNiff's email summarizing his call with Mr. Black on April 5, 2016, Kvaal wrote, "lower upgrade rate is good news I would guess?" McNiff replied by confirming that lower upgrade rates were positive for AT&T because they are "good for cash (lower capex for handsets) and margin (eip has negative margin related to financing costs)." [J. Ex. 294 (Apr. 5, 2016 email).]

666.    On April 11, 2016, according to Evans, he tried calling Nomura analyst Jeffrey Kvaal to discuss Stephens's comments at the March 9, 2016 Deutsche Bank conference, but he found out Womack had already reached out to him. [J. Ex. 295 (Apr. 11, 2016 email); Evans Dep. Tr. (P. Ex. 71) 201:18-202:14).]

667.    By April 15, 2016, Nomura had not made any further updates to its estimates since its March 17, 2016 report. *See* Suthammanont Decl. ¶ 4(a).

668.    On April 15, 2016, Womack spoke by phone to McNiff and Kvaal. [JSF ¶¶ 204; 251.]

669.    Kvaal and McNiff each took notes of the April 15, 2016 call. [P. Ex. 35 (Kvaal's notes); Kvaal Dep. Tr. (P. Ex. 78) 141:10-1146:15; Kvaal Inv. Tr. (P. Ex. 60) 129:19-24; P. Ex. 36 (McNiff's Notes); McNff Inv. Tr. (P. Ex. 62) 204:12-21 ("These contain your notes of your conversation with Mr. Womack on April 15th 2016? A. Yeah …"); McNiff Inv. Tr. (P. Ex. 62) 206:2-24 ("Yeah. These – this [document] looks like a conversation with Chris Womack on 4/15").]

670.    McNiff took notes of the call while it was ongoing so that he could refer to them later and relied on them to be an accurate record of what was discussed. [McNiff Inv. Tr. (P. Ex. 62) 91:23-92:22 ("Q. What are your practices for notetaking when you're speaking with investor relations personnel for AT&T? A. I wish to take the notes that I think are relevant or, you know, try to get down as much as I can … Q. You try to take down what they're telling you that you deem relevant or important to your work? A. Yeah, that's fair. Yeah." McNiff Dep. Tr. (P. Ex. 80) 119:12-121:5 (Q. Why would you take notes of these calls? A. I just have a bad memory, so just to keep track of – you know, the calls and what's on them. Q. So you could refer to it at a later point? Yeah … yeah, exactly.").]

671.    Kvaal took notes of the call while it was ongoing so that he could refer to them later and relied on them to be an accurate record of what was discussed. [Kvaal Dep. Tr. (P. Ex. 78) 141:145:19 ("Q. Was it your regular practice to take notes of the calls that you had with investor relations professionals from the issuers you were covering as a sell side analyst? A. Oh, for sure yes. Q. What was the purpose of taking notes for your calls with IR folks from issuers you were covering? A. I can't always remember everything that they said … Q. So the purpose is to keep a record that you can refer to later; is that fair? [objection] Q. Yes, that's right… Q. So

it's important, then, that your notes be an accurate reflection of what was said on the phone? [objection] A. Yeah…").]

672.     Kvaal and McNiff's notes of the April 15, 2016 call with Womack both reference upgrade rates at 5% levels. [P. Ex. 35 (Kvaal's notes: "Record low upgrade rates – low 5% range); P. Ex. 36 (McNiff's notes: "Upgrade rate: 5% <u>levels</u>").]

673.     On April 15, 2016, after his call with Womack, Kvaal wrote in an email sent to two buy-side clients: "I spoke to AT&T this morning. This is a very low quarter for handset sales. They upgrade rate, which has been at 8-9% historically, is at an all-time low this quarter at 5%." [J. Ex. 296 (Apr. 15, 2016).]

674.     Womack told Nomura's analysts on April 15, 2016 that AT&T's upgrade rate for the first quarter would be a record low of around 5%. [P. Ex. 35 (Kvaal's notes: "Record low upgrade rates – low 5% range); P. Ex. 36 (McNiff's notes: "Upgrade rate: 5% <u>levels</u>"); J. Ex. 296 (Apr. 15, 2016) (April 15, 2016 email from Kvaal: "I spoke to AT&T this morning. This is a very low quarter for handset sales. They upgrade rate, which has been at 8-9% historically, is at an all-time low this quarter at 5%"); Kvaal Inv. Tr. (P. Ex. 60) 151:3-152:7 ("Q. So whether explicitly or implicitly, your takeaway from what Mr. Womack told you was that they were going to report a 5 percent record low upgrade rate in the first quarter? A. Yeah. I would have been surprised if it had been 50 basis points away from 5 percent or more than 50 basis points").]

675.     On April 19, 2016, Nomura published a research report revising its estimates for AT&T's first quarter of 2016. [J. Ex. 84 (Nomura April 19, 2016 Report); *see also* JSF ¶ 252.]

676.     In connection with its April 19, 2016 estimate revision, Nomura reduced its quarterly wireless equipment revenue estimate for AT&T from $3.374B to $2.868B (a 15% decline year over year) and reduced its quarterly consolidated revenue estimate from $41.372B

to $40.535B. [J. Ex. 84 (Nomura April 19, 2016 Report); J. Ex. 247 (Nomura Model as of April 19, 2016).]

677.     Although they did not model AT&T's upgrade rates, in their April 19, 2016 Kvaal and McNiff wrote Nomura's April 19, 2016 AT&T research report that "[f]or AT&T, we are projecting a handset upgrade rate of 5% …" [J. Ex. 84 at 5 (Nomura April 19, 2016 Report).]

678.     In Nomura's April 19, 2016 AT&T Research Report, Kvaal and McNiff wrote that "[w]e have heightened confidence in our metrics, including … a record low upgrade rate of ~5%." [J. Ex. 84 at 2 (Nomura April 19, 2016 Report).]

679.     Kvaal derived his "heightened confidence" in his quarterly upgrade rate estimate from his April 15, 2016 phone call with Womack. [Kvaal Inv. Tr. (P. Ex. 60) 157:9-17 ("Q. What did you mean by heightened confidence in our metrics? A. Yeah, I suspect that has to do with certainly an element of having spoken to Chris [Womack] in that statement.").]

680.     In Nomura's April 19, 2016 note, Kvaal and McNiff raised their price target for AT&T from $39 to $44, citing improving service margins as the primary driver. [J. Ex. 84 (Nomura April 19, 2016 Research Report) at 4 ("[w]e are raising our price target on AT&T shares to $44 to reflect improving service margins through cost savings and a greater emphasis on profitable subscribers.").]

681.     Kvaal and McNiff noted in their report that that these margin improvements, in turn, were driven at least partially by decreasing upgrade rates and equipment revenues. [J. Ex. 84 (Nomura April 19, 2016 Research Report) at 5 ("While this adjustment [reduced equipment revenues] lowers our revenue forecast, it does improve our margin forecast as equipment installment plans typically have a ~15 negative margin associated with them); *id.* at 6 ("From a margin impact, the reduction in our 1Q revenue forecast was mostly offset by an increase in our

wireless service margins and the benefit of less equipment installment plans which have a negative margin."); Kvaal Dep. Tr. (P. Ex. 78) 167:24-168: ("Q … 'equipment installment plans typically have a 15 percent negative margin associated with them' What does that mean? A. That means that for every dollar that they sell on a phone, they lose 15 cents.").]

682.    After publishing Nomura's revised forecasts on April 19, 2016, Kvaal forwarded his research report separately to a buy-side client and informed him that "The genesis of the note was T [AT&T] making sure the outliers on equipment revenue were whipped back into line." [J. Ex. 297.]

683.    Kvaal understood the purpose of Womack's outreach on April 15, 2016 was to induce him to reduce his equipment revenue and total revenue estimates. [J. Ex. 297 (April 19, 2016 email from Kvaal, forwarding Nomura's estimate revision to a client: "The genesis of the note was T [AT&T] making sure the outliers on equipment revenue were whipped back into line."); Kvaal Dep. Tr. (P. Ex. 78) 162:16-164:14 ("Q. 'The genesis of the note was T making sure the outliers were whipped back into line.' What did you mean by that? A … the concept is that if – if analysts are too far from consensus on any one metric, then it kind of fouls up what the consensus number is. That can trip a company up when they're reporting their results. Q. Are you referring here to your call with Mr. Womack on April 15th? A. It appears to be so, yes. … You were one of the outliers AT&T was whipping into line? [objection] A. I think that's a reasonable conclusion to draw from the email, yes ..."); J. Ex. 298 (April 19, 2016 email from Kvaal, forwarding Nomura's estimate revision to a client "AT&T was talking down the recovery in service revenues in February/March and in March/April have been pressing on very low upgrade rates/light equipment revenue. I spoke to them on Friday [April 15, 2016] and this was the key message."); Kvaal Dep. Tr. (P. Ex. 78) 159:18-160:18.]

684.     On April 19, 2016 after Nomura's April 19 estimate revision reducing Nomura's revenue and equipment revenue forecasts for AT&T's first quarter, Viola emailed Womack and Black "Kvaal came thru." [J. Ex. 175 (April 19, 2016 email from M. Viola re: Morgning IR Note – April 19."]

> xiii.   BTIG

685.     Evans participated in a call with sell-side analysts from BTIG on April 5, 2016. [JSF ¶ 253.]

686.     The call between Evans and BTIG on April 5, 2016 lasted 34 minutes and 17 seconds. [JSF ¶ 254.]

687.     Evans does not recall what he specifically stated in his call to BTIG on April 5, 2016. [Evans Dep. Tr. (P. Ex. 71) 188.14-18 ("Q. Do you have a specific memory of speaking to him? A. Oh, I remember speaking to Walt. But, you know, I don't remember the exact words of that part of the conversation.").]

688.     On April 7, 2016, BTIG issued a note regarding AT&T and the three other major mobile carriers revising the upgrade rate estimates and revenue for those four public companies. [J. Ex. 85 (Apr. 7, 2016 BTIG note); *see also* JSF ¶ 255.]

689.     BTIG's revision of AT&T's upgrade rate change was greater than any of the other three mobile public companies, changing from 6.5% to 4.7%, a nearly 28% decline, while the greatest decline for the other three mobile companies upgrade rate was 20%. [J. Ex. 85 at 4 (Apr. 7, 2016 BTIG note).]

690.     In its April 7, 2016 Note, BTIG highlighted to its customers the impact of AT&T lower upgrade rate estimate on AT&T's revenue: "AT&T represented the most dramatic change to our upgrade rate estimates, which resulted in a more than $2.5 billion reduction in our estimate

of AT&T's equipment revenue and cost of goods sold." [J. Ex. 85 at 4 (Apr. 7, 2016 BTIG note).]

691.    BTIG's revised upgrade rate for AT&T on April 7, 2016 of 4.7% is exactly the same as AT&T's internal nonpublic estimate at that time of Evan's call with BTIG. [*Compare* J. Ex. 85 *with* J. Ex. 133 at 6 (March 23, 2016 email and Mobility 2+1 Deck); *see also* J. Ex. 201 (Mar. 23, 2016 email from Evans: "When we were previously discussing the upgrade rate, I had been talking about a low 5% range. Volumes continued to be very low in March and the new estimate being used in the 2+1 is 4.7%. Chris [Womack] had been initially using something closer to this number to explain revenue softness and I moved him up but should not have.").]

692.    Evans testified that it was "lucky" or a "coincidence" that BTIG had the same upgrade rate estimate of 4.7% as what AT&T's then internal upgrade rate of 4.&%. [Evans Inv. Tr. (P. Ex. 53) 119:7-12.]

693.    Walter Piecyk, the Senior Analyst at BTIG covering AT&T during the time Evans called BTIG on April 5, 2016, has no memory of speaking to Evans during that relevant time, including on April 5, 2016, and he did not take notes when he spoke to AT&T IR people. [Piecyk Dep. Tr. (P. Ex. 82) 59:6-16, 174:14-19.]

694.    Joseph Galone, the Junior Analyst working with Piecyk at BTIG covering AT&T during the time Evans called BTIG on April 5, 2016, has no memory of speaking to Evans during that relevant time, including April 5, 2016, and he did not take notes when he spoke to AT&T IR people. [Galone Dep. Tr. (P. Ex. 74) 102:21-103:21.]

695.    From at least January 2014 through April 7, 2016 (when BTIG issued its note revising its estimates for AT&T's upgrade rate and revenue for the 1st Quarter of 2016), both Piecyk and Galone regularly communicated with Evans by email and telephone and sought

and/or obtained information from Evans regarding AT&T's business. (*See*, *e.g.*, P. Ex. 1 (Jan. 7, 2014 email if all auction spectrum 10 MHz), P. Ex. 2 (Jan. 29, 2014 email asking for "upgrades going forward" and if Next phones included or excluded from upgrade rate), P. Ex. 3 (Jan. 29, 2014 email asking if most of the pre-paid losses were conversions to postpaid plans and other questions about interest expenses), P. Ex. 4 (Jan. 29, 2014 email seeking percentage of Next phone plan upgraders and purchasers who took option "no money down"), P. Ex. 5 (Feb. 11, 2014 email seeking ending postpaid tablet base data and historical data on postpaid tablets); P. Ex. 25 (Apr. 5, 2016 email requesting information on pro forma for various quarters in 2015); and P. Ex. 9 (July 26, 2015 email seeking more specificity about the upgrade rate data).]

696. The person in AT&T's IR department that Piecyk communicated with most was Evans. [Piecyk Dep. Tr. (P. Ex. 82) 92:22 to 93:3.]

697. Galone considers Evans to be a "business friend." [Galone Dep. Tr. (P. Ex. 74) 54:15-16.]

698. Piecyk has no memory of Stephen's remarks at the March 9, 2016 Deutsche Bank conference or how such remarks impacted BTIG's April 7, 2016 note. [Piecyk Dep. Tr. (P. Ex. 82) 166:24-167:19.]

699. Piecyk, a seasoned senior analysis covering A&T for many years, when shown Stephen's statements regarding the update rate on March 9, 2016 at the Deutsche Bank Conference, testified that "[t]hat looks like a generic sentence that executives say all the time." [Piecyk Dep. Tr. (P. Ex. 82) 168:11-19.]

*xiv. Jefferies*

700. The analyst with principal responsibility for covering AT&T for Jefferies was Michael McCormack. [JSF ¶ 256.]

701.    Between January 27 and April 7, 2016 Jefferies estimated that AT&T would report total revenues for the first quarter of 2016 of $41.409 billion, on quarterly equipment revenues of $3.665 billion (an increase of 8.6% year-over-year) and a quarterly wireless upgrade rate of 6.6%. [P. Ex. 45 (Jefferies Model dated 1.27.2016, sent to client on March 4, 2016 (*see* J. Ex. 280)).]

702.    On March 18, Womack spoke with McCormack by phone to review Jefferies' AT&T model. [P. Ex. 18 (Mar. 18, 2016 email from McCormack to Womack) (McCormack: "Can u push model review to later?" Womack: "Sure – How's 9? 10?" McCormack: 10 works. Thx."); *see also* JSF ¶ 257.]

703.    On April 6, 2016, Evans spoke with McCormack by phone. [JSF ¶ 258; P. Ex. 27 (Apr. 6, 2016 email from Evans to McCormack referencing discussion "this morning").]

704.    On April 7, 2016, Jefferies updated its estimates, revising its total revenue estimates for AT&T's first quarter to $40.756 billion, on quarterly wireless equipment revenues of $3.024 billion (a 10.4% decline year-over-year) and an upgrade rate of 5.0%. [P. Ex. 29 (Jefferies AT&T Model dated April 7, 2016).]

705.    In its research report accompanying its estimate revision, Jefferies raised target price for AT&T due, in part, to improved margins resulting from lower upgrades, which it also believed would support a higher quarterly earnings-per-share than analysts were then forecasting. [P. Ex. 30 (Jefferies April 7, 2016 Research Report) ("Commentary suggests historically low upgrade rates … We expect this dynamic and improving ARPU declines to drive upside to margins, with our 48.7% estimate roughly 130bps above consensus. As a result, we believe Consensus EPS of $0.69 is conservative"); *see also* JSF ¶ 259.]

*xv.   William Blair*

706.    The analyst with primary responsibility for covering AT&T at William Blair was James Breen. [JSF ¶ 260].

707.    From January 27, 2016 through April 24, 2016, William Blair estimated that AT&T would report total revenues of $41.55 billion for the first quarter of 2016 on quarterly wireless equipment revenues of $3.347 billion (roughly flat year-over-year). [P. Ex. 47 (Jan. 27, 2016 William Blair model) (see native).]

708.    On March 11, 2016, Breen sent an email to Womack with the subject line, "random question," writing, "Chris, Our firm is doing work for a company that refurbishes and distributes iphone and Samsung phones that people trade in and we're trying to get a size of the market. Any color you can add to this, of the phones you guys sold last year, how many are new v refurbished? Etc…" Womack replied, in part, "We have ~58m smartphones in our base and on average, subs upgrade every three years." [J. Ex. 227 (Mar. 17, 2016).]

709.    On March 31, 2016, Womack emailed Breen: "Hey Jim – let me know if you have time next Thursday or Friday to review consensus. I want to make sure you have a sense of where the numbers are for the street." Womack and Breen agreed to speak at 11:00 am EDT on April 7, 2016. [J. Ex. 89 (Mar. 31, 2016); *see also* J. Ex. 90 (Womack calendar invite confirming time for April 7, 2016 call); JSF ¶ 261.]

710.    On April 7, beginning at 11:00 am EDT, Womack and Breen spoke for approximately 45 minutes. [JSF ¶ 262; *see also* Womack Dep. Tr. (P. Ex. 88) 252:23-254:19.]

711.    When, by April 19, 2016, Breen had not revised his estimates, Viola emailed Womack and Black that consensus estimates for AT&T quarterly revenues were then at $40.59 billion, still slightly above what AT&T would report, and that "[w]e really need Breen and Bowen to adjust." [J. Ex. 174 (Apr. 19, 2016).]

712.     When Viola wrote "we really need Breen and Bowen to adjust," in his email to Black and Womack, he meant that AT&T's IR Department needed William Blair and Pacific Crest to reduce their revenue estimates in order to bring consensus revenue estimates down to a level that AT&T could meet or beat. [J. Ex. 174 (Apr. 19, 2016); Viola Inv. Tr. (P. Ex. 54) 221:24-225:9; 225:1-4 (describing his April 19 email: "Well, we didn't want to – we were attempting not to miss revenue because we had a preference that we'd rather not miss, we'd rather meet or beat"); Womack Dep. Tr. (P. Ex. 88) 255:9-257:13; Womack Inv. Tr. (P. Ex. 55) 258:22-261:23.]

713.     The following day, on April 20, 2016, Womack emailed Breen: "Hey Jim – did you publish your preview yet? I may have missed it." Breen replied, "Not yet, end of week." Womack replied "cool." [J. Ex. 304 (Apr. 21, 2016 email chain).]

714.     On April 21, 2016, Breen responded to Womack again, writing "Hey, we looked through everything and not sure we need a preview as our numbers are close to consensus, let me know if you want to discuss." [J. Ex. 304 (Apr. 21, 2016 email chain).]

715.     When Breen sent this email to Womack, he did not intend to publish any revisions to his estimates for AT&T's first quarter. [Breen Dep. Tr. (P. Ex. 68) 134:19-22 ("Q. Is it fair to say that as of 1:47 p.m. on Thursday, April 2st, it was your intention to not do a preview for the first quarter of 2016? A. At the point when I sent that email, yes").]

716.     Six minutes after being informed that Breen was "not sure we need a preview" on April 21, 2016, Womack called Breen; the two spoke for 17 minutes. [Breen Dep. Tr. (P. Ex. 68) 136:4-9; Womack Inv. Tr. (P. Ex. 55) 262:12-264:20; *see also* JSF ¶ 263.]

717.     Later on April 21, 2016, Black emailed Viola a report detailing what reporting services were then calculating as consensus revenue estimates for AT&T's first quarter. Black

wrote that "[f]or William Blair, Chris W. spoke with Breen this afternoon and he indicated that they are planning on adjusting their estimates – they report in both First Call and Bloomberg." [J. Ex. 300 (Apr. 21, 2016 email from Black to Viola).]

718.    On April 24, 2016—three days after Breen received this call from Womack and two days before AT&T would report its quarterly results—William Blair published revised estimates for AT&T, reducing its total revenue estimates from $41.55 to $40.51 billion, on lower equipment revenues. William Blair also lowered its EPS estimate from $0.70 to $0.68. [J. Ex. 91 (Apr. 24, 2016 Blair Research Report); J. Ex. 92 (William Blair Model as of Apr. 24, 2016); *see also* JSF ¶ 264.]

719.    Breen understood Womack's April 21 call as a signal to him that his revenue forecasts for AT&T's first quarter 2016 were too high and needed to be reduced. [Breen Dep. Tr. (P. Ex. 68) 134:1-137:9 ("Q. Do you recall whether he [Womack] told you anything during that [April 21] call that made you decide to revise your estimates downward one billion dollars when you hadn't decided to do that previously? [objection] A. Clearly there was some discussion around that because then I ultimately decided to do it."); Breen Inv. Tr. (P. Ex. 56) 197:3-24 ("Q. April 21 is three weeks after quarter end, right? A. Yes. Q. And that's five days before they are going to report their earnings? A. That's right, yeah. Q. So Mr. Womack by that point presumably has a pretty good idea of where AT&T's revenues are going to come out? A. Yeah, I guess. I don't know. I basically speculating now. Q. And the morning of the 21st, you didn't think a preview was necessary because your numbers were close to consensus? A. Yes. Q. And then you speak with Womack on the afternoon of the 21st and then two business days later you adjust your estimates? A. Yes. Q. And you don't recall anything about that conversation with Mr. Womack on the 21st? A. I don't."); Breen Inv. Tr. (P. Ex. 56) 223:16-225:7 (". . . if a

company is calling me multiple times on a piece of public information, they then they clearly think it's important. And if the company thinks it's important, you know, it implies that I should think it's important … They were – you know, clearly they were working toward a number.").]

720.    Breen only read the specific portions of Stephens's Deustche Bank remarks to which Womack directed his attention. [Breen Dep. Tr. (P. Ex. 68) 124:12-23 ("Q. . . . Do you recall reading that particular section of these remarks [p. 3 of Stephens's Deutsche Bank remarks] in April of 2016? A. No. Q. Okay. Do you recall what in Mr. Stephens' remarks you did review? A. The part around the 'bring your own device' and handset financing, the [Next] programs. Q. And you knew -- and you knew to review those, because Mr. Womack pointed you to -- your attention to those -- to those areas? A. That's correct.").]

721.    Below is a chart of the communications with William Blair, the emails and calls with William Blair, William Blair's revenue estimate for 1Q16, AT&T's own projected revenue, and the Bloomberg consensus that illustrates the facts set forth above:

**Figure 4. William Blair Communications Timeline**[49]

This figure plots the timeline of AT&T's IR team communicating with James Breen at William Blair several times via phone and email. The vertical short-dashed red and blue lines represent emails from AT&T and William Blair respectively. The vertical longer-dashed red lines represent calls from AT&T to William Blair. The top axis refers to the numbering of the calls and emails shown in Section 4.3 of this report. Additionally, the solid blue line represents William Blair's total revenue estimate for Q1 2016, the solid red line represents AT&T's internal projection for total revenue, and the green line represents the Bloomberg consensus estimate for revenue. AT&T's efforts in contacting James Breen appear to have played a key role in pushing the Bloomberg consensus estimate to be below AT&T's internal projection.



[Vasilescu Decl. Ex. 4 at 22 (Griffin Feb. 15, 2022 Report).]

> xvi.   *Pacific Crest*

722.   On April 7, 2026, Pacific Crest, which covered AT&T and other mobile companies like Verizon and T-Mobile, issued an earnings preview with estimates for 1Q16 for various public companies, including AT&T ("Pacific Crest April 7 Note"). [JSF ¶ 265; J. Ex. 93 (Apr. 7, 2016 Pacific Crest note).]

723.   The Pacific Crest April 7 Note stated that its estimates for AT&T revenue for the 1st Quarter of 2016 was $41.691 Billion. [J. Ex. 93 at 6 (Apr. 7, 2016 Pacific Crest note).]

724.    The next day, on April 8, 2016, Evans called Michael Bowen, the senior analyst at Pacific Crest, to set up a further call to discuss AT&T's CFO public statement on March 9, 2015. [JSF ¶ 200; J. Ex. 176 (Apr. 8, 2016 email).]

725.    Prior to calling Pacific Crest, Evans discussed with Black which one of them should call Pacific Crest. Evans pointed out to Black that he, Evans, "had success in getting an attendee for Michael Bowen's [Pacific Crest] conference" and, for that reason, Black and Evans agreed that Evans would call Pacific Crest. [Evans Dep. Tr. (P. Ex. 71) 183:21-184:15.]

726.    Evans understood before he spoke to Bowen on April 8, 2016, that Bowen was aware of the prior upgrade trend in the market. [Evans Dep. Tr. (P. Ex. 71) 198:23-199:20.]

727.    At the time Evans spoke to Bowen, Evans understood that, while some analysts knew the upgrade trend, they did not know when and at what rate the upgrade rate would bottom out. [Evans Inv. Tr. (P. Ex. 53) 140:13-141:5 ("[Q.] Focusing on the former, with the first component, that there has been a trend of decreasing upgrade rates, as far as you could tell, was Mr. Bowen completely unaware of that separate and apart from Mr. Stephens's thought he would not be surprised to see the trend continue? A. No, he -- he was aware of the prior trend. Consumer -- or, because of consumer behavior with the non-subsidized model, most analysts were trying to guess what they would bottom out at, what the lowest level, where it will hit the bottom. And then, what John is saying, It's continuing to go down, a lot of analysts had thought it would bottom out at a certain level; but they moved that and were saying it's going to be future periods that it's going to bottom out, based on John's comments.").]

728.    During the April 8, 2016 call, Evans conveyed to Bowen that AT&T's "upgrade rate would be at a record low," as confirmed by Bowen's email to his junior analyst immediately after his call with Evans. [J. Ex. 242 (Apr. 8, 2016 email).]

729.     As of April 8, 2016, AT&T had not publicly disclosed that its upgrade rate would be "a record low." [Suthammanont Decl. ¶ 4(b).]

730.     Evans participated in a call with Pacific Crest analysts Michael Bowen and Brandon Nispel on April 15, 2016. [JSF ¶ 266.]

731.     During the call on April 15, 2016, as confirmed by the typed and handwritten notes taken contemporarily by the Pacific Crests analysts, and the Bowen's deposition testimony, Evans conveyed to Pacific Crest that AT&T's "upgrade will be a record low." [Bowen Dep. Tr. (P. Ex. 67) 69:17-70:25 ("Q. . . .Do you have an independent recollection of the things said in this [April 15, 2016] call, apart from these notes? A. Well, of course. I mean, yes, I – I remember the conversation . . . . Q. . . . what do you remember him saying about Mr. Stephens' comments as it mattered to you? A. That upgrade rates were going to be at a record low, it was going to negatively impact revenue, that consensus was too high, that they had been talking to different analysts, and that he had been wanting to get in touch with me"); *id.* at 74:19-75:21 ("Q. . . . Do you recall there being a discussion about upgrade rates will be a record low? A. Yes. Q. What do you recall? A. Exactly what's here [in my notes]. I recall Kent telling me that they were expecting upgrade rates to be really low for the fourth quarter. I believe we lowered to 4.8 percent. I think he had told me somewhere around five percent back then . . . . Q. . . . . Was that a consensus figure he was giving you? [objection] A. . . . No, that was what he told me that AT&T would likely experience in the … first quarter."); Nispel Inv. Tr. (P. Ex. 63) 114:17-117:23 ("Q. So Mr. Evans told you, and you recall this, that upgrade rates for AT&T's first quarter would be at a record low? A. I think that's fair . . . Q. Was this new news to you? A. The record low? Yes."); P. Ex. 34 (Pacific Crest typed notes); P. Ex. 96 (Bowen Declaration and handwritten notes).]

732.    Bowen specifically recalled what Evans conveyed on his April 15, 2016, call to Pacific Crest: "[Defense Counsel.] Okay. Now, let me ask you this: Do you have an independent recollection of the things said in this call, apart from these notes? A. Well, of course. I mean, yes, I – I remember the conversation, yes." [Bowen Dep. Tr. (P. Ex. 67) 69:17-21.]

733.    Bowen specifically remembered that Evans told him the following: "[Defense counsel] As best you can remember, what do you remember him saying about Mr. Stephens' comments as it mattered to you? A. That upgrade rates were going to be at a record low, it was going to negatively impact revenue, that consensus was too high, that they had been talking to different analysts, and that he had been wanting to get in touch with me." [Bowen Dep. Tr. (P. Ex. 67) 70:18-25; *see also* P. Ex. 34 at 2 (Pacific Crest notes: "Upgrade rates will be a record low. Record before was 5.6% - 5.7% . . . Postpaid upgrade rate down to around 5%") P. Ex. 34 at 3 ("Equipment revenues are lower y/y b/c of lower upgrade rates. 3-4 people still not lowered that they have told them they will. Consensus is 40.6 and it is going down. 40.3 is a good number."); P. Ex. 96 at 4 (Bowen handwritten notes: "equipment rev lower due to upgrade rates").]

734.    When pressed by defense counsel, Bowen again confirmed he specifically remembered Evans telling him that AT&T would have the lowest upgrade rate as confirmed by the contemporaneous notes:

> Q. All right. Now, I want to go down to the next full paragraph that's not indented. "Upgrade rates will be a record low. Record before was 5.6 to 5.7 percent. Some of it is just math, because you have Apple selling in their own stores." Do you see that? Do you recall there being a discussion about upgrade rates will be a record low?
>
> A. Yes.
>
> Q. What do you recall?

> A. Exactly what's here. I recall Kent [Evans] telling me that they
> were expecting upgrade rates to be really low for the fourth [*sic*]
> quarter. I believe we lowered to 4.8 percent. I think he had told me
> somewhere around five percent back then. I see that down below,
> so I recall that correctly.

[Bowen Dep. Tr. (P. Ex. 67) 74:19-75:8; *see also* P. Ex. 34 at 2 (Pacific Crest notes: "Upgrade rates will be a record low. Record before was 5.6% - 5.7% . . . Postpaid upgrade rate down to around 5%"); P. Ex. 96 at 4 (Bowen handwritten notes: "postpaid upgrade rate – 5%").]

735.    Bowen specifically remembered that Evans told him that the upgrade rate would be a record low: "[Defense counsel] Okay, but as you sit here today, it's your recollection that Mr. Evans told you, as best you can recall, specifically told you that upgrade rates would be very low and gave you a number of five percent? A. Correct. Q. Tell me why -- out of all the calls you've had and all the notes and meetings, tell me why your recollection of that is specific. **Was there something about it that made you remember this to this day? A. That it was just shockingly bad. Q. That the number was bad? A. Yes**." [Bowen Dep. Tr. (P. Ex. 67) 76:8-20 (emphasis added); *see also* P. Ex. 34 at 2 (Pacific Crest notes: "Upgrade rates will be a record low. Record before was 5.6% - 5.7%").]

736.    According to Bowen, Evans's call on April 15, 2016, was not normal: "I would say it is highly unusual to have gotten a call like that, with that information, at that juncture before earnings." [Bowen Dep. Tr. (P. Ex. 67) 20:16-19.]

737.    Bowen regularly took notes of his calls with personnel from issuers he covered, and it was his practice to accurately record the information provided to him, including by Evans, so that he could refer to it later in his work as an analyst. [P. Ex. 96 at 2-3 ¶¶ 4-5 (Bowen Decl.).]

738.    On April 19, 2016, Pacific Crest released a new note, among other things, addressing the estimates for AT&T for the 1Q16 ("Pacific Crest April 19 Note"). [J. Ex. 243 (Apr. 19, 2016 Pacific Crest note); *see also* JSF ¶ 267.]

739.    The headline for Pacific Crest's April 19 Note was "Upgrade Rate His Air Pockets; Adjusting Estimates for T and VZ." [J. Ex. 243(Apr. 19, 2016 Pacific Crest note); *see also* JSF ¶ 267.]

740.    Pacific Crest's April 19 Note revised its estimate for AT&T's revenue for 1Q16 to $40.5673 billion from its previous revenue estimate published on April 7, 2016 of $41.691 billion, a more than $1 billion reduction. [J. Ex. 243 at 2 (Apr. 19, 2016 Pacific Crest note).]

741.    In making its April 19 Note revenue estimate, Pacific Crest changed its estimate of the upgrade rate for AT&T to 4.8% taking into account what Evans told Bowen and Nispel. [Bowen Dep. Tr. (P. Ex. 67) 88:1-11.]

742.    Unbeknown to Pacific Crest, also on April 19, 2016, Womack discussed with his supervisor at AT&T, Viola, and Evans, seeking to have the third party entity that published the consensus to exclude Pacific Crest's prior estimate had Pacific Crest not changed its estimate. [*See* Ex. J. Ex. 175 (Apr. 19, 2016 email chain) (Apr. 19, 2016).]

743.    At the time Evans spoke to Bowen on April 15, 2016, Evans was working on arranging for an AT&T executive to attend Bowen's Pacific Crest conference later that year. [Evans Dep. Tr. (P. Ex. 71) 183:14-184:7 ("Q. Now, you didn't talk to Pacific Crest until sometime after March 31. Do you know how it came to be that you were the one speaking with Pacific Crest and not Mr. Black when, on this chart, as of March 31, it looks like Mr. Black was assigned to Pacific Crest? A. Yes. Q. How did that come about? A. I was in a conversation I had with Michael Black. I was telling him I was having to -- I had success in getting an attendee for

Michael Bowen's conference. From what I remember, Michael said, 'Well, do you know him'? And I said yes. And he said, Well, can you call him -- or – 'When you call him, can you also let him know what John Stephens had said at Deutsche Bank, the publicly stated comments?'").]

744.    Evans generally recollects that he spoke Bowen and Nispel on April 8, 2016 and April 15, 2016, but claims the most he did was point them to Stephen's speech on March 9, 2016 concerning among other things AT&T's upgrade cycle and consensus. [*E.g.*, Evans Inv. Tr. (P. Ex. 53) 126:3-23 ("Q. . . .do you recall having had those phone calls with Mr. Bowen? A. I remember talking to Michael Bowen. Q. At about – A. -- about that time. Q. Okay. And what did you discuss? A. I wanted to make sure that he was aware that John Stephens had presented at Deutsche Bank and the comments that he made. Q. Okay. And was he aware? A. No. Q. How did you go about in the conversation making him aware of the Deutsche Bank conference? Can you tell me what you said to him? A. I don't remember word for word, but in effect, I just -- when I would call, I would just say, I wanted to make sure you were aware of what John -- you know, that John Stephens presented at the Deutsche Bank conference and that he made comments about the upgrade cycle at that time."); 127:4-11 ("Q. Did Mr. Bowen ask any questions about what that -- what Mr. Stephens's comments meant more specifically? A. No, I don't -- from what I remember, I don't remember specifics about it. I really don't. Um, I do remember that he was going on vacation and he wanted to meet later with his junior, to -- to go over things."); 145:4-147:8 ("Q. Phone records, I'll represent to you, indicate that at about 12:35 April 15, 2016, you had a call to Brandon Nispel that lasted just over 45 minutes. . . . Hearing that, do you recall having had that call? A. Um, I remember the call; I don't remember specifically the words on it. But we went over the model, yes. Q. And tell me about that. What generally do you remember about the call? A. Um, I would only remember what is a typical call

with Brandon at that time. It was actually the first time I'd ever talked to Brandon, and he was just in -- working the model, and he was asking about consensus.").]

745.    Evans acknowledged he may have given the Top Ten averages to Nispel on his call with him. [Evans Inv. Tr. (P. Ex. 53) 131:17-132:17 ("Q. Did you convey any information to Mr. Bowen that would be information that other analysts didn't have? A. I wouldn't have been surprised if he had asked about what the consensus was. Or Brandon Nispel may have asked. Q. And how did you address that? A. If I had the consensus, I would have told him -- you know, discussed it with him. Q. Okay. And, again, 'consensus' in that context -- I'll need you to break that down -- is, consists of what, as you used the term? A. It's mostly for -- what we had discussed with analysts was the -- what we call the Top 10. . . . And it was, you know, over a number of metrics. So Brandon Nispel -- and, normally, what he does is, on a quarterly basis, he'll ask number of metrics what -- and try to understand where he's at compared to his competitors, just to make sure she's in the ballpark. Q. And are equipment upgrade rates one of those metrics? A. I can't remember, but, you know, it's possible.").]

*xvii.    Scotiabank*[3]

746.    Black participated in a call with Scotiabank analyst Matthew Lee on April 8, 2016. [JSF ¶ 268.]

747.    Lee took contemporaneous notes of the call with Black in which he memorialized the sum and substance of the call. [P. Ex. 32 (Apr. 11, 2016 email).]

---

[3]      The parties, due to the letter rogatory process in Canada, were not able to schedule the deposition of Lee until May 5, 2022, and have agree that the parties may update the facts concerning Scotiabank in the parties' response briefing.

748. On the call, Black communicated to Lee that, for 1Q16, with respect to the handset upgrade rate, AT&T customers were "[n]ot upgrading as fast" and "devices being used for longer[.]" [P. Ex. 32 (Apr. 11, 2016 email).]

749. On the call, Black also communicated to Lee that equipment revenue for 1Q16 for AT&T's consumer and business wireless had declined by approximately 10%. [P. Ex. 32 (Apr. 11, 2016 email).]

750. On the call, Black also communicated to Lee that AT&T's total revenue for that quarter was in the range between $40.1 billion and $40.5 billion. [P. Ex. 32 (Apr. 11, 2016 email).]

751. Lee was also made aware on this call that Black had determined one other sell-side analyst's calculations with respect to churn was too low and had removed that analyst from Black's own calculations of analysts' averages. [P. Ex. 32 (Apr. 11, 2016 email).]

752. Following the call with Black, Scotiabank published a report on April 19, 2016, containing Scotiabank's 1Q16 estimates for AT&T, including Scotiabank's 1Q16 estimate for AT&T's total revenue of $40.38 billion. [J. Ex. 95 (Apr. 19, 2016 Scotiabank report); *see also* JSF ¶ 269.]

753. The Scotiabank report included Scotiabank's 1Q16 estimate that AT&T's equipment revenue would decline by approximately 9 percent year over year. [J. Ex. 95 (Apr. 19, 2016 Scotiabank report)]

    *xviii.   Buckingham*

754. On January 26, 2016, Buckingham published a research report in which it estimated AT&T's 1Q16 Wireless segment revenue to be $18.805 billion, a 3.4% increase year-over-year, and total consolidated revenue to be $41.286 billion, a 26.7% growth year-over-year. [J. Ex. 96 at 5 (Jan. 26, 2016 Buckingham Note); *see also* JSF ¶ 270.]

755.    A Buckingham model of AT&T, with the "last modified date" of March 22, 2016, contained the same $18.805 billion wireless revenue and $41.286 billion consolidated revenue projection. [P. Ex. 19 (wireless revenue at "Operating Model" Tab Cell BQ281; Total consolidated revenue at "Financial" Tab Cell BQ8).]

756.    Buckingham's March 22, 2016 model projected AT&T's equipment revenue to be $3.614 billion. [P. Ex. 19 ("Operating Model" Tab Cell BQ280).]

757.    Buckingham's March 22, 2016 model projected that 32% of AT&T's postpaid customer base would upgrade each year. [P. Ex. 19 ("Operating Model" Tab Cell BQ300).]

758.    In Buckingham's model, the upgrade rate, divided by 4, factored into Buckingham's estimate of "upgrade equipment revenue"—which was $2.213 billion in the March 22, 2016 model. [P. Ex. 19 ("Operating Model" Tab Cell BQ78 formula dividing upgrade rate from Cell BW300 by 4).]

759.    On April 8, 2016, Black emailed James Ratcliffe a sell-side analyst at Buckingham Research, stating: "Prior to the beginning of the earnings cycle I wanted to reach out to see if you have any questions on the quarter, consensus, etc." [J. Ex. 283 at 4 (email chain).]

760.    Black and Ratcliffe agreed to speak on April 12, 2016. [J. Ex. 283 at 4 (email chain).]

761.    Black participated in a call with sell-side analysts from Buckingham Research on April 12, 2016. [JSF ¶ 271.]

762.    Black told Buckingham that they were "out of range of consensus[.]" [J. Ex. 189 (Apr. 21, 2016 email) ("I spoke to James Ratcliff this past Friday as well as his junior associate just yesterday afternoon and they are aware that they are out of range of consensus and both

indicated that they were going to adjust their estimates"); Black Dep. Tr. (P. Ex. 66) 308:1-8 ("Q. And you told them on the phone call that they were out of range of consensus. Right? A. I spoke to them about consensus. Q. And when you spoke to them about consensus, you told them they were out of range of consensus. Right? A. Of consensus, yes.").]

763.    On April 12, 2016, Black emailed an AT&T employee to inform him that he was "expecting another analyst to update shortly" and identified Buckingham Research as the firm. [J. Ex. 177 at 2-3 (Apr. 12, 2016 emails).]

764.    On April 20, 2016, Black spoke to the junior analyst from Buckingham about consensus and told him that Buckingham was out of range of consensus. [J. Ex. 189 (Apr. 21, 2016 email) ("I spoke to James Ratcliff this past Friday as well as his junior associate just yesterday afternoon and they are aware that they are out of range of consensus and both indicated that they were going to adjust their estimates") ; Black Dep. Tr. (P. Ex. 66) 308:1-8 ("Q. And you told them on the phone call that they were out of range of consensus. Right? A. I spoke to them about consensus. Q. And when you spoke to them about consensus, you told them they were out of range of consensus. Right? A. Of consensus, yes.").]

765.    On April 21, 2016, Black emailed Viola updating him on consensus estimates and writing, in part: "For Buckingham, I spoke to James Ratcliff this past Friday as well as his junior associate just yesterday afternoon and they are aware that they are out of range of consensus and both indicated that they were going to adjust their estimates. . . ." [J. Ex. 189 (Apr. 21, 2016 email).]

766.    A Buckingham model, with the "last modified date" of April 22, 2016, estimated AT&T's Wireless segment revenue for 1Q16 to be $17.660 billion and $41.141 billion

consolidated revenue projection. [P. Ex. 39 (wireless revenue at "Operating Model" Tab Cell BQ281; Total consolidated revenue at "Financial" Tab Cell BQ8).]

767.    Buckingham's April 22, 2016 model projected AT&T's equipment revenue to be $2.803 billion. [P. Ex. 39 ("Operating Model" Tab Cell BQ280).]

768.    Buckingham's April 22, 2016 model projected that 22% of AT&T's postpaid customer base would upgrade each year. [P. Ex. 39 ("Operating Model" Tab Cell BQ300).]

769.    In Buckingham's model, the upgrade rate, divided by 4, factored into Buckingham's estimate of "upgrade equipment revenue"—which was $1.521 billion in the April 22, 2016 model. [P. Ex. 39 ("Operating Model" Tab Cell BQ78 formula dividing upgrade rate from Cell BW300 by 4).]

770.    On April 25, 2016, Buckingham published revised estimates for AT&T's 1Q16, changing its Wireless segment revenue to $17.660 billion (a 2.9% decrease year-over-year) and total operating revenue estimate to $40.141 billion (a 23.2% year-over-year increase. [J. Ex. 97 at 4 (Apr. 25, 2016 Buckingham Note); *see also* JSF ¶ 272.]

> *xix.   Bank of America*

771.    The analysts with principal responsibility for covering AT&T for Bank of America were David Barden and Michael Funk. [JSF ¶ 273.]

772.    From January 27 through April 18, 2016, Bank of America estimated that AT&T would report total revenues for the first quarter of 2016 of $41.798 billion, on quarterly wireless equipment revenues of $3.774 billion (an 11.9% increase year-over-year), and a quarterly upgrade rate of 7.7%. [P. Ex. 33 (Jan. 29, 2016 model sent externally on April 12, 2016).]

773.    Black had a call with Michael Funk on April 11, 2016. [JSF ¶ 274.]

774.    Womack had a call with David Barden on April 12, 2016. [JSF ¶¶ 203; 274.]

775.    On April 18, 2016, BofA updated its estimates, revising its total revenue forecast for AT&T from $41.798 billion to $40.41 billion, on quarterly wireless equipment revenues of $2.882 billion (a decrease of 14.6% year over year) and a quarterly upgrade rate of 5.1%. [P. Ex. 38; *see also* JSF ¶ 275.]

776.    In its research report accompanying its revised estimates, Bank of America noted that "[o]ur 1Q16 EPS forecast increases from $0.68 to $0.71 on lower handset expense." [J. Ex. 98 (Bank of America Research Report, April 18, 2016).]

　　　　　　　　*xx.   DA Davidson*

777.    The analyst with primary responsibility for covering AT&T from DA Davidson was James Moorman. [JSF ¶ 276].

778.    DA Davidson initiated its coverage of AT&T on February 3, 2016. [JSF ¶ 277; J. Ex. 99 (Feb. 3, 2016 DA Davidson Initiation Report).]

779.    Its initial estimate for AT&T's total revenue the first quarter of 2016 was $41.477 billion, on anticipated quarterly wireless equipment revenues $3.432 billion (roughly flat year-over-year) and a postpaid upgrade rate of 6.7%. [P. Ex. 46 (DA Davidson Model as of February 3, 2016) (see native).]

780.    DA Davidson revised its estimates on March 7, 2016, reducing its total revenue estimate to $40.870 billion, on an anticipated quarterly wireless equipment revenues of $2.825 billion (a decline of 16.3%) and a postpaid upgrade rate of 6.7%. [J. Ex. 100 (DA Davidson, March 7, 2016 Research Report); P. Ex. 10 (DA Davidson Model as of March 7, 2016); *see also* JSF ¶ 278.]

781.    On April 11, 2016, Womack spoke to Moorman by phone. [JSF ¶¶ 202; 279; J. Ex. 302 (Apr. 8, 2016 email btwn Womack and Moorman setting up call for April 11).]

782.    Although DA Davidson had already reduced quarterly estimates for AT&T's total and wireless revenues for the first quarter of 2016, DA Davidson adjusted these metrics again on April 13, 2016, two days after Moorman spoke with Womack. [J. Ex. 101 (Apr. 13, 2016 DA Davidson Research Report, titled "Q1 Preview: Lower Handset Upgrades Should Benefit EBITDA").]

783.    On April 13, Davidson adjusted its quarterly estimates for AT&T, reducing its total revenue estimate for AT&T's first quarter of 2016 to $40.044 billion on anticipated quarterly wireless equipment revenues of $2.562 (a decline of 24% year-over-year), and a quarterly postpaid upgrade rate of 5.0%. [J. Ex. 101 (Apr. 13, 2016 DA Davidson Research Report, titled "Q1 Preview: Lower Handset Upgrades Should Benefit EBITDA"); P. Ex. 90 (DA Davidson Model as of April 13, 2016); *see also* JSF ¶ 280.]

784.    In its research report accompanying its estimate revision on April 13, 2016, DA Davidson wrote that "[w]hile a lower upgrade rate means lower equipment revenue, it also means higher EBITDA margins due to the absence of the cost of the handset upgrade," and noted, accordingly, that "[w]e have lowered our Q1 revenue estimate, but raised our EBITDA and EPS estimates, largely due to lower expected handset upgrades." [J. Ex. 101 (Apr. 13, 2016 DA Davidson Research Report).]

**E.  AT&T Beats Consensus Revenue Estimates**

785.    On April 25, 2016, the day before AT&T released its 1Q16 results, Stephens emailed Viola, "May just beat revenue consensus." Viola responded: "I think we will :-)" [J. Ex. 179 (Apr. 25, 2016 email chain).]

786.    AT&T Management celebrated when AT&T beat the consensus estimate for AT&T's revenue results for the 1st Quarter of 2016. For example, Stephenson corresponded with Ralph de la Vega on April 24 and April 25, 2016 concerning that AT&T Business Solutions

"beat consensus on 5 key metrics in 1Q." [P. Ex. 40 (Apr. 25, 2016 email chain); J. Ex. 3 ¶ 13(a).]

787.    On April 25, 2016, after seeing the estimate reductions by William Blair and Buckingham, Stephens reported to AT&T's CEO, Stephenson: "These two updates may do it for us – we may beat revenue consensus – not by much but a beat nonetheless." Stephenson replied, "Good." [P. Ex. 41 (Apr. 25, 2016 email); J. Ex. 3 ¶ 13(b).]

### i.   Analysis of Defendants' Calls and Consensus Movement

788.    Following calls from Defendants, the analysts contacted by AT&T lowered their revenue estimates by an average of $1 billion to $40.416 billion. [Vasilescu Decl. Ex. 5 at 47 ¶ (b) (Wolk Feb 15, 2022 Report).]

789.    On March 1, 2016, the First Call consensus revenue estimate for 1Q16 was $41.311 billion and the analyst revisions brought the First Call consensus revenue estimate down to $40.468 billion by April 25, 2016. [Vasilescu Decl. Ex. 4 at 17-18 (Griffin Feb. 15, 2022 Expert Report).]

790.     The below chart plots (i) calls between AT&T and analysts (black dots); (ii) analyst revisions (blue diamonds); (iii) AT&T's total revenue (red line); (iv) First Call consensus (purple line); and (v) AT&T's Top Ten average (blue line) in March and April 2016.



[Vasilescu Decl. Ex. 4 at 20 (Griffin Feb. 15, 2022 Expert Report).]

791.     On March 1, 2016, the Bloomberg consensus revenue estimate for 1Q16 was $41.309 billion and the analyst revisions brought the Bloomberg consensus revenue estimate down to $40.468 billion by April 25, 2016. [Vasilescu Decl. Ex. 4 at 17-18 (Griffin Feb. 15, 2022 Expert Report).]

792.    The below chart plots (i) calls between AT&T and analysts (black dots); (ii) analyst revisions (blue diamonds); (iii) AT&T's total revenue (red line); (iv) Bloomberg consensus (green line); and (v) AT&T's Top Ten average (blue line) in March and April 2016.



[Vasilescu Decl. Ex. 4 at 19 (Griffin Feb. 15, 2022 Expert Report).]

793.    1Q16 was the only quarter in AT&T's earnings history (going back to 2006) when it was able to overcome a significantly positive estimation error (i.e., analyst were overly optimistic in terms of revenue forecasts initially) and beat the revenue consensus on its earnings date. [Vasilescu Decl. Ex. 2 at 19 (Cohen Feb. 15, 2022 Report).]

794.    The below chart demonstrates the evolutions of consensus revenue estimates for
the 25 quarters since 2006 when analysts' estimation errors were greater than 0.5%--among
them, 1Q16 (the red dotted line) was the only quarter when analyst estimates were eventually
revised down to a value lower than the reported revenue (the orange broken line) allowing for an
eventual revenue beat.



[Vasilescu Decl. Ex. 2 at 19 (Cohen Feb. 15, 2022 Report).]

795.    AT&T's IR department was statistically more likely to be involved in calls with
analysts whose revenue estimates were above AT&T's likely revenue in 1Q 2016 than in any of

the other seven fiscal quarters in 2015 and 2016. [Vasilescu Decl. Ex. 2 at 24 (Cohen Feb. 15, 2022 Report).]

796.    The below table compares the median improvement (dollar amounts in millions) and the median improvement ratio for 1Q16 against other earnings quarters and demonstrates that (i) a higher percentage of the revenue revisions in 1Q16 were preceded by calls with AT&T than other average quarters during the sample period; and (ii) the post-call revisions in 1Q16 resulted in large improvements on average, in contrast with other quarters.

| Quarters | Prior Call Between AT&T and Analysts | Median Improvement Ratio | Median Improvement ($ amount in millions) | Revision count |
|---|---|---|---|---|
| Q1 2016 | Yes | 1.6% | $653.2 | 19 |
| | No | 0.3% | $118.3 | 7 |
| Other Quarters | Yes | 0.1% | $30.8 | 82 |
| | No | 0.3% | $91.0 | 53 |

[Vasilescu Decl. Ex. 2 at 26 (Cohen Feb. 15, 2022 Report).]

797.    The below chart summarizes (i) the particular metrics that appear in notes or summaries of analysts' calls with the Individual Defendants; (ii) whether those metrics were tracked in First Call or Bloomberg consensus estimates and AT&T's Top Ten averages; (iii) the range of metrics that appear in analysts' notes; (iv) and the dates of the calls with analyst firms and firms for which there are notes:

185

| Metric | Tracked in "Consensus" | Tracked by AT&T "Top-Ten" Average | Range Disclosed | JP Morgan | UBS | DB | Wells | RBC | Drexel | Citi | Nomura | P Crest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Conversation | | | | 3/9 | 3/9, 3/16 | 3/17 | 3/17, 3/22 | 3/22 | 3/24 | 3/31 | 4/5, 4/15 | 4/15 |
| Equipment Upgrade | | ✓ | 5.0% - 5.3% | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Equipment Revenue Growth | | ✓ | (25)% - (10)% | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Wireless Service Growth | | | > 0.8% | | ✓ | | | | | | | |
| Wireless Service Margin | | ✓ | 46.0% - 48.5% | | | ✓ | ✓ | | | ✓ | ✓ | |
| Business Solutions EBITDA Margin | | ✓ | 36.5% - 37.0% | | ✓ | | | ✓ | | | ✓ | |
| Business Solutions Operating Margin | | | 23.1% - 23.5% | | | | | | | ✓ | | |
| Consolidated Revenue / Growth | ✓ | ✓ | 22.5% - 24.3% $39.9 - $40.5 | ✓ | | | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Consolidated EBITDA Margin | ✓ | | 32.0% - 32.7% | | | | ✓ | ✓ | | ✓ | ✓ | |
| Consolidated Operating Margin | ✓ | ✓ | 18.3% - 19.0% | | | | ✓ | ✓ | | | | |
| EPS | ✓ | ✓ | $0.68 - $0.70 | ✓ | | | ✓ | ✓ | | ✓ | ✓ | |

[Vasilescu Decl. Ex. 5 at 35 (Wolk Feb 15, 2022 Report).]

798.    The EPS estimates in analysts' notes did not match the actual consensus estimate range of EPS:

| | Low | High |
|---|---|---|
| CNN Money | $0.66 | $0.76 |
| I/B/E/S | $0.66 | $0.72 |
| Zacks | $0.65 | $0.72 |
| **Combined Range of Third-Party Consensus** | **$0.65** | **$0.76** |
| 1Q16E EPS in Analysts' Notes | $0.69 | $0.70 |

[Vasilescu Decl. Ex. 5 at 50 (Wolk Feb 15, 2022 Report).]

799.    Given the changes in analysts' models, the reductions in equipment revenue estimates in 1Q16 should have resulted in an EPS increase of $0.04 per share. [Vasilescu Decl. Ex. 5 at 51-53 (Wolk Feb 15, 2022 Report).]

800.    Analyst estimates of AT&T's 1Q16 upgrade rate were higher prior to the calls with Defendants than they were following the calls, as the below chart illustrates:



Note: Data includes all analysts that forecast an upgrade rate pre-disclosure, Appendix B.

[Vasilescu Decl. Ex. 5 at 61-62 (Wolk Feb 15, 2022 Report).]

801.    Analyst estimates of AT&T's 1Q16 equipment revenue were almost uniformly positive prior to the calls with Defendants, while following the calls, they were all negative as the below chart illustrates:



[Vasilescu Decl. Ex. 5 at 61-62 (Wolk Feb 15, 2022 Report).]

802.    The below chart illustrates (i) analysts' average forecast for equipment revenue growth prior to AT&T's calls, (ii) AT&T's IR estimates of equipment revenue; (iii) the average percentage disclosed during the calls for which there are notes; (iv) analysts' average equipment revenue estimate following the calls, and (v) AT&T's actual reported equipment revenue growth rate for 1Q16:



[Vasilescu Decl. Ex. 5 at 73 (Wolk Feb 15, 2022 Report).]

803.    Analysts revised their equipment revenue and total revenue below the average expectations at the time of their revisions, as illustrated in the following charts:



[Vasilescu Decl. Ex. 5 at 66 (Wolk Feb 15, 2022 Report).]

804.    The probability of the 14 analysts that included upgrade rates in their models forecasting an upgrade rate of 5.2% or less was statistically close to zero as illustrated by the below table:

|  | Slowdown Continues Scenario |
|---|---|
| Average Upgrade Rate of Every Analyst's Forecast | 5.7% |
| Probability a Single Analyst Would Forecast 5.2% or Lower | 0.003% |
| Probability 14 Analysts Would Forecast 5.2% or Lower | 3.02E-63<br>< 0.0000000000% |

Note: Based on a standard deviation of 0.12%. Excludes two analysts that did not maintain their forecasts.

[Vasilescu Decl. Ex. 5 at 69 (Wolk Feb 15, 2022 Report).]

## III.    Other Relevant Facts

805.    On August 17, 2015, Black sent Drexel Hamilton analyst Barry Sine an outline of questions for AT&T to address at an investor conference. [J. Ex. 237; Sine Dep. Tr. (P. Ex. 83) 340:11-341:16 ("this was an email where I went back and forth with Mr. Black on potential topics of conversation that I might have with [an AT&T executive]".]

190

806.     Among the topics of interest to investors that Black suggested Sine cover during the conference was "AT&T's strategy for increasing revenues[.]" [J. Ex. 237 at 4; Sine Dep. Tr. (P. Ex. 83) 343:14-344:5 ("[Q.] Do you see there that it says, 'What is AT&T's strategy for increasing revenues?' A. Yes. Q. . . . To your understanding, was this something that your investors might care about in 2015? A. Yes. Q. What about 2016? A. Yes.").]

807.     On March 25, 2016, Wells Fargo analyst Jennifer Fritzcche made 19 separate calls to investor clients to discuss AT&T's lower equipment revenues. [P. Ex. 50 (Apr. 10, 2016 email): Fritzsche Dep. Tr. (P. Ex. 73) 139:8-19 ("Q. . . . This [P. Ex. 50] reflects outreach by you to talk to buy-side investors regarding lower equipment revenue for both T [AT&T] and VZ [Verizon]? A. That's correct. Q. . . . you made 19 separate calls to buy-side investors to discuss, in part, AT&T's equipment revenues? A. That's correct.").]

808.     On June 14, 2016, RBC analyst Brian Hyun responded to a colleague's question "What are the three biggest questions to focus on for T, relative to what you get the most questions on from clients?" by listing five questions including "Will the upgrade rate go back higher or is the mid-5% the new norm?" [J. Ex. 258 (June 14, 2016 email from Hyun).]

809.     On September 9, 2016, UBS analyst John Hodulik emailed a buy-side investor: "Record low smartphone upgrades . . . have contributed to record low churn while boosting margins for the U.S. carriers . . . . We believe it is clear that upgrades have bottomed. More upgrades, coupled with increased competition will likely lead to additional churn . . . ." Investor: "This is great. What are the YTD upgrades e.g. H1'16 vs. H2'16?" [P. Ex. 49 (Sept. 9, 2016 email).]

**A. Summary Charts**

810.    The chart attached hereto as Appendix A depicts the 1Q16 quarterly wireless upgrade rate estimate for each analyst firm before and after the relevant contact from Individual Defendants.

811.    The chart attached hereto as Appendix B depicts the 1Q16 quarterly wireless equipment revenue estimate for each analyst firm before and after the relevant contact from Individual Defendants.

812.    The chart attached hereto as Appendix C depicts the 1Q16 quarterly total revenue estimate for each analyst firm before and after the relevant contact from Individual Defendants.

813.    The chart attached hereto as Appendix D excerpts the most pertinent portions of notes or summaries that analysts prepared contemporaneously to memorialize their communications with Individual Defendants.

Dated: New York, New York          SECURITIES AND EXCHANGE COMMISSION
     May 3, 2022

By:  /s/ Victor Suthammanont_____
    Victor Suthammanont
    Alexander M. Vasilescu
    David Zetlin-Jones
    Joy Guo
    200 Vesey Street, Suite 400
    New York, New York 1028
    (212) 336-5674 (Suthammanont)
    Email: SuthammanontV@sec.gov

    Attorneys for Plaintiff